FILED

DEC 3 0 2024

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
            DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS**

CONTIQUE WILLCOT,

                              Plaintiff,

     v.

SECURITIES & EXCHANGE COMMISSION,
GTS SECURITIES LLC, ARI RUBINSTEIN,
NEXT BRIDGE HYDROCARBONS, INC., JOHN
BRDA, GREGORY MCCABE, FINANCIAL
INDUSTRY REGULATORY AUTHORITY

                              Defendants.

**Case No.:  MO:24-CV-317**

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES
LAWS**

JURY TRIAL DEMANDED

## I.    **INTRODUCTION**

1.  This action arises from a comprehensive and pervasive course of conduct encompassing

    market manipulation, dereliction of regulatory duties, breaches of fiduciary obligations, and

    transgressions of constitutional rights, which collectively compromised the integrity and

    trustworthiness of the United States financial markets. Plaintiff, CONTIQUE WILLCOT, a

    retail investor and Lieutenant in the Fire Service, hereby initiates this action to seek redress

    from Defendants for their complicity in a systemic pattern of misconduct that resulted in

    substantial and widespread financial detriment. This document reveals the defendants' myriad

    SEC and FINRA violations, strategically intertwined through a constellation of deceptive

    tactics, the misuse of improper trading mechanisms, and the perpetuation of unconstitutional

    regulatory frameworks. Such actions have systematically marginalized retail investors, while

    disproportionately favoring institutional market participants.

1

a) At the core of this matter lie the Non-Voting Series A Preferred Shares of Meta Materials, Inc. (MMTLP), which were intended to represent equity interests in Next Bridge Hydrocarbons (NBH) subsequent to a corporate spin-off. Rather than facilitating a smooth and orderly transition to private ownership, market makers, broker-dealers, and regulatory authorities engaged in a series of manipulative practices, including the creation and circulation of synthetic/counterfeit shares and the execution of naked short sales. These illicit activities resulted in the inundation of the market with counterfeit shares, the artificial suppression of legitimate share prices, and the consequent deprivation of shareholders of their rightful economic value. Regulatory entities, including the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), and the Depository Trust & Clearing Corporation (DTCC), demonstrably failed to fulfill their statutory obligations to oversee market activity, thereby enabling these abuses to continue unchecked.

b) A pivotal juncture within this orchestrated scheme occurred on December 9, 2022, when the Financial Industry Regulatory Authority (FINRA) issued a U3 trading halt, effectively indefinitely suspending trading in MMTLP shares. Citing an ill-defined 'extraordinary event,' FINRA imposed this draconian measure without affording any transparency or providing a discernible path towards resolution, thereby rendering tens of thousands of investors entirely unable to access their vested assets. This action not only constituted a grave procedural irregularity but also constituted a manifest violation of constitutional principles. FINRA, a private entity operating as a self-regulatory organization, arrogated to itself quasi-governmental powers without the requisite oversight mandated by the doctrine of separation of powers, the Appointments Clause, and the principle of nondelegation of legislative authority to private entities. Recent judicial pronouncements, including the landmark decisions of Alpine Securities Corp. v. FINRA and SEC

2

v. Sloan, provide compelling legal precedent that unequivocally underscores these fundamental constitutional and statutory shortcomings.

c) The systemic misconduct observed herein transcends the governance deficiencies exhibited by the Financial Industry Regulatory Authority (FINRA). Broker-dealers of significant stature, including Fidelity Investments and Charles Schwab, and prominent market makers such as GTS Securities, actively participated in concerted efforts to manipulate the trading activity of MMTLP shares, thereby generating substantial profits through the exploitation of artificially inflated supply while simultaneously inflicting substantial financial losses upon retail investors. Vertically integrated regulatory agencies, including the Securities and Exchange Commission (SEC) and the Depository Trust & Clearing Corporation (DTCC), demonstrably failed to fulfill their mandate to enforce compliance regulations, conduct thorough investigations into reported irregularities, or effectively resolve discrepancies observed within shareholder accounts. These collective failures created an environment that facilitated and perpetuated unchecked market manipulation, constituting a clear and unambiguous violation of antitrust laws and the provisions of federal securities statutes.

d) Corporate leadership within Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons likewise bears substantial responsibility for their collective failure to adequately address the emergent trading irregularities, reconcile the persistent discrepancies observed within shareholder accounts, or ensure the requisite level of corporate accountability. Executives within these entities engaged in conduct that misled investors regarding the true financial prospects of their respective assets, while simultaneously neglecting the fundamental fiduciary duties owed to their shareholders. This inaction not only exacerbated the harm inflicted by the manipulative

practices of other Defendants but also contributed to a significant erosion of investor confidence and a severe undermining of the integrity of the broader market.

e) Plaintiff contends that fraudulent activities related to MMTLP were orchestrated by market makers, short sellers, and broker-dealers, including Fidelity Investments and TD Ameritrade (now Charles Schwab) in the Plaintiff's case, through naked short selling. These actions led to the creation of illegal counterfeit shares and perpetuated market manipulation. Subsequently, the Defendants weaponized the unilateral U3 trading halt imposed by the Financial Industry Regulatory Authority (FINRA) as a calculated mechanism to further conceal their fraudulent activities. This manipulation prevented the Depository Trust & Clearing Corporation (DTCC) from clearing the trades, a failure the DTCC never transparently addressed. The U3 halt, coupled with the inaction and negligence of other regulatory bodies, constitutes a severe breach of investor protections, statutory mandates, and core constitutional principles. Such actions fostered an environment of unchecked market manipulation, causing significant harm to the Plaintiff and other investors. The indefinite duration of this trading halt mirrors the statutory violations identified in SEC v. Sloan, wherein the Supreme Court condemned the SEC for unlawfully extending a trading halt beyond the ten-day statutory limit without congressional authorization. Moreover, FINRA's unchecked exercise of its delegated authority, as scrutinized in Alpine Securities Corp. v. FINRA, directly contravenes the constitutional principle that private entities with delegated authority remain subject to meaningful governmental oversight.

f) Notwithstanding the passage of nearly two years since the imposition of the U3 trading halt, Defendants have demonstrated a conspicuous absence of meaningful action to address the identified systemic failures or to provide adequate redress for the substantial harm inflicted upon investors. Retail investors remain ensnared within a state of financial and legal limbo, deprived

4

of the ability to liquidate their positions or to achieve a satisfactory reconciliation of their respective shareholdings. This prolonged and inexcusable inaction has not only resulted in significant and enduring financial detriment but has also served to underscore the inherent vulnerabilities and systemic deficiencies within the prevailing market oversight framework. The stark disparity observed in the regulatory responses to the events surrounding MMTLP and the trading frenzy involving GameStop further exemplifies the inequitable and discriminatory treatment routinely experienced by retail investors within the current market structure.

g) This action seeks to obtain compensatory damages for the substantial financial and emotional harm sustained by the Plaintiff and, concurrently, to challenge the fundamental structural and constitutional deficiencies inherent within the governance framework of the Financial Industry Regulatory Authority (FINRA). By adjudicating these systemic shortcomings, this Honorable Court possesses the unique opportunity to restore a measure of fairness and transparency to the United States financial markets, safeguard the fundamental rights of retail investors, and reaffirm the paramount importance of the constitutional principles that govern the exercise of regulatory authority. Such remedial action is not merely desirable but, rather, imperative to rectify the grave failures that have imperiled investor confidence and severely compromised the integrity of the market.

## II.    <u>JURISDICTION AND VENUE</u>

2.  Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under federal law, including violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 12–27). Supplemental jurisdiction over any related state law claims is proper under 28 U.S.C. § 1367.

3. Diversity jurisdiction is also proper under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiff, a resident of Florida, and Defendants, whose principal places of business are located in other states, including but not limited to Texas, New York, and Washington, D.C.

4. Venue is appropriate in the United States District Court for the Northern District of Texas under 28 U.S.C. § 1391(b) because the Defendants conduct substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

5. Notwithstanding the passage of nearly two years since the imposition of the U3 trading halt, none of the regulatory or governance entities entrusted with the paramount responsibility of ensuring the fair and equitable operation of the securities markets—including the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), the Depository Trust & Clearing Corporation (DTCC), transfer agents, broker-dealers, market makers, and the executive leadership of the publicly traded companies related to this matter—have demonstrated an effective resolution or remediation of the cascading challenges arising from this unprecedented event. This collective failure to fulfill their respective obligations has resulted in clear and unambiguous violations of federal securities laws and antitrust statutes, thereby causing substantial and quantifiable financial harm to the Plaintiff.

6. Despite the passage of over two years since the imposition of the U3 trading halt, the relevant Defendants, including regulatory bodies and market participants, have conspicuously failed to adequately investigate the systemic irregularities that precipitated this event. They have

also neglected to implement corrective measures to mitigate the ongoing harm. This inaction

constitutes a grave dereliction of duty, particularly given the ample time and resources

available to address critical issues such as the proliferation of synthetic/counterfeit shares,

persistent failures to achieve proper trade settlements, unresolved account reconciliations,

and the substantial financial detriment inflicted upon a significant segment of retail investors.

## III.    **PARTIES**

7. Plaintiff: CONTIQUE WILLCOT (hereinafter referred to as "Plaintiff" or "Willcot") has at

   all times mentioned herein been a resident and citizen of the city of Pembroke Pines, in the

   County of Broward, in the State of Florida. He is a Lieutenant at Miami-Dade Fire Rescue

   and shareholder of Meta Materials and Next Bridge Hydrocarbons.

8. Defendant: Securities and Exchange Commission (SEC): The Securities and Exchange

   Commission (hereinafter "SEC") is the federal agency responsible for enforcing securities

   laws, regulating the securities industry, and ensuring market integrity. The SEC is

   headquartered at 100 F Street NE, Washington, D.C., 20549.

9. Defendant Financial Industry Regulatory Authority (FINRA): The Financial Industry

   Regulatory Authority (hereinafter "FINRA") is a self-regulatory organization authorized by

   the Securities and Exchange Commission (SEC) to oversee and regulate broker-dealers and

   ensure compliance with federal securities laws. FINRA is headquartered at 1735 K Street

   NW, Washington, D.C., 20006.

10. Defendant Next Bridge Hydrocarbons, Inc. (NBH): Next Bridge Hydrocarbons, Inc.

   (hereinafter "NBH") was formed as part of the corporate spin-off from Meta Materials, Inc.,

   intended to provide MMTLP shareholders with private ownership of its oil and gas assets.

   NBH is a private oil and gas exploration, and development company incorporated in the State

of Nevada with its principal place of business located at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116.

11. Defendant Greg McCabe: Greg McCabe (hereinafter "McCabe") is the CEO and Chairman of Next Bridge Hydrocarbons (NBH) and the President of McCabe Petroleum Corporation, located at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701.

12. Defendant John Brda: John Brda (hereinafter "Brda") is the former Chief Executive Officer of Torchlight Energy Resources. Brda played a significant role in structuring the merger between Torchlight Energy Resources and Meta Materials and in the subsequent creation of MMTLP shares. The company's last known address is 1425 Frontenay Ct., St. Louis MO 63122

13. Defendant GTS Securities: GTS Securities (hereinafter "GTS") is a market maker operating on the New York Stock Exchange, headquartered at 545 Madison Avenue, 15th Floor, New York, New York, 10022.

## IV.    **STATEMENT OF FACTS**

14. John Brda, a former Chief Executive Officer of Torchlight Energy Resources, was instrumental in the corporate merger with Metamaterial Technologies Inc., which culminated in the formation of Meta Materials, Inc. Moreover, Brda played a significant role in the preparatory stages of the corporate spin-off of Next Bridge Hydrocarbons and the subsequent registration of the corresponding shares.

15. Clifton DuBose, a legal professional affiliated with Lynch, Chappell & Alsup, P.C., served as the Chief Executive Officer of Next Bridge Hydrocarbons (NBH) during the pivotal period encompassing the transition of MMTLP shares to private equity. In this capacity, DuBose

8

played a crucial role in facilitating the corporate transition of NBH, a process of paramount importance in addressing the concerns of shareholders regarding the spin-off and the resolution of outstanding share discrepancies. DuBose tendered his resignation from this position in January 2024.

16. Gregory McCabe, a seasoned corporate executive, held key leadership positions within Torchlight Energy Resources and subsequently Next Bridge Hydrocarbons. In his capacity, McCabe was actively involved in the valuation and management of NBH's oil and gas assets during the corporate spin-off from Meta Materials, Inc. Subsequently, he assumed the role of Chief Executive Officer of NBH, succeeding Clifton DuBose.

17. Ari Rubenstein, serving as Chief Executive Officer of GTS Securities, oversees the operations of a market-making firm dedicated to facilitating liquidity and trading activities within financial markets. GTS Securities operates within a rigorous regulatory framework designed to ensure orderly market conditions and fulfill the requisite responsibilities of a market maker.

18. Frank La Salla, serving as President and Chief Executive Officer of the Depository Trust & Clearing Corporation (DTCC), oversees the organization's crucial role in facilitating the clearing and settlement processes for securities trades. The DTCC plays an indispensable role in ensuring the accurate recording and timely settlement of transactions across the broad spectrum of financial markets.

19. Robert W. Cook, serving as President and Chief Executive Officer of the Financial Industry Regulatory Authority (FINRA), oversees the organization's regulatory functions, which encompass the enforcement of FINRA's rules and the promotion of fair and equitable market

practices. Cook's leadership is aligned with FINRA's core mission of safeguarding investor interests and upholding market integrity.

20. Gary Gensler, in his official capacity as Chairman of the Securities and Exchange Commission (SEC), is responsible for overseeing the agency's enforcement of federal securities laws. Under his leadership, the SEC monitors market practices and works to ensure transparency, fairness, and compliance with securities regulations.

21. On or about May 2, 2008, Pole Perfect Studios commenced filings as a private entity under the Central Index Key (CIK) number 0001431959. Following its merger with Torchlight Energy Resources on November 23, 2010, this CIK number (0001431959) was transferred to Torchlight Energy Resources, making it responsible for subsequent filings.

22. According to SEC Rule 313 of Regulation S-T, upon the occurrence of a merger between two companies, the series and class (contract) identifiers assigned to the original entities shall not be transferred to the newly formed merged entity. Instead, the merged entity is required to obtain new series and class (contract) identifiers through the EDGAR filing system. Furthermore, the original identifiers must be updated to reflect the merger, with their status marked accordingly as inactive or merged.

23. On June 28, 2021, Torchlight Energy Resources transferred its CIK (0001431959) to Meta Materials, Inc. following their merger. The concurrent use of CIK number 0001431959 by both Meta Materials, Inc. and MMTLP represents a potential infringement of SEC regulations, specifically Rule 313 of Regulation S-T, which mandates distinct identifiers for separate entities. This action is likely to obscure transaction records and potentially mislead investors, thereby contravening Rule 10b-5's prohibition against deceptive practices in securities transactions.

24. Additionally, the improper utilization of a CIK number undermines the record-keeping and internal control requirements stipulated under the Securities Exchange Act, which necessitate precise tracking of securities filings and transactions.

25. A CUSIP (Committee on Uniform Securities Identification Procedures) number is a unique nine-character alphanumeric code assigned to financial securities in the United States and Canada. It is used to uniquely identify securities such as stocks, bonds, and mutual funds, facilitating accurate processing, clearing, and settlement of trades.

26. Additionally, CUSIP numbers simplify record-keeping and reduce transaction errors, providing a reliable identifier for both investors and institutions.

27. Unlike Central Index Key (CIK) numbers, which identify entities filing with the SEC, CUSIP numbers specifically identify individual financial securities, ensuring clarity and accuracy in trading and tracking within financial markets.

28. From 2010 to 2020, Torchlight Energy Resources (TRCH) traded a cumulative total of 745 million shares on public markets. This substantial trading volume reflected its decade-long activity in the oil exploration sector and positioned it for the eventual merger with Meta Materials, Inc. Trading history highlights the scale of its operations and shareholder engagement during this period.

29. On or about April 23, 2020, John Brda, then CEO of Torchlight Energy Resources (TRCH), and Greg McCabe, then Chairman of TRCH, made statements inflating the valuation of the oil and gas properties that would later form NBH.

30. They announced a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional

11

zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting.

31. Based on Brda and McCabe's stated 'probable reserve' of 3.678 billion barrels of oil at the Orogrande site and the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel, the perceived above-ground value of the asset was approximately $209.51 billion.

32. Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting the potential fair market value prior to extraction.

33. These statements, from NBH corporate officers and social media influencers regarding the probable reserve, inferred great expectations regarding NBH's financial prospects and were referenced consistently in shareholder discussions leading up to the MMTLP transition.

34. On March 1, 2020, Torchlight Energy presented an Investor Presentation via PowerPoint or email to interested parties, emphasizing the company's focus on assets in the Permian Basin, notably the Orogrande, Hazel, and Winkler projects.

35. The Orogrande Project was identified as the flagship asset, comprising over 134,000 acres with a substantial recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case.

36. The presentation underscored the project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, the company highlighted its belief in the presence of oil, framing the central question as not whether oil exists but determining the exact quantity recoverable.

37. In June 2020, Brda, along with the members of Torchlight Energy Resources' board of directors, resolved to pursue a strategic initiative aimed at salvaging the company through a merger with Meta Materials Inc., a corporation focused on advanced technological innovations.

38. This merger was presented to shareholders as a critical measure to stabilize the company, with claims that it was necessitated by the pressing need to address an overwhelming number of illegal short shares allegedly created in the market.

39. These short positions were portrayed as a significant threat to Torchlight's financial stability, further justifying the urgency and strategic importance of the merger.

40. Shareholders were led to believe that this merger would provide a pathway to resolve the systemic challenges posed by these short shares while transitioning the company toward a future in high-tech innovation.

41. On December 14, 2020, Torchlight Energy Resources Inc. (TRCH), a Texas-based oil exploration company, initiated a merger plan with Meta Materials Inc. (MMAT), a Canada-based high-technology materials firm.

42. The merger aimed at combining TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action marked a pivotal shift for both companies, setting the foundation for the creation of Meta Materials, Inc.

43. From January 1, 2021, to June 21, 2021, Torchlight Energy Resources (TRCH) traded a total of 3.6 billion shares. This unprecedented trading volume occurred over just six months, a significant increase compared to the company's cumulative trading volume of 745 million shares recorded over the prior decade, raising concerns about unusual trading activity.

44. A 'Z-test' statistical analysis was performed to evaluate the trading volumes of TRCH using historical data from 2010 to 2020 and the first half of 2021 (analysis was conducted on July 14, 2024).

45. The analysis considered an average daily variation of 5% over 10 years and concluded that it was statistically impossible for 3.6 billion shares to have been traded in TRCH during this six-month period without manipulation or an unpredictable, non-uniform event influencing the market.

46. Upon information and belief, during the first six months of 2021, naked shorts were added to TRCH by Ari Rubenstein, in concert with others. These actions likely contributed to the anomalous trading volumes observed during this time, further indicating market manipulation.

47. However, under the Clayton Act, Section 3 (15 U.S.C. § 14), and the Sherman Antitrust Act, Sections 1 and 2 (15 U.S.C. §§ 1–2), such agreements may be rendered null and void when they are tied to or facilitate anticompetitive conduct, including monopolistic behaviors that restrain trade or suppress competition. Additionally, naked short selling is prohibited under Exchange Act Rule 10b-21, the Naked Short Selling Antifraud Rule, which makes it unlawful for any person to submit an order to sell a security if they deceive a broker-dealer, participant of a registered clearing agency, or purchaser regarding their intention or ability to deliver the security by the settlement date and subsequently fail to deliver the security by that date.

48. In June 2021, GTS, under the direction of Ari Rubenstein, and Canaccord Genuity, a Canadian market maker, jointly filed paperwork to register the "Series A Preferred Stock" for

trading on the Over-The-Counter (OTC) market for NASDAQ, without the authorization or permission of MMAT or TRCH executives.

49. GTS and Canaccord violated FINRA Rule 2010 by engaging in deceptive practices and failing to uphold high standards of commercial honor. They relied on outdated, decade-old information, submitting falsified Form 211 filings to facilitate the tradability of what would later become MMTLP. This breached FINRA Rule 9552, which requires members to provide accurate and current data. Additionally, their actions allowed for naked short selling, contravening Regulation SHO, specifically Rule 204. These practices compromised market integrity and fairness, thereby breaking FINRA Rule 2010.

50. In a letter dated June 21, 2021, the OCC explicitly stated that "Series A Preferred Shares" would not trade.

51. However, that letter informed options traders that they were not required to close out short positions through the merger until what would become "MMTLP" could trade on the OTC market. This directive directly contradicted the intentions and filings of the merged companies.

52. The OCC memorandum dated June 21, 2021, was exclusively shared with market makers and hedge funds, including GTS and Ari Rubenstein.

53. GTS, under the supervision of Ari Rubenstein, had a duty to record all short sales, including naked shorts, and was granted additional time to close out fails-to-deliver under the "market maker exemption" rule, which is part of Regulation SHO, specifically under Rule 203(b). This rule provides exceptions for bona fide market making activities, allowing market makers to engage in short sales without the immediate requirement to close out fails-to-deliver.

54. Pursuant to FINRA Rule 204(b), market makers engaged in bona fide market-making activities are provided exceptions allowing additional time to close out fails-to-deliver resulting from such activities.

55. However, they are also required to maintain daily records of their fails-to-deliver and report them as necessary to ensure transparency and regulatory oversight.

56. The Depository Trust & Clearing Corporation (DTCC) is obligated to maintain precise and comprehensive records of securities trades and ensure the efficient electronic recovery and dissemination of information related to securities transactions within U.S. stock markets, as part of its role in promoting transparency and regulatory compliance.

57. On June 25, 2021, the CIK number 0001431959 transitioned again when Torchlight conducted a reverse takeover (RTO) with Meta Materials.

58. The shared use of CIK number 0001431959 between Pole Perfect, then Torchlight, now Meta Materials constitutes a potential violation of SEC regulations requiring distinct identifiers for separate entities.

59. Such actions may obscure transaction records and mislead investors, contravening Rule 10b-5 prohibition on deceptive practices in securities transactions.

60. During the merger of Torchlight Energy Resources and Metamaterial Technologies Inc., Gregory McCabe, a key executive and shareholder, publicly underscored the significant potential value of the Orogrande Basin oil and gas assets. He emphasized the probable oil reserves and the presence of other unproven assets within the basin, drawing attention to its strategic importance in the merger.

61. However, public filings and disclosures at the time valued the Orogrande Basin assets at $47 million—an amount significantly lower than the estimated $20.96 billion to $41.92 billion based on the below-ground valuation of probable reserves.

62. Subsequent disclosures during the Next Bridge Hydrocarbons spin-off brought to light notable discrepancies in these valuations, raising concerns about the accuracy and transparency of the initial assessments.

63. On June 28, 2021, MMTLP shares were created during the spin-off in which TRCH transitioned specific assets into Next Bridge Hydrocarbons (NBH).

64. These shares, designated as "Series A Preferred Shares," were intended to represent private ownership in NBH and were not meant to trade publicly.

65. On October 6, 2021, GTS Securities and Canaccord Genuity began trading MMTLP shares publicly. This activity occurred despite directives in TRCH's proxy statement, which prohibited public trading of the Series A Preferred Shares.

66. Despite the regulatory requirement for independent CIKs, MMTLP began trading on OTC markets on October 7, 2021, under the same CIK number 0001431959, as Pole Perfect, then Torchlight, then Meta Materials, now MMTLP.

67. This use of a shared CIK raises questions of compliance with SEC filing rules, including potential violations of Regulation S–T Rule 10(b) and Rule 10b-5.

68. On or about October 7, 2021, GTS Securities and Canaccord Genuity facilitated public trading of MMTLP shares on the OTC market. These actions were not authorized by TRCH or Meta Materials executives.

69. When John Brda, former CEO of Torchlight Energy, notified OTC Markets of this unauthorized trading, OTC Markets directed him to FINRA. FINRA subsequently informed

Brda that he lacked standing to bring a formal complaint, as he was no longer the CEO. This unauthorized listing initiated significant trading irregularities and confusion among investors.

70. From October 7, 2021, to December 9, 2022, GTS Securities engaged in trading activities that resulted in the creation of synthetic/counterfeit shares, exceeding the authorized float of MMTLP shares. Which is, again, prohibited under Exchange Act Rule 10b-21, the Naked Short Selling Antifraud Rule.

71. Between October 2021 and December 2022, GTS Securities, under its market maker exemption, participated in trading activities involving synthetic/counterfeit MMTLP shares. These shares were created without the required "locates," exceeding the authorized float of legitimate shares.

72. Between October 1, 2022, and December 8, 2022, MMTLP stock experienced significant volatility, with prices ranging from a low of $2.85 to a high of $12.50.

73. During this period, the market capitalization for MMTLP, a relatively unknown oil and gas exploration company, fluctuated between approximately $1.5 billion and $6.5 billion.

74. Given the company's total authorized share count of 165.5 million, this level of market capitalization and volatility suggests the potential influence of synthetic/counterfeit (rehypothecated) shares or naked short selling.

75. Between November 15 and December 5, 2022, John Brda sold approximately 300,000 shares of MMTLP. During this period, the trading price of MMTLP ranged between $2.90 and $9.90. Based on this price range, Brda's transactions generated proceeds estimated between $870,000 and $2,970,000.

76. Publicly available social media posts from this timeframe show that Brda encouraged others to purchase MMTLP shares and denied selling any of his own shares.

Such actions constitute a pump-and-dump scheme, a form of securities fraud where the price of a stock or security is artificially inflated through false, misleading, or greatly exaggerated statements (the "pump"). The perpetrators, having established a position in the company's stock, sell their shares at the inflated price (the "dump"), after which the price typically falls, causing significant losses to subsequent investors. This scheme is prohibited under several U.S. securities laws, including the Securities Act of 1933, the Securities Exchange Act of 1934, and the Sarbanes-Oxley Act of 2002.

77. Brda later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt.

78. On November 23, 2022, MMTLP shareholders were advised to transfer their shares to the transfer agent, American Stock Transfer & Trust Company (AST), now operating as Equiniti Trust Company, to facilitate the distribution of Next Bridge Hydrocarbons shares.

79. This transfer was intended to streamline the corporate action and ensure shareholders receive their Next Bridge shares directly.

80. Additionally, shareholders were informed they would receive bonus shares of NBH Newco as an incentive for transferring their shares to AST; however, these bonus shares were never delivered, raising concerns about the representations made to shareholders.

81. On November 30, 2022, Gregory McCabe sold approximately 6.8 million shares of MMTLP out of his total holdings of 18,758,249 shares, which constituted 11.37% of the float. On that date, the trading price of MMTLP ranged between a low of $7.76 and a high of $10.00.

82. Based on this price range, McCabe's transactions generated proceeds estimated between $52,768,000 and $68,000,000. Under SEC rules regarding beneficial ownership, McCabe was required to report these share transactions, as he held more than 5% of the float.

19

83. A series of emails obtained through a Freedom of Information Act (FOIA) request and released in redacted form indicate that individuals at both the SEC and FINRA, on December 5, 2022, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, Mr. Jay Gibbons, and an unidentified redacted individual, were aware of fraudulent activities affecting the trading of MMAT and MMTLP shares.

84. These emails provide insight into regulatory awareness of irregularities during the period leading up to the FINRA-imposed U3 halt.

85. This also means that FINRA Blue Sheets, formally known as Electronic Blue Sheet (EBS) data, are reports that broker-dealers submit to regulators such as FINRA and the SEC, were being used as early as December 5, 2022, if not before this.

86. These reports contain detailed trade information, including the identity of the buyer and seller, trade size, trade price, and other transaction-specific details. The purpose of Blue Sheets is to assist regulators in monitoring the markets, detecting suspicious trading activity, and investigating potential securities violations like market manipulation or insider trading.

87. Blue Sheets are crucial for ensuring transparency and accountability in the financial markets, enabling regulators to reconstruct trading activity and identify patterns of misconduct.

88. On December 7, 2022, both FINRA and Meta Materials (MMAT) corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, no new trades could be executed after December 8, 2022, but shareholders could settle positions, including short position close-only trades, through the end of trading on December 12, 2022.

89. The corporate action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for Next Bridge Hydrocarbons (NBH) shares or dividends set for December 14, 2022.

90. On December 8, 2022, Jeff Mendl, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA-approved corporate action. Mendl confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

91. Also on December 8, 2022, FINRA failed to attend a scheduled meeting with the Depository Trust & Clearing Corporation (DTCC) and attorneys from Meta Materials regarding unresolved issues with the MMTLP corporate action.

92. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the prior notice indicating that MMTLP shares would be "CANCELLED" upon conversion to Next Bridge Hydrocarbons shares.

93. This revision omitted the December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

94. At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code (commonly referred to as S.O.S.), signifying a heightened urgency to close their positions. The data reflected transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (i.e., $290.00+), an extraordinary deviation characteristic of a severe short squeeze.

95. Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late

to cancel." This indicated significant irregularities in the handling of MMTLP trades,

affecting more than 65,000 shareholders (Traudt v. Rubenstein, 2024, Docket No. 2:34-cv-

782, U.S. District Court for the District of Vermont).

96. Many MMTLP traders, including the Plaintiff, were holding their shares with the intent to

execute opportunity trades—to sell, rather than buy—on December 9 and 12, 2022. They

were prepared to accept the best possible offers for their trades before the close of all trading

on December 12, 2022, as specified in the approved corporate action referenced above.

97. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-

regulatory organization operating under delegated authority from the Securities and

Exchange Commission, FINRA justified the halt by citing "extraordinary circumstances."

However, this action left many investors unable to access their investments, with no clear

resolution provided.

98. FINRA justified the trading halt with the following statement: "FINRA has determined that

an extraordinary event has occurred or is ongoing that has caused or has the potential to

cause significant uncertainty in the settlement and clearing process for shares of MMTLP and

that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and

the public interest."

99. In the same FINRA notice announcing the halt (UPC #35-22) dated December 9, 2022,

FINRA further clarified that the trading halt would remain in effect until the deletion of

MMTLP, scheduled for December 13, 2022.

100.   Any subsequent reference to the FINRA U3 halt, after December 13, 2022, is

acknowledged as accurate in form. However, for the purposes of this complaint, it is

considered a matter of semantics, as the halt was officially lifted by FINRA on December 13,

2022. Despite this, no further action, remedy, or resolution has been undertaken as of

December 23, 2024, leaving the matter unresolved for a total of 740 days.

101.    Given the principles of the Private Nondelegation Doctrine, there are significant

questions regarding FINRA's authority to issue the U3 trading halt:

a) The Private Nondelegation Doctrine stipulates that Congress cannot delegate its

legislative authority to private entities without ensuring adequate governmental oversight and

control to prevent unchecked regulatory power.

b) 1. SEC-FINRA Model: As a self-regulatory organization (SRO), FINRA operates

under the stringent oversight of the Securities and Exchange Commission (SEC). The SEC

possesses comprehensive authority to approve, modify, or disapprove FINRA's rules and can

review and overturn FINRA's disciplinary actions.

c) Uniform Body of Precedent: Judicial bodies have consistently upheld the SEC-FINRA

model, ruling that it does not contravene the Private Nondelegation Doctrine. This is predicated

on the SEC's ultimate control over FINRA's rulemaking and enforcement activities, ensuring that

FINRA's regulatory functions are supervised by a governmental entity.

d) Conflict with Precedent: A determination that FINRA's structure violates the Private

Nondelegation Doctrine would contradict established legal precedent. Courts have uniformly

recognized that the SEC's oversight and control over FINRA's activities prevent any

unconstitutional delegation of authority to a private entity.

102.    In summary, declaring FINRA's structure unconstitutional under the Private

Nondelegation Doctrine would contradict consistent judicial findings. These findings affirm

that the SEC's oversight ensures that FINRA's regulatory power is not an improper delegation

of legislative authority to a private entity, thereby questioning the validity of FINRA's power to issue measures such as the U3 trading halt without adequate oversight.

103.    FINRA's authority to issue such halts is derived from its statutory role under the Securities Exchange Act of 1934, and the halt applied to securities trading across U.S. financial markets.

104.    While the halt was ostensibly intended to address market irregularities, FINRA's structure as a private entity wielding quasi-governmental powers without direct executive oversight raises questions under the separation of powers doctrine.

105.    As a privately governed organization, FINRA's Board of Governors is not appointed by the President or subject to the checks and balances typically applied to federal agencies, prompting constitutional considerations relevant to its governance and actions.

106.    From its establishment as an SRO under the Maloney Act amendments to the Securities Exchange Act of 1934, FINRA has exercised significant regulatory powers, including the ability to enact rules, conduct investigations, and impose sanctions, functions typically reserved for federal agencies.

107.    These powers were evident during FINRA's issuance of the U3 trading halt on MMTLP shares on December 9, 2022, an action that had significant financial and legal implications for investors.

108.    However, FINRA's governance by a private membership-based Board of Governors raises structural questions about its authority to take such impactful actions. This board is neither appointed by the President nor confirmed by the Senate, operating outside the framework outlined in the Appointments Clause of the U.S. Constitution, which ensures accountability for individuals wielding significant federal authority.

*SEC v. Jarkesy (2024); Alpine Securities Corporation v. FINRA (2024); Scottsdale Capital Advisors v. FINRA (2023)*

109.    Pursuant to the U3 Halt imposed on MMTLP, I, along with other investors, received advisement to transfer our shares of Next Bridge Hydrocarbons (NHB) to the designated transfer agent, American Stock Transfer (AST). This action was undertaken in an effort to obtain an aggregate share count, given our inability to procure the requisite blue sheets from the relevant entities. I proceeded with the transfer of my shares in the expectation of achieving a comprehensive share count; however, all attempts to do so were unsuccessful despite exhausting all available avenues.

110.    Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These restrictions would have limited new short positions and helped stabilize the market during the transition.

111.    On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in Next Bridge Hydrocarbons, despite its status as a private company not intended for public trading.

112.    Coulson further stated that resolving these short positions would be "easier if Next Bridge shares became publicly tradable," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

113.    FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ failed to clearly define the 'extraordinary event' that justified the halt.

114.   Despite receiving thousands of complaints from shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remained, to date, FINRA's only significant communication with shareholders regarding the halt.

115.   On February 20, 2023, Fleming, a TD Ameritrade (Schwab) employee, admitted during a conversation with Traudt that the U3 halt of MMTLP trading on December 9, 2022, was requested by broker-dealers to "protect ourselves," directly acknowledging institutional interests rather than retail investor protection as the motive. (Traudt v. Rubenstein, 2024, Docket Number: 2:34-cv-782, United States District Court for the District of Vermont.)

116.   This conversation, which was recorded by TD Ameritrade (TDA), later Schwab, was initially made available for playback at Traudt's request but was later denied (Traudt v. Rubenstein, 2024).

117.   In March 2024, Traudt again sought access to these recordings from Schwab's trade desk, which had acquired TDA, but Schwab also refused to release the audio. These refusals suggest a coordinated effort to suppress evidence that could reveal the reasons behind the trading halt (Traudt v. Rubenstein, 2024).

118.   On April 1, 2023, documents released through a Freedom of Information Act (FOIA) request revealed that the SEC and FINRA were aware of trading irregularities related to MMTLP as early as November 2021.

119.   High-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W. Cook, were documented as having knowledge of these issues. Despite this, no substantive action was taken to resolve these irregularities or inform the investing public, further exacerbating market confusion and investor harm.

120.    On April 18, 2023, Clifton DuBose, CEO of Next Bridge Hydrocarbons, sent a letter to FINRA requesting assistance to address unresolved issues arising from the MMTLP spin-off, asking for access to the Blue Sheets.

121.    In the context of Meta Materials (MMAT) and its preferred shares (MMTLP), Blue Sheets would provide critical insights into the trading activities during the period of alleged market manipulation and synthetic/counterfeit share creation.

122.    For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets could reveal the number of trades executed, the counterparties involved, and whether the transactions involved legitimate shares or synthetic/counterfeit ones.

123.    Given the allegations of naked short selling and the creation of synthetic/counterfeit shares, regulators' analysis of Blue Sheets could expose discrepancies in the total volume of shares traded versus the actual number of legitimate shares issued or prove all of these allegations unfounded.

124.    If regulators were to release Blue Sheets for MMAT and MMTLP, they could uncover the extent of market irregularities alleged by retail investors and advocacy groups.

125.    For instance, these sheets might highlight unusually high trade volumes that exceed the total outstanding shares, corroborating claims of synthetic/counterfeit shares.

126.    Furthermore, they could reveal whether broker-dealers and market makers engaged in practices like failure-to-deliver (FTD) settlements or improper short selling, which may have depressed the stock price or caused financial harm to shareholders.

127.    The lack of Blue Sheet transparency in the MMTLP case has been a critical point of contention for investors seeking clarity regarding the abrupt U3 trading halt and its impact on their holdings.

128.    The release of Blue Sheets for MMTLP and MMAT would provide a definitive account of the trading activity, allowing allegations of irregularities, such as synthetic/counterfeit share creation or naked short selling, to be substantiated or disproven.

129.    Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. This transparency is essential to restoring investor trust and ensuring accountability for any misconduct. If there was fraud or other corruption, withholding this information raises significant concerns regarding the motives and potential complicity of regulatory bodies. The absence of transparency could be seen as an attempt to shield malfeasance or prevent the full scope of fraudulent activities from being uncovered, thereby undermining the principles of fair and open markets.

130.    DuBose outlined concerns regarding outstanding short positions in Next Bridge shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt.

131.    The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

132.    FINRA did not concur with his recommendations nor provide any meaningful remedy with their response letter on June 7, 2023.

133.    On or about July 15, 2022, Next Bridge Hydrocarbons (NBH) received its own CIK number, 0001936756, in preparation for its planned spin-off from MMTLP. This was the same CIK used for Pole Perfect, then Torch Light, then Meta Materials, now NBH (while MMAT still exists as a legal entity).

134.    A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt.

135.    Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this supplemental FAQ marked only the second significant attempt by FINRA to communicate with shareholders about the halt.

136.    To date, these two FAQs remain FINRA's only substantial communications with shareholders regarding the trading halt.

137.    On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP.

138.    Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2022. Gensler acknowledged familiarity with MMTLP but did not know the specific share count, suggesting it might be publicly available.

139.    Norman expressed dissatisfaction with the SEC's responses and indicated plans to send another letter seeking detailed information.

140.    On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning Meta Materials Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress.

141.    On January 15, 2024, NBH executives, including Clifton DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred during a period of ongoing market uncertainty.

142.    On June 5, 2024, over 40 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's December 9, 2022, U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies.

143.    The letter emphasized that FINRA's actions led to widespread investor harm and confusion, with over 40,000 letters received from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

144.    After Meta Materials declared bankruptcy on August 9, 2024, its final filing under this CIK occurred on September 20, 2024.

145.    On October 2, 2024, University Lands issued a formal termination letter to Hudspeth Operating (HudOp), a subsidiary of Next Bridge Hydrocarbons (NBH), citing breaches of the Development Unit Agreement (DUA) due to the non-payment of annual royalties and HudOp's refusal to fulfill its drilling obligations for the 2024 operational year.

146.    The termination letter also highlighted HudOp's lack of any concrete plans for future development of the Orogrande lease, further demonstrating its failure to meet the terms of the agreement. University Lands demanded the release of the lease within 90 days and retained the right to pursue legal remedies if HudOp failed to comply with its environmental responsibilities, including plugging existing wells and remediating the land.

147.   In response to the October 2, 2024, termination of the Orogrande lease, Greg McCabe, Chairman and CEO of Next Bridge Hydrocarbons, expressed disappointment with University Lands' decision, framing it as a setback for the company.

148.   However, NBH has not taken any formal corporate measures to address the lease termination, leaving shareholders questioning the company's commitment to the Orogrande project and its broader operational strategy. This lack of action has further fueled concerns about NBH's management and the viability of its core assets.

149.   On November 13, 2024, the plaintiff, a shareholder of Next Bridge Hydrocarbons (NBH), submitted a formal Request for Information (RFI) to NBH. The RFI raised critical questions regarding corporate governance, the total share count, discrepancies in share delivery, and the resolution of potential naked short selling.

150.   Despite the legal rights granted under Texas Business Organizations Code Section 21.218 and Nevada Revised Statutes Chapter 78.257, NBH failed to provide a comprehensive response to the RFI within the 14-day deadline specified, and as of today December 23, 2024, there has been no correspondence from the defendant.

151.   The RFI was sent by USPS Registered Mail to NBH's registered address at 500 West Texas Ave, Suite 890, Midland, TX, 79701 on November 13, 2024; and it was received at that location on November 18, 2024.

152.   This lack of response obstructed the shareholder's ability to assess management practices and investigate discrepancies, raising concerns about transparency and adherence to fiduciary obligations.

153.   A formal Books and Records Check was demanded from McCabe and NBH on November 19, 2024, by the Plaintiff, and seven other shareholders. This letter requesting

lawful shareholder access to records held by McCabe and NBH was officially served to McCabe at 500 W Texas Ave Ste 890, Midland, TX 79701.

154.    To date, no response to the Books & Records check has been received from McCabe or NBH.

155.    On November 22, 2024, the SGT. MAJOR Daniel Auxier  issued a formal demand letter to NBH's Board of Directors, reiterating his entitlement to corporate records under Texas Business Organizations Code Section 21.218 and federal securities laws.

156.    The letter specifically sought explanations for the withdrawal of the SEC S-1 filing, the termination of the University Lands lease, and the justification for a $2 million loan at above-average interest rates.

157.    The letter was sent via email to NBH Investor Relations at nextbridge@dennardlascar.com, on November 22, 2024, where receipt was never confirmed. The same RFI was also sent by USPS Registered Mail to NBH's registered address at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116 on November 23, 2024; however, it was not received at that location.

158.    On November 25, 2024, Next Bridge Hydrocarbons (NBH) issued an official communication via investor relations email stating that the company had relocated its corporate offices from 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116, to Midland, Texas, within the offices of McCabe Petroleum Corporation (MPC) under a rent-free agreement.

159.    The announcement omitted the full address of the new location and contradicted existing public records, including NBH's most recent SEC Form 10-Q filed on September 30, 2024, and its last EDGAR filing on October 8, 2024, which both listed the Fort Worth address as its business location.

160.   Additionally, USPS records continue to reflect the Fort Worth address, creating confusion and undermining transparency regarding NBH's corporate headquarters.

161.   USPS Registered Mail, with the RFI and Demand letter, was also sent to the MPC address, 500 W Texas Ave Ste 890, Midland, TX 79701 on November 26, 2024. To date, no response has been received.

162.   Under the Corporate Transparency Act (CTA), reporting companies are required to update their Beneficial Ownership Information (BOI) reports within 30 days of any inaccuracies or changes to the disclosed information. This includes changes in the name or address of a beneficial owner or the appointment of a new senior officer, such as the CEO. Despite these requirements, the defendant failed to comply with the CTA by not registering his current address. This noncompliance significantly impeded my efforts to locate him, thereby obstructing the due process.

163.   NBH did not provide the requested documentation or address the substantive inquiries within the seven-day response period stipulated in the letter. This failure further compounded concerns about NBH's transparency and potential violations of fiduciary duties to its shareholders.

164.   As of December 23, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

165.   While the letter, co-signed by over 70 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

166. Throughout 2019 and 2022, the Depository Trust & Clearing Corporation (DTCC) managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

167. Investor communications and related records from the period reflect discrepancies in settlement obligations related to synthetic/counterfeit shares.

168. Throughout 2021 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

169. Throughout 2022 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

170. Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings.

171. As of the present date, Next Bridge Hydrocarbons has not been assigned a CUSIP number for its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

172. This absence creates challenges in identifying and managing transactions involving Next Bridge Hydrocarbons' common stock, complicating compliance with financial reporting standards and market transparency.

173.    The lack of a CUSIP number for Next Bridge Hydrocarbons highlights a gap in ensuring the orderly trading and tracking of its securities within financial markets.

174.    It has been well established that over 18 different internal CUSIPs have been used to track MMTLP holdings in various Broker/Dealers such as Robinhood, TradeStation, ETrade, JP Morgan, Fidelity, Vanguard, Interactive Brokers, among many others.*

175.    TD Ameritrade used internal CUSIP 6DA993019, and Charles Schwab uses internal CUSIP 629999590 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/EQ almost two years after the spin-off to NBH.

176.    Fidelity uses internal CUSIP 591994371 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/EQ almost two years after the spin-off to NBH.

177.    While the definitive number of outstanding shares still held by broker-dealers through internal CUSIPs and not registered with AST/EQ is undetermined, even a single unreconciled share highlights a significant issue.

178.    Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. Thousands, if not millions, of shares remain unreconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt.

179.    The inability to reconcile all MMTLP shares to NBH shares, years later at AST/EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

180.    In January 2021, the Gamestop (GME) event unfolded as retail investors, coordinated through social media platforms like Reddit's WallStreetBets, initiated a short squeeze

targeting heavily shorted stocks. This led to Gamestop's stock price surging over 1,000% within days.

181.   Regulators, including the SEC, responded swiftly with public statements about market volatility and integrity, and brokerages such as Robinhood imposed temporary trading restrictions, citing liquidity concerns. These restrictions, while controversial, were quickly lifted, allowing GME trading to resume.

182.   Congressional hearings were convened within weeks, featuring testimony from Robinhood executives, hedge funds, and retail advocates, while regulators pledged to investigate systemic risks exposed by the volatility.

183.   The Gamestop event ultimately received widespread media attention, immediate regulatory acknowledgment, and a comprehensive examination of its impact on retail investors and the broader market.

184.   In stark contrast, the MMTLP event began on December 9, 2022, when FINRA issued a sudden U3 trading halt on Meta Materials' Series A Preferred Shares (MMTLP) just two days before their planned transition into Next Bridge Hydrocarbons, a private company.

185.   Unlike Gamestop, where trading resumed promptly after temporary restrictions, the MMTLP trading halt has remained in effect for 745 days as of December 23, 2024. FINRA cited an "extraordinary event" to justify the halt but failed to provide a detailed explanation at the time.

186.   The first communication regarding the halt came 97 days later, in March 2023, through a FINRA FAQ that did not clarify the nature of the "extraordinary event." A supplemental FAQ was issued 332 days after the halt but also failed to address key concerns, including the allegations of synthetic/counterfeit shares or the systemic failures affecting retail investors.

187.   Despite tens of thousands of complaints submitted to FINRA, the SEC, and
Congressional Representatives, no Congressional hearings or meaningful investigations have
taken place. Shareholders remain unable to trade their positions, and MMTLP investors
continue to face financial harm with no clear recourse.

188.   Unlike Gamestop, which received immediate regulatory scrutiny and resumed trading,
MMTLP investors have endured prolonged inaction and a lack of accountability, highlighting
significant disparities in how the two events were addressed.

189.   In contrast, the GameStop trading episode and the NBH Fiasco highlights significant
disparities in the public and governmental engagement with market regulation issues,
prompting questions about the consistency and fairness of responses to events affecting retail
investors and market integrity.

190.   Institutional market participants, including broker-dealers and market makers, profited
from the creation and trading of synthetic/counterfeit shares during the MMTLP transition.
Retail investors, however, experienced significant financial losses as a result of these trading
practices.

191.   These institutional participants stand to make considerable profits by not closing their
short positions, particularly when synthetic/counterfeit shares or naked short selling is used
as a trading tactic. If Next Bridge Hydrocarbons (NBH) were to declare bankruptcy, all
shares would become worthless, relieving short sellers of all financial liabilities, regardless of
the FINRA-imposed U3 halt.

192.   Public records and shareholder complaints from 2023 and 2024 demonstrate systemic
delays in resolving trading discrepancies related to MMTLP shares. Moreover, these records
and complaints indicate a clear lack of willingness or effort to address and rectify these

issues, thereby exacerbating financial and emotional distress for the affected investors Retail investors are left without a clear resolution or recourse for their financial losses.

193. The prolonged inaction by regulatory bodies, over the last two years, combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets. Retail investors remain uncertain about the status of their holdings and future resolutions.

194. Institutional market participants engaged in trading practices involving synthetic/counterfeit MMTLP shares that created an oversupply in the market. This artificial oversupply contributed to the suppression of legitimate share prices.

195. Retail investors have experienced ongoing difficulties in accessing their investments in MMTLP shares following the U3 halt. The lack of liquidity has resulted in prolonged financial uncertainty and loss.

196. To date, FINRA has refused all attempts to provide access to the Blue Sheet records for MMAT and MMTLP, despite repeated requests from shareholders, legal and government representatives, or advocacy groups seeking transparency regarding trading activity.

197. This lack of disclosure has obstructed efforts to investigate allegations of naked short selling, synthetic/counterfeit share creation, and market manipulation during the trading periods in question. Specifically, Blue Sheet data is critical to understanding the abrupt and unprecedented U3 trading halt of MMTLP shares on December 9, 2022, and whether such actions were influenced by irregular or unlawful trading practices.

198. FINRA's refusal to release these records has exacerbated the financial and emotional harm suffered by retail investors and has raised significant concerns about regulatory accountability and oversight in safeguarding market integrity.

199. Shareholders have repeatedly requested audits of MMTLP share discrepancies to distinguish legitimate shares from synthetic/counterfeit ones. To date, no comprehensive audit has been conducted, leaving unresolved questions about the status of outstanding shares.

200. Synthetic/counterfeit share creation and trading irregularities during the MMTLP-to-NBH transition have contributed to financial harm for retail investors. These actions have highlighted vulnerabilities in market oversight, transparency, and enforcement.

201. The U3 halt and the prolonged lack of resolution for investors highlight the potential concerns stemming from FINRA's privately governed structure, as it may bypass safeguards designed to promote transparency and oversight.

202. FINRA's authority over market participants, particularly in cases of disciplinary or enforcement actions like the trading halt, underscores its substantial role in securities regulation and the constitutional considerations of its accountability and governance.

203. Questions regarding FINRA's constitutional role have been articulated in legal principles, particularly those involving the nondelegation doctrine, and are highly relevant to its handling of the MMTLP U3 trading halt issued on December 9, 2022.

204. This doctrine restricts Congress from delegating legislative powers without clear and specific guidance, yet FINRA operates with broad authority to create rules, enforce them, and adjudicate disputes, including halting trading activities that significantly impact investors.

205. Concerns arise as to whether FINRA's sweeping powers align with Article I of the U.S. Constitution, given its private governance structure and the lack of intelligible principles guiding its regulatory actions.

206.    The application of these delegated powers during the U3 halt—where investors were left without access to their assets or meaningful resolution for nearly two years—exemplifies the constitutional considerations surrounding FINRA's role.

207.    The nondelegation doctrine underscores the importance of ensuring that quasi-governmental entities like FINRA operate with accountability and within constitutionally defined limits, particularly in situations where their actions impose significant and lasting consequences on market participants.

208.    Throughout the MMTLP-to-NBH transition, regulatory bodies have deflected responsibility for addressing trading irregularities, leaving investors without a resolution for two years. The lack of clear accountability has prolonged market instability and shareholder uncertainty.

209.    Your Honor, the egregious nature and frequency of FINRA's violations necessitate invoking this Court's equitable powers to revoke FINRA's immunity. Such conduct profoundly breaches public trust and flagrantly disregards the protection of American and International investors.

210.    I respectfully submit that, notwithstanding the absolute immunity conferred upon Self-Regulatory Organizations such as the Financial Industry Regulatory Authority (FINRA) in relation to their official determinations, such immunity does not extend to their adherence to the law concerning criminal conduct. In instances where FINRA permitted the trading of in excess of 600,000,000 naked counterfeit shares of MMTLP, and subsequently neglected to address the actions of wrongdoers facilitating these unlawful activities, FINRA may be deemed complicit in the commission of these crimes. It is asserted that FINRA has violated applicable laws and is cognizant of such violations. It is my contention that this awareness

underlies their reluctance to disclose the blue sheets. If, indeed, they possess no information

of a sensitive nature, one must inquire: what impedes the release of the blue sheets?

211.   The circumstances surrounding MMTLP shares reveal systemic regulatory failures,

including anomalous trading activity, substantial financial losses to retail investors, and

severe emotional distress. Despite overwhelming evidence of wrongdoing, regulatory

agencies, including FINRA, have shown reluctance to conduct thorough investigations and

impose meaningful sanctions.

212.   Investors are often forced into arbitration, a forum biased toward industry participants

with limited avenues for recourse. FINRA's immunity shields it from accountability,

perpetuating a system where investors are denied justice. Arbitration remedies are

insufficient to compensate for significant financial and emotional damages suffered.

213.   This Court must recognize that FINRA's conduct, rather than serving the public interest,

undermines it. FINRA has operated with such impunity for so long that it is now comfortable

with the systemic destruction of investors. Allowing such egregious violations and abuse of

power to continue with impunity would set a dangerous precedent, eroding public confidence

in the financial markets' integrity.

214.   I propose naming FINRA as a defendant, but it is anticipated that their ultimate immunity

will shield them from accountability, which is inherently unjust and unconscionable. If they

cannot be held liable for their role, the responsibility must shift to the SEC for failing to

oversee FINRA and regulate brokers effectively. Thus, the SEC must be sued to ensure

justice and accountability for the harm inflicted on investors. The lack of transparency and

prolonged inaction has eroded trust in U.S. financial markets, leaving retail investors in a

state of uncertainty and financial distress. High-profile entities, such as Donald Trump's

media company DJT, have also been affected, with CEO Devin Nunes aligning the company's plight with that of MMTLP. The absence of regulatory action and accountability in the U.S. stands in stark contrast to international responses, highlighting the urgent need for reform and justice in financial markets. FINRA's actions or lack thereof, demand scrutiny and rectification to restore fairness and integrity in the market.

215.    It is deeply troubling that investors are required to act lawfully and assume in good faith that everyone else, including brokers, market makers, hedge funds, and regulatory agencies, including FINRA, would behave similarly. Investors would face severe punishment for any violations, while FINRA's immunity allows it to escape punitive damages and lawsuits, effectively enabling other entities to rob investors through actions such as the U3 halt. This immunity is fundamentally unfair and undermines the principles of justice and accountability.

216.    If I have impressed and impacted the court in the smallest way, I plead for relief for the 65,000 shareholders.


## V. **ALLEGATIONS**

217.    Plaintiff, CONTIQUE WILLCOT, brings this action to redress systemic failures in the U.S. financial markets, which have caused harm to retail investors through a combination of regulatory negligence, manipulative practices, and constitutional violations. Central to this case is FINRA's indefinite U3 trading halt on MMTLP shares, which has deprived investors of access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating without sufficient oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and

the private nondelegation doctrine. Recent legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, underscore the statutory and constitutional violations inherent in FINRA's actions.

218.    FINRA's structural deficiencies are compounded by the failures of other regulatory entities, including the SEC and the DTCC, to fulfill their statutory duties to protect investors and ensure market integrity. Despite the existence of regulations like FINRA's own Rule 2020, which prohibits manipulative and deceptive devices, and SEC Rule 17f-1, which mandates the reporting of counterfeit securities, these entities have failed to investigate or remedy widespread irregularities such as synthetic or counterfeit share creation and naked short selling, which have manipulated the market for MMTLP shares. The Defendants' inaction has enabled institutional participants to profit at the expense of retail investors, further undermining confidence in the fairness and transparency of the markets.

219.    The Plaintiff also seeks to highlight the role of corporate leadership at Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons, whose failures to address trading irregularities, reconcile shareholder discrepancies, and ensure accountability have exacerbated the harm suffered by investors. These leaders have neglected their fiduciary duties, misrepresented the financial prospects of their assets, and allowed discrepancies in share reconciliation to persist, leaving shareholders in a prolonged state of uncertainty and financial distress.

220.    The harm caused by these systemic failures is both significant and ongoing. Retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover their investments, while institutional participants who engaged in manipulative practices remain unaccountable. The constitutional and statutory violations identified in this

case are emblematic of broader governance flaws in the financial markets, which must be addressed to protect investors and maintain public confidence in the integrity of the system.

221.    In light of these failures, the Plaintiff seeks declaratory and injunctive relief to restore fairness and transparency to the markets. This includes addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts as articulated in Sloan, and ensuring that private entities acting under delegated authority are subject to meaningful government oversight, as emphasized in Alpine. These steps are necessary to rectify the systemic issues that have caused lasting harm to retail investors.

222.    This case also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm suffered, as well as systemic reforms to prevent future market abuses. The harms detailed herein are not isolated incidents but indicative of systemic vulnerabilities that require judicial intervention to safeguard the rights of all investors.

223.    The prolonged inaction of regulatory bodies in addressing the U3 halt and related market irregularities stands in stark contrast to the swift responses seen in other market events, such as the GameStop trading episode. This disparity highlights the need for equitable treatment of retail investors and a consistent application of regulatory oversight to uphold market integrity. Without such reforms, the systemic failures described in this case will continue to jeopardize public trust in the financial markets.

224.    By bringing this action, the Plaintiff seeks not only to recover damages but also to hold the Defendants accountable for their roles in enabling a scheme of market manipulation, price manipulation, systemic negligence, and constitutional violations. Addressing these

issues presents the Court with an opportunity to restore fairness and transparency to the financial markets, reaffirm the constitutional principles that govern regulatory authority, and protect the rights of investors whose trust in the system has been profoundly eroded. Failure to address these issues will lead to continued market manipulation and unfair practices, further eroding investor confidence in the regulatory and legal systems meant to protect them. This inaction will set a precedent that discourages accountability, resulting in increased litigation and financial instability. Moreover, failing to address these matters will undermine the authority and effectiveness of regulatory bodies, weakening the overall framework that governs market operations.

The following legal questions arise from the Plaintiff's claims and are critical to determining liability, damages, and appropriate relief in this matter:

a. Whether the Defendants violated the Securities Exchange Act of 1934 and other applicable federal securities laws by failing to maintain market integrity, permitting manipulative practices such as the creation and trading of synthetic/counterfeit shares, and neglecting their statutory duties to protect investors.

b. Whether the Defendants engaged in anticompetitive conduct or market manipulation in violation of the Sherman Antitrust Act and the Clayton Act, fostering a monopolistic and exploitative environment detrimental to retail investors.

c. Whether the issuance of the U3 halt by FINRA on December 9, 2022, was justified under applicable laws and regulations, and whether FINRA, the SEC, and DTCC demonstrated the requisite diligence and transparency in resolving the trading halt and its consequences.

d. Whether the SEC, FINRA, and DTCC failed to fulfill their regulatory responsibilities by supervising one another, enforcing compliance with federal securities laws, and investigating and addressing synthetic/counterfeit share discrepancies during the MMTLP-to-NBH transition.

e. Whether FINRA's governance structure, as a private self-regulatory organization exercising significant quasi-governmental authority without sufficient oversight, violated constitutional principles, including the separation of powers, the Appointments Clause, and the private nondelegation doctrine.

f. Whether the Private Securities Litigation Reform Act of 1995 (PSLRA) unconstitutionally obstructs retail investors, such as the Plaintiff, from pursuing securities fraud claims by imposing heightened pleading standards and discovery stays that deny access to critical evidence, thereby preventing the resolution of claims related to systemic market manipulation, such as the proliferation of synthetic/counterfeit shares and the FINRA-imposed U3 halt on MMTLP.

g. Whether GTS Securities and other market participants violated their legal obligations by engaging in manipulative trading practices, including naked short selling, synthetic/counterfeit share creation, and other actions that suppressed legitimate share prices and exacerbated harm to retail investors.

h. Whether broker-dealers, including Charles Schwab, breached fiduciary duties owed to retail investors by facilitating trading irregularities, profiting from the proliferation of synthetic/counterfeit shares, and failing to reconcile oversold positions, despite their statutory obligation to safeguard customer securities and funds.

i. Whether AST/EQ and the DTCC failed to accurately reconcile synthetic/counterfeit shares and legitimate beneficial ownership during the MMTLP-to-NBH transition, leaving retail investors in financial and legal uncertainty.

j. Whether the corporate leadership of Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons were aware of widespread trading irregularities, including synthetic/counterfeit share discrepancies, and whether their failure to act contributed to prolonged harm to shareholders.

k. Whether FINRA, the SEC, and DTCC demonstrated negligence, incompetence, or apathy by failing to investigate and resolve market irregularities, discrepancies in share counts, and systemic failures to reconcile shareholder accounts, thereby fostering an environment of regulatory inaction and prolonged harm to retail investors.

l. Whether FINRA and other regulatory bodies acted beyond their statutory and procedural authority by imposing the U3 halt without providing transparent and timely justification, in violation of the principles articulated in SEC v. Sloan and other applicable precedents.

m. Whether the lack of coordination and communication between the SEC, FINRA, and DTCC directly contributed to unresolved discrepancies in MMTLP and NBH shares, leaving investors without clarity, resolution, or access to their assets.

n. Whether retail investors, including the Plaintiff, suffered a violation of their due process rights due to the lack of clarity, transparency, and recourse options provided during and after the U3 trading halt, warranting compensatory, injunctive, and punitive relief.

o. Whether the Defendants failed to disclose material information, such as trading irregularities, synthetic/counterfeit share creation, or share discrepancies, that would have informed investors, mitigated harm, and preserved market confidence.

p. Whether institutional market participants, including market makers and broker-dealers, engaged in unjust enrichment by profiting from trading irregularities, exploiting synthetic/counterfeit shares and naked short positions, and avoiding financial liabilities at the expense of retail investors.

q. Whether FINRA, the SEC, DTCC, and associated broker-dealers violated investor protection laws by failing to address systemic vulnerabilities and permitting irregularities that undermined market transparency and fairness.

r. Whether retail investors, including the Plaintiff, are entitled to compensatory and punitive damages, injunctive relief, and systemic reforms to address the financial and emotional harm suffered due to the Defendants' collective misconduct.

s. Whether the Defendants' failures, omissions, and alleged misconduct reflect broader systemic flaws in the regulatory framework governing the securities markets, necessitating judicial intervention to safeguard market integrity and protect the rights of retail investors.

t. Whether the refusal to disclose critical trading data, such as Blue Sheets, impedes investors' ability to investigate claims of market manipulation and reconcile outstanding share discrepancies, further exacerbating financial harm.

u. Whether retail investors were disproportionately harmed in comparison to institutional participants, who avoided liabilities yet profited from systemic market irregularities, creating an inequitable environment in violation of federal securities and antitrust laws.

## COUNT I:

## Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78) – Against All Defendants

224. Defendants violated Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) (as well as FINRA's own Rule 2020, which prohibits manipulative and deceptive devices) by engaging in manipulative practices, including the proliferation of synthetic/counterfeit shares, creation of artificial supply, and failure to ensure market transparency.

225. Defendants further violated Section 9(a) (15 U.S.C. § 78i(a)) by manipulating the price of MMTLP shares through artificial trading conditions, including pumping and dumping, naked short selling and synthetic/counterfeit share creation, designed to suppress share value and harm retail investors.

226. FINRA, SEC, & DTCC, violated Section 17(a) (15 U.S.C. § 78q(a)) (as well as SEC Rule 17f-1, which mandates the reporting of counterfeit securities) by failing to maintain accurate records and ensure market transparency during the MMTLP-to-NBH transition. Their negligence in reconciling discrepancies in share ownership allowed systemic irregularities to persist and thus, doing the opposite of the nature of their existence which is to regulate the market to protect retail investors.

227. Corporate Defendants, including Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons leadership, violated Section 13(d) (15 U.S.C. § 78m(d)) by failing to disclose material information regarding beneficial ownership and discrepancies in outstanding shares.

228. Defendants violated Rule 13b2-2 (17 C.F.R. § 240.13b2-2) by making false or misleading statements to auditors or failing to maintain accurate financial records related to MMTLP share discrepancies.

## COUNT II:

## Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1–2) and Clayton Act (15 U.S.C. §§ 12–27) – Against All Defendants

229. Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1) by colluding to facilitate synthetic/counterfeit share creation, naked short selling, and other anti-competitive practices that suppressed competition and harmed retail investors.

230. GTS Securities and other market participants breached Section 2 of the Sherman Act (15 U.S.C. § 2) by attempting to monopolize trading in MMTLP shares through predatory practices. They created counterfeit shares, violating the Securities Exchange Act of 1934 and NYSE Rules 2010, 3110, and 5210. Their naked short selling and misinformation during investigations resulted in significant financial losses for retail investors and compromised market integrity.

231. Regulatory bodies, including FINRA, SEC, and DTCC, violated Section 7 of the Clayton Act (15 U.S.C. § 18) by failing to prevent concentrated market power and anti-competitive acquisitions.

232. Defendants collectively violated Section 4 of the Clayton Act (15 U.S.C. § 15), which provides for recovery of damages resulting from anti-competitive actions.

## COUNT III:

### Negligence – Against All Defendants

233. FINRA, SEC, and DTCC violated Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to prevent manipulative practices and maintain orderly markets. Their inaction regarding synthetic/counterfeit share creation and trading irregularities enabled systemic harm.

234. FINRA violated Regulation SHO, specifically Rule 204, by issuing the U3 halt and eliminating the final three days of trading. Rule 204 mandates that firms close out "fails to deliver" positions within a prescribed period. By taking this action, FINRA effectively exempted short sellers from the obligation to rectify their positions according to the established regulatory framework, thereby undermining market integrity.

235. Defendants collectively breached their duty of reasonable care (Restatement (Second) of Torts § 283), resulting in foreseeable and avoidable harm to retail investors, including the Plaintiff.

## COUNT IV:

### Failure to Resolve the FINRA U3 Halt – Against FINRA, SEC, and DTCC

236. FINRA, SEC, and DTCC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by failing to resolve the U3 halt in a timely and transparent manner, depriving shareholders of access to their investments.

237. FINRA's issuance of the U3 halt violated its obligations under Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5) (15 U.S.C. § 78f(b)(5)) to maintain fair and equitable trading standards. Having an intimate knowledge and understanding of the U3 halt and the implications thereof, FINRA knowingly and willingly became a market manipulator and price manipulator as well.

238. The SEC and FINRA failed to enforce prompt resolution of the U3 halt, violating their statutory duties under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)).

## COUNT V:

### Unjust Enrichment – Against All Defendants

239. Defendants violated Rule 10b-5 (17 C.F.R. § 240.10b-5) and Section 29(b) (15 U.S.C. § 78cc(b)) by profiting from illegal contracts involving synthetic/counterfeit shares and oversold positions.

240. Institutional market participants unjustly enriched themselves at the expense of retail investors by manipulating trading conditions to benefit from suppressed share prices.

## COUNT VI:

### Conspiracy to Commit Fraud – Against All Defendants

241. Defendants violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 20.10b-5) by conspiring to manipulate securities markets through synthetic/counterfeit share creation and suppressing MMTLP's value.

242. Defendants violated 18 U.S.C. § 371 by conspiring to defraud the U.S. government and regulatory systems, as well as 18 U.S.C. § 1349 by engaging in a scheme to commit wire and securities fraud.

## COUNT VII:

### Failure to Supervise – Against FINRA and SEC

243. FINRA and SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to supervise broker-dealers and market makers adequately, enabling manipulative practices such as price manipulation and synthetic/counterfeit share creation.

244. Defendants also violated Rule 15c3-5 (17 C.F.R. § 240.15c3-5) by failing to establish adequate controls to monitor market access and prevent trading abuses.

## COUNT VIII:

### Emotional Distress (Negligent or Intentional Infliction) – Against All Defendants

245. Defendants' reckless disregard for foreseeable harm caused emotional distress to Plaintiff, violating their obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) to protect investors.

246. Defendants acted with intentional or reckless disregard for the emotional and financial toll of the U3 halt and systemic irregularities, directly causing harm.

### **Defendant Inclusion Summary**

247. The following Defendants, through their actions, omissions, negligence, incompetence, or intentional misconduct, contributed to systemic market failures, suppressed retail investor rights, and enabled manipulative and anticompetitive practices. Their collective conduct resulted in violations of federal securities laws, breaches of fiduciary duty, unjust enrichment, and significant financial and emotional harm to the Plaintiff. While the specific roles of each Defendant are detailed throughout this Complaint, the Defendants share culpability for creating and sustaining the conditions that led to these violations:

248. FINRA, SEC, and DTCC: These regulatory entities are included in Counts I, II, III, IV, VII, and VIII for their collective failure to fulfill statutory oversight responsibilities under federal securities laws. Their negligence enabled the proliferation of synthetic/counterfeit shares, naked short selling, and systemic market manipulation. FINRA's issuance of the indefinite U3 halt, without timely resolution or transparency, further violated its obligations under Sections 17A and 19 of the Securities Exchange Act. The SEC and DTCC compounded the harm by failing to enforce compliance with clearing and settlement standards, leaving retail investors in financial and legal limbo.

249. GTS Securities: Included in Counts I, II, V, and VII for engaging in naked short selling, creating synthetic/counterfeit shares, and manipulating market dynamics. GTS exploited regulatory exemptions to gain monopolistic control over trading activity in MMTLP shares, profiting from suppressed share prices to the detriment of retail investors.

250. Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons Leadership: Included in Counts I, III, V, and VII for their roles in perpetuating trading irregularities and synthetic/counterfeit share proliferation. Corporate executives, including Gregory McCabe and John Brda, knowingly made misleading public statements about the value of Orogrande Basin assets and failed to address discrepancies in MMTLP shares, exacerbating harm to retail investors.

251. Corporate Leadership and Market Participants: The specific acts of recklessness, negligence, and intentional misconduct by the leadership of the named entities, as outlined in the Acts of Scienter, underscore their collective culpability. Their roles in enabling synthetic/counterfeit share creation, engaging in naked short selling, and manipulating market conditions directly contributed to the harm suffered by the Plaintiff and other retail investors.

252. By their actions and omissions, all Defendants have demonstrated a pattern of negligence, misconduct, and disregard for their statutory and fiduciary duties. Their collective conduct has undermined market integrity, suppressed retail investor rights, and violated federal securities, antitrust, and consumer protection laws.

253. Specific Acts of Scienter as Defined Under the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b):

    a) FINRA (Leadership under Robert W. Cook)

        i. Reckless issuance of the U3 halt (December 9, 2022): FINRA imposed an indefinite halt on MMTLP trading without adequate investigation or justification, despite knowledge of synthetic/counterfeit share proliferation and trading irregularities.

ii. Failure to resolve the U3 halt: FINRA neglected its statutory obligation to resolve the halt in a transparent and timely manner, violating Section 19(c) of the Securities Exchange Act and causing prolonged financial harm to investors.

iii. Intentional inaction despite awareness: Despite documented evidence and public complaints about synthetic/counterfeit shares, FINRA failed to conduct meaningful investigations or enforce compliance with federal securities laws.

iv. Omission of material facts in public communications: FINRA misled the market by failing to disclose the reasons for the U3 halt or the steps necessary to resolve the trading discrepancies.

b) SEC (Leadership under Gary Gensler)

i. Failure to enforce compliance with federal securities laws: The SEC neglected its oversight duties by failing to investigate or address systemic market irregularities, including synthetic/counterfeit share creation and naked short selling.

ii. Complicity in FINRA's inaction: The SEC allowed FINRA's U3 halt to persist indefinitely without requiring transparency or resolution, violating its statutory responsibilities under Sections 15A and 17A of the Securities Exchange Act.

iii. Neglect of investor protection responsibilities: Despite knowledge of investor harm caused by synthetic/counterfeit shares, the SEC failed to act in a manner consistent with its mission to protect retail investors.

iv. Deliberate regulatory apathy: The SEC's lack of intervention, despite its authority and duty to supervise FINRA and the DTCC, indicates intentional disregard for systemic failures.

c) DTCC (Leadership under Frank La Salla)

i. Failure to enforce settlement standards: The DTCC permitted unresolved fails-to-deliver and synthetic/counterfeit shares to proliferate, violating Section 17A(a)(1) of the Securities Exchange Act.

ii. Neglect of reconciliation duties: Despite its role as a clearing agency, the DTCC failed to reconcile outstanding shares, leaving retail investors in financial limbo during the MMTLP-to-NBH transition.

iii. Omission of material discrepancies: The DTCC did not disclose known settlement issues or irregularities, allowing manipulative practices to persist.

iv. Facilitation of manipulative trading practices: By failing to enforce proper clearing and settlement standards, the DTCC knowingly enabled the creation and trading of synthetic/counterfeit shares.

d) GTS Securities (Leadership under Ari Rubenstein)

i. Naked short selling: GTS Securities engaged in illegal naked short selling, flooding the market with synthetic/counterfeit shares and suppressing the price of MMTLP stock.

ii. Manipulation of supply and demand: GTS intentionally created artificial trading conditions to benefit from suppressed share prices, directly harming retail investors.

iii. Exploitation of regulatory exemptions: GTS used loopholes and exemptions in trading regulations to evade accountability for its manipulative practices.

iv. Profiteering from synthetic/counterfeit shares: GTS knowingly profited from trading synthetic/counterfeit shares while concealing its role in market manipulation.

h) Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons Leadership (John Brda, George Palikaras, Gregory McCabe respectively)

i. Misrepresentation of asset valuations: Gregory McCabe knowingly overstated the valuation of Orogrande Basin assets to inflate shareholder expectations and attract investments.

ii. Encouraging trading despite irregularities: John Brda encouraged buy orders for MMTLP shares while offloading his own holdings during periods of trading irregularities.

iii. Failure to address trading irregularities: Both McCabe and Brda neglected their fiduciary responsibilities to investigate and resolve synthetic/counterfeit share discrepancies, despite awareness of the harm caused to retail investors.

iv. Misleading shareholders: Public communications from leadership failed to disclose critical information about trading irregularities, share discrepancies, and synthetic/counterfeit share creation, misleading investors about the true state of their holdings.

## Action for Declaratory Judgment & Injunctive Relief #1

## Finding the Private Securities Litigation Reform Act (15 u.s.c. § 78u-4)

## Unconstitutional As Applied

## 1st ISSUE: SEPARATION OF POWERS

254. Plaintiff incorporates by reference all preceding paragraphs, including FACTS 1 through 215, and asserts that the Private Securities Litigation Reform Act of 1995 (PSLRA) is unconstitutional as applied to this case. The PSLRA's restrictive provisions exacerbate the systemic injustices suffered by Plaintiff and other retail investors, necessitating its invalidation and an injunction against its continued enforcement.

255. The PSLRA infringes upon the separation of powers doctrine by imposing heightened pleading standards and discovery stays that impede the judiciary's ability to adjudicate securities fraud cases effectively. In the context of the MMTLP trading halt, these restrictions prevent retail investors from holding FINRA, the SEC, and market participants accountable for fraudulent conduct and systemic failures. By legislatively dictating procedural and evidentiary burdens that obstruct access to justice, the PSLRA undermines the judiciary's inherent authority to manage litigation and resolve disputes, constituting an impermissible legislative intrusion into judicial functions.

## 2ND ISSUE: VIOLATIONS OF THE 1ST, 4TH, AND 15TH AMENDMENTS

256. Plaintiff incorporates by reference all preceding paragraphs.

257. The PSLRA's stringent pleading requirements violate the First Amendment by chilling access to the courts. In this case, the requirement to plead fraud with particularity places an insurmountable burden on retail investors seeking to challenge the systemic manipulation of MMTLP shares, including synthetic/counterfeit share creation and naked short selling. These manipulative practices are concealed within the operations of broker-dealers, clearinghouses, and regulators, making critical evidence inaccessible to Plaintiffs without discovery. The PSLRA

effectively denies investors their right to petition the government for redress of grievances, a core First Amendment guarantee.

258. The PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small retail investors while shielding institutional actors from accountability. In this case, the Act prevents Plaintiff from pursuing claims against FINRA, the SEC, DTCC, and market participants who profited from systemic manipulation. By insulating powerful financial entities, such as broker-dealers and market makers, from scrutiny, the PSLRA creates a two-tiered system of justice that favors well-resourced defendants at the expense of individual investors.

259. The PSLRA contravenes the Due Process Clause of the Fifth Amendment by effectively denying Plaintiffs the opportunity to prove their claims. Its stay of discovery provisions prevent access to essential evidence—such as FINRA's decision-making process for the U3 halt and the DTCC's reconciliation records for synthetic/counterfeit shares—while simultaneously imposing heightened pleading standards. This procedural Catch-22 deprives investors of their right to a meaningful opportunity to be heard, a fundamental due process guarantee.

260. The PSLRA violates the Equal Protection Clause of the Fourteenth Amendment as it applies to state-law securities fraud claims. By preempting state-law remedies and imposing restrictive federal standards, the PSLRA limits access to justice for investors pursuing claims in state forums. This unequal treatment creates a de facto preference for corporate defendants, particularly broker-dealers and market makers, in violation of the Constitution's guarantee of equal protection under the law.

261. The PSLRA's safe harbor provision for forward-looking statements is particularly relevant to this case, as it incentivizes corporate malfeasance. Defendants, including market makers and corporate leadership, were shielded by this provision despite engaging in misleading conduct, such as misrepresenting the value of MMTLP shares and suppressing shareholder access through the U3 halt. This legislative overreach disrupts the balance between investor protection and corporate accountability, directly undermining the goals of federal securities laws.

262. The PSLRA's legislative history demonstrates significant lobbying influence by industry groups, further evidencing regulatory capture. The Act's provisions favor institutional actors, such as those responsible for the manipulation of MMTLP shares, while denying retail investors a fair opportunity to pursue their claims. This systemic bias prioritizes the interests of financial entities over the public interest, violating principles of fairness and trust in the regulatory framework.

263. The PSLRA's impact on judicial economy is evident in this case. Its procedural barriers require Plaintiffs to meet heightened pleading standards based on incomplete information, increasing the likelihood of piecemeal litigation and interlocutory appeals. Courts are forced to adjudicate motions to dismiss without a full evidentiary record, leading to inefficiencies that undermine the objectives of federal procedural rules.

264. The PSLRA's limitations on joint and several liability exacerbate the harm caused by Defendants' collusive conduct. In this case, multiple market participants—including broker-dealers, FINRA, and the DTCC—acted in concert to manipulate MMTLP shares and suppress retail investor rights. By restricting liability to a proportional basis, the PSLRA shields culpable entities from full accountability and leaves victims inadequately compensated for their losses.

**WHEREFORE:**

265. For the reasons stated above, Plaintiff seeks:

    a) Declaratory Relief: A judicial declaration that the PSLRA is unconstitutional as applied in this case. Its provisions conflict with fundamental constitutional principles, including separation of powers, due process, and equal protection, and undermine the rights of retail investors harmed by systemic market manipulation.

    b) Injunctive Relief: An injunction prohibiting the enforcement of the PSLRA's provisions, including heightened pleading standards, discovery stays, and safe harbor protections, in this case and others involving systemic manipulation and regulatory failures.

    c) Restoration of Judicial Authority: An order affirming the judiciary's inherent authority to manage securities litigation without undue legislative interference, ensuring that investors retain access to justice and a meaningful opportunity to hold Defendants accountable.

<u>**Action for Declaratory Judgement & Injunctive Relief #2**</u>

<u>**Constitutional Challenge to the Structure and Authority of the Financial Industry**</u>

<u>**Regulatory Authority (FINRA)**</u>

266. The Plaintiff hereby challenges the constitutional authority and corporate structure of the Financial Industry Regulatory Authority (FINRA) on three grounds: separation of powers, the Appointments Clause, and unconstitutional delegation of legislative power. FINRA wields significant executive authority—such as suspending trading, enforcing securities laws, and imposing sanctions—without presidential oversight, violating the President's Article II duties. Its Board of Governors, exercising substantial authority under U.S. law, are appointed by FINRA's

members rather than through constitutionally required processes under the Appointments Clause. Furthermore, the SEC's delegation of broad regulatory powers to FINRA represents an unconstitutional transfer of legislative authority to an entity outside the legislative branch, compounding the constitutional concerns surrounding its governance and operations.

<u>Allegation 1: Violation of the Separation of Powers</u>

267. Plaintiff alleges that the Financial Industry Regulatory Authority (FINRA) operates in violation of the separation of powers doctrine established by the United States Constitution. Under Article II, Section 1, all executive power is vested in the President of the United States, and under Article II, Section 3, the President is tasked with ensuring that the laws are faithfully executed. These provisions centralize executive authority and require that any entity exercising executive powers must remain accountable to the President.

a) FINRA exercises significant executive powers, including suspending trading in securities, enforcing compliance with the Securities Exchange Act of 1934 (15 U.S.C. § 78), conducting investigations, enacting rules, and imposing sanctions. However, FINRA operates independently of presidential oversight. Its Board of Governors is not appointed or removable by the President but instead selected by its private membership. Even the Securities and Exchange Commission (SEC), which oversees FINRA to a limited degree, can only remove FINRA's Board of Governors for willful violations of the law, abuse of authority, or unjustified failure to enforce regulations (15 U.S.C. § 78s(h)(4)(B)). This limited oversight underscores FINRA's insulation from presidential control.

b) In Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), the Supreme Court held that entities exercising significant executive authority must

remain accountable to the President to preserve the separation of powers. Like the Public

Company Accounting Oversight Board (PCAOB) in that case, FINRA wields executive power

without sufficient accountability to the executive branch. This lack of accountability undermines

the constitutional framework and impermissibly impedes the President's ability to fulfill their

constitutional duties under Article II.

c) Therefore, FINRA's structure, which grants it significant executive powers while

shielding it from presidential oversight, violates the separation of powers doctrine and the

constitutional design for ensuring accountability in the exercise of governmental authority.

### Allegation 2: Violation of the Appointments Clause

268. Plaintiff alleges that the structure and appointment process of the Financial Industry

Regulatory Authority (FINRA) violate the Appointments Clause of the United States

Constitution, which governs the selection of officers who exercise significant authority under

federal law. Article II, Section 2, Clause 2 of the Constitution requires that principal officers of

the United States be appointed by the President with the advice and consent of the Senate.

Alternatively, Congress may vest the appointment of inferior officers in the President alone,

courts of law, or heads of departments.

a) FINRA's Board of Governors wields substantial authority under federal law, including

the power to enact rules, enforce securities regulations, conduct disciplinary proceedings, and

impose sanctions. These functions qualify its Board members as "officers of the United States"

under the criteria established in Buckley v. Valeo, 424 U.S. 1 (1976), which defined officers as

individuals exercising significant authority under U.S. law. Despite this, FINRA's Board is not

appointed by the President, nor is it confirmed by the Senate. Instead, Board members are

selected by FINRA's private membership, bypassing the constitutional process for appointing officers.

b) This appointment process violates the Appointments Clause. Under Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), and Edmond v. United States, 520 U.S. 651 (1997), officers exercising significant independent authority under federal law must be appointed in conformity with Article II. The Supreme Court has emphasized that the Appointments Clause is essential for maintaining accountability and separation of powers by ensuring that officers of the United States are appointed through constitutionally mandated procedures.

c) Furthermore, if members of FINRA's Board are deemed inferior officers, their appointments must still comply with the Appointments Clause. They must be appointed by the President, courts of law, or the head of a department. Since FINRA's private membership does not constitute a "department" under Article II, its process for appointing Board members remains unconstitutional, even if Board members are classified as inferior officers.

d) Accordingly, the selection of FINRA's Board of Governors by its membership violates the Appointments Clause of the United States Constitution and undermines the accountability required for individuals exercising significant authority under federal law.

<u>Allegation 3: Unconstitutional Delegation of Legislative Authority</u>

269. Plaintiff alleges that the delegation of broad regulatory and rulemaking authority to the Financial Industry Regulatory Authority (FINRA) violates the nondelegation doctrine enshrined in Article I, Section 1 of the United States Constitution, which vests all legislative powers in Congress. This doctrine prohibits Congress from delegating its legislative authority to any entity,

particularly private organizations or entities outside the legislative branch, without clear and specific guidance.

a) Under the Securities Exchange Act of 1934 (15 U.S.C. § 78o-3(b)), Congress authorized the SEC to delegate significant rulemaking, enforcement, and disciplinary powers to FINRA. These powers include the ability to draft and enforce securities regulations, conduct investigations, impose sanctions, and govern the conduct of broker-dealers. However, Congress provided only minimal guidance regarding the scope and limits of these powers, effectively granting FINRA quasi-legislative authority to create and enforce securities laws.

b) The delegation is further problematic because FINRA operates as a private, self-regulatory organization rather than a public entity directly accountable to the federal government. Unlike public agencies, FINRA lacks the safeguards of political accountability inherent in entities operating within the constitutional structure. In A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), the Supreme Court invalidated a delegation of legislative authority to a private industry group, holding that Congress cannot abdicate its legislative responsibilities or allow private entities to govern in the absence of clear legislative standards. Similarly, in J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394 (1928), the Court held that any delegation of legislative authority must include an "intelligible principle" to guide its exercise. Congress's delegation to FINRA fails this test by granting it sweeping, unsupervised authority with few meaningful constraints.

c) If FINRA is considered part of the federal government, the delegation of powers is unconstitutional as it improperly gives legislative powers to an executive body, violating the separation of powers. If FINRA is seen as a private entity, it is even more unconstitutional since it grants quasi-legislative powers to an entity outside the constitutional framework.

66

d) Therefore, the SEC's delegation of legislative authority to FINRA violates the

nondelegation doctrine and impermissibly allows a private, quasi-governmental entity to exercise

powers reserved for Congress under Article I of the Constitution.

## Supplemental Authority from Alpine Securities Corp. v. FINRA

270. On November 22, 2024, the DC Circuit Court of Appeals issued a pivotal decision in

Alpine Securities Corp. v. Financial Industry Regulatory Authority and United States of

America, Case No. 1:23-cv-01506. This decision provides substantial support for Plaintiff's

claims, particularly regarding the U3 trading halt issued by FINRA.

### Summary of Alpine Decision

271. The DC Circuit ruled that FINRA's expulsion orders violated the private nondelegation

doctrine because they took effect immediately without SEC oversight. The court held that private

entities like FINRA must act only as an aid to accountable government agencies that retain

ultimate authority to approve or disapprove the private entity's actions. The lack of such

oversight rendered FINRA's actions unconstitutional.

272. In Alpine, the court emphasized: The irreparable harm caused by FINRA's actions,

including financial ruin and the destruction of Alpine's business before full SEC review and the

balance of equities and public interest in ensuring fair regulatory processes.

### Applicability to Plaintiff's Case

273. The reasoning in Alpine is directly applicable to this case. The U3 trading halt issued by

FINRA on December 09, 2022 was similarly imposed without any prior validation or review by

the SEC. This mirrors the unconstitutional delegation of authority identified in Alpine and resulted in irreparable harm to Plaintiff.

274. As in Alpine, injunctive relief is the only adequate remedy to prevent further harm and to restore the integrity of the market. Plaintiff respectfully requests this Court to issue relief consistent with Alpine, mandating a resumption of trading in MMTLP to allow the market to function properly and enable Plaintiff and other investors to close their positions.

## Supplemental Authority from SEC v. Sloan

275. In SEC v. Sloan, 436 U.S. 103 (1978), the U.S. Supreme Court addressed the legality of trading halts implemented by the SEC, establishing critical limitations on the scope and duration of such regulatory actions. The Court held that a trading halt could be imposed for no longer than ten days unless specifically authorized by Congress. This landmark decision underscored the necessity for regulatory agencies to act strictly within the bounds of their statutory authority.

276. The Sloan Court found that the SEC violated its own rules by extending a trading halt beyond the permissible ten-day limit, thereby infringing on shareholders' rights and disrupting market operations without proper justification. The ruling emphasized two central principles; 1. regulatory agencies must adhere to statutory and procedural limits in exercising their authority and 2. prolonged trading halts require clear congressional authorization to avoid undue harm to market integrity and investor rights.

## Applicability to Plaintiff's Case

277. The Sloan decision is directly relevant to the circumstances surrounding FINRA's indefinite U3 halt on [MMTLP or relevant stock]. While Sloan addressed the SEC's actions, the principles articulated by the Supreme Court apply equally to FINRA's regulatory authority. By imposing an

68

indefinite halt without SEC review or statutory authorization, FINRA has exceeded the legal limitations outlined in Sloan. The failure to define or justify the "extraordinary event" allegedly warranting this indefinite halt further compounds the overreach.

278. The Supreme Court's decision in Sloan establishes a compelling precedent that regulatory actions—such as trading halts—must be; 1. time-limited and supported by statutory authority and 2. implemented transparently to ensure protection of shareholder rights and market stability.

279. In this case, FINRA's indefinite U3 halt stands in direct conflict with these principles. The halt has effectively deprived shareholders of their right to trade, caused irreparable harm, and undermined market integrity. Like the SEC in Sloan, FINRA's actions lack the procedural safeguards and statutory authorization required to justify such an extraordinary measure.

<u>Reinforcing the Need for Injunctive Relief</u>

280. The Sloan precedent reinforces Plaintiff's request for injunctive relief to restore trading in MMTLP. FINRA's actions mirror the regulatory overreach condemned in Sloan, creating an urgent need for judicial intervention to protect the rights of investors and the integrity of the market.

<u>Integration of Sloan with Alpine</u>

281. When viewed in conjunction with the DC Circuit's recent decision in Alpine Securities Corp. v. FINRA, Sloan further demonstrates that FINRA's unchecked regulatory actions violate established legal principles. Sloan highlights the statutory limits on trading halts, while Alpine addresses the constitutional deficiencies of FINRA's lack of government oversight. Together, these cases present a comprehensive legal basis for the relief sought by Plaintiff.

WHEREFORE

282. For the reasons stated above, Plaintiff seeks:

a) Declaratory Relief: A judicial declaration that the Private Securities Litigation Reform Act of 1995 (PSLRA), as applied in this case, is unconstitutional. Its provisions conflict with fundamental constitutional principles, including the separation of powers, due process, and equal protection, and obstruct the rights of retail investors harmed by systemic market manipulation.

b) Injunctive Relief: An order enjoining the enforcement of the PSLRA's provisions that impose heightened pleading standards, discovery stays, and safe harbor protections, as these provisions violate constitutional guarantees and exacerbate systemic barriers to justice for retail investors.

c) Declaratory Judgment on Access to the Courts: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the First Amendment by effectively denying investors their right to petition the government for redress of grievances through judicial processes.

d) Declaratory Judgment on Equal Protection: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small investors and shielding institutional actors, thereby creating a two-tiered system of justice.

e) Declaratory Judgment on Due Process: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA's heightened pleading requirements and

discovery stays violate the Due Process Clause of the Fifth Amendment by denying Plaintiffs the ability to access critical evidence needed to substantiate their claims.

f) Declaratory Judgment on State Remedies: An order and judgment declaring that the PSLRA violates the Equal Protection Clause of the Fourteenth Amendment by preempting state-law securities fraud claims and imposing federal standards that disproportionately disadvantage individual investors.

g) Declaratory Judgment on Safe Harbor Provisions: An order and judgment declaring that the PSLRA's safe harbor provision for forward-looking statements unconstitutionally incentivizes fraudulent conduct, undermines market integrity, and violates the fundamental purposes of securities laws to protect investors and deter malfeasance.

h) Injunctive Relief on Judicial Economy: An order enjoining the continued enforcement of the PSLRA's provisions that increase inefficiencies and piecemeal litigation by forcing courts to adjudicate motions to dismiss without a complete evidentiary record.

i) Declaratory Relief on Liability Provisions: An order and judgment declaring that the PSLRA's limitations on joint and several liability for defendants unconstitutionally shield culpable parties who engage in fraudulent schemes, thereby leaving victims inadequately compensated.

## VI.    CONCLUSION

283. The Plaintiff, CONTIQUE WILLCOT, has brought this action to address systemic failures in the U.S. financial markets that have harmed retail investors through a combination of regulatory negligence, manipulative practices, and constitutional violations. At the center of this case lies FINRA's indefinite U3 trading halt on MMTLP shares, which deprived investors of

access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating without sufficient oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and the private nondelegation doctrine. Recent legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, underscore the statutory and constitutional violations inherent in FINRA's actions.

a) FINRA's structural deficiencies are compounded by the failures of other regulatory entities, including the SEC and the DTCC, to fulfill their statutory duties to protect investors and ensure market integrity. These organizations failed to investigate or remedy widespread irregularities such as synthetic/counterfeit share creation and naked short selling, which manipulated the market for MMTLP shares. The Defendants' inaction enabled institutional participants to profit at the expense of retail investors, further undermining confidence in the fairness and transparency of the markets.

b) The Plaintiff also seeks to highlight the role of corporate leadership at Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons, whose failures to address trading irregularities, reconcile shareholder discrepancies, and ensure accountability exacerbated the harm suffered by investors. These leaders neglected their fiduciary duties, misrepresented the financial prospects of their assets, and allowed discrepancies in share reconciliation to persist, leaving shareholders in a prolonged state of uncertainty and financial distress.

c) The harm caused by these systemic failures is both significant and ongoing. Retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover their investments, while institutional participants who engaged in manipulative practices remain unaccountable. The constitutional and statutory violations identified in this case are emblematic

72

of broader governance flaws in the financial markets, which must be addressed to protect investors and maintain public confidence in the integrity of the system.

d) In light of these failures, the Plaintiff seeks declaratory and injunctive relief to restore fairness and transparency to the markets. This includes addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts as articulated in Sloan, and ensuring that private entities acting under delegated authority are subject to meaningful government oversight, as emphasized in Alpine. These steps are necessary to rectify the systemic issues that have caused lasting harm to retail investors.

e) This case also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm suffered, as well as systemic reforms to prevent future market abuses. The harms detailed herein are not isolated incidents but indicative of systemic vulnerabilities that require judicial intervention to safeguard the rights of all investors.

f) The prolonged inaction of regulatory bodies in addressing the U3 halt and related market irregularities stands in stark contrast to the swift responses seen in other market events, such as the GameStop trading episode. This disparity highlights the need for equitable treatment of retail investors and a consistent application of regulatory oversight to uphold market integrity. Without such reforms, the systemic failures described in this case will continue to jeopardize public trust in the financial markets.

g) In bringing this action, the Plaintiff seeks not only to recover damages but also to hold the Defendants accountable for their roles in enabling a scheme of market manipulation,

systemic negligence, and constitutional violations. By addressing these issues, this Court has the opportunity to restore fairness and transparency to the financial markets, reaffirm the constitutional principles that govern regulatory authority, and protect the rights of investors whose trust in the system has been profoundly eroded.

## VII. **PRAYER FOR RELIEF**

284. WHEREFORE, Plaintiff prays for judgment in his favor and relief as follows:

a) Declaratory Judgment 1 & Injunctive Relief: Issue a declaration and corresponding injunctive relief finding that the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) is unconstitutional as applied to this case, as it unduly restricts access to justice for retail investors and infringes upon their constitutional rights.

b) Declaratory Judgment 2 & Injunctive Relief: Issue a declaration and corresponding injunctive relief challenging the structure and authority of the Financial Industry Regulatory Authority (FINRA) as unconstitutional, given its lack of adequate governmental oversight and accountability, which has resulted in improper and prejudicial actions, including the imposition and handling of the U3 trading halt on MMTLP shares.

c) A declaration that Defendants' actions and omissions violated federal securities laws, including Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), and other applicable federal regulations, as well as the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and fiduciary duties owed to retail investors.

d) A declaration that FINRA's U3 trading halt on MMTLP shares, imposed on December 9, 2022, and lifted on December 13, 2024, was improper, prejudicial, and constituted a violation

of regulatory responsibilities owed to the investing public, thereby causing material harm to over 65,000 shareholders, including Plaintiff.

e) An order awarding compensatory damages to Plaintiff in an amount to be determined at trial, including:

i. The loss of value and liquidity of Plaintiff's MMTLP shares resulting from Defendants' misconduct.

ii. Damages arising from the suppression of share prices and trading opportunities caused by synthetic/counterfeit share creation, naked short selling, and the improper U3 halt.

iii. Recovery of Plaintiff's documented financial losses exceeding $35,000.

f) Plaintiff seeks compensatory damages against each Defendant, in an amount no less than $5,000,000, for two years of emotional distress and mental anguish suffered as a direct result of Defendants' prolonged misconduct, failure to resolve the U3 trading halt, and refusal to provide necessary clarity or remedies regarding trading irregularities. Defendants knowingly shielded short sellers while weaponizing the U3 halt, administered by FINRA, to harm Plaintiff. Their actions, fully aware of the harm being caused, demonstrated an intentional lack of resolution, necessitating this lawsuit to hold them accountable for their deliberate wrongdoing. In addition, Plaintiff seeks treble damages as allowed by law.

g) An order awarding treble damages pursuant to the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton Act for Defendants' anticompetitive practices, which restrained market competition, fostered monopolistic environments, and caused disproportionate harm to retail investors, including the Plaintiff.

h) An order requiring injunctive relief to ensure market transparency and prevent similar systemic failures, including:

i. A full audit of all MMTLP and MMAT share transactions, including the identification and reconciliation of synthetic/counterfeit shares and beneficial ownership records.

ii. The public release of all records, communications, and trading data related to MMTLP and MMAT shares, including information held by FINRA, DTCC, broker-dealers, and other involved parties.

iii. A mandate requiring Defendants, including regulatory bodies and corporate leadership, to implement and enforce enhanced oversight mechanisms to prevent the proliferation of synthetic/counterfeit shares, naked short selling, and other manipulative practices.

i) An order requiring the disgorgement of profits wrongfully obtained by Defendants through the trading of synthetic/counterfeit shares, naked short selling, and related market manipulation, including unjust enrichment by market makers, broker-dealers, and transfer agents.

j) An award of punitive damages to deter Defendants and others from engaging in similar wrongful conduct in the future.

k) An order requiring the Securities and Exchange Commission (SEC) and Financial Industry Regulatory Authority (FINRA) to:

i. Establish clearer guidelines for regulatory intervention in cases of market irregularities.

ii. Improve oversight and accountability measures to ensure transparency in corporate actions, trading halts, and share reconciliations.

iii. To eliminate the potential conflict of interest arising from Ari Rubenstein's dual roles, I respectfully request that you prohibit holding both positions simultaneously to ensure market integrity and fairness.

l) An award of pre- and post-judgment interest on all compensatory damages to account for the time value of Plaintiff's losses and to ensure full recovery of the harm caused.

p) An award of Plaintiff's reasonable costs and expenses incurred in pursuing this action, including court fees, filing fees, and any costs associated with expert analysis or testimony.

q) Any such other relief as the Court may deem just, equitable, and proper to ensure accountability for Defendants' misconduct and restore trust in U.S. financial markets.

## VIII.  **DEMAND FOR JURY TRIAL**

285. The Plaintiff hereby demands a trial by jury for all claims and issues triable as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 23, 2024

SIGN HERE

*Contique Willcot*

Contique Willcot, pro se ipso

6940 SW 10th Ct

Pembroke Pines, FL 33023

**CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, CONTIQUE WILLCOT, duly certify and say, as to the claims asserted under the federal

securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the

best of my knowledge and belief.

Executed on December 23, 2024.                **Signature:** *Contique Willcot*

**Name:** CONTIQUE WILLCOT



