No. _____

# In the
# Supreme Court of the United States

---

ALPINE SECURITIES CORPORATION,

*Petitioner,*

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY,

*Respondent.*

&

UNITED STATES OF AMERICA,

*Intervenor-Respondent.*

---

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the District of Columbia Circuit**

---

**PETITION FOR A WRIT OF CERTIORARI**

---

Maranda E. Fritz
MARANDA E. FRITZ PC
521 Fifth Avenue 17th
Floor
New York, New York
10175
Phone: (646) 584-8231
maranda@fritzpc.com

*Additional Counsel listed on
inside cover*

DAVID H. THOMPSON
   *Counsel of Record*
BRIAN W. BARNES
ATHIE O. LIVAS
COOPER & KIRK, PLLC
1523 New Hampshire
   Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Petitioner*

February 20, 2025

Kenneth G. Turkel
David A. Hayes
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street
Suite 1900
Tampa, FL  33602
Phone: (813) 834-9191
kturkel@tcb-law.com

*Counsel for Petitioner*

i

## QUESTIONS PRESENTED

Petitioner is a securities broker-dealer that is the target of an enforcement proceeding brought by FINRA—a putatively "private" organization vested by statute with authority to make and enforce federal law. FINRA's leadership is not selected by or accountable to anyone in the Executive Branch, and Petitioner challenged the enforcement proceeding on the ground that FINRA's structure violates the Constitution's structural provisions. In the decision below, a divided panel of the D.C. Circuit held that FINRA's authority to summarily expel broker-dealers from the securities industry without prior review by the SEC violates the private non-delegation doctrine. But the D.C. Circuit refused to enjoin the enforcement proceeding in its entirety, reasoning that being subjected to an enforcement action by a constitutionally illegitimate actor does not constitute irreparable injury. The questions presented are:

1. Whether the "here-and-now injury" inflicted by "an illegitimate proceeding, led by an illegitimate decisionmaker," *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023), constitutes an irreparable injury for purposes of a preliminary injunction; and

2. Whether FINRA's structure and asserted power to enforce the federal laws, including its exercise of unfettered prosecutorial discretion, violates the Constitution's structural provisions.

ii

## PARTIES TO THE PROCEEDING

This petition arises from the United States Court of Appeals for the District of Columbia Circuit. Petitioner is Alpine Securities Corporation.

Scottsdale Capital Advisors Corporation is a plaintiff in the district court but was not a party to the appeal in the Court of Appeals and is not a petitioner here.

Respondent is the Financial Industry Regulation Authority. Additionally, the United States of America is an intervenor-respondent.

iii

## CORPORATE DISCLOSURE STATEMENT

Per Supreme Court Rule 29, Petitioner is wholly owned by SCA Clearing LLC, an Arizona limited liability company. Scottsdale Capital Advisors is wholly owned by Scottsdale Capital Advisors Holdings LLC, an Arizona limited liability company. No publicly held company owns 10% or more of either entity's stock.

iv

## RELATED PROCEEDINGS

This case arises from the following proceedings:

- *Alpine Sec. Corp. v. FINRA*, No. 23-5129 (D.C. Cir. Nov. 22, 2024)

- *Alpine Sec. Corp. v. FINRA*, No. 23-1506 (D.D.C. June 7, 2023)

There are no related proceedings.

v

# TABLE OF CONTENTS

PAGE

QUESTIONS PRESENTED........................................i

PARTIES TO THE PROCEEDING ........................... ii

CORPORATE DISCLOSURE STATEMENT .......... iii

RELATED PROCEEDINGS ....................................iv

TABLE OF AUTHORITIES.................................. viii

PETITION FOR A WRIT OF CERTIORARI .............1

OPINIONS BELOW ...................................................6

JURISDICTION .........................................................6

CONSTITUTIONAL, STATUTORY, AND
REGULATORY PROVISIONS INVOLVED .............6

STATEMENT..............................................................7

I.   The Modern FINRA................................................7

II.  FINRA's Enforcement Action ...............................9

III. Procedural History ..............................................10

REASONS FOR GRANTING THE PETITION .......15

I.   Courts and jurists have diverged on the questions
     presented. ...........................................................15

     A.  Lower court judges disagree about whether
         being subjected to an unconstitutional
         enforcement proceeding establishes
         irreparable injury.........................................15

     B.  Courts have diverged on FINRA's
         constitutionality. ..........................................18

vi

II. The decision below is contrary to this Court's
precedents and constitutional first principles. ... 19

   A. The decision below conflicts with *Axon* and
      subjugates structural constitutional injuries
      to second-class status. .................................. 19

   B. A straightforward application of this Court's
      precedents establishes that FINRA's
      structure and exercise of federal executive
      power is unconstitutional. ........................... 24

III. The questions presented are exceptionally
    important. .......................................................... 29

   A. Whether being forced to undergo an
      unconstitutionally structured adjudication
      inflicts an irreparable injury is exceptionally
      important. .................................................... 29

   B. Whether FINRA, a purportedly private
      body, can exercise government enforcement
      power while eschewing all constraints on
      government power is exceptionally
      important. .................................................... 33

IV. This case presents an ideal vehicle to resolve
    these questions. .................................................. 34

V. In the alternative, the Court should hold this
   petition for *Consumer's Research*, or any other
   private non-delegation cases granted this
   Term. .................................................................... 36

CONCLUSION ....................................................... 37

vii

## APPENDIX

APPENDIX A – OPINION OF THE UNITED
    STATES COURT OF APPEALS FOR THE
    DISTRICT OF COLUMBIA CIRCUIT,
    FILED NOVEMBER 22, 2024 ........................... 1a

APPENDIX B – ORDER OF THE UNITED
    STATES COURT OF APPEALS FOR THE
    DISTRICT OF COLUMBIA CIRCUIT,
    FILED NOVEMBER 22, 2024 ......................... 79a

APPENDIX C – ORDER OF THE UNITED STATES
    COURT OF APPEALS FOR THE DISTRICT OF
    COLUMBIA CIRCUIT,
    FILED JULY 5, 2023 ....................................... 82a

APPENDIX D – MEMORANDUM OPINION OF
    THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLUMBIA,
    FILED JUNE 7, 2023 ...................................... 93a

APPENDIX E – EXCERPTS OF THE
    CONSTITUTION OF THE
    UNITED STATES ......................................... 134a

viii

# TABLE OF AUTHORITIES

CASES                                                              PAGE(S)

*Am. Trucking Ass'ns v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009)..........................17

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023).........2, 9, 20, 21, 22, 24, 30

*Birkelbach v. SEC*,
    751 F.3d 472 (7th Cir. 2014)..........................7, 8

*Bowsher v. Synar*,
    478 U.S. 714 (1986)..........................................19

*Brewer v. W. Irondequoit Cent. Sch. Dist.*,
    212 F.3d 738 (2d Cir. 2000) ............................17

*Caplin & Drysdale, Chartered v. United States*,
    491 U.S. 617 (1989)..........................................23

*Carter v. Carter Coal Co.*,
    298 U.S. 238 (1936)..........................................25

*Cochran v. SEC*,
    No. 19-10396 (5th Cir. Sept. 24, 2019)...........16

*Collins v. Yellen*,
    594 U.S. 220 (2021)...................................24, 31

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
    575 U.S. 43 (2015)........................................4, 25

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010)...........19, 26, 28, 35, 36, 37

*Hilton v. Braunskill*,
    481 U.S. 770 (1987)..........................................16

ix

*In re Series 7 Broker Qualification Exam*
    *Scoring Litig.*,
    548 F.3d 110 (D.C. Cir. 2008)..........................9

*John Doe Co. v. CFPB*,
    849 F.3d 1129
    (D.C. Cir. 2017) ........................3, 16, 20, 21, 23

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) .............................17

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
    103 F.4th 748 (10th Cir. 2024) ................15, 24

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995).........................................33

*Loma Linda-Inland Consortium for Healthcare*
    *Educ. v. NLRB*,
    No. 23-5096, 2023 WL 7294839
    (D.C. Cir. May 25, 2023) ..........................16, 17

*Lucia v. SEC*,
    585 U.S. 237 (2018)............................19, 20, 27

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).........................................23

*Morrison v. Olson*,
    487 U.S. 654 (1988)............................19, 29, 30

*NASD v. SEC*,
    431 F.3d 803 (D.C. Cir. 2005)..........................7

*Nat'l Horsemen's Benevolent & Protective*
    *Ass'n v. Black*,
    107 F.4th 415 (5th Cir. 2024) ........................18

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982)...................................25, 26

x

*NLRB v. Cath. Bishop of Chi.*,
   440 U.S. 490 (1979)...................................16, 17

*Oklahoma v. United States*,
   144 S. Ct. 2679 (2024)....................................18

*Oklahoma v. United States*,
   62 F.4th 221 (6th Cir. 2023) ....................18, 27

*R. H. Johnson & Co. v. SEC*,
   198 F.2d 690 (2d Cir. 1952) .....................18, 19

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020)...........................................30

*Ryder v. United States*,
   515 U.S. 177 (1995).........................................31

*SEC v. Goble*,
   682 F.3d 934 (11th Cir. 2012).........................10

*SEC v. Novinger*,
   40 F.4th 297 (5th Cir. 2022) ..........................32

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)......................19, 22, 23, 30

*Sorrell v. SEC*,
   679 F.2d 1323 (9th Cir. 1982)..................18, 19

*Springer v. Gov't of Philippine Islands*,
   277 U.S. 189 (1928).........................................26

*Springsteen-Abbott v. SEC*,
   989 F.3d 4 (D.C. Cir. 2021)............................11

*Tilton v. SEC*,
   824 F. 3d 276 (2d Cir. 2016) ..........................31

*Turbeville v. FINRA*,
   874 F.3d 1268 (11th Cir. 2017)......................26

xi

*United States ex rel. Polansky v. Exec.*
   *Health Res., Inc.,*
   599 U.S. 419 (2023)......................................4, 29

*Weinberger v. Romero–Barcelo,*
   456 U.S. 305 (1982)..........................................22

*Weissman v. NASD,*
   500 F.3d 1293 (11th Cir. 2007)....................7, 9

*Whistler Invs., Inc. v. Depository Tr.*
   *& Clearing Corp.,*
   539 F.3d 1159 (9th Cir. 2008)..........................8

*YAPP USA Auto. Sys., Inc. v. NLRB,*
   No. 24-1754, 2024 WL 4489598
   (6th Cir. Oct. 13, 2024) .............................15, 24

*Zepeda v. INS,*
   753 F.2d 719 (9th Cir. 1983)...........................17

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015).............................................19

STATUTES

15 U.S.C.
   § 78u(a)(1).........................................................8
   § 78s(b).........................................................7, 8
   § 78s(b)(2)(E) ...................................................8
   § 78o-3(b)(7)...................................................26

28 U.S.C.
   § 1254(1) ...........................................................6
   § 1331.........................................................6, 10

OTHER AUTHORITIES

11A Charles Alan Wright & Arthur R.
   Miller, *Federal Practice & Procedure* § 2948.1
   (3d ed. 2024) ...................................................17

xii

*Enforcement: Who We Are*, FINRA,
   https://bit.ly/3QYSvL0
   (last visited Feb. 19, 2025) ............................26

FINRA Regulatory Notice 16-25 (July 22, 2016) .......8

*In re Dep't of Enf't v. Charles Schwab & Co.*,
   2014 WL 1665738 (FINRA Bd. of
   Govs. Apr. 24, 2014)..........................................8

*Jean Eaglesham, SEC Wins With In-House Judges*,
   WALL ST. J. (May 6, 2015),
   http://bit.ly/4i4V3Bn .......................................31

Jennifer L. Mascott, *Who Are 'Officers of the United
   States'?*, 70 STAN. L. REV. 443 (2018) .............28

*Officers of the United States Within the Meaning of
   the Appointments Clause*, 31 Op. OLC 73
   (Apr. 16, 2007), http://bit.ly/4i0iRXg........28, 29

James F. Tierney, *Reconsidering Securities Bars*,
   29 STAN. J. L. BUS. & FIN. 134 (2024).............35

1

## PETITION FOR A WRIT OF CERTIORARI

The Financial Industry Regulatory Authority, Inc. ("FINRA") is a nominally private corporation that acts as a federal government agency.

FINRA, a Delaware corporation, enforces the federal securities laws and its own rules that carry the force of federal law. In so doing, FINRA investigates, prosecutes, adjudicates, and punishes individuals and entities who are forced to join FINRA as a condition of doing business in the United States securities industry. FINRA exercises discretion over when, how, against whom, and with what threatened federal force to prosecute its alleged violations. Through its aggressive enforcement regime and unchecked prosecutorial discretion, FINRA makes and executes policy judgments on behalf of the Executive Branch and, in turn, the American people.

Based on its unusual status as the purportedly "private" enforcer of the federal securities laws, FINRA insists that it can exercise enforcement power derived from the government, mandated by the government, and with immunity reserved for the government. To make matters worse, FINRA exercises government power more freely than the government itself. That is, free from the structural constitutional limitations that *constrain* the government.

FINRA's exercise of federal executive power violates the private non-delegation doctrine, the Appointments Clause, and Article II's guarantees of presidential supervision and removal. Fundamentally, if FINRA seeks to wield government power—assuming it may do so at all—it must abide

2

by the associated limits on government power. At the very least, the Government cannot delegate to a private party authority to do that which it cannot constitutionally do itself.

In an audacious exercise of its unusual and sweeping authority, FINRA employed a truncated enforcement action—the Expedited Proceeding—against Petitioner, a securities broker-dealer that challenged FINRA's unconstitutional structure in federal court. FINRA threatened Petitioner with the corporate death penalty: immediate and permanent expulsion from the securities industry. In other words, an end to Petitioner's business for good.

Petitioner challenged this effort, and the D.C. Circuit agreed with Petitioner in part. After a motions panel of the D.C. Circuit granted Petitioner an injunction pending appeal, Pet.App.83a, 91a–92a, Judge Millett, writing for the majority, enjoined FINRA from expelling Petitioner from the securities industry without *any* review by the SEC—the government agency that is meant to supervise FINRA. Pet.App.3a.

The divided D.C. Circuit refused, however, to enjoin FINRA from otherwise exercising its federal enforcement powers against Petitioner because it thought such relief was unnecessary to prevent an irreparable injury. Petitioner argued that this Court's recognition that "subjection to an illegitimate proceeding, led by an illegitimate decisionmaker" is a "here-and-now injury" that "is impossible to remedy once the proceeding is over"—*Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023), established that Petitioner's subjection to the FINRA Expedited Proceeding was an

3

irreparable injury. The panel majority rejected that argument, disagreeing with Petitioners and the district court that *Axon* applies in the context of establishing irreparable injury for injunctive relief. Pet.App.40a–44a.

Judge Walker wrote separately, explaining that the majority's decision was a "victory for the Constitution," Pet.App.46a, but did not go far enough. He agreed with Petitioner entirely and would have found FINRA unconstitutional on separation of powers grounds under a straightforward application of this Court's precedents. Pet.App.67a (FINRA Hearing Officers "are indistinguishable from the administrative law judges in *Lucia* and the special trial judges in *Freytag*."). Judge Walker also explained that the majority erred in rejecting Petitioner's request for an injunction against FINRA moving forward with its enforcement action based on its misreading of *Axon*. Pet.App.70a–76a. He invoked an opinion by then-Judge Kavanaugh for the proposition that being subjected to actions of an "unconstitutionally structured agency" constitutes irreparable injury. *See John Doe Co. v. CFPB*, 849 F.3d 1129, 1136 (D.C. Cir. 2017) (Kavanaugh, J., dissenting) ("Irreparable harm occurs almost by definition when a person or entity demonstrates a likelihood that it is being regulated on an ongoing basis by an unconstitutionally structured agency that has issued binding rules governing the plaintiff's conduct and that has authority to bring enforcement actions against the plaintiff.").

This Court should grant review to consider: (1) whether a constitutional structural injury—for example, subjection to an unconstitutionally

4

structured enforcement proceeding—constitutes an irreparable injury in the context of injunctive relief; and (2) whether FINRA's unusual status as the purportedly private enforcer of the federal securities laws violates the Constitution's structural provisions.

As three Justices of this Court have already recognized, giving private parties the power to exercise significant authority under the laws of the United States raises serious and important Article II concerns. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 442 (2023) (Kavanaugh, J., concurring, in which Barrett, J., joined); *id.* (Thomas, J., dissenting). After all, "[w]hen it comes to private entities" exercising governmental powers, there is "not even a fig leaf of constitutional justification." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring).

Judges and courts have diverged on both of these exceptionally important questions. As to the threshold question of whether being forced to endure an unconstitutional adjudication gives rise to an irreparable injury, some Circuits have erected a categorical bar establishing that such injuries are not irreparable. Other federal judges expressly disagreed, often relying on this Court's opinion in *Axon* for the proposition that suffering at the hands of a constitutionally infirm adjudicator cannot be remedied later on. These dissenters include Judge Walker, Judge Rao, and then-Judge Kavanaugh. Without specific reference to *Axon*-style injuries, other Circuits have broadly stated that *all* constitutional injuries create irreparable harm, implicitly taking the side of the dissenters. As to FINRA's constitutional status, the D.C. Circuit below

5

split from other Circuits by enjoining FINRA from exercising its unchecked enforcement power on private non-delegation grounds. Other Circuits have blessed the SEC-FINRA relationship, pointing to it as the exemplar of a constitutional delegation to a private body. Meanwhile, FINRA regulates an entire, and critical, industry in the United States. Clarity about whether that vast web of regulatory power complies with the Constitution's dictates is sorely needed by regulated parties and FINRA itself.

This case presents an ideal vehicle to take up these important issues. Petitioner presented its arguments at every stage of the proceedings, in which thorough and thoughtful opinions (plus two rounds of supplemental briefing) aired out the questions presented. And this case presents the private non-delegation question in the context of an actual enforcement action by a private enforcer—raising in stark relief the particular constitutional problem of outsourced prosecutorial discretion and the *enforcement* of federal law by one private party against another.

In the alternative to granting certiorari, the Court could hold this petition for the private non-delegation case over which it has already granted review, *see FCC v. Consumers' Rsch.*, No. 24-354 (cert. granted Nov. 22, 2024), or the several other private non-delegation petitions currently pending before the Court, if review is granted there. *See* Cert. Pet., *Horseracing Integrity & Safety Auth., Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n*, No. 24-433 (U.S. Oct. 15, 2024); Cert. Pet., *FTC v. Nat'l Horsemen's Benevolent & Protective Ass'n*, No. 24-429 (U.S. Oct. 16, 2024); Cert. Pet., *Walmsley v. FTC*, No.

6

24-420 (U.S. Oct. 10, 2024); Cert. Pet., *Oklahoma v. United States*, No. 23-402 (U.S. Oct. 13, 2023).

In sum, this Court should grant review or, in the alternative, hold the petition for *Consumers' Research* (or the HISA cases, if review is granted there). Either way, this constitutional challenge to the "private" and utterly unaccountable enforcer of our nation's securities laws is worthy of this Court's review.

## OPINIONS BELOW

The D.C. Circuit's panel opinion is available at 121 F.4th 1314, and reproduced at Pet.App.1a–78a. The D.C. Circuit's motions panel order granting Petitioner an injunction pending appeal is available at 2023 WL 4703307, and reproduced at Pet.App.82a–91a. The district court's opinion is available at 678 F. Supp. 3d 88, and reproduced at Pet.App.93a–133a.

## JURISDICTION

The judgment of the court of appeals was entered on November 22, 2024. The district court had jurisdiction under 28 U.S.C. § 1331, and the jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS INVOLVED

Article II to the United States Constitution is reproduced in the Appendix beginning at Pet.App.134a.

7

## STATEMENT

### I.  The Modern FINRA

The Financial Industry Regulatory Authority is a nominally private corporation that acts as a federal government enforcement agency.

FINRA's predecessor, the National Association of Securities Dealers ("NASD"), was originally created as a voluntary and member-run collaborative association—a "self-regulatory organization" or "SRO," and for several decades operated in that manner.

In recent decades, FINRA replaced the NASD and transformed the private regulation of the securities industry from a collaborative, member-run enterprise into a full-fledged enforcement agency in which membership is compelled, external non-industry governance is mandated, and aggressive enforcement and imposition of devastating penalties comparable to those imposed by the SEC are backed by the force of federal law.

Petitioner and nearly every other broker-dealer is obligated by federal law to join FINRA as a condition of doing business in the United States securities industry. Pet.App.9a, 11a.

FINRA performs a variety of important functions: "adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws[.]" *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007); *see NASD v. SEC*, 431 F.3d 803, 805–06 (D.C. Cir. 2005). FINRA also has rulemaking authority, and its rules carry the force and status of federal law. *See*

8

*Birkelbach v. SEC*, 751 F.3d 472, 475 n.2 (7th Cir. 2014); *see also* 15 U.S.C. § 78s(b). Indeed, FINRA's rules are so well established as federal law that they *preempt* contrary state law. *See Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1168 (9th Cir. 2008). Remarkably, the SEC can even "aid in the enforcement" of FINRA's rules. 15 U.S.C. § 78u(a)(1). FINRA rules also carry the trappings of federal law; the SEC is directed by statute to publish FINRA's rule changes in the Federal Register. *See* 15 U.S.C. § 78s(b)(2)(E).

FINRA investigates, prosecutes, and imposes penalties—including permanent expulsion from the securities industry—for alleged violations not only of FINRA's own rules but also of the federal securities laws. The SEC has permitted and even encouraged this development, embracing and expanding a "private" enforcement arm and enabling it to engage in aggressive action unburdened by the dictates of the Constitution or democratic accountability.

Were there any doubt about the modern FINRA's status as the "private" enforcer of our federal securities laws, the Court may take FINRA's word for it. FINRA has repeatedly claimed in litigation, enforcement proceedings, and public guidance that its rules are federal law. *See, e.g., In re Dep't of Enf't v. Charles Schwab & Co.*, 2014 WL 1665738, at \*16 (FINRA Bd. of Govs. Apr. 24, 2014) ("FINRA rules have the force and effect of a federal regulation."); FINRA Regulatory Notice 16-25 at 3 (July 22, 2016) ("FINRA's rules . . . have the force of federal law. FINRA rules are not mere contracts that member firms and associated persons can modify.").

9

So too, FINRA has repeatedly and successfully argued that it is immune from tort suits arising from its prosecutorial, adjudicatory, and enforcement conduct on the ground that it is performing governmental functions. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008); *Weissman*, 500 F.3d at 1296 ("Because they perform a variety of vital governmental functions . . . SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions.").

## II.  FINRA's Enforcement Action

Petitioner Alpine is a broker-dealer forced to register as a FINRA member and subject to its federal enforcement power as a condition of participation in the securities industry. Pet.App.9a, 11a.

Petitioner sued FINRA in federal court alleging that FINRA's structure and exercise of federal power violated the Constitution. On April 14, 2023, this Court decided *Axon Enterprise v. FTC*, 598 U.S. 175 (2023), holding that plaintiffs do not have to circumnavigate an internal administrative-review process for a district court to consider structural constitutional claims against an agency. *Id.* at 185. On April 19, 2023, just five days after the *Axon* opinion was handed down, FINRA filed an Expedited Proceeding against Petitioner, seeking to deploy its truncated and accelerated process to obtain an order permanently expelling Petitioner from the industry and in turn putting Petitioner out of business.

The Expedited Proceeding is procedurally unique and unusually powerful. Unlike FINRA's ordinary

10

disciplinary proceedings, the Expedited Proceeding is conducted by a single Hearing Officer whose order would have become immediately effective without review by FINRA's in-house appellate tribunal or the SEC. Thus, unlike most FINRA Hearing Officer decisions, the expulsion order that FINRA sought to impose through the Expedited Proceeding would have become effective *immediately* and forced the closure of Petitioner's business.[1]

FINRA's Expedited Proceeding arose out of a complicated tapestry of FINRA procedures. FINRA alleges that Petitioner violated a cease-and-desist order contained in an Initial Hearing Panel Decision from a prior FINRA enforcement proceeding. FINRA does not claim that Petitioner violated any clear and specific provision of that cease-and-desist order. Rather, FINRA alleges that Petitioner engaged in conduct that violated the general "obey the law" provisions of the earlier FINRA order. *See, e.g.*, *SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) (expressing skepticism over the enforcement of such broad provisions).

## III. Procedural History

Petitioner sued to challenge FINRA's structure and exercise of federal power. The district court had jurisdiction under 28 U.S.C. § 1331.

Throughout the proceedings below, Petitioner has argued that FINRA, a purportedly "private" body that enforces the federal securities laws against other

---

[1] The D.C. Circuit's narrow injunction below would prevent FINRA from permanently expelling Petitioner from the securities industry before any SEC review. Pet.App.3a.

11

private parties, violates the Appointments Clause, Article II's requirements of presidential removal and supervision, and the private non-delegation doctrine. After FINRA launched the Expedited Proceeding seeking to expel Petitioner from the securities industry, Petitioner sought to enjoin that proceeding. Based on these arguments, Petitioner twice secured injunctive relief from the D.C. Circuit.

On February 6, 2023, the United States intervened "for the limited purpose of defending the constitutionality of the federal securities laws, including the Securities Exchange Act of 1934, as amended by the Maloney Act of 1938, 15 U.S.C. § 78a et seq." United States' Not. of Intervention at 1, *Scottsdale Cap. Advisors Corp. v. FINRA*, No. 8:22-cv-2347-MSS-TGW (M.D. Fla. Feb. 6, 2023), Doc. 28.

On May 9, 2023, Petitioner filed an emergency motion for preliminary injunctive relief from FINRA's Expedited Proceeding in the Middle District of Florida, where Petitioner originally sued. On May 26, 2023, after briefing and a hearing, the district court transferred this case to the District of Columbia.

The district court below initially denied Petitioner's motion for injunctive relief based on *Springsteen-Abbott v. SEC*, 989 F.3d 4 (D.C. Cir. 2021), reasoning that Petitioner's claims failed at the outset because "the administrative process before [FINRA] and the [SEC] will not be exhausted until the SEC has had an opportunity to rule on the result of the FINRA proceeding." *See* D.D.C. Minute Order of May 26, 2023. Petitioner filed a motion for reconsideration, Doc. 65 (D.D.C. May 30, 2023), advising the district court that this Court had recently

12

overruled *Springsteen-Abbott* in *Axon*. The district court acknowledged the applicability of *Axon* and concluded that "under the Supreme Court's explicit language, the nature of the constitutional claims asserted here . . . suffice to show irreparable harm to Alpine." Pet.App.130a. Yet the court concluded that Alpine's renewed motion for a preliminary injunction failed on the merits.

Amidst all this, FINRA pressed forward with the Expedited Proceeding against Petitioner, seeking to expel Petitioner from the securities industry as quickly as it could. FINRA commenced its hearing in the Expedited Proceeding on June 5, 2023, before the district court had ruled on Petitioner's then-pending preliminary injunction motion.

As FINRA relentlessly pursued the Expedited Proceeding, Petitioner brought an expedited appeal and sought an emergency injunction pending appeal from the D.C. Circuit. After briefing, the panel granted Petitioner an injunction pending appeal. Pet.App.83a (Petitioner "has satisfied the stringent requirements for an injunction pending appeal."). The same day, the FINRA hearing was suspended.

In a concurring statement, Judge Walker explained that Petitioner clearly faced irreparable harm absent an injunction, both "because the ongoing FINRA enforcement proceedings would put it out of business" and because under *Axon*, "the resolution of claims by an unconstitutionally structured adjudicator is a 'here-and-now injury' that cannot later be remedied." Pet.App.85a (Walker, J., concurring). Judge Walker further explained that

13

Petitioner was likely to succeed on the merits of its constitutional claims against FINRA.

After the motions panel issued its order, FINRA took the extraordinary step of moving for en banc reconsideration of the motions panel's order. The D.C. Circuit denied FINRA's motion. FINRA at the same time forged ahead in the district court, moving to dismiss Petitioner's complaint on June 30, 2023. Doc. 93 (D.D.C. June 30, 2023). The district court rejected FINRA's effort, granting Petitioner's motion (over FINRA's opposition) to hold the district court proceedings in abeyance during the course of appellate review. *See* D.D.C. Minute Order of July 26, 2023.

At the merits panel stage in the D.C. Circuit, the case was reassigned to a new panel. After briefing, oral argument, and a round of supplemental briefing, the new panel agreed with Petitioner in part and, ruling on private non-delegation grounds, directed that an injunction of the Expedited Proceeding be entered "enjoining FINRA from giving effect to any expulsion order issued against Alpine until either the SEC reviews the order on the merits or the time for Alpine to seek SEC review lapses." Pet.App.45a. As to Petitioner's claims arising out of the Appointments Clause, the Court held that Petitioner failed to establish irreparable harm, finding that Petitioner "overreads *Axon*." Pet.App.41a.

After putting *Axon* aside, the majority opinion for the panel relied on Circuit decisions for the proposition that a separation of powers injury does not establish irreparable harm. Pet.App.35a–40a. Judge Walker's opinion explained that those decisions,

14

which FINRA had not even cited, predate *Axon* and are either non-binding or involve inapposite topics. *See* Pet.App.40a–42a (Walker, J., concurring in the judgment in part and dissenting in part).

In particular, the D.C. Circuit focused on two aspects of *Axon* to hold that it did not apply to structural constitutional injuries asserted in a preliminary injunction posture. First, *Axon* involved a "statutory jurisdictional question" and "did not speak to what constitutes irreparable harm for purposes of the extraordinary remedy of a preliminary injunction." Pet.App.41a Second, "[n]othing in *Axon* addressed an asserted injury from a member of a private organization having to go through a hearing process before such an entity." Pet.App.43a. Judge Walker, concurring in the judgment in part and dissenting in part, adopted a different reading of *Axon*. *Id*. (Walker, J., concurring in the judgment in part and dissenting in part). As to the factual differences between this case and *Axon*, he reasoned: "To be sure, *Axon* was answering a question about whether a district court had jurisdiction, not whether a court should grant a preliminary injunction. But I struggle to see how an injury that is completely 'impossible to remedy' (the standard there) meaningfully differs from an injury that is 'beyond remediation' (the standard here)." Pet.App.71a (Walker, J., concurring in the judgment in part and dissenting in part) (citations omitted). No party moved for rehearing of the panel's decision.

Petitioner timely moved the D.C. Circuit panel to stay its mandate pending Petitioner's forthcoming petition for certiorari. The panel denied the request in

15

an unreasoned order. Judge Walker would have granted the stay pending certiorari.

On February 18, 2024, Petitioner applied to this Court for a stay of the D.C. Circuit's judgment or the FINRA enforcement proceeding. That application remains pending.

## REASONS FOR GRANTING THE PETITION

### I. Courts and jurists have diverged on the questions presented.

#### A. Lower court judges disagree about whether being subjected to an unconstitutional enforcement proceeding establishes irreparable injury.

Courts of appeals judges have strongly disagreed about whether separation-of-powers harms are sufficient to meet the irreparable-injury standard. The Tenth Circuit, Sixth Circuit, and now the D.C. Circuit have all declined to apply *Axon*'s here-and-now-injury language where a party seeks to establish irreparable injury to support injunctive relief. *See Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 760 (10th Cir. 2024); *YAPP USA Auto. Sys., Inc. v. NLRB*, No. 24-1754, 2024 WL 4489598, at *3 (6th Cir. Oct. 13, 2024). Yet at least three judges, all sitting on this nation's most active administrative-law court, have disagreed that separation-of-powers injuries should be treated this way.[2]

---

[2] Although a summary order, a unanimous panel of judges on the Fifth Circuit issued an injunction pending appeal in *Cochran v. SEC*, No. 19-10396 (5th Cir. Sept. 24, 2019), the

16

In this case, Judge Walker vehemently rejected the idea that an injury can be somehow both "impossible to remedy" under *Axon* yet not "irreparable." As he explained, those two phrases are indistinguishable. Pet.App.70a–72a.

Judge Walker's dissent on this point accords with a dissent from then-Judge Kavanaugh shortly before he was appointed to this Court. Then-Judge Kavanaugh's dissent was in *John Doe Co. v. CFPB*, where a plaintiff corporation sought an injunction because it was "being regulated by an unconstitutionally structured agency, the Consumer Financial Protection Bureau." 849 F.3d at 1135 (Kavanaugh, J., dissenting). The mere existence of the "authority" of an unlawfully constructed agency "to bring enforcement actions against the plaintiff," he explained, was enough to establish the irreparable harm necessary for an injunction. *Id.* at 1136. The greater intrusion of an actual enforcement proceeding surely meets that bar as well.

In addition to Judge Walker and then-Judge Kavanaugh, Judge Rao has also concluded that the injury of "being subjected to ultra vires proceedings" before an agency constitutes irreparable harm. *Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, No. 23-5096, 2023 WL 7294839, at *17 (D.C. Cir. May 25, 2023) (Rao, J., dissenting). In *Loma Linda* a religious school sought "to enjoin the early

---

companion case to *Axon* at this Court. Thus, it follows that the judges on that panel viewed being subjected to an unconstitutional agency adjudication as an irreparable injury. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (including irreparable injury as a requirement for an injunction pending appeal).

17

stages of a proceeding before the National Labor Relations Board" because the NLRB lacks jurisdiction over religious educational institutions. *Id.* at *1; *see NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490 (1979). The D.C. Circuit denied Loma Linda's emergency motion for an injunction because, as relevant here, review could eventually be obtained after the NLRB made a final decision. *Loma Linda*, 2023 WL 7294839, at *10. Judge Rao dissented. Relying on *Axon*, she explained that Loma Linda "has established irreparable harm because . . . [it] experiences an ongoing injury by being subjected to ultra vires proceedings before the NLRB, and this is an injury that cannot be redressed after the fact." *Id.* at *17 (Rao, J., dissenting); *see also id.* at *14. The fact that judges who deal with intricacies of administrative law on a day-in and day-out basis cannot agree on an answer demonstrates the need for this Court's review.

The conflict runs even deeper than just *Axon*. "When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. 2024); *see*, *e.g.*, *Zepeda v. INS*, 753 F.2d 719, 726–27 (9th Cir. 1983) (Fourth Amendment); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (Eighth Amendment); *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 745–46 (2d Cir. 2000) (Equal Protection Clause); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1058–59 (9th Cir. 2009) (Supremacy Clause). The holdings of the Tenth, Sixth, and D.C. Circuits are thus outliers when viewed against constitutional-injury jurisprudence of the Circuits more broadly.

18

Regardless of who has the better reading of *Axon*, this question is worthy of this Court's review. The question of what impact a structural injury has on the irreparable injury analysis will recur in every structural constitutional challenge seeking to enjoin some kind of proceeding. That courts and jurists have significantly diverged on this critically important threshold question urges this Court's review.

## B. Courts have diverged on FINRA's constitutionality.

The federal courts of appeals have diverged on whether FINRA's unusual status complies with the Constitution.

The Sixth Circuit, for example, remarked that "[i]n case after case, the courts have upheld th[e] arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors." *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2679 (Mem.) (2024). The Fifth Circuit likewise referenced "circuit cases concluding that FINRA's enforcement role presents no private nondelegation problem," *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 434 (5th Cir. 2024), and distinguished the unconstitutional (in its view) Horseracing Integrity and Safety Authority from FINRA. *Id.*

The D.C. Circuit below, by contrast, held that FINRA's exercise of federal enforcement authority in this case violated the private non-delegation doctrine. Pet.App.3a–4a. This decision diverges from those earlier Circuit cases blessing the SEC-FINRA regulatory relationship, or the relationship between

19

the SEC and FINRA's predecessor, the NASD. *See, e.g.*, *R. H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982).

Moreover, this Court has a long-standing practice of reviewing structural Constitutional questions—especially those implicating Article II—even where no circuit split has yet developed. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015); *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010); *Morrison v. Olson*, 487 U.S. 654 (1988). *Free Enterprise Fund*, which involved the purportedly "private" PCAOB, is particularly instructive, as this case presents a closely analogous question, and FINRA's unconstitutionality follows directly from *Free Enterprise Fund*.

## II. The decision below is contrary to this Court's precedents and constitutional first principles.

### A. The decision below conflicts with *Axon* and subjugates structural constitutional injuries to second-class status.

This Court has recognized that being subjected to proceedings by an unconstitutionally structured decisionmaker constitutes a "here-and-now injury" "that can be remedied by a court." *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (internal quotation marks omitted); *see also Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986) (same). This follows directly from the straightforward principle that hearing officers and administrative law judges routinely exercise "significant authority" over the defendants in these hearings. *Lucia v. SEC*, 585 U.S. 237, 245–46 (2018).

20

They take testimony, conduct trials, rule on the admissibility of evidence, and, perhaps most importantly, coerce compliance with their discovery orders. *See id.*; Pet.App.68a (Walker, J., concurring in the judgment in part and dissenting in part) ("Hearing officers 'have authority to do all things necessary and appropriate to discharge [their] duties,' which (as in *Lucia* and *Freytag*) includes taking testimony, conducting trials, ruling on the admissibility of evidence, and enforcing compliance with discovery orders.").

This Court has also recognized that such an injury is time-sensitive—it is "impossible to remedy once the proceeding is over." *Axon*, 598 U.S. at 191. This too makes perfect sense. Once a proceeding is final, the person or body wielding allegedly unconstitutional power via the proceeding relinquishes their claim of power to require and adjudicate the hearing. Thus, there is legally and practically no way to cure the past injury the hearing itself caused. A "here-and-now injury" that is "impossible to remedy" after the fact is—by definition—an "irreparable injury." It is an injury that cannot be fixed once it is suffered, and that fact alone is enough to resolve this important question. *See* Pet.App.70a (Walker, J., concurring in judgment and dissenting in part).

Then-Judge Kavanaugh's dissent in *John Doe Co. v. CFPB* is instructive. There, the D.C. Circuit held that a separation-of-powers violation is "not invariably an irreparable injury" because "[v]acatur . . . would fully vindicate the separation-of-powers rights of the Company." *John Doe Co.*, 849 F.3d at 1135 (cleaned up) (citing various cases later distinguished in *Axon*). But as then-Judge Kavanaugh

21

explained, "[i]rreparable harm occurs almost by definition when a person or entity demonstrates a likelihood that it is being regulated on an ongoing basis by an unconstitutionally structured agency." *Id.* at 1136 (Kavanaugh, J., dissenting). That principle was later adopted by this Court in *Seila Law* and *Axon*.

The D.C. Circuit below disagreed, acknowledging this interpretation of *Seila Law* and *Axon* as "arguable" but distinguishing those cases on factual grounds. Pet.App.42a (majority opinion). It "[f]irst" noted that "*Axon* answered a statutory jurisdictional question about whether Congress intended to 'oust[] district courts of jurisdiction' they would ordinarily have by requiring that parties instead litigate their claims through agency proceedings." Pet.App.41a (quoting *Axon*, 598 U.S. at 185–186). True, but this is a distinction without a difference. The fact that *Axon* did not involve a motion for a preliminary injunction does nothing to alter the holding that suffering at the hands of an unconstitutional adjudicator is "impossible to remedy" after the proceeding is over. *Axon*, 598 U.S. at 191. And that holding was certainly necessary to the case because one of the so-called *Thunder Basin* factors asked whether delayed review could meaningfully remedy the injury. *See id.*

The hypothetical set out by Justice Kagan's majority opinion in *Axon* proves why that case governs the irreparable-injury analysis. Petitioner, just like Axon Enterprise, is not complaining only about the *outcome* of the proceeding before FINRA. "The claim, again, is about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker." *Id.* Thus, even if Petitioner were to prevail on the merits

22

of its claims, it "would have the same claim had it *won* before the agency." *Id.* And after the proceeding in front of FINRA is over, neither the SEC nor "the court of appeals can do [any]thing," *id.*, to turn back the clock and remedy the "here-and-now injury" suffered by Petitioner, *Seila Law*, 591 U.S. at 212. The fact that Petitioner will have suffered the same injury if it wins in front of FINRA shows that delayed review cannot possibly repair its injury.

That Petitioner and other litigants who bring structural constitutional challenges can litigate their claims in federal court while the administrative adjudication proceeds is likewise of no moment. Filing a complaint in federal court, without any meaningful injunctive relief, does not stop the adjudication or lessen the injury of being subject to the adjudication. Sometimes quite the opposite is true, as this case demonstrates. FINRA doggedly pursued Petitioner throughout this case's odyssey through the federal courts—all the more expeditiously and aggressively after this Court decided *Axon* and Petitioner could immediately pursue its constitutional claims in federal court.

True, if the federal case reaches final judgment before the unconstitutional agency proceeding concludes, the plaintiff *may*[3] be entitled to some relief against the proceeding. But the relief provided by a final judgment does nothing to remedy the "here-and-

[3] Under the D.C. Circuit's holding below, it is not even clear that a plaintiff could receive a *permanent* injunction against an unconstitutional enforcement proceeding after obtaining a ruling on the merits, as an "irreparable injury" is also a requirement for permanent injunctive relief. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–13 (1982).

23

now injury" suffered by the plaintiff every day between the filing of the complaint and the entry of that judgment. *Id.* "A party seeking a preliminary injunction in one court is not barred from obtaining the preliminary injunction simply because some other court might someday grant relief to that party." *John Doe Co.*, 849 F.3d at 1137 (Kavanaugh, J., dissenting).

The D.C. Circuit's attempt to distinguish *Axon*'s holding because FINRA is a purportedly private organization also does nothing to distinguish *Axon*. Pet.App.42a–43a. Being forced to undergo an unconstitutionally structured hearing in front of an unconstitutionally structured entity adjudicated by an unconstitutionally structured hearing officer who does not even *claim* to represent the public interest, like all government agencies must do, makes the constitutional problem worse, not better. In any case, the purportedly private nature of FINRA is a non sequitur with little relevance to this threshold question. That a purportedly private organization helms the allegedly unconstitutional proceeding does not make the harm suffered lesser or easier to remedy.

The D.C. Circuit's decision to treat a separation-of-powers violation as an injury that can await relief later renders structural constitutional injuries "second-class" and "subject to an entirely different body of rules than the" injuries suffered under the Constitution's other protections. *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion). "[T]here is no such distinction between, or hierarchy among, constitutional rights," and no reason to treat separation of powers claims any differently. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 628 (1989).

24

Finally, although the D.C. Circuit wisely did not rely on it, the Tenth and Sixth Circuits have relied on *Collins v. Yellen* to hold that an injury inflicted by an unconstitutional adjudication is not "irreparable." 594 U.S. 220 (2021). In their view, *Collins* requires that a plaintiff also show that the constitutional flaw "actually impacted, or will impact, the actions taken" by the adjudicator to be entitled to relief. *Leachco, Inc.*, 103 F.4th at 757; *YAPP USA Auto. Sys.*, 2024 WL 4489598, at *3. But the challenge in *Collins* was not to an ongoing unconstitutional adjudication, but to a *past* action. As the Court put it, "the only remaining remedial question concern[ed] *retrospective* relief." *Collins*, 594 U.S. at 257 (emphasis added). In cases like this one and *Axon*, the challenge is not to the substance of the final decision made, but to the authority of the decisionmaker to force the ongoing proceeding at all. When this Court said in *Axon* that being hauled in front of an unlawful adjudicator constituted a "here-and-now injury," it did not add any qualification that this "injury" only exists if the defendants can prove that the proceeding would have turned out differently. *Axon*, 598 U.S. at 191 (cleaned up). Indeed, such a showing would be impossible because the proceeding is not yet over. Thus, *Collins* is irrelevant for the purposes of irreparable injury, and the fact that two circuits have held otherwise reinforces the need for this Court to step in.

25

## B. A straightforward application of this Court's precedents establishes that FINRA's structure and exercise of federal executive power is unconstitutional.

"Article II of the Constitution begins, 'The executive Power shall be vested in a President of the United States of America.' That means private citizens cannot wield significant executive authority. Nor can anyone in the government, except for the President and the executive officers appointed and removable consistent with Article II." Pet.App.46a.

"When it comes to private entities" exercising executive power, meanwhile, there is "not even a fig leaf of constitutional justification." *Ass'n of Am. R.Rs.*, 575 U.S. at 62 (Alito, J., concurring). This follows directly from the Constitution's structure: "[p]rivate entities are not vested with . . . the executive Power, Art. II, § 1, cl. 1, which belongs to the President." *Id.* (internal quotation marks omitted); *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 311–12 (1936) ("This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business.").

The enforcement of federal laws is one such governmental power. *Id.* Indeed, it is the *quintessential executive* power. Article II vests this executive power in the President of the United States. And "the enforcement of federal law" is a core presidential power. *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982). After all, "it is the President who is

26

charged constitutionally to take Care that the Laws be faithfully executed." *Id.* at 750 (internal quotation marks omitted). And it is axiomatic that "to enforce [the federal laws] or appoint the agents charged with the duty of such enforcement . . . are executive functions." *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928). As Madison put it, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter. Fund*, 561 U.S. at 492 (quoting 1 Annals of Cong. 463 (1789)).

FINRA engages in that classic federal executive power reserved for the President and those the President supervises: enforcing FINRA rules that carry the force of federal law, the SEC's rules, and the federal securities laws themselves against private parties like Petitioner. FINRA admits that it engages in "vigorous . . . enforcement of FINRA and MSRB rules, and federal securities laws and rules." *Enforcement: Who We Are*, FINRA, https://bit.ly/3QYSvL0 (last visited Feb. 19, 2025). In fact, when a FINRA member violates the Exchange Act, FINRA is *required* to "levy sanctions that carry the force of federal law." *Turbeville v. FINRA*, 874 F.3d 1268, 1270–71 (11th Cir. 2017); *see* 15 U.S.C. § 78o-3(b)(7). This enforcement function is derivative from, ultimately belongs to, and is performed on behalf of the SEC—an independent federal agency.

Assuming FINRA may exercise federal governmental power over other private parties at all, it is insufficiently supervised by the SEC in doing so. FINRA is empowered to exercise unchecked prosecutorial discretion—it decides *independently* who to investigate, prosecute, adjudicate, and

27

ultimately punish. That the SEC may exercise after-the-fact review does not change FINRA's vast agenda-setting power. This goes far beyond the mere "aides and advisors" role for private entities that some lower Courts have blessed. *Oklahoma*, 62 F.4th at 228–29.

But FINRA goes even further. It not only exercises unsupervised government power—it does so without abiding by any of the associated constraints on government power. Because FINRA can eschew the constitutional protections that apply to the SEC, it has been permitted to wield government power that extends even beyond that of its delegating agency. But where FINRA exercises executive power, assuming it may do so at all, it must be subject to the supervision and control of the President, as required by Article II and the Court's precedents interpreting it.

This conclusion follows directly from this Court's precedents. Applying these principles in *Lucia v. SEC*, this Court held that SEC ALJs are "Officers of the United States," and thus must be appointed consistent with the Appointments Clause. SEC ALJs, this Court explained, exercise "significant discretion," have "the authority needed to ensure fair and orderly adversarial hearings," and may serve as the "last-word" in an enforcement action. 585 U.S. at 247–52. All of that is also true of FINRA Hearing Officers, who "are indistinguishable from the administrative law judges in *Lucia* and the special trial judges in *Freytag*." Pet.App.67a (Walker, J., concurring in the judgment in part and dissenting in part). To permit FINRA Hearing Officers to perform precisely the same function as ALJs without any accountability to the President or adherence to other constitutional protections would make no sense. FINRA officers

28

must likewise be appointed consistent with the Constitution's Appointments Clause.

As to presidential removal, this Court held in *Free Enterprise Fund v. PCAOB*, that the structure of a private, quasi-governmental board violated the separation of powers because its officers enjoyed two separate levels of protection from presidential removal. 561 U.S. at 482. Here again, FINRA's structure is identical in this respect and is unconstitutional under a straightforward application of this Court's precedent. *See* Pet.App.68a–70a (Walker, J., concurring in the judgment in part and dissenting in part) (FINRA's structure violates both the Appointments Clause and Article II's protections on presidential removal).

It makes no difference that FINRA is purportedly "private." If anything, that makes the constitutional problem worse, not better. The Constitution's structural protections turn on the nature of the power exercised, not the label ascribed to the actor. "In the Founding era, the term 'officer' was commonly understood to encompass *any individual* who had ongoing responsibility for a governmental duty." Jennifer L. Mascott, *Who Are 'Officers of the United States'?*, 70 STAN. L. REV. 443, 450 (2018) (emphasis added). As the Office of Legal Counsel has further explained, any "position to which is delegated by legal authority a portion of the sovereign powers of the federal government and that is 'continuing' is a federal office subject to the Constitution's Appointments Clause." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. OLC 73 (Apr. 16, 2007), http://bit.ly/4i0iRXg. Delegated sovereign powers, in turn, "primarily

29

involve binding the Government or third parties for the benefit of the public, such as by administering, executing, or authoritatively interpreting the laws." *Id.* at 77. "[F]ederal employment is not necessary for the Appointments Clause to apply," and "the applicability of the [Appointments] Clause does not depend on whether Congress has formally and directly created an 'office.' " *Id.* at 78. This rule applies to all positions, "however labeled." *Id.* at 73.

The Constitution's structural guarantees do not rise or fall with whether the person seeking to close a business in the name of the federal government happens to be on the government payroll. As three Justices have already recognized, giving private individuals power to exercise significant authority under the laws of the United States raises serious Article II concerns. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 440–41 (2023) (Kavanaugh, J., concurring). Just so here.

## III. The questions presented are exceptionally important.

### A. Whether being forced to undergo an unconstitutionally structured adjudication inflicts an irreparable injury is exceptionally important.

In recent years, this Court has rigorously enforced the Constitution's structural protections. In the past few Terms alone, this Court has decided *Axon Enterprise v. FTC*, *Collins v. Yellen*, *Saul v. Carr*, *United States v. Arthrex, Inc.*, *Seila Law LLC v. CFPB*, and *Lucia v. SEC*, among others. These decisions recognize the fundamental principle that Justice Scalia famously noted: a government may

30

boast a terrific bill of rights, yet flimsy structural protections render such guarantees "worthless." *See Morrison*, 487 U.S. at 697 (Scalia, J., dissenting).

Yet these important protections will be for naught if meaningful injunctive relief for ongoing structural injuries—namely, subjection to an unconstitutional enforcement action by an unconstitutional decisionmaker—is categorically unavailable.

It is a dangerous enterprise to afford structural constitutional protections second-class status. When individual rights are at issue, Courts recognize the importance of injunctive relief. Indeed, this Court has held that a violation of the First Amendment constitutes a per se irreparable injury. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam). There is no reason to treat litigants raising structural constitutional claims worse, forcing those litigants suffering a "here-and-now injury" to *continue* to suffer that irreparable injury while the laborious process of obtaining a final judgment plays out. *Seila Law*, 591 U.S. at 212. All the more where suffering that injury may have the effect of mooting the litigant's claims for injunctive relief.

Nullifying the ordinary tool for stopping unlawfully inflicted and irreparable injuries—the preliminary injunction—leaves litigants in the type of no-win situation that *Axon* was supposed to prevent. "[R]eview . . . available in a court of appeals after an agency completes its work hardly makes up for a day in court before an agency says it's done." *Axon*, 598 U.S. at 216 (Gorsuch, J., concurring in the judgment) (emphasis omitted).

31

After all, once an unlawful adjudication reaches a final decision (after it was not properly enjoined), the litigant is left only with the option of challenging the *result* of the adjudication, instead of the adjudication *itself*. This is a meaningful difference. At this point, the result of the adjudication may end up shielded by various finality-protecting doctrines, such as the *de facto* officer doctrine. *See Ryder v. United States*, 515 U.S. 177, 182 (1995). Additionally, this Court has already held that a litigant challenging the result of an administrative action based on a separation-of-powers error is required to show that the structural flaw influenced the substantive decision. *See Collins*, 594 U.S. at 259–60. No such requirement exists when challenging the adjudication itself.

In addition to relegating structural injuries to this no-man's land between a rock and a hard place, a rule holding that subjection to an unconstitutionally structured adjudication is not an irreparable injury also creates additional practical difficulties. Only those with the greatest endurance, and the deepest pockets, can fight unconstitutional adjudicators in both federal court and on their home turf. *Cf.* Jean Eaglesham*, SEC Wins With In-House Judges*, WALL ST. J. (May 6, 2015), http://bit.ly/4i4V3Bn (analyzing difference in win rate between in-house and federal-court adjudications). For this reason, among others, the "vast majority" of people called before administrative tribunals settle and give up their right to review in a real court. *Tilton v. SEC*, 824 F. 3d 276, 298 n.5 (2d Cir. 2016) (Droney, J., dissenting).

These practical realities are severely heightened by the pressure administrative tribunals impose on individuals to settle and give concessions that a

32

federal court would never enforce. For instance, every defendant who has settled before the SEC for the past 50 years has signed a "gag order" that prohibits the defendant from ever disputing the factual basis underlying the charges against him. *See, e.g.*, *SEC v. Novinger*, 40 F.4th 297, 308 (5th Cir. 2022) (Jones, J., concurring, joined by Duncan, J.) ("If you want to settle, SEC's policy says, 'Hold your tongue, and don't say anything truthful—ever'—or get bankrupted by having to continue litigating with the SEC. A more effective prior restraint is hard to imagine."). This leverage created by unequal litigation burdens in unconstitutional administrative tribunals can only be fixed if a federal court has the ability to *enjoin* an ongoing proceeding that is unconstitutional.

As this Court has emphasized time and again, the Constitution's structural protections matter. They matter to the operation of government, and to individuals who would seek protection from arbitrary exercises of government power. But these protections would matter little if, as the D.C. Circuit majority below would have it, litigants subject to an unconstitutionally structured enforcement action had no way to enjoin that action.

This Court's guidance is needed on this critically important threshold question, which will recur in countless different substantive contexts before countless different bodies exercising government power against individuals.

33

## B. Whether FINRA, a purportedly private body, can exercise government enforcement power while eschewing all constraints on government power is exceptionally important.

FINRA exercises one of the most powerful forms of federal executive power. Meanwhile, it expressly eschews any obligation to abide by the structural and procedural constraints on federal executive power. That is a constitutional problem, and one with serious implications for the law and for the nation. After all, FINRA's unsupervised exercise of federal power creates broad policy consequences for the American people and existential consequences for securities brokers like Petitioner. And FINRA's status and power implicates core constitutional protections critical to the separation of powers and to government accountability more broadly.

As to the law, the federal government may not "evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995). As Judge Walker put it: "It would be odd if the Constitution *prohibits* Congress from vesting significant executive power in an unappointed and unremovable government administrator but *allows* Congress to vest such power in an unappointed and unremovable private hearing officer." Pet.App.90a.

And as a practical matter, FINRA exercises sweeping authority over the securities industry in the United States. Indeed, FINRA itself admitted that this case has "far-reaching real-world implications."

34

FINRA's Reply in Supp. of Pet. for Reh'g at 5–6, Doc. 2010871 (D.C. Cir. Aug. 3, 2023). FINRA purports to regulate an entire industry, and an important one at that. This Court should provide guidance, sooner rather than later, on whether that widespread and aggressive regulation complies with the Constitution's commands.

## IV. This case presents an ideal vehicle to resolve these questions.

This case presents an unusually good vehicle to decide whether being forced into an unconstitutional adjudication constitutes irreparable injury. Petitioner sought an injunction against the Expedited Proceeding, based on a variety of structural constitutional defects that Petitioner has raised at every stage of every proceeding. The D.C. Circuit merits panel refused to enjoin FINRA's Expedited Proceeding on the sole ground that Petitioner had not established irreparable harm on the basis of the *Axon* issue, regardless of whether Petitioner could have established a likelihood of success on the merits. Pet.App.85a–86a.

Nor is it a barrier to deciding the second question presented that the D.C. Circuit majority below rested its ruling entirely on the threshold holding that Petitioner's constitutional structural injury did not constitute an irreparable injury. Judge Walker's opinions, first concurring in the judgment of the motions panel, Pet.App.84a, and then concurring in the judgment and dissenting in part at the panel-stage, Pet.App.46a, analyzed the substantive Article II issues in great depth.

35

This case also presents an unusually good vehicle to consider FINRA's constitutionality. It is the rare case in which a broker-dealer subject to FINRA's power chooses to challenge FINRA's authority. *See* James F. Tierney, *Reconsidering Securities Bars*, 29 STAN. J. L. BUS. & FIN. 134, 155 (2024). And it is the rarer case still in which that broker-dealer can survive long enough to see its constitutional claims through to this Court's review. *See id.* Here, it was the D.C. Circuit's initial injunction pending appeal that ensured that Petitioner's business could survive long enough to seek this Court's review. This set of circumstances, which has created the ideal vehicle for review of FINRA's enforcement authority, is unlikely to present often.

While this Court sometimes hesitates to take up review of cases arising from a preliminary injunction, that is no reason to deny certiorari in this case, where the question of irreparable injury would *only* arise in the context of a preliminary posture. Any petition asking this Court to settle a question involving the proper standard for preliminary relief will necessarily arise in a preliminary posture. In any case, the usual considerations for avoiding review of cases in a preliminary posture do not apply here. Resolution of the threshold legal question related to structural constitutional injuries would not turn on any record facts not yet developed.

With Courts and jurists already divided on both questions presented, further percolation would be of little benefit to this Court. This case presents the question whether a single body—FINRA—is unconstitutionally structured. Given this discrete focus on a single entity, additional decisions beyond

36

the existing split in authority would do little to illuminate the issue. *See Free Enter. Fund*, 561 U.S. 477 (granting review over the constitutionality of the quasi-private PCAOB despite *no* split in authority). Further, additional factual contexts would be of little help where this case already cleanly presents a private party being subjected to a full-fledged FINRA enforcement proceeding.

**V.  In the alternative, the Court should hold this petition for *Consumers' Research*, or any other private non-delegation cases granted this Term.**

The Court has already granted certiorari in a private non-delegation case this Term. In *Federal Communications    Commission    v.    Consumers' Research*, No. 24-354 (cert. granted Nov. 22, 2024), this Court will consider whether the FCC violated the private non-delegation doctrine by delegating certain federal government functions to a purportedly private body.

The Court also has before it several pending requests for review over private non-delegation questions in the context of the Horseracing Integrity and Safety Authority (HISA), a purportedly "private" body highly analogous to FINRA. *See* Cert. Pet., *Horseracing Integrity & Safety Auth., Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n*, No. 24-433 (U.S. Oct. 15, 2024); Cert. Pet., *FTC v. Nat'l Horsemen's Benevolent & Protective Ass'n*, No. 24-429 (U.S. Oct. 16, 2024); Cert. Pet., *Walmsley v. FTC*, No. 24-420 (U.S. Oct. 10, 2024); Cert. Pet., *Oklahoma v. United States*, No. 23-402 (U.S. Oct. 13, 2023).

37

HISA's constitutionality also presents an acknowledged circuit split, *see* Horseracing Integrity & Safety Auth.'s Resp. to Pet. for Reh'g at 1, *Oklahoma*, No. 23-402 (U.S. Nov. 6, 2024) ("There is now a square conflict among the Courts of Appeals." (capitalization omitted)), and the Solicitor General has urged the Court to grant review, *see* Cert. Pet., *Nat'l Horsemen's Benevolent & Protective Ass'n*, No. 24-429, *supra*. Accordingly, the Court may prefer to consider this petition alongside those related petitions.

\*\*\*

If FINRA seeks to "exercise[] power in the people's name," *Free Enter. Fund*, 561 U.S. at 497—assuming it may do so at all—it must do so subject to "Presidential oversight," *id.*, and the other protections against government overreach guaranteed to the People.

## CONCLUSION

The Court should grant the petition for certiorari.

February 20, 2025

Respectfully submitted,

Maranda E. Fritz
Maranda E. Fritz PC
521 Fifth Avenue
17th Floor
New York, New York
10175
Phone: (646) 584-8231
maranda@fritzpc.com

David H. Thompson
  *Counsel of Record*
Brian W. Barnes
Athie O. Livas
Cooper & Kirk, PLLC
1523 New Hampshire
  Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600

38

Kenneth G. Turkel          dthompson@cooperkirk.com
David A. Hayes
TURKEL CUVA BARRIOS,
P.A.
100 North Tampa
Street
Suite 1900
Tampa, FL  33602
Phone: (813) 834-9191
kturkel@tcb-law.com

*Counsel for Petitioner*

**APPENDIX**

*i*

## TABLE OF APPENDICES

*Page*

APPENDIX A — OPINION OF THE UNITED
STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT,
FILED NOVEMBER 22, 2024. . . . . . . . . . . . . . . . .1a

APPENDIX B — ORDER OF THE UNITED
STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT,
FILED NOVEMBER 22, 2024. . . . . . . . . . . . . . . .79a

APPENDIX C — ORDER OF THE UNITED
STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT,
FILED JULY 5, 2023 . . . . . . . . . . . . . . . . . . . . . . .82a

APPENDIX D — MEMORANDUM OPINION OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA,
FILED JUNE 7, 2023 . . . . . . . . . . . . . . . . . . . . . . .93a

APPENDIX E — EXCERPTS OF THE
CONSTITUTION OF THE UNITED STATES . .134a

1a

**APPENDIX A — OPINION OF THE UNITED
STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT,
FILED NOVEMBER 22, 2024**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23-5129

ALPINE SECURITIES CORPORATION,

*Appellant,*

v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY AND UNITED STATES OF AMERICA,

*Appellees.*

Argued February 8, 2024    Decided November 22, 2024

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-01506)

**OPINION**

Before: SRINIVASAN, *Chief Judge*, MILLETT and
WALKER, *Circuit Judges*.

2a

*Appendix A*

Opinion for the Court filed by *Circuit Judge* MILLETT.

Opinion concurring in the judgment in part and dissenting in part filed by *Circuit Judge* WALKER.

MILLETT, *Circuit Judge*: The United States securities industry is regulated by both private entities and the federal government. These private regulators, referred to as self-regulatory organizations, date back centuries to when groups of securities traders adopted self-governing rules by which they would conduct business and ensure public trust in their operations.

Today, a private corporation, the Financial Industry Regulatory Authority ("FINRA"), regulates and oversees large parts of the securities industry. Congress, however, has overlain federal law on those private self-regulatory practices. As relevant here, federal law effectively requires most firms and individuals that trade securities to join FINRA as a condition of engaging in that business. Federal law, in turn, subjects FINRA to oversight by the Securities and Exchange Commission ("SEC") and requires that FINRA ensure that its members comply both with FINRA's own rules and with federal securities laws.

In 2022, FINRA sanctioned one of its members, Alpine Securities Corporation, for violating FINRA's private rules for member behavior and imposed a cease-and-desist order against Alpine. Alpine then sued in federal court, challenging FINRA's constitutionality.

3a

*Appendix A*

While that lawsuit was pending, FINRA concluded that Alpine had violated the cease-and-desist order and initiated an expedited proceeding to expel Alpine from membership in FINRA. Alpine then sought a preliminary injunction from the district court against the expedited proceeding, arguing that FINRA is unconstitutional because its expedited action against Alpine violates either the private nondelegation doctrine or the Appointments Clause. The district court denied the preliminary injunction.

We now reverse only to the extent the district court allowed FINRA to expel Alpine with no opportunity for SEC review. Alpine is entitled to that limited preliminary injunction because it has demonstrated that it faces irreparable harm if expelled from FINRA and the entire securities industry before the SEC reviews the merits of FINRA's decision. Alpine has also demonstrated a likelihood of success on its argument that the lack of governmental review prior to expulsion violates the private nondelegation doctrine. We accordingly hold that FINRA may not expel Alpine either before Alpine has obtained full review by the SEC of the merits of any expulsion decision or before the period for Alpine to seek such review has elapsed.

At the same time, we hold that Alpine has not demonstrated that it will suffer irreparable harm from participating in the expedited proceeding itself as long as FINRA cannot expel Alpine until after the SEC conducts its own review. For that reason, Alpine has not shown that it is entitled to a preliminary injunction halting that proceeding altogether.

4a

*Appendix A*

As this case comes to us in a preliminary-injunction posture, we necessarily do not resolve the ultimate merits of any of Alpine's constitutional challenges, and our determination about Alpine's likelihood of success on the private nondelegation issue is based only on the early record in this case. We leave it to the district court on remand to determine the ultimate merits of Alpine's claims.

## I

## A

By way of background, the securities industry in the United States has engaged in extensive self-regulation for more than two centuries. Efforts to create organized, self-policing stock markets in the United States began in the late eighteenth century. *See* Stuart Banner, *The Origin of the New York Stock Exchange, 1791-1860*, 27 J. Legal Stud. 113, 114-115 (1998). The earliest effort came in 1791, when securities traders in New York agreed to abide by fourteen rules. *Id.* at 114. Those rules created auction procedures, required employment of a stockbroker, and developed a means for enforcing sales contracts. *Id.* at 114-115. Participants to the agreement who violated the rules would be barred from future transactions with other participants. *Id.* at 115. After the stock market crashed in 1792, these fourteen rules were succeeded by the well-known 1792 Buttonwood Agreement, in which a group of New York traders agreed, among other things, to regulate stock trade commissions. *Id.* As the story goes, the traders signed that agreement in the shade of

5a

*Appendix A*

a buttonwood tree—though that part of the story may be apocryphal. *See id.* at 115 n.3.

Following the War of 1812, New York securities brokers, sensing an opportunity to make money trading in federal debt securities, organized themselves into the New York Stock and Exchange Board, known today as the New York Stock Exchange. Banner, *supra*, at 115. Their first constitution set minimum commissions on trades, imposed rules for trading, and set membership criteria. *See* Constitution of the New York Stock & Exchange Board (1817), https://perma.cc/E5WAFHR6. The constitution also provided that a member who refused to comply with its rules could have a hearing before the Board and could be expelled if it continued to violate the rules. *Id.* § 15. Traders in other cities soon followed suit, forming the Boston and Philadelphia stock exchanges by 1835. Banner, *supra*, at 116.

These exchanges functioned as private regulators in the early American securities industry. The New York Stock and Exchange Board took on an outsized role as the foremost stock exchange in the country. Banner, *supra*, at 119. Among other things, it adopted membership criteria, promulgated rules with which members had to comply, and developed a quasi-judicial system that employed panels of exchange members for adjudicating disputes. *Id.* at 120-126, 132-133. Members who violated the exchange's rules, such as by breaching sales contracts, could be suspended or expelled from the exchange and barred from doing business with its members. *Id.* at 122. In this way, the exchange both facilitated securities trading and promoted

6a

*Appendix A*

an image of trustworthiness and credibility to the public. *Id.* at 123, 140. This entire self-regulatory scheme was private, with the exchange funded through membership fees. *Id.* at 116.

**B**

For the next century, the securities industry remained largely autonomous. Then, after the catastrophic 1929 stock market crash and the ensuing Great Depression, Congress passed a series of laws regulating the securities industry, including the Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. § 78a *et seq.*) ("Exchange Act"). The Exchange Act created the Securities and Exchange Commission, a federal agency tasked with overseeing and regulating the securities industry. Exchange Act § 4, 48 Stat. at 885. In addition to direct rulemaking authority, Congress gave the SEC a supervisory role over private exchanges and required them to register with the SEC and to comply with the SEC's orders. Exchange Act §§ 6, 19, 48 Stat. at 885-886, 898-899; *see* Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws*, 62 N.C. L. Rev. 475, 482-483 (1984).

Congress later realized that the SEC was underequipped to regulate securities trading that was taking place off the exchanges through informal networks of securities traders. *See* Smythe, *supra*, at 483. To address that problem, Congress passed the Maloney Act of 1938, Pub. L. No. 75-719, 52 Stat. 1070

7a

*Appendix A*

(1938) (codified as amended in scattered sections of 15 U.S.C.). Rather than expand the SEC, Congress took what it saw as a "distinctly preferable" route: Creating a system of "cooperative regulation," in which the task of regulating securities traders would "be largely performed by representative organizations of investment bankers, dealers, and brokers[.]" S. Rep. No. 75-1455, at 4 (1938). The SEC would take on a supervisory role by "exercising appropriate supervision in the public interest, and exercising supplementary powers of direct regulation." *Id.* As Justice Douglas put it while chair of the SEC, the self-regulatory model of securities regulation permits private entities to "take the leadership with Government playing a residual role." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 128, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973) (quoting William O. Douglas, Democracy and Finance 82 (J. Allen ed. 1940)).

To achieve its goal of "cooperative regulation," the Maloney Act established "registered securities associations"—self-regulatory organizations registered with the SEC that are composed of brokers and dealers. *See* 15 U.S.C. § 78*o*-3. These organizations are required to adopt rules for their members to follow and to enforce both their own rules and federal securities laws against their members. *See id.* § 78*o*-3(b).

In 1939, the National Association of Securities Dealers ("NASD") became the nation's first registered securities association. Smythe, *supra*, at 477-478, 483-485. NASD's initial rules required its members to "observe high standards of commercial honor and just and

8a

*Appendix A*

equitable principles of trade," and prohibited members from "mak[ing] improper use of a customer's securities or funds." Paul S. Grant, *The National Association of Securities Dealers: Its Origin and Operation*, 1942 Wis. L. Rev. 597, 602-603 (1942). NASD also regulated the commissions that its members could charge, generally deeming commissions above five percent to be unreasonable. *In the Matter of the Rules of the Nat'l Ass'n of Sec. Dealers, Inc.*, Exchange Act Release No. 3574, 1944 WL 26641, at \*1 (S.E.C. June 1, 1944).

Since 1938, Congress has repeatedly amended the Exchange Act to bolster the self-regulatory scheme by increasing government oversight while preserving self-regulatory organizations' primary role in regulating the securities industry. *See* S. Rep. No. 94-75, at 22 (1975) (noting "the sheer ineffectiveness of attempting to assure [regulation] directly through the government on a wide scale"). The most significant of these amendments came in 1975 and 1983.

In 1975, "Congress initiated a major overhaul of the Exchange Act and drastically shifted the balance of rulemaking power in favor of Commission oversight." *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1129 (9th Cir. 2005). The 1975 amendments require self-regulatory organizations to submit rule changes to the SEC for approval before they can go into effect. *Id.* at 1130; *see* 15 U.S.C. § 78s(b)(1). The SEC may also "abrogate, add to, and delete from" self-regulatory organizations' rules. 15 U.S.C. § 78s(c).

9a

*Appendix A*

Then, in 1983, Congress made joining a self-regulatory organization mandatory for virtually all securities traders. Pub. L. No. 98-38, § 3, 97 Stat. 205 (1983). The SEC, however, retains the authority to exempt individual traders from that membership requirement. 15 U.S.C. § 78*o*(b)(9).

**C**

Today, FINRA is the only registered securities association in the United States. FINRA was formed after the SEC approved a merger between NASD and the New York Stock Exchange's enforcement arm. 72 Fed. Reg. 42,169, 42,169 (Aug. 1, 2007). FINRA is organized as a Delaware nonprofit corporation operated by private individuals and receives no funding from the federal government. Like early self-regulatory organizations, FINRA is financed entirely through "fees, fines, penalties, and sanctions levied against its members." Second Am. Compl. ¶¶ 41, 52-53.

As required by federal law, FINRA promulgates rules for its members to follow. Some of FINRA's rules are almost word-for-word identical to NASD rules from the 1930s and 1940s. For example, FINRA, like the NASD in 1939, requires members to "observe high standards of commercial honor and just and equitable principles of trade." FINRA Rule 2010; *see* NASD Rule 1 ("A member * * * shall observe high standards of commercial honor and just and equitable principles of trade."), *reprinted in* Grant, *supra*, at 602. FINRA's rules also carry forward NASD's prohibition on members "mak[ing] improper use

10a

*Appendix A*

of a customer's securities or funds." FINRA Rule 2150(a); *see* NASD Rule 19(a) ("No member shall make improper use of a customer's securities or funds."), *reprinted in* Grant, *supra*, at 603 n.3. In addition, FINRA continues to use NASD's five-percent policy, which generally considers commissions greater than five percent to be unreasonable. *See* FINRA Rule 2121; FINRA Rule 2121 Supplementary Material .01 ("The [Five-Percent] Policy has been reviewed by the Board of Governors on numerous occasions and each time the Board has reaffirmed the philosophy expressed in 1943.").

Under the Exchange Act, FINRA must enforce its rules against its members and "provide a fair procedure for" disciplining members who violate FINRA rules. 15 U.S.C. §§ 78*o*-3(b)(2), (7)-(8). FINRA must also ensure that members comply with the Exchange Act and SEC rules and regulations. *Id.*

Typical FINRA enforcement actions take place before an internal FINRA panel and may involve multiple levels of review. *See Saad v. SEC*, 873 F.3d 297, 300 (D.C. Cir. 2017). FINRA members may appeal to a FINRA appellate body, the decisions of which may also be reviewed by the FINRA Board. *Id.* Final FINRA decisions may be appealed to the SEC, which generally performs "its own review of the disciplinary action," and may modify, affirm, or set aside any part of FINRA's decision. *Id.*; 15 U.S.C. § 78s(e)(1). Finally, FINRA members can petition a court of appeals for review of an adverse SEC decision. 15 U.S.C. § 78y(a)(1).

11a

*Appendix A*

FINRA rules separately provide for expedited disciplinary proceedings for certain types of misconduct, including violating a previously issued FINRA order. *See* FINRA Rules 9556, 9559. These expedited proceedings have more compressed timelines and generally involve less internal review. *See* FINRA Rule 9559(f)(2) (requiring a hearing within ten days after a member is served notice). Appellate review of expedited proceedings within FINRA is discretionary. *See* FINRA Rule 9559(q). Violators may still appeal to the SEC from the final FINRA decision, but "[t]he filing of an application for review by the SEC shall not stay the effectiveness of final FINRA action, unless the SEC otherwise orders." FINRA Rule 9559(r).

## II

### A

Alpine Securities Corporation is a securities broker-dealer, meaning that it trades securities on behalf of others and for itself. *See* 15 U.S.C. § 78c(a)(4)-(5). Alpine is a member of FINRA.

In 2018, Alpine's finances took a turn for the worse. Alpine attributed its financial troubles in part to an earlier SEC enforcement action against Alpine for violation of federal securities laws that culminated in a $12 million civil penalty against Alpine for "egregious * * * [and] illegal conduct on a massive scale." *See SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020). To stem its losses, Alpine adopted a new business model, ending individual retail investment services and imposing significantly higher fees.

12a

*Appendix A*

Alpine's revamped business model attracted scrutiny from FINRA. After Alpine customers complained to FINRA about the firm's fees, FINRA opened an investigation and then charged Alpine by complaint in August 2019. App. 164. A FINRA disciplinary panel concluded that Alpine had violated a litany of FINRA rules. The panel found that Alpine's new fees—including a $5,000 monthly account fee that was a 600-fold increase from Alpine's prior $100 annual account fee—were unreasonable. App. 192, 195. The panel also found that Alpine had charged several types of fees that, when combined, "resulted in unfair and excessive prices and commissions" that were "well in excess of 5%, and in many instances well in excess of 10% per trade." App. 219-221. In addition, the panel found that Alpine misappropriated customer property by seizing customer-owned securities, App. 201, 206, and violated liquidity rules when it made an unauthorized withdrawal of over $600,000 from Alpine's funds to pay an unprecedentedly large "bill" owed to an Alpine affiliate, App. 226, 228. FINRA's findings involved violations only of FINRA's own internal rules; FINRA did not find that Alpine had violated federal securities laws or regulations.

Deeming Alpine's misconduct "intentional and egregious," the FINRA panel expelled Alpine from FINRA, issued a cease-and-desist order prohibiting Alpine from charging the fees and commissions the panel had held were unreasonable, and ordered it to pay restitution to injured customers. App. 240, 243, 246-248. Alpine appealed to FINRA's internal appellate body, which automatically stayed the expulsion order. FINRA

13a

*Appendix A*

Br. 13; *see* FINRA Rule 9311(b). That appeal is still
pending before FINRA.

Alpine's appeal within FINRA did not stay the cease-
and-desist order against it because that order became final
when the panel issued it. FINRA Br. 13-14; *see* FINRA
Rule 9311(b). Alpine could have appealed that order to the
SEC, FINRA Rules 9370, 9870, but chose not to and so
that order went into and remains in effect.

## B

Alpine and an affiliate business subsequently sued
FINRA in the United States District Court for the Middle
District of Florida, challenging FINRA's constitutionality.
Alpine raised challenges under the private nondelegation
doctrine, Appointments Clause, First Amendment, Fifth
Amendment, and Seventh Amendment. The United
States intervened to defend the constitutionality of the
relevant parts of federal securities law, such as the
general requirement that a trader be a member of a self-
regulatory organization as a condition of doing business.
*See* 15 U.S.C. § 78*o*(b)(1). The district court in Florida
subsequently transferred the case to the United States
District Court for the District of Columbia.

While Alpine's suit was pending, FINRA received
reports that Alpine was continuing to charge fees and
commissions in violation of the unchallenged cease-
and-desist order. FINRA Br. 14. FINRA's enforcement
department then opened a second investigation that led to
FINRA initiating an expedited disciplinary proceeding

14a

*Appendix A*

against Alpine. FINRA's complaint alleged that Alpine had violated the cease-and-desist order more than 35,000 times by charging over $4 million in unreasonable fees and commissions. App. 251. The complaint alleged only violations of internal FINRA rules; it did not allege any violations of federal securities laws or regulations. FINRA's enforcement department sought Alpine's immediate expulsion from FINRA. App. 265.[1]

Back in district court where its lawsuit against FINRA was pending, Alpine sought a preliminary injunction against FINRA's expedited proceeding. The district court denied that request. *Scottsdale Cap. Advisors Corp. v. FINRA*, 678 F. Supp. 3d 88, 94 (D.D.C. 2023). As relevant here, the court held that FINRA is a private entity and not part of the government, so the Appointments Clause does not apply to its personnel. *Id.* at 106. Next, the court held that FINRA does not violate the private nondelegation doctrine because the SEC can review all FINRA decisions. *Id.* at 107.[2]

---

1. Alpine's conduct and allegedly repeated violations over multiple years are not at issue in this preliminary injunction or this appeal. We therefore express no view on any of FINRA's decisions or allegations, including whether Alpine committed the conduct FINRA found or alleged, whether Alpine's conduct violated any FINRA rules, or what, if any, sanctions would be appropriate.

2. The district court also rejected Alpine's claims under the First, Fifth, and Seventh Amendments. *Scottsdale*, 678 F. Supp. 3d at 106, 108. Alpine does not raise those claims on appeal. Because Alpine does not press its Seventh Amendment claim here, the Supreme Court's recent decision in *Securities and Exchange Commission v. Jarkesy*, — U.S. —, 144 S. Ct. 2117, 219 L.Ed.2d 650 (2024), does not

15a

*Appendix A*

This court granted Alpine an emergency injunction pending appeal, enjoining FINRA's expedited proceeding against Alpine. *Alpine Sec. Corp. v. FINRA*, No. 23-5129, 2023 WL 4703307, at *1 (D.C. Cir. July 5, 2023).

**III**

The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). A party requesting a preliminary injunction must show that (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) the issuance of a preliminary injunction "is in the public interest." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022) (quoting *Winter*, 555 U.S. at 20, 129 S.Ct. 365).

We review the district court's weighing of those preliminary-injunction factors for an abuse of discretion. We review any questions of law underlying the decision *de novo*. *Abdullah v. Obama*, 753 F.3d 193, 197-198 (D.C. Cir. 2014).

---

affect our resolution of this interlocutory appeal. *See id.* at 2127-2128 ("The Seventh Amendment therefore applies and a jury is required. Since the answer to the jury trial question resolves this case, we do not reach the nondelegation or removal issues.").

Midland/Odessa Division   Case No.: MO:24-CV-317

16a

*Appendix A*

**IV**

Alpine makes its two constitutional arguments in the alternative—either (1) FINRA is a private entity that the government has invested with too much power, in violation of the private nondelegation doctrine, or (2) FINRA is a governmental entity, in which case its expedited proceeding violates the Appointments Clause of the Constitution. We begin with Alpine's private nondelegation argument, which challenges the Exchange Act's assignment of some regulatory role to FINRA, a private entity. In doing so, we assume without deciding that FINRA and the United States are correct that FINRA is not a governmental entity.

We hold that Alpine is entitled to a limited preliminary injunction because it has demonstrated a likelihood of success on the merits of its private nondelegation claim to the extent that FINRA can unilaterally expel a member and, in so doing, bar the expelled entity from engaging in stock trading, all without governmental superintendence or control. Given that federal securities law generally transforms FINRA's membership decision into a flat legal prohibition on trading securities at all, the absence of SEC review before such a decision takes effect likely runs afoul of the private nondelegation doctrine, which requires that a private entity statutorily delegated a regulatory role be supervised by a government actor. In addition, the remaining preliminary-injunction factors favor granting an injunction. Alpine faces potential expulsion from FINRA, which effectively amounts to being barred from the securities industry. Under federal law, expulsion would

17a

*Appendix A*

likely put Alpine out of business, and would do so before the SEC performs a full review of FINRA's decision.

**A**

To begin, we find that Alpine has demonstrated that it is likely to prevail on its private nondelegation claim to the extent that FINRA's expulsion decision can, due to federal law, expel it from the securities industry. *See Winter*, 555 U.S. at 20, 129 S.Ct. 365.

**1**

Congress has long delegated regulatory authority to private entities. For example, in the early 1800s, Congress delegated significant economic regulatory authority to the Bank of the United States, a private entity, including the authority to control the United States' money supply. Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 Yale L.J. 1836, 1883 (2015) (cited in FINRA Br. 23-24); *see* Alexander Hamilton, Report on a National Bank (Dec. 13, 1790) (arguing that a national bank was needed to augment the United States' money supply and to issue standardized currency), *available at* https://perma.cc/6QE4-NRH8; 13 Reg. Deb. 440, 442 (1837) (Sen. James Buchanan) (describing the Bank's control of the money supply and calling the Second Bank of the United States the "regulator of the currency"); *see also* Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443, 531 (2018) ("Congress saw the bank as a public-private nongovernmental entity.") (cited in Alpine Opening Br. 47; FINRA Br. 23-24). Similarly, "[f]or as

18a

*Appendix A*

long as the eminent domain power has been exercised by the United States, it has also been delegated to private parties." *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 483, 141 S.Ct. 2244, 210 L.Ed.2d 624 (2021); *see Luxton v. North River Bridge Co.*, 153 U.S. 525, 529, 14 S.Ct. 891, 38 L.Ed. 808 (1894).

For a delegation of governmental authority to a private entity to be constitutional, the private entity must act only "as an aid" to an accountable government agency that retains the ultimate authority to "approve[], disapprove[], or modif[y]" the private entity's actions and decisions on delegated matters. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *see Association of American R.R.s v. Department of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013) (*Amtrak I*), *vacated on other grounds*, 575 U.S. 43, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015); *see also Association of American R.R.s v. Department of Transp.*, 896 F.3d 539, 546 (D.C. Cir. 2018) (private delegation constitutional where government agency "exercise[s] authority and surveillance" over the private entity) (quotation marks omitted); *Oklahoma v. United States*, 62 F.4th 221, 228-229 (6th Cir. 2023) (similar); *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) (similar); *Walmsley v. Federal Trade Comm'n*, 117 F.4th 1032, 1039-1040 (8th Cir. 2024) (Where a statute gives the government agency "broad power to subordinate the [private entity's] enforcement activities, the statute is not unconstitutional in all of its applications.").

Typically, SEC oversight of FINRA disciplinary actions involves the SEC "conduct[ing] its own review"

19a

*Appendix A*

of any final decision or sanction. *Saad*, 873 F.3d at 300; *see* 15 U.S.C. § 78s(e); *see also PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1064 (D.C. Cir. 2007) (Federal law requires the SEC "to review *de novo* a disciplinary sanction imposed by [FINRA.]"). That review includes an "independent review of the record" to determine whether the FINRA member "engaged in the conduct FINRA found," "whether that conduct violated the rules specified in FINRA's determination," and whether the discipline otherwise accords with the Exchange Act. *Devin Lamarr Wicker*, Exchange Act Release No. 100148, 2024 WL 2188603, at *7 (S.E.C. May 15, 2024). In addition, the SEC can approve, disapprove, or modify FINRA's actions. *Saad*, 873 F.3d at 300; 15 U.S.C. § 78s(e)(1)(A).

**2**

Review of expulsions imposed through FINRA's expedited proceedings, however, functions differently. Alpine has shown, on the record before us, that the SEC does not exercise ultimate control over FINRA's decisions to expel its members in expedited proceedings because those orders take effect immediately, before the SEC can review them, and the severe consequences associated with expulsion can make any later review by the SEC a largely academic exercise.

To begin, the SEC does not conduct any review of an expulsion order in an expedited proceeding before it goes into effect. Under FINRA rules, an expulsion takes effect immediately upon the issuance and "prompt" service of FINRA's decision. FINRA Rules 9360, 9559(*o*)(5), (q)(4)-(5). Federal law, on the other hand, specifies that SEC

20a

*Appendix A*

review must wait until *after* FINRA has issued its final decision and imposed any sanction. 15 U.S.C. § 78s(d)(1)-(2). Taken together, those provisions mean that SEC review can come only after, not before, the expulsion takes effect.

Yet delayed SEC review of expulsion orders will almost always be too little too late. With limited exceptions, federal law prohibits entities from trading securities unless they are a member of a registered securities association. 15 U.S.C. § 78*o*(b)(1). FINRA is the only such association in the United States, meaning that, as a practical matter, securities traders must be members of FINRA to conduct their business. As a result, expulsion from FINRA effectively amounts to expulsion from the securities industry as a whole. Expelled FINRA members may not trade securities on behalf of themselves or their clients. Barred from pursuing their trade, many expelled FINRA members could be forced out of business before they can obtain SEC review of the merits of FINRA's decision. That is the fate that Alpine claims will befall it. *See* Decl. of Maranda E. Fritz ¶ 7, ECF 46 (May 9, 2023) ("An expulsion order against Alpine * * * would force Alpine to close its business."); *see also* Oral Arg. Tr. 58:5-8 (FINRA's counsel explaining that Alpine would violate the Exchange Act if it continued to trade securities after expulsion).

To be sure, the SEC can stay the effectiveness of an expulsion order. *See* 15 U.S.C. § 78s(d). But the SEC's stay authority likely is insufficient to satisfy the constitutional requirements of meaningful SEC merits review for two reasons.

21a

*Appendix A*

First, a stay is not automatic. Under both FINRA rules and federal law, petitioning the SEC for review does not itself stay an expulsion order. FINRA Rule 9559(r); 15 U.S.C. § 78s(d)(2); 17 C.F.R. § 201.420(d). Instead, unless the SEC chooses to act on its own, the expelled FINRA member must file a separate written request for a stay after filing its application for SEC review, *see* 17 C.F.R. §§ 201.401(a), (d), and prove that it is entitled to a stay. While the SEC rules provide that it will expedite consideration of stay requests, *see id.* § 201.420(d)(3), the process still takes time, during which the total bar on securities trading will already be taking its toll.

At oral argument, counsel for FINRA represented that the SEC granted Alpine a stay in two business days in a prior FINRA disciplinary matter. Oral Arg. Tr. 58:10-14. That is a quick turnaround, but that stay appears to have been the discretionary issuance of an interim, administrative stay just to allow for full consideration of Alpine's stay motion. *Alpine Sec. Corp.*, Exchange Act Release No. 86719, 2019 WL 3933691, at *1 (S.E.C. Aug. 20, 2019). Plus, this preliminary record does not reveal how often such interim stays are entered or the standard for their issuance. Full consideration of stay motions appears to take longer, with the SEC taking weeks or even months before acting. *See, e.g.*, *Michael Clark*, Exchange Act Release No. 92521, 2021 WL 3210138, at *1 (S.E.C. July 29, 2021) (denying stay three months after filing); *Scottsdale Cap. Advisors Corp.*, Exchange Act Release No. 83783, 2018 WL 3738189, at *1 (S.E.C. Aug. 6, 2018) (granting stay two weeks after filing). Because expulsion from FINRA carries with it a moratorium on all securities

22a

*Appendix A*

trading, even a few days or weeks may be too long for an expelled FINRA member to stay afloat.

Stays are also not easily obtained. Like courts, the SEC starts from the premise that a stay is an "extraordinary remedy." *Michael Clark*, 2021 WL 3210138, at *2 (quotation marks omitted; citing *Nken v. Holder*, 556 U.S. 418, 432, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)). The party seeking the stay bears the burden of proof and must demonstrate that (1) it has a "strong likelihood" of success on the merits; (2) it will suffer irreparable harm without a stay; (3) no other party will suffer substantial harm as a result of a stay; and (4) a stay is likely to serve the public interest. *NYPPEX, LLC*, Exchange Act Release No. 100177, 2024 WL 2289209, at *1 (S.E.C. May 20, 2024). If an expelled member cannot make that extraordinary showing and persuade the SEC to exercise its discretion to grant a stay, then no timely SEC review will be available.

To be sure, *if a stay is granted*, the ensuing SEC review would be plenary. *See PAZ Sec.*, 494 F.3d at 1064. But that "if"—and the time it takes to get there—means that *no* SEC review takes place until after the effects of any expulsion have been felt.

Second, the SEC's granting or denying of a stay is not a decision on the merits. The private nondelegation doctrine requires that a government actor be able to "approve[], disapprove[], or modif[y]" a private actor's decisions on delegated matters. *See Adkins*, 310 U.S. at 388, 399, 60 S.Ct. 907; *Amtrak I*, 721 F.3d at 671. In reviewing a stay application, however, the SEC does none of those things. Instead, the SEC has been explicit that a decision on a stay

23a

*Appendix A*

application does not decide the merits, and that "[a]ny final resolution must await the Commission's determination of the merits of [the underlying] appeal." *Scottsdale Cap. Advisors*, 2018 WL 3738189, at *4 (quoting *Bloomberg L.P.*, Exchange Act Release No. 83755, 2018 WL 3640780, at *7 (S.E.C. July 31, 2018)); *see Alpine Sec.*, 2019 WL 3933691, at *1 ("[O]ur determination to grant this interim stay should not be interpreted as suggesting that we have decided any matter regarding this appeal[.]").

The result of this regulatory scheme is that FINRA can, without any SEC review of its decision on the merits, effectively decide who can trade securities under federal law. Due to FINRA's current expedited-hearing process, the SEC statutorily cannot review expulsion orders before they go into effect and may be unable or unwilling to grant a stay so that it can meaningfully review a decision before it goes into effect and the expelled member's business collapses.

So if the SEC reviews FINRA's expulsion orders at all, it does so only through a stay proceeding that disfavors immediate relief for the expelled member and does not decide the merits. That falls short of what the private nondelegation doctrine requires: an accountable government actor that "retains the discretion to approve, disapprove, or modify" FINRA's delegated decisions. *Amtrak I*, 721 F.3d at 671 (formatting modified); *see Adkins*, 310 U.S. at 388, 60 S.Ct. 907.

The government points out that the SEC has some statutory authority to waive the requirement that a trader

24a

*Appendix A*

be a member of a registered securities association. *See* 15 U.S.C. § 78*o*(b)(9). But even after this court invited supplemental briefing, the SEC has made no showing that Alpine could obtain such a waiver, let alone while FINRA's expedited proceeding against it is pending and before an expulsion order could issue.

**3**

The dissenting opinion favors a broader injunction that would prevent FINRA from policing its member's misconduct at all. In doing so, the dissenting opinion goes far beyond even Alpine's nondelegation arguments. Remember that FINRA is not enforcing any federal law or SEC regulation against Alpine in the underlying proceeding. Yet the dissenting opinion reasons that FINRA nonetheless runs afoul of the private nondelegation doctrine by exercising "significant executive authority" when it enforces *its own private rules* against a member and seeks remedies against that member that run only to FINRA, and not to the government. Dissenting Op. at 1343-45.

That is incorrect on multiple fronts. To start, remember that, in this case, FINRA is not alleging or seeking to enforce any federal law or regulation. Its complaint is that Alpine failed to comply with a prior FINRA cease-and-desist order that rested solely on findings of non-compliance with FINRA's internal rules. App. 250-265. And Alpine chose not to seek SEC review of that cease-and-desist order. With the exception of the expulsion order addressed above, the dissenting

25a

*Appendix A*

opinion's list of activities that it equates with the exercise of "significant executive authority" refers simply to FINRA's own internal procedures for investigating member compliance with FINRA's membership rules. In addition, any fines ordered by FINRA are paid to FINRA, not to the United States Treasury. Second Am. Compl. ¶¶ 41, 52-53; Financial Guiding Principles, FINRA, at 2, https://perma.cc/SAB6-CZ49. Many of those measures, including the conduct of investigative hearings, *predate* any congressional involvement with private securities regulators. Banner, *supra*, at 123-124 (fines); Constitution of the New York Stock & Exchange Board § 15 (hearings). They are not an authority bestowed by the federal government.

Next, the dissenting opinion raises a nondelegation argument that Alpine itself has not advanced. So that cannot provide a likelihood of success to support injunctive relief. *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) (arguments not raised on appeal are forfeited).

Finally, the dissenting opinion's reasoning melds the private nondelegation doctrine with Alpine's Appointments Clause arguments. The latter, though, is where the Supreme Court has housed the "significant executive authority" inquiry on which the dissenting opinion relies. *See Lucia v. SEC*, 585 U.S. 237, 245-246, 138 S.Ct. 2044, 201 L.Ed.2d 464 (2018); *Freytag v. Commissioner*, 501 U.S. 868, 881-882, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991); *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("[A]ny appointee exercising significant

26a

*Appendix A*

authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of [Article II].") (quoting U.S. Const. Art. II, § 2, cl. 2); *see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 506, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010).

The dissenting opinion notably cites just one district court opinion applying its "significant executive authority" test to a private nondelegation challenge. Dissenting Op. at 1341 n.28. An argument never advanced by the party requesting a preliminary injunction and unsupported by a single case from the Supreme Court, this court, or any appellate court cannot establish the likelihood of success necessary to permit the issuance of a preliminary injunction.

**B**

The remaining preliminary-injunction factors—irreparable harm, the balance of equities, and the public interest—also support Alpine.

Alpine faces irreparable harm because it faces a grave risk of being forced out of business before full SEC review, rendering any opportunity for later review at best inadequate and, at worst, moot. A business's "destruction in its current form" commonly qualifies as irreparable harm. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *see In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("[F]inancial injury can be irreparable where no

27a

*Appendix A*

adequate compensatory or other corrective relief will be available at a later date[.]") (formatting modified); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Recoverable monetary loss may constitute irreparable harm" if "the loss threatens the very existence of the movant's business.").

Here, Alpine has shown that its expulsion from FINRA will effectively amount to exclusion from the securities industry, forcing it to shutter its operations immediately. *See* Decl. of Maranda E. Fritz ¶ 7, ECF 46 (May 9, 2023); *see also* Oral Arg. Tr. 58:5-8 (FINRA's counsel explaining that Alpine would violate the Exchange Act if it continued to trade securities after expulsion).

Neither FINRA nor the government disputes this reality or its crushing consequences for Alpine's business operations. To be sure, FINRA's counsel at oral argument assured that Alpine could "reinstate their business in the event that the SEC ultimately reverses FINRA's determination." Oral Arg. Tr. 57:18-20. That argument blinks reality. As FINRA's counsel conceded, full review by the SEC could take months, if not longer. Oral Arg. Tr. 57:24-25; *see, e.g.*, *Devin Lamarr Wicker*, 2024 WL 2188603, at *1 (affirming bar against an individual over two years after appeal was filed). It is not realistic to expect that Alpine, choked of any income or business from securities trading, could simply reopen its doors months, if not years, after FINRA locked them shut.

The magnitude of Alpine's injury also tips the balance of equities in favor of Alpine. FINRA unquestionably

28a

*Appendix A*

has an interest in enforcing its own rules. *See* 15 U.S.C. § 78*o*-3(b)(6) (self-regulatory organizations must "protect investors and the public interest"). FINRA argues that its interest may be seriously impaired if the subjects of the "more than 1,000 pending FINRA investigations * * * [sought] injunctive relief in federal court." FINRA Br. 56. But our opinion is narrow and limited to expedited expulsion proceedings, where the irreversible nature of the underlying sanction prevents review on the merits by the SEC. As a result, the impairment to FINRA's operations is relatively limited, and is outweighed by the magnitude of Alpine's injury.

Finally, the public interest does not weigh against granting an injunction. An injunction ensures that Alpine's constitutional claims can be fully litigated, without being throttled by a shutdown of its business. Also, the injunction will not leave shareholders or the public unprotected from "continued victimization" by Alpine, FINRA Br. 56. As a threshold matter, whether Alpine actually committed the violations FINRA alleges is not before us, and we express no view on that issue.

In any event, as Alpine concedes, the SEC itself remains free to bring its own enforcement action against Alpine if it considers such action necessary to protect the public and to enforce securities laws. Alpine Opening Br. 51. The public also has notice of Alpine's prior violations through BrokerCheck, a publicly available service that Alpine links to from its own website. *See* Alpine Securities, https://perma.cc/PQ3C-HQG3; BrokerCheck Report: Alpine Securities Corporation at 16, BrokerCheck (listing required public disclosures of prior regulatory

29a

*Appendix A*

incidents), https://perma.cc/7PE8-H7JF; *see also* FINRA
Rule 2210(d)(8) (requiring member firms' websites to
include a "readily apparent reference and hyperlink
to BrokerCheck"). FINRA's ongoing, non-expedited
proceeding against Alpine is also a matter of public
record. *See* FINRA Rule 8313(a) (requiring public release
of disciplinary complaints and decisions upon request).

**C**

For those reasons, we reverse the district court's
denial of a preliminary injunction and instruct the
district court, on remand, to enjoin FINRA during the
pendency of this litigation from expelling Alpine (should
such an order issue) until after the SEC has reviewed any
expulsion order in FINRA's expedited proceeding or the
time for Alpine to seek SEC review of an expulsion order
has elapsed.

Our opinion today is limited in at least four ways.
First, this case comes to us on a motion for a preliminary
injunction. Our determination is, therefore, necessarily
preliminary, as the only question is whether, on the
limited record before us, Alpine has proven it is *likely* to
succeed and to be irreparably harmed. *See Winter*, 555
U.S. at 20, 129 S.Ct. 365. Additional record development
may or may not change Alpine's prospects. For example,
record evidence may demonstrate that Alpine can stay in
business long enough for the SEC to complete its review
of FINRA's expedited expulsion order without injunctive
relief, or that the SEC's stay authority functions in such a
way that a stay is effectively automatic and immediately
available.

30a

*Appendix A*

Second, our opinion is limited to expulsion orders issued in expedited proceedings. In many cases, the lack of pre-enforcement government review is unlikely to violate the Constitution because review can take place after FINRA's sanctions take effect. That is because many types of sanctions imposed by FINRA, short of expulsion, can be undone later. Censures can be rescinded, fines can be returned, and cease-and-desist orders can be lifted. *See* FINRA Rule 8310(a) (listing potential sanctions); *cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191-192, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023) (Parties often must "wait before appealing, even when doing so subjects them to significant burdens.") (quotation marks omitted). For that reason, Alpine has not demonstrated at this time that it is entitled to a preliminary injunction against any sanctions short of expulsion that FINRA may impose in the expedited proceeding.

Expulsion from FINRA, though, is unique because federal law requiring membership in a self-regulatory organization, 15 U.S.C. § 78*o*(b)(1), forces expelled FINRA members, without any governmental review of the merits, to shut down their securities-trading businesses—a harm that can have immediate and often financially devastating consequences that cannot be adequately remedied later. That is true at least for companies like Alpine that do not engage in any other significant business that could sustain their operations. *See* BrokerCheck Report: Alpine Securities Corporation, *supra*, at 10 ("This firm does not engage in other non-securities business.").[3]

_____

3. FINRA will also sometimes bar individuals from associating with a FINRA member. *See* FINRA Rule 8310(a)(5). Such a bar may

31a

*Appendix A*

Third, this opinion does not speak to either FINRA's own ability to delay the effectiveness of its expulsion orders in expedited proceedings, or the SEC's authority to lower its stay standard in expulsion cases. We note, for example, that FINRA automatically stays the effectiveness of all sanctions other than a bar or expulsion issued following a non-expedited disciplinary proceeding. FINRA Rule 9370(a). The SEC also sometimes stays monetary penalties or short-term suspensions regardless of the likelihood of success on the merits. *See, e.g., Allen Holeman*, Exchange Act Release No. 86769, 2019 WL 4044065, at *2 (S.E.C. Aug. 26, 2019); *Donald L. Koch*, Exchange Act Release No. 3860, 2014 WL 2800778, at *3 n.15 (S.E.C. June 20, 2014) ("While [the SEC has] customarily stayed suspensions less than a bar, granting a stay of a permanent bar pending Commission review [is] appropriate only in extraordinary circumstances.") (formatting modified).

Fourth, nothing in our opinion questions the constitutionality of enforcing an expulsion order, or any other sanction, after the SEC has affirmed it. Alpine

---

be meaningfully different from expulsion of a FINRA member firm since a person barred from trading securities can pursue other work while appealing to the SEC, while a firm organized for the purpose of trading securities cannot.

We also note that membership in a registered securities association like FINRA is not mandatory for securities traders that only trade on one exchange. 15 U.S.C. § 78*o*(b)(1). Such firms can instead be members of the exchanges on which they trade. *Id.* Alpine does not trade exclusively on one exchange. We therefore express no view as to the constitutional implications of FINRA's expulsion of a firm that trades on only one exchange and chooses to be a member of both FINRA and that exchange.

32a

*Appendix A*

has raised no such argument here and has not sought a preliminary injunction on that basis. So all we hold today is that it appears on this record that SEC review is not available as a practical matter in expedited expulsion proceedings prior to businesses being forced to close, and that gap likely runs afoul of the private nondelegation doctrine.

**V**

We turn next to Alpine's Appointments Clause claims. Alpine argues that FINRA's hearing officers are officers of the United States who must be appointed in conformance with the Appointments Clause and must be removable at will. Alpine Opening Br. 42-47. We hold that Alpine is not entitled to a preliminary injunction on these claims because it has not demonstrated that it will suffer irreparable harm from its asserted Appointments Clause violations pending resolution of the district court case.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24, 129 S.Ct. 365; *see Benisek v. Lamone*, 585 U.S. 155, 158, 138 S.Ct. 1942, 201 L.Ed.2d 398 (2018); *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). To that end, parties seeking a preliminary injunction, among other things, must clear a "high standard" and demonstrate that their injury is "both certain and great[.]" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-298 (D.C. Cir. 2006) (quotation marks omitted). That is, parties must demonstrate that their injury is sufficiently serious that there is a "clear and present need for equitable relief"

33a

*Appendix A*

on an expedited timeline and without the benefit of full factual development and hurried consideration of legal questions. *Id.* (quotation marks omitted).

Alpine makes two arguments for irreparable harm arising from the alleged Appointments Clause violations. First, it claims that FINRA can force it to close. Alpine Opening Br. 48. Second, it claims that it is being subjected to an unconstitutional proceeding before an unconstitutional body. Alpine Opening Br. 48. On this early record, neither of those injuries necessitates preliminary injunctive relief as to Alpine's Appointments Clause claims.

**A**

We begin with the asserted harm of forced closure as a result of expulsion from FINRA. That harm is no longer pressing given that we have already held that FINRA cannot expel Alpine until after the SEC has reviewed such a decision and made its own determination as to whether Alpine can continue to trade securities. Under the limited preliminary injunction we have ordered, the SEC will have the final word. And what the SEC will independently decide, after "conduct[ing] its own review," *Saad*, 873 F.3d at 300, about Alpine's ability to continue to trade securities is unknown. In fact, Alpine has previously "succeed[ed] * * * in having all the findings and sanctions of the FINRA Hearing Officer reversed by the SEC." Alpine Br. 48, *see Scottsdale Cap. Advisors Corp.*, Exchange Act Release No. 93052, 2021 WL 4242630, at *1 (S.E.C. Sept. 17, 2021) ("Upon our independent review of the record, * * * we have

34a

*Appendix A*

determined to set aside FINRA's findings of violations and the imposition of sanctions."). Without knowing how the SEC will rule and without any argument from Alpine about the likelihood that the SEC would uphold an expulsion order (should FINRA issue one), Alpine's expulsion after full SEC review is far too uncertain and unpredictable at this time to warrant the extraordinary relief of a preliminary injunction. *See Chaplaincy*, 454 F.3d at 298.

Even if the SEC ultimately were to affirm an expulsion order against Alpine, the significant consequences that come with expulsion from FINRA would be imposed by the SEC, not FINRA. Alpine, notably, does not dispute that the SEC's members are constitutionally appointed and have the authority to expel Alpine from the securities industry consistent with the Appointments Clause. To be sure, if FINRA's structure were ultimately held to violate the Appointments Clause, then arguably a new hearing before a properly appointed hearing officer might be necessary even if the SEC separately signed off on any expulsion order. *See Lucia*, 585 U.S. at 251, 138 S.Ct. 2044 ("[T]he appropriate remedy for an adjudication tainted with an appointments violation is a new hearing before a properly appointed official.") (quotation marks omitted). But those questions are best considered after the SEC has rendered its decision in this case, not before, as Alpine raises no claim of irreparable harm from the SEC review process itself. We accordingly express no view on those questions.

35a

*Appendix A*

**B**

**1**

Without the possibility of unilateral expulsion from the securities industry by FINRA, Alpine is left with its asserted injury of being forced to litigate before an allegedly unconstitutionally appointed FINRA officer. Invoking prior circuit precedent that holds that constitutional violations "constitute[] irreparable injury[,]" Alpine claims that the alleged violations of the Appointments Clause it identifies are "per se irreparable harm." Alpine Opening Br. 48 (quoting *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).

Three of our prior cases foreclose that argument.

First, in *Deaver v. Seymour*, 822 F.2d 66 (D.C. Cir. 1987), Deaver sought a preliminary injunction against a criminal investigation led by an independent counsel, *id.* at 66. Deaver claimed that the independent counsel had been unconstitutionally appointed. *Id.* at 68. This court held that, even assuming that the independent counsel was a "a pretender to the throne," any Appointments Clause violation was not irreparable because it could be redressed "by a reversal of any conviction." *Id.* at 70-71; *see id.* at 72 (Ginsburg, J., concurring) ("It is of no moment that Deaver bases his challenge upon the alleged unconstitutionality of the office of independent counsel[.]"). The court further explained that to hold otherwise would circumvent the final judgment rule. *Id.* at 71. And it would force us to decide "serious" issues with "far-ranging and troubling

36a

*Appendix A*

constitutional implications" through "accelerated and unorthodox review"—constitutional questions that we would have no need to decide should Deaver be acquitted. *Id.* Because "[w]e have an obligation to avoid constitutional questions if at all possible[,]" we affirmed the district court's denial of a preliminary injunction. *Id.*; *see Camreta v. Greene*, 563 U.S. 692, 705, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) ("A longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (quotation marks omitted); *Liverpool, N.Y. & Phila. S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885). As Chief Justice Rehnquist observed when denying a stay in *Deaver*, "[t]here [would] be time enough for [Deaver] to present his constitutional claim to the appellate courts if and when" Deaver were to be convicted in the underlying prosecution. *Deaver v. United States*, 483 U.S. 1301, 1303, 107 S.Ct. 3177, 97 L.Ed.2d 784 (1987) (Rehnquist, C.J., in chambers).

Second, in *In re al-Nashiri*, 791 F.3d 71 (D.C. Cir. 2015), a Guantanamo Bay detainee sought mandamus relief against an ongoing military commission proceeding on the ground that the commission's judges were not appointed in conformance with the Appointments Clause, *id.* at 75. Of course, the standards for mandamus relief and preliminary injunctions differ in some respects. But what matters here is that they both require the movant to show irreparable injury. *Compare National Ass'n of Crim. Def. Lawyers, Inc. v. Department of Justice*, 182 F.3d 981, 986 (D.C. Cir. 1999) ("[T]o determine whether a 'supervisory' writ of mandamus shall issue," courts consider whether

37a

*Appendix A*

the party seeking the writ "will be harmed in a way not correctable on appeal[.]"), *with Changji Esquel Textile 1 Co. Ltd.*, 40 F.4th at 721 ("A plaintiff seeking a preliminary injunction 'must establish that * * * he is likely to suffer irreparable harm in the absence of preliminary relief[.]'") (quoting *Winter*, 555 U.S. at 20, 129 S.Ct. 365).

In that vein, *In re al-Nashiri* held that the detainee had not demonstrated irreparable harm because he had not identified any "immediate or ongoing harm stemming from the [military commission's] alleged constitutional defects." 791 F.3d at 80. For example, the commission had not yet convicted the detainee, and the detainee had not alleged that the improperly appointed judges were biased against him. *Id.* at 79-80. Said another way, *In re al-Nashiri* holds that simply participating in a proceeding conducted by an allegedly unconstitutionally appointed officer is not itself irreparable harm that justifies extraordinary relief. *See id.*

Third, in *John Doe Co. v. Consumer Financial Protection Bureau*, 849 F.3d 1129 (D.C. Cir. 2017), a private company sought a preliminary injunction against an investigation by the Consumer Financial Protection Bureau, *id.* at 1131. The company claimed that (1) the Bureau was unconstitutionally structured; (2) the investigation against it violated the separation of powers; and (3) "any alleged separation-of-powers injury is by its very nature irreparable." *Id.* at 1133-1135. We rejected that third argument and held that, "[i]n the absence of 'immediate or ongoing harm stemming from the [Bureau's] alleged constitutional defects,' the 'violation of separation

38a

*Appendix A*

of powers' by itself is not invariably an irreparable injury." *Id.* at 1135 (second alteration in original) (quoting *In re al-Nashiri*, 791 F.3d at 79-80).

Taken together, those three cases squarely hold that being investigated by, or participating in a proceeding before, an unconstitutionally appointed officer is not, without more, an injury that necessitates preliminary injunctive relief. And Alpine has not asserted anything more. *See Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 754 (10th Cir. 2024) ("[A] separation of powers violation, alone, [does] not constitute irreparable harm[.]").

As a panel, we are bound by our precedent unless "intervening Supreme Court precedent * * * clearly dictate[s] a departure[.]" *Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023) (quoting *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232 n.2 (D.C. Cir. 2018)); *see also LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc). To do so, intervening Supreme Court authority must "effectively overrule, *i.e.*, eviscerate, the law of our circuit." *Bahlul*, 77 F.4th at 925 (formatting modified).

Alpine, however, makes no argument at all that our precedent has been effectively overruled or that there is any other basis on which this panel could depart from it. In fact, Alpine ignores all three of those cases.

39a

*Appendix A*

**2**

The dissenting opinion makes arguments on Alpine's behalf that it has forfeited. But to no avail. For example, the dissenting opinion claims that our decision in *Deaver* depended critically on "the Federal Rules of Criminal Procedure, criminal-law precedents, equity's interaction with criminal proceedings, and the collateral-order exception to the final-judgment rule[,]" none of which this case involves. Dissenting Op. at 1349. To be sure, the court in *Deaver* mentioned those factors. 822 F.2d at 70-71. But its ultimate ruling did not *depend* on them. Instead, the ruling—like Chief Justice Rehnquist's own decision—hinged on the availability of full relief on later review. *Id.* at 71; *see Deaver*, 483 U.S. at 1303, 107 S.Ct. 3177 (Rehnquist, C.J., in chambers) ("There will be time enough for applicant to present his constitutional claim to the appellate courts if and when he is convicted of the charges against him."). That has to be right. Court-made rules and precedent necessarily would have to take a back seat if just going forward with the case inflicted a constitutional injury.

The dissenting opinion equally errs in arguing that *In re al-Nashiri* confined its holding to the context of military commissions. *See* Dissenting Op. at 1349-50. Considerations about insulating the military from legislative or judicial interference appear nowhere at all—not one word—in *al-Nashiri*'s analysis of irreparable harm. *See* 791 F.3d at 79-81. This court's historic practice of faithful panel adherence to circuit precedent cannot be circumvented by pretending a prior decision said something it plainly did not.

40a

*Appendix A*

Finally, the dissenting opinion's effort to unravel the precedential status of *John Doe* fails. This court has treated that published decision as binding precedent for seven years. *See, e.g., Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 877 F.3d 1066, 1066 (D.C. Cir. 2017); *CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 688 (D.C. Cir. 2017). A later panel is not free to sweep away that history. Especially based on an argument that no party has advanced.

**C**

Turning to the arguments that Alpine raises to support its preliminary injunction motion, Alpine anchors its irreparable harm argument in *Axon Enterprise v. Federal Trade Commission*, 598 U.S. 175, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023), arguing that it automatically mandates a finding of irreparable harm here. That is incorrect.

In *Axon*, the question before the Supreme Court was whether parties to an ongoing proceeding before a governmental agency had to first go through the agency's administrative process before suing in federal court to challenge the administrative proceeding's structural constitutionality. 598 U.S. at 180, 143 S.Ct. 890. The Supreme Court concluded that they do not because, in enacting the relevant statutory review schemes, 15 U.S.C. §§ 45(c), 78y, "Congress [did] not intend to limit [court] jurisdiction" when constitutional challenges are made to the agency process itself. *Axon*, 598 U.S. at 186, 143 S.Ct. 890. The Supreme Court reasoned that an alleged

41a

*Appendix A*

Appointments Clause violation is "a here-and-now injury" that "is impossible to remedy once the [administrative] proceeding is over," *id.* at 191, 143 S.Ct. 890 (quotation marks omitted), and so an aggrieved party could file that constitutional challenge directly in federal court.

Seizing on that language, Alpine claims that *Axon* held that being forced to participate in an unconstitutional agency proceeding necessarily qualifies as irreparable harm supporting the issuance of a preliminary injunction. That overreads *Axon* in two respects.

First, *Axon* answered a statutory jurisdictional question about whether Congress intended to "oust[] district courts of jurisdiction" they would ordinarily have by requiring that parties instead litigate their claims through agency proceedings. *Axon*, 598 U.S. at 185-186, 143 S.Ct. 890. The Court's answer to *Axon*'s question turned in significant part on the common-sense intuition that a structural constitutional question was both "wholly collateral to" the questions at issue in agency proceedings and lies "outside the agency's expertise." *Id.* at 186, 143 S.Ct. 890.

In finding Axon's claims within the district court's ordinary jurisdiction, the Court did not speak to what constitutes irreparable harm for purposes of the extraordinary remedy of a preliminary injunction. True, the Court also reasoned that the injury it identified could not be remedied if a party were forced to litigate before the agency prior to raising its claims in federal court. *Axon*, 598 U.S. at 192, 143 S.Ct. 890. But here, there is

42a

*Appendix A*

no barrier to Alpine litigating its constitutional claims directly in federal court. That is exactly what it has done. Instead, the question before us, which was not answered in *Axon*, is whether the injury Alpine claims is so great that it necessitates "accelerated and unorthodox" summary review of the merits without a developed factual record. *Deaver*, 822 F.2d at 71; *see Harrel v. Raoul*, — U.S. —, 144 S. Ct. 2491, 2492, — L.Ed.2d — (2024) (Thomas, J., statement respecting the denial of certiorari) ("This Court is rightly wary of taking cases in an interlocutory posture."); *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (en banc) (McConnell, J., concurring) ("[M]any preliminary injunctions must be granted hurriedly and on the basis of very limited evidence," forcing courts "to make a choice under conditions of grave uncertainty.").

Put another way, *Axon* at most says that, as a matter of statutory jurisdiction, a federal-court challenge to an unconstitutional appointment can begin before the agency acts. It does not say that every agency proceeding already underway must immediately be halted because of an asserted constitutional flaw. So while Alpine's interpretation of *Axon* is "arguable," *Axon* does not "clearly dictate a departure from circuit law." *Bahlul*, 77 F.4th at 926 (quotation marks omitted). Importantly, Alpine does not argue otherwise.

Second, as Alpine's *private* nondelegation argument suggests, FINRA is not a government agency like those at issue in *Axon*. FINRA is a Delaware nonprofit corporation, and its personnel are private employees, not government employees. Regardless of whether FINRA

43a

*Appendix A*

is ultimately found to be wearing a government hat when it expels members, it is also formally a private, self-regulatory membership organization. Nothing in *Axon* addressed an asserted injury from a member of a private organization having to go through a hearing process before such an entity. Whether or not Alpine has a meritorious Appointments Clause objection to the FINRA process in its current form, *Axon* does not speak to the nature of any such injury clearly enough to "dictate a departure" by this panel from prior circuit precedent. *Bahlul*, 77 F.4th at 926 (quotation marks omitted). And again, Alpine tellingly has not argued to the contrary.

In sum, we hold that Alpine has not demonstrated irreparable harm stemming from the alleged violations of the Appointments Clause other than the harm from expulsion that is already redressed by the nondelegation preliminary injunction. Because "[a] movant's failure to show any irreparable harm is * * * grounds for refusing to issue a preliminary injunction," we hold that Alpine is not entitled to a preliminary injunction based on its asserted Appointments Clause violations. *Chaplaincy*, 454 F.3d at 297; *see Winter*, 555 U.S. at 22, 129 S.Ct. 365 (Issuing a preliminary injunction without "demonstrat[ing] that irreparable injury is likely * * * is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). We accordingly express no view on the remaining preliminary-injunction factors, including whether Alpine has demonstrated a likelihood of success on the merits of the applicability of the Appointments Clause to FINRA's employees. All we hold is that Alpine has not shown, on this record, that any

44a

*Appendix A*

such violation would present irreparable harm to Alpine that necessitates the exceptional remedy of a preliminary injunction against the proceeding itself.

**VI**

"'Long settled and established practice may have great weight' in interpreting constitutional provisions about the operation of government." *CFPB v. Community Fin. Servs. Ass'n of America*, 601 U.S. 416, 442, 144 S.Ct. 1474, 218 L.Ed.2d 455 (2024) (Kagan, J., concurring) (quoting *Chiafalo v. Washington*, 591 U.S. 578, 592-593, 140 S.Ct. 2316, 207 L.Ed.2d 761 (2020)). Self-regulation in the securities industry has existed for centuries, and Congress has repeatedly reaffirmed its own nearly century-old commitment to this system. Given that history and the preliminary record in this case, we proceed carefully at this early stage of the litigation, where we lack the benefit of full factual development and the wisdom it affords.

Alpine has met its burden of demonstrating a likelihood that the private nondelegation doctrine requires that SEC review be available before Alpine can be expelled from FINRA because, under federal law, that decision would effectively ban Alpine from the securities trading industry. Alpine has also shown that it faces irreparable harm if expelled from the securities industry in that it will have to shut down its business immediately. For those reasons, the district court erred in denying Alpine a preliminary injunction protecting it against being expelled from FINRA (should FINRA issue such an order) until either the SEC affirms FINRA's decision or the time for Alpine to seek SEC review has elapsed.

45a

*Appendix A*

As to Alpine's Appointments Clause claims, Alpine has not demonstrated that it faces irreparable harm stemming from participating in FINRA's hearing process enforcing FINRA's membership rules, since FINRA's decision can no longer pose the threat of wholesale exclusion from securities trading. For that reason, Alpine is not entitled to a preliminary injunction against FINRA's expedited proceeding itself, and FINRA may resume the expedited proceeding against Alpine.

Finally, we underscore that nothing in this opinion resolves Alpine's claims on the merits. We leave that for the district court to decide on remand.

For the foregoing reasons, we reverse the district court insofar as it held that FINRA could singlehandedly expel Alpine and thereby exclude it from the securities trading industry, and remand for the court to enter a limited preliminary injunction enjoining FINRA from giving effect to any expulsion order issued against Alpine until either the SEC reviews the order on the merits or the time for Alpine to seek SEC review lapses. The injunction pending appeal entered by this court on July 5, 2023, is hereby dissolved only to the extent that it enjoins FINRA's expedited proceeding from going forward. The portion of the injunction that would preclude FINRA from giving effect to any expulsion order it might issue against Alpine will remain in effect until the district court issues its injunction.

*So ordered.*

46a

*Appendix A*

WALKER, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

Article II of the Constitution begins, "The executive Power shall be vested in a President of the United States of America." That means private citizens cannot wield significant executive authority. Nor can anyone in the government, except for the President and the executive officers appointed and removable consistent with Article II.

The Financial Industry Regulatory Authority is a nominally private corporation. It investigates, prosecutes, and adjudicates violations of federal securities laws. Those laws generally forbid broker-dealers from doing business unless they belong to FINRA.

Today, the majority holds that the Constitution likely requires government review before FINRA may expel a company from its ranks and thereby put that company out of business. That holding is a victory for the Constitution.

But it is only a partial victory because the problems with FINRA's enforcement proceedings run even deeper. FINRA wields significant executive authority when it investigates, prosecutes, and initially adjudicates allegations against a company required by law to put itself at FINRA's mercy. That type of executive power can be exercised only by the President (accountable to the nation) and his executive officers (accountable to him).

47a

*Appendix A*

By flouting that principle through an "illegitimate proceeding, led by an illegitimate decisionmaker,"[1] FINRA imposes an irreparable injury that this court should prevent by granting the requested preliminary injunction in its entirety.

I respectfully dissent from the majority's decision to deny that relief.

**I**

In response to the 1929 stock market crash and the onset of the Great Depression, Congress enacted a series of laws to regulate securities trading.[2] The Securities Exchange Act of 1934 introduced registration, disclosure, and reporting requirements designed to restore confidence in the U.S. stock market.[3] The Act also created the Securities and Exchange Commission to enforce the nation's securities laws.

A few years later, the Maloney Act addressed trading activity outside the major exchanges.[4] It encouraged

---

1. *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191, 143 S. Ct. 890, 903, 215 L.Ed.2d 151 (2023).

2. *See SEC v. Jarkesy*, — U.S. —, 144 S. Ct. 2117, 2125, 219 L.Ed.2d 650 (2024).

3. Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (1934) (codified at 15 U.S.C. § 78a, *et seq.*).

4. *See* Maloney Act of 1938, ch. 677, sec. 1, § 15A(b)(3), 52 Stat. 1070, 1070 (1938) (codified at 15 U.S.C. § 78*o*-3(b)(11)).

48a

*Appendix A*

broker-dealers to organize securities associations and register them as self-regulatory bodies.[5]

For several decades, membership in securities associations was voluntary.[6] But in 1983, Congress changed course and made membership mandatory for nearly all

---

5. *See id.* sec. 1, § 15A(a), 52 Stat. at 1070; *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 700 n.6, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) ("The Maloney Act supplements the Securities and Exchange Commission's regulation of the over-the-counter markets by providing a system of cooperative self-regulation through voluntary associations of brokers and dealers.").

The Maloney Act was not the government's first attempt to regulate over-the-counter activity. President Roosevelt approved in 1934 an applicable "code of fair competition" under the National Industrial Recovery Act. Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All, in* Building Responsive and Responsible Financial Regulators in the Aftermath of the Global Financial Crisis 234 (Pablo Iglesias-Rodríguez ed., 2015). But this was short-lived, as the Supreme Court ruled in 1935 that the Act was unconstitutional. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541-42, 55 S.Ct. 837, 79 L.Ed. 1570 (1935).

6. *Over-the-Counter Trading and the Maloney Act*, 48 Yale L.J. 633, 646 (1939).

While federal law did not mandate membership, over-the-counter stockbrokers were faced with "two choices, either to join a registered association and get some voice as to what rules shall govern them, or stay out and be regulated by the Commission." *Id.* As an additional incentive, the Act provided members with a limited exemption from the antitrust laws that permitted members to offer discounts exclusively to members. Maloney Act, sec. 1, § 15A(i)(3), (n), 52 Stat. at 1074-75.

49a

*Appendix A*

brokers and dealers.[7] And today, the only securities association recognized by the SEC is FINRA.[8] That means, in effect, membership in FINRA is mandatory for anyone who wants to run a brokerage.

FINRA is led by a Board of Governors,[9] comprised of "industry" and "public" representatives, who are either

---

7.  An Act To Make Certain Amendments to Sections 4, 13, 14, 15, and 15B of the Securities Exchange Act of 1934, sec. 3, § 15(b)(8), 97 Stat. 205, 206-07 (1983) ("It shall be unlawful for any broker or dealer required to register pursuant to this title to effect any transaction in . . . any security . . . unless such broker or dealer is a member of a securities association. . . . ") (codified as amended at 15 U.S.C. § 78*o*(a)(1), (b)(1)).

8.  *See Exemption for Certain Exchange Members*, 88 Fed. Reg. 61,850, 61,851 (Sept. 7, 2023) (noting FINRA is "the only" registered national securities association).

FINRA is the product of a 2007 merger between the National Association of Securities Dealers and the New York Stock Exchange's enforcement arm. *Order Approving Proposed Rule Change to Amend the By-Laws of NASD*, 72 Fed. Reg. 42,169, 42,169-70 (Aug. 1, 2007).

The federal statute that requires all brokerages to maintain membership in a securities association does have what might be read as an exception—15 U.S.C. § 78*o*(b)(9) authorizes the SEC to "conditionally or unconditionally exempt from [the requirement to join a securities association] any broker or dealer." However, it appears that this provision has been used only to create formal rules carving out broad, categorical exemptions for groups of broker-dealers whose activities fall somewhat outside the gambit of the industries FINRA is expected to regulate. *See* 17 C.F.R. §§ 240.15b9-1, 240.15b9-2; *U.S. Securities Corp.*, SEC Staff No-Action Letter, 1995 SEC No-Act. LEXIS 470, at *3 (Feb. 1, 1995).

9.  *See* By-Laws of the Corporation, FINRA, art. VII, § 1, https://perma.cc/8FUG-PPKZ.

50a

*Appendix A*

elected by FINRA's members or appointed by the Board itself.[10] The Board selects a chief executive officer, who directly supervises the Office of Hearing Officers.[11] The hearing officers preside over enforcement proceedings.[12]

Though FINRA describes itself as "a private corporation that the government did not create and does not control," it functions in ways similar to a government agency.[13] Federal law grants FINRA the power to promulgate rules that carry "the force of law" upon SEC approval.[14] In addition to that quasi-legislative power, FINRA acts in "an adjudicatory and prosecutorial capacity"

---

10. *See id.* art. I, §§ (n), (r), (t), (w), (z), (dd), (tt), (xx) (defining each type of representative); *id.* art. VII, § 4(a) (Composition and Qualifications of the Board); *id.* art. VII, § 5 (Term of Office of Governors).

11. *See id.* art. VIII, § 1; *Office of Hearing Officers*, FINRA, https://perma.cc/VM5D-7RP2 ("OHO reports directly to FINRA's Chief Executive Officer.").

12. *See Office of Hearing Officers*, FINRA ("Hearing Officers . . . preside over disciplinary and expedited actions commenced by FINRA's Enforcement Department. . . . ").

13. FINRA Br. at 2.

14. *See McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 673 (9th Cir. 2013).

FINRA itself has claimed—in other contexts where the constitutionality of its structure has not been challenged—that "FINRA rules have the force and effect of a federal regulation." *In re Charles Schwab & Co.*, 2014 WL 1665738, at *16 (FINRA Apr. 24, 2014).

51a

*Appendix A*

and "is required by statute to enforce the securities laws."[15]

In particular, FINRA is responsible for "enforc[ing] compliance" with the Securities Exchange Act and any "rules and regulations thereunder."[16] Much like the SEC, FINRA has its own "Department of Enforcement," which can initiate investigations and prosecutions when it suspects a violation of "any rule, regulation, or statutory provision, including the federal securities laws and the regulations thereunder."[17]

The Department of Enforcement conducts invasive investigations. It can require brokers to "provide information orally, in writing, or electronically."[18] It also can force a broker's employees to "testify at

---

15. *See Austin Municipal Securities, Inc. v. National Association of Securities Dealers, Inc.*, 757 F.2d 676, 692 (5th Cir. 1985).

16. 15 U.S.C. § 78s(g)(1); *see also National Association of Securities Dealers, Inc. v. SEC*, 431 F.3d 803, 804 (D.C. Cir. 2005) (noting that FINRA has "express statutory authority to adjudicate actions against members who are accused of illegal securities practices and to sanction members found to have violated the Exchange Act or Securities and Exchange Commission . . . regulations").

17. FINRA Rule 9211(a)(1).
FINRA's rules, including past versions, can be accessed at https://www.finra.org/rules-guidance/rulebooks/finra-rules.

18. FINRA Rule 8210(a)(1).

52a

*Appendix A*

a location specified by FINRA staff, under oath or affirmation."[19]

After that, FINRA may initiate a formal enforcement proceeding to fine members or expel them from FINRA.[20] Because FINRA membership is mandatory, expulsion from FINRA is, in effect, expulsion from the securities industry. From a broker's perspective, it's the "corporate death penalty."

These enforcement proceedings come in two forms. In the ordinary proceeding, a member may appeal an unfavorable ruling first to an internal appellate tribunal and then to the SEC.[21] But in an expedited proceeding, sometimes overseen by only one hearing officer, internal review of the decision is discretionary, and the hearing officer's decision to expel a member takes effect immediately, before the member can appeal to the SEC.[22]

This panoply of enforcement powers requires no contemporaneous oversight by the SEC. The SEC does not control FINRA's investigations, its prosecutions, or its initial adjudications. Until the SEC accepts an appeal from

---

19. *Id.*

20. FINRA Rules 8310(a), 9211(a).

21. FINRA Rules 9311(a), 9349(a), 9370(a).

The FINRA Board may, at its discretion, choose to review a case heard by the internal appellate tribunal and affirm, modify, or reverse its decision. FINRA Rule 9351(a), (d).

22. FINRA Rule 9559(d), (q), (n), (r).

Midland/Odessa Division    Case No.: MO:24-CV-317

53a

*Appendix A*

a final FINRA decision, FINRA wields its enforcement powers unilaterally.

Today's case illustrates those powers in action. For almost six years, FINRA has been investigating and prosecuting Alpine Securities Corporation. Three years into that process, FINRA decided to expel Alpine from the securities industry, and it ordered Alpine to cease and desist its alleged misconduct.

While contesting that decision before FINRA's appellate tribunal, Alpine challenged FINRA's constitutionality in federal court. During that litigation, FINRA launched an expedited proceeding to immediately expel Alpine for allegedly violating the cease-and-desist order. Though Alpine could ask the SEC to review any final expulsion order, an emergency expulsion order is not automatically stayed during the SEC's review.[23]

So Alpine moved to preliminarily enjoin that emergency proceeding until the final resolution of its claims. When the district court denied that motion, Alpine appealed. A panel of this court determined that Alpine's arguments merited an injunction pending appeal.[24]

---

23. FINRA Rule 9559(r).

24. *See Alpine Securities Corp. v. FINRA*, 2023 WL 4703307, at *1 (D.C. Cir. July 5, 2023); *see also id.* at *4 (Walker, J., concurring) ("There is a serious argument that FINRA hearing officers exercise significant executive power. And it is undisputed that they do not act under the President. That may be a constitutional problem.").

54a

*Appendix A*

## II

We consider four factors when deciding whether Alpine should receive a preliminary injunction: Is Alpine likely to succeed on its claims? Will it likely suffer an irreparable injury without relief? Who does the balance of equities favor? And which side does the public interest support?[25] The first two factors—likelihood of success and irreparable injury—"are the most critical" in this inquiry.[26] We review a district court's weighing of factors for abuse of discretion and its legal conclusions de novo.[27]

## III

The merits of this case turn on two bedrock principles. First, the government must not delegate significant executive authority to private actors. Second, public officers must not exercise significant executive authority unless they are removable by the President and properly appointed.[28]

---

25. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

26. *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)).

27. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

28. The majority criticizes this formulation, claiming it "melds the private nondelegation doctrine with Alpine's Appointments Clause arguments." Majority Op. at 1329. But the private nondelegation doctrine and Appointments Clause can be viewed

55a

*Appendix A*

Alpine has made a strong showing that FINRA, whether private or public, violates one of these principles.

**A**

Article II of the Constitution vests the "executive Power" with the President.[29] This vesting clause is "essentially a grant of the power to execute the laws."[30] Article II further provides that the President "shall take Care that the Laws be faithfully executed."[31] Thus, any "enforcement of federal law" necessarily implicates the executive power,[32] because the authority "to enforce [federal laws] or appoint the agents charged with the duty of such enforcement" are "executive functions."[33]

---

as two sides of the same coin, even though they have developed on separate doctrinal tracks. *See United States ex rel. Zafirov v. Florida Medical Associates, LLC*, No. 8:19-CV-01236-KKM-SPF, 2024 WL 4349242, slip op. at 49 n.8 (M.D. Fla. Sept. 30, 2024) ("The Supreme Court has, at times, articulated the 'significant authority' element of its test for officer status as a negative restraint on delegated executive power.").

29.  U.S. Const. art. II, § 1; *Seila Law, LLC v. CFPB*, 591 U.S. 197, 213, 140 S. Ct. 2183, 2197, 207 L.Ed.2d 494 (2020) (recognizing that the executive power "belongs to the President alone").

30.  *Myers v. United States*, 272 U.S. 52, 117, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

31.  U.S. Const. art. II, § 3.

32.  *Nixon v. Fitzgerald*, 457 U.S. 731, 750, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982).

33.  *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 202, 48 S.Ct. 480, 72 L.Ed. 845 (1928).

56a

*Appendix A*

It "would be impossible for one man to perform" all enforcement actions himself.[34] So the Constitution "assumes" that the President will appoint "lesser executive officers" to assist in "discharging the duties of his trust."[35] Depending on the circumstances, these officers can investigate citizens, search their homes, arrest them, question them, issue regulatory orders, and carry out judicially approved penalties ranging from fines to imprisonment.[36]

While any government employee who enforces federal law exercises some amount of Executive Power, anyone who continuously and permanently "exercis[es] *significant authority* pursuant to the laws of the United States is an 'Officer of the United States.'"[37] An "Officer" must be properly appointed (as prescribed by Article II's Appointments Clause) and properly removable by the President (as implied by Article II's Vesting Clause).[38] Those requirements increase the officer's accountability

---

34. *Seila Law*, 140 S. Ct. at 2197 (cleaned up).

35. *Id.*

36. *See National Horsemen's Benevolent & Protective Association v. Black*, 107 F.4th 415, 428 & nn.9-10 (5th Cir. 2024) (listing "quintessentially executive functions" and citing authorities).

37. *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (emphasis added).

38. U.S. Const. art. II, § 2, cl. 2 (Appointments Clause); *id.* art. II, § 1, cl. 1 (Vesting Clause); *see also Seila Law*, 140 S. Ct. at 2197; *Lucia v. SEC*, 585 U.S. 237, 244-45, 138 S. Ct. 2044, 2051, 201 L.Ed.2d 464 (2018).

57a

*Appendix A*

to the President, who is accountable to the people, whose liberty is at stake.

Because these constitutional safeguards have been thought to apply only to the government, not private actors,[39] "core governmental power must be exercised by the Department on which it is conferred and must not be delegated to others in a manner that frustrates the constitutional design."[40] So just as Congress cannot delegate its legislative power to the President, the

---

39. *See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 542, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (stating that in analyzing whether the U.S. Olympic Committee violated the First Amendment, the "fundamental inquiry is whether [it] is a governmental actor to whom the prohibitions of the Constitution apply"); *National Horsemen*, 107 F.4th at 436-37 ("Challenges based on private nondelegation, on the one hand, and the Appointments Clause, on the other, appear mutually exclusive."); *cf.* Alexander Volokh, *The Myth of the Federal Private Nondelegation Doctrine*, 99 Notre Dame L. Rev. 203, 248 (2023) ("This strict separation-of-powers view opposes delegations to private parties because they're not part of the government. But presumably, if those private parties went through presidential nomination and Senate confirmation, the problem would be cured, because that appointment would have made them part of the federal government (most likely part of the executive branch). Perhaps a proponent of that view would say that this 'private' party had thereby become 'public.' And my view is essentially the same: any private party can validly wield federal governmental power, provided they are properly appointed. I don't particularly care whether we label them 'public' or 'private,' because I don't think this labeling should matter much.").

40. *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004).

58a

*Appendix A*

President's executive power cannot be delegated away from the Executive Branch.[41]

Even worse than an interbranch delegation is an extrabranch delegation—the "most obnoxious form" of delegation.[42] If the vast powers of the federal government could be exercised *outside* the constitutional system, the government would be "able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."[43]

To be sure, private actors can sometimes play a small role in enforcing the law when they are closely controlled.[44]

---

41. *See Schechter Poultry*, 295 U.S. at 535-39, 55 S.Ct. 837; *Pittston*, 368 F.3d at 394.

42. *Carter v. Carter Coal Co.*, 298 U.S. 238, 311, 56 S.Ct. 855, 80 L.Ed. 1160 (1936); *cf. Schechter Poultry*, 295 U.S. at 537, 55 S.Ct. 837 ("But would it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? . . . The answer is obvious. Such a delegation of legislative power is unknown to our law and is utterly inconsistent with the constitutional prerogatives and duties of Congress.").

43. *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 397, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995).

44. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399, 60 S.Ct. 907, 84 L.Ed. 1263 (1940) (private entities must always "function subordinately" to the agency and under that agency's "authority and surveillance"); *Association of American Railroads v. U.S. Department of Transportation* ("*Amtrak I*"), 721 F.3d 666, 671 (D.C. Cir. 2013) (private entities may "help a government agency

59a

*Appendix A*

But private actors may not exercise so much power that they function as the government itself.[45] The government "may employ private entities for *ministerial* or *advisory* roles, but it may not give these entities governmental power over others," at least not when the private office is "continuing and permanent."[46]

**B**

FINRA is likely a private entity exercising significant executive authority. If so, FINRA subverts the constitutional design.

**1**

FINRA is a Delaware corporation, but it wields the significant executive authority that the Constitution vests in the Executive Branch alone.

Start by considering some of the actions FINRA may take, all without government oversight:

---

make its regulatory decisions"), *vacated and remanded on other grounds sub nom. Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) ("*Amtrak II*").

45.  *United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016) ("when an actor is endowed with law enforcement powers beyond those enjoyed by private citizens, courts have traditionally found the exercise of the public police power engaged").

46.  First quoting *Pittston*, 368 F.3d at 395; then quoting *Lucia*, 138 S. Ct. at 2051 (quoting *United States v. Germaine*, 99 U.S. 508, 511-12, 25 L.Ed. 482 (1879)).

Midland/Odessa Division    Case No.: MO:24-CV-317

60a

*Appendix A*

- Open an investigation;[47]

- Demand to inspect books, records, or accounts;[48]

- Require a brokerage employee to provide information orally, in writing, or electronically;[49]

- Require an employee to testify under oath;[50]

- Exercise prosecutorial discretion to choose formal disciplinary action instead of informal disciplinary action or to choose no action at all;[51]

---

47. Jessica Hopper, *Working on the Front Lines of Investor Protection—How an Enforcement Action Becomes an Enforcement Action*, FINRA (June 4, 2020), https://perma.cc/N8ZB-8VCG ("FINRA investigations are opened from various sources, including examination findings, automated surveillance reports, filings made with FINRA, customer complaints, tips, and referrals from other regulators and FINRA departments.").

48. FINRA Rule 8210(a)(2).

49. FINRA Rule 8210(a)(1).

50. *Id.*

51. *See* FINRA Rule 9211(a); *Schellenbach v. SEC*, 989 F.2d 907, 912 (7th Cir. 1993) ("[FINRA] disciplinary proceedings are treated as an exercise of prosecutorial discretion."); *Wedbush Securities, Inc.*, Exchange Act Release No. 78568, 2016 WL 4258143, at *16 (Aug. 12, 2016) ("FINRA has broad prosecutorial discretion in deciding against whom charges should be brought and what those charges

61a

*Appendix A*

- Authorize complaints against member broker-dealers;[52]

- Demand submission of trading data;[53]

- Negotiate settlements;[54]

- Require members to participate in live adjudicatory proceedings before an in-house tribunal;[55]

- Release, at its discretion, information related to disciplinary proceedings;[56]

- Impose the costs of the disciplinary proceeding on the disciplined member as FINRA "deems fair and appropriate";[57]

---

should be."); Hopper, *Working on the Front Lines*; *Enforcement*, FINRA, https://perma.cc/G7RV-7J9N ("If it appears that rules have been violated, Enforcement will determine whether the conduct merits formal disciplinary action.").

52. FINRA Rule 9211(b).

53. FINRA Rules 8211, 8213.

54. FINRA Rule 9270.

55. FINRA Rules 9221(b), 9231, 9235.

56. FINRA Rule 8313.

57. FINRA Rule 8330.

62a

*Appendix A*

- Issue large fines;[58] and

- Expel a firm from FINRA and (in effect)
  from the securities industry, for violation of
  federal securities laws, federal regulations,
  or FINRA rules, or for failure to "promptly"
  pay a fine, sanction, or cost.[59]

Put simply, for brokers required (by statute) to join a
securities association, FINRA operates as the "principal
decisionmaker in the use of federal power."[60] That's
because it enforces federal law and rules that carry the
force of law.[61] And it does so without any initial approval

_____

58.  *See*, *e.g.*, News Release, FINRA, *FINRA Orders Record
Financial Penalties Against Robinhood Financial LLC* (June 30,
2021), https://perma.cc/2KC4-EJZS (FINRA "fined Robinhood
Financial LLC $57 million and ordered the firm to pay approximately
$12.6 million in restitution, plus interest").

59.  FINRA Rule 8320(c); *see also* FINRA Rule 8310(a).

60.  *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023).

61.  In this context, the relevant actions include both traditional
enforcement tools and the quasi-judicial functions that the Supreme
Court has said that an executive branch agency may perform without
exercising the judicial power. *Adkins*, 310 U.S. at 400, 60 S.Ct. 907.
The Constitution, of course, does not tolerate delegations of judicial
power any more than it does delegations of executive or legislative
power. *Buckley*, 424 U.S. at 121, 96 S.Ct. 612 (1976) (quoting *J.W.
Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348,
72 L.Ed. 624 (1928)) ("in the actual administration of the government
Congress or the Legislature should exercise the legislative power,
the President or the State executive, the Governor, the executive
power, and the Courts or the judiciary the judicial power").

63a

*Appendix A*

from its supposed supervisor, the SEC. This "especially provocative exercise of governmental power by a private organization" transgresses the private nondelegation doctrine.[62]

**2**

FINRA attempts to avoid this conclusion by suggesting that any private nondelegation problem posed by FINRA's enforcement powers are solved by SEC review because, at the very end of the process, the SEC can reverse a sanction that FINRA imposes. But reversal of the sanction does not negate the vast array of powers that FINRA exercises *before* the matter even reaches the SEC.

Moreover, FINRA's insistence that SEC review cures its constitutional defect is impossible to reconcile with *Lucia v. SEC*. The Supreme Court held in *Lucia* that the SEC's administrative law judges are "Officers of the United States" who must be properly appointed and removable, regardless of the SEC's ability to review their decisions.[63] There is no reason to think that nearly identical hearing officers who are private, rather than

---

62. 1 Kenneth Culp Davis, Administrative Law Treatise 141 (1st ed. 1958)).

Unlike a congressional delegation of legislative power to the executive branch, a delegation of executive power to a private entity cannot be saved by an "intelligible principle." *See Amtrak I*, 721 F.3d at 671 ("Even an intelligible principle cannot rescue a statute empowering private parties to wield regulatory authority.").

63. *See Lucia*, 138 S. Ct. at 2049-56.

64a

*Appendix A*

governmental, can enjoy the same degree of authority without (at least) the same restrictions. That would mean that the Constitution requires less accountability when significant executive authority is delegated *outside* the executive branch than when such authority is delegated *within* it.

Even putting *Lucia* aside, consider FINRA's power to initiate an enforcement action that may expel a company from the securities industry with the force of law. The problem? That's the power to decide "whether to take enforcement actions against violators of federal law,"[64] and it is among "the greatest unilateral powers a *President* possesses under the Constitution."[65] Only the President can decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law."[66]

---

64. *United States v. Texas*, 599 U.S. 670, 685, 143 S. Ct. 1964, 1975, 216 L.Ed.2d 624 (2023).

65. *In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013) (emphasis removed and added); *see also id.* at 266 ("Prosecutorial discretion encompasses the Executive's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or entities who violate federal law.").

66. *Texas*, 143 S. Ct. at 1971 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429, 141 S. Ct. 2190, 2207, 210 L.Ed.2d 568 (2021)); *see also Buckley*, 424 U.S. at 138, 96 S.Ct. 612 ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)); *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("the Executive

65a

*Appendix A*

FINRA, however, would have us simply ignore that "aspect of the executive power."[67]

Also consider FINRA's power to settle an enforcement action. Suppose, for example, that FINRA has been investigating a company for about six years.[68] Of course, the investigation and enforcement proceedings have cost the company significant time and resources. But finally, after six years, FINRA and the company negotiate a deal: The company can stay in business—for the price of a fine and a waiver of its right to SEC review.

That settlement would "constitute final disciplinary action of FINRA."[69] But look at what's missing. At *no time* was the SEC involved.[70] Nor was *any* executive officer with a commission from the

_____

Branch has exclusive authority and absolute discretion to decide whether to prosecute a case").

67. *Texas*, 143 S. Ct. at 1975.

68. Six years is about the amount of time FINRA has been pursuing Alpine, which by way of reference is also about the amount of time Kenneth Starr investigated Bill Clinton *added to* the time Robert Mueller investigated Donald Trump.

69. FINRA Rule 9270(g).

70. *See* 17 C.F.R. § 201.420(a) (authorizing petition for SEC review only after final FINRA determination); *id.* § 201.401(d) (granting SEC discretion to stay final FINRA determinations but not pending FINRA proceedings); *cf. National Horsemen*, 107 F.4th at 430 (a private entity was not "subordinate to the agency" because, among other things, its penalties were "not automatically stayed pending appeal" to the agency).

66a

*Appendix A*

President—just a Delaware corporation enforcing federal law.[71]

That illustrates a constitutionally significant difference between rulemaking and enforcement. Rulemaking can sometimes be properly supervised by final-stage review if the review occurs *before* the rule takes effect.[72] In contrast, enforcement actions cannot be properly supervised by final-stage review because severe restrictions on liberty can occur at every step.[73] So, for an enforcement action, the issue of *when* oversight occurs is just as important as *how much* oversight occurs.

## C

It is no solution to say FINRA is a "part of the Government."[74] Classifying FINRA as a public agency might solve its private nondelegation problem, but it runs headlong into the rest of the Constitution.

To start, FINRA probably is *not* part of the government. It was not created by the government. It is

---

71. *See National Horsemen*, 107 F.4th at 430 (describing a similar "settlement scenario").

72. *Id.* at 423-26.

73. *Id.* at 430-31. *But see id.* at 433-35 & n. 20 ("express[ing] no opinion on whether the SEC-FINRA relationship poses any constitutional issues under the private nondelegation doctrine" but distinguishing FINRA from the private regulatory body at issue in that case).

74. *Amtrak II*, 135 S. Ct. at 1253.

67a

*Appendix A*

not controlled by the government. It is not funded by the government. All these facts point in the same direction: FINRA is a private entity.[75]

But even if we assume FINRA is a governmental entity, Article II problems immediately arise because FINRA's hearing officers are indistinguishable from the administrative law judges in *Lucia* and the special trial judges in *Freytag*.[76] As such, hearing officers must be (1) properly appointed and (2) removable by the President—two conditions hearing officers cannot satisfy.

As in *Lucia* and *Freytag*, FINRA's hearing officers are permanent employees in continuing offices exercising "important functions" identified by the Supreme Court as

---

75. *See* FINRA Br. at 2, 10 (FINRA is "a private corporation that the government did not create and does not control" and "funded by member fees and 'fines, penalties, and sanctions levied against its members'"); By-Laws of the Corporation, art. VI, § 1; *see also Kim v. FINRA*, 698 F. Supp. 3d 147, 163 (D.D.C. 2023) (denying preliminary injunction based on Article II claims in part "because FINRA is likely not a state actor").

76. *See Lucia*, 138 S. Ct. at 2052-54; *Freytag v. Commissioner*, 501 U.S. 868, 880-82, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991).

Indeed, FINRA's able counsel conceded that FINRA hearing officers exercise the same "significant authority" as the ALJs in *Lucia*. Oral Arg. Tr. at 66 ("I agree [hearing officers] exercise the same powers as SEC ALJs which in *Lucia* were found to exercise significant authority pursuant to the laws of the United States."); *see also id.* at 69 ("[I]n *Lucia*, the Supreme Court identified four powers that SEC ALJs exercised. Those four powers involved conducting hearings, hearing witnesses, enforcing discovery orders. Those four powers are also exercised by FINRA Hearing Officers.").

68a

*Appendix A*

markers of "significant authority."[77] Hearing officers "have authority to do all things necessary and appropriate to discharge [their] duties," which (as in *Lucia* and *Freytag*) includes taking testimony, conducting trials, ruling on the admissibility of evidence, and enforcing compliance with discovery orders.[78] And in performing these tasks, hearing officers exercise a wide degree of discretion—a hallmark of "significant authority."[79] In other words, as in *Lucia* and *Freytag*, FINRA's hearing officers possess "nearly all the tools of federal trial judges."[80]

The upshot is this: If FINRA is part of the government, then hearing officers are "Officers of the United States,"[81] and that means they must be appointed directly by the President, courts of law, or heads of departments—like the officials in *Lucia* and *Freytag*.[82] In addition, they can't be insulated from presidential removal by more than one level of for-cause removal restrictions.[83]

---

77.  *Freytag*, 501 U.S. at 881-82, 111 S.Ct. 2631 (second part quoting *Buckley*, 424 U.S. at 126, 96 S.Ct. 612.).

78.  FINRA Rule 9235(a); *see also* FINRA Rule 9280; FINRA Rule 9260 et seq.

79.  *Freytag*, 501 U.S. at 882, 111 S.Ct. 2631.

80.  *See Lucia*, 138 S. Ct. at 2053.

81.  Alpine also argued that members of FINRA's Board of Governors are "Officers of the United States." Alpine Br. at 46. I'll leave that issue for another day.

82.  *See Lucia*, 138 S. Ct. at 2049, 2052.

83.  *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 514, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010).

69a

*Appendix A*

FINRA's hearing officers violate both these principles. They are (presumably) appointed by FINRA,[84] not the SEC. And they have multiple layers of tenure protection. Specifically, hearing officers can be removed only by the FINRA CEO,[85] who in turn can be removed only for good cause by the SEC Commissioners,[86] who themselves are understood to be removable by the President only for good cause.[87]

\* \* \*

---

84. The record does not reveal the precise mechanism by which hearing officers are appointed, but the corporate bylaws provide that FINRA Regulation, Inc., the subsidiary of FINRA that is responsible for enforcement functions, "may employ such agents and employees as the Board may deem necessary or advisable." By-Laws of FINRA Regulation, Inc., FINRA, art. 7, § 7.3, https:// perma.cc/GS25-29PZ.

85. *Office of Hearing Officers*, FINRA, https://perma.cc/ VM5D-7RP2 ("[E]mployment protections exist for Hearing Officers to further ensure their independence. Only FINRA's Chief Executive Officer can terminate a Hearing Officer, and the termination can be appealed to the Audit Committee of FINRA's Board of Governors.").

86. 15 U.S.C. § 78s(h)(4)(B).

87. The Supreme Court has not expressly held that SEC commissioners are subject to tenure protection but decided *Free Enterprise Fund* "with that understanding." *See* 561 U.S. at 487, 130 S.Ct. 3138 ("The parties agree that the Commissioners cannot themselves be removed by the President except under the *Humphrey's Executor* [*v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935)] standard of 'inefficiency, neglect of duty, or malfeasance in office. . . .'"); *see also Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022) ("SEC Commissioners may only be removed by the President for good cause.").

70a

*Appendix A*

In short, Congress requires FINRA to "enforce" both its own rules and federal securities law, without adequate control by the President.[88] That arrangement violates the Constitution. Alpine has therefore demonstrated a strong likelihood of success on the merits.

**IV**

Alpine has also shown that the denial of a preliminary injunction will likely cause irreparable harm.

Irreparable harm has two components. The asserted injury must be certain and imminent.[89] And it must be something that can't later be fixed by "adequate compensat[ion] or other corrective relief."[90]

The Supreme Court's recent decision in *Axon Enterprise, Inc. v. FTC* tells us that Alpine faces certain and imminent harm that cannot later be fixed.[91] There, as here, the regulated party challenged the constitutionality of an enforcement action because the decisionmakers were

---

88. 15 U.S.C. § 78o-3(b)(2) (one of many requirements for FINRA to be recognized as a registered securities association).

89. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

90. *Id.* at 297-98 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

91. 598 U.S. 175, 190-93, 143 S. Ct. 890, 903-04, 215 L.Ed.2d 151 (2023).

71a

*Appendix A*

"insufficiently accountable to the President."[92] There, as here, the regulated party objected to the "harm" of "being subjected" to an "unconstitutional . . . proceeding by an unaccountable" decisionmaker.[93] And there, as here, being subjected "to an illegitimate proceeding, led by an illegitimate decisionmaker" was "a here-and-now injury" that "*is impossible to remedy once the proceeding is over*" because a "proceeding that has already happened cannot be undone."[94]

To be sure, *Axon* was answering a question about whether a district court had jurisdiction, not whether a court should grant a preliminary injunction.[95] But I struggle to see how an injury that is completely "impossible to remedy" (the standard there) meaningfully differs from an injury that is "beyond remediation" (the standard here).[96] When likely to succeed in a challenge to enforcement proceedings based on the Appointments Clause or the President's removal power, a party has

---

92. *Id.* at 897 ("Both respondents claim that the agencies' administrative law judges (ALJs) are insufficiently accountable to the President, in violation of separation-of-powers principles.").

93. *Id.* at 903 (quoting Brief for Petitioner at 36, *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) (No. 21-86), 2022 WL 1502571, at *36).

94. *Id.* at 903-04 (emphasis added) (second part quoting *Seila Law*, 140 S. Ct. at 2196).

95. Majority Op. at 1335-36.

96. First quoting *Axon*, 143 S. Ct. at 903; then quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

72a

*Appendix A*

the "right[] not to undergo the complained-of agency proceedings," which according to *Axon* are "impossible to remedy once the proceeding is over."[97] Nothing about *Axon*'s reasoning limits that fundamental legal principle to a defendant's motion to dismiss for lack of jurisdiction or excludes it from applying to a plaintiff's motion for a preliminary injunction.

None of this means that "every agency proceeding already underway must immediately be halted because of an asserted constitutional flaw."[98] The movant must show, among other things, a likelihood of success on the merits. So assuming that most administrative agencies are structured in a way that complies with the Constitution, there will be no wave of preliminary injunctions.[99]

The majority cites a handful of our circuit's cases for the proposition that a separation-of-powers violation alone is not enough for irreparable harm: *Deaver v. Seymour*; *In re al-Nashiri*; and *John Doe v. CFPB*.[100] But none of these cases supplies a rule that controls this case.[101]

---

97.  *Axon*, 143 S. Ct. at 903-04.

98.  Majority Op. at 1336.

99.  And even if there were a wave, the "fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *Free Enterprise Fund*, 561 U.S. at 499, 130 S.Ct. 3138 (quoting *Bowsher v. Synar*, 478 U.S. 714, 736, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)).

100.  Majority Op. at 1333-35.

101.  Alpine had no need to address *Deaver*, *al-Nashiri*, or *John Doe*—FINRA did not rely on them, and they do not control this case. *But see* Majority Op. at 1334-35.

73a

*Appendix A*

*First*—in *Deaver v. Seymour*, former presidential aide Michael Deaver asked the court to enjoin an independent counsel from indicting him. He argued that the independent counsel's appointment was unconstitutional.[102] This court declined to enjoin the indictment.[103] It reasoned in part that Deaver could "move to dismiss the charges under Federal Rule of Criminal Procedure 12(b)(1) for 'defects in the institution of the prosecution.'"[104]

*Deaver* is not on point. It depended on the Federal Rules of Criminal Procedure, criminal-law precedents, equity's interaction with criminal proceedings, and the collateral-order exception to the final-judgment rule. Today's case involves none of those topics.[105]

Absent *Axon*, perhaps *Deaver* would provide some guidance. But *Axon* stands for the very proposition that

---

102. 822 F.2d 66, 66-67 (D.C. Cir. 1987).

103. *Id.* at 66-67.

104. *See id.* at 68, 70.

105. Despite its differences with today's case, *Deaver* ended up promising something like what Alpine is seeking—the opportunity to obtain relief from a district court (there, a 12(b)(1) dismissal; here, a preliminary injunction) *before* being subjected to proceedings involving someone unconstitutionally appointed (there, a prosecutor; here, a hearing officer). *Id.* at 68-70. To be sure, in a line of dicta, the court speculated that it would not consider a future *appeal* if the district court denied Deaver's 12(b)(1) motion. *Id.* at 70-71. But today's challenge to a civil enforcement proceeding does not turn on dicta about the application of criminal-procedure rules to a hypothetical appeal.

74a

*Appendix A*

the majority says *Deaver* rejects. And if forced to choose between the two, I'll take *Axon*—a Supreme Court case from last year that involved a civil enforcement proceeding like today's case—over a circuit case from 37 years ago that involved a criminal prosecution unlike today's case.

*Second*—in *al-Nashiri*, a detainee at Guantanamo Bay sought mandamus relief from a military commission proceeding.[106] Even at first blush, the differences in the cases are apparent. Mandamus relief and preliminary injunctions have different standards because they serve distinct functions.[107]And the military's critical role requires insulation from interference by the judicial and legislative branches—a principle the Supreme Court has upheld time and again.[108] The mandamus posture and military nature of the case make *al-Nashiri* inapposite.

*Third*—in *John Doe*, a party regulated by the Consumer Financial Protection Bureau sought a

---

106. 791 F.3d 71, 73 (D.C. Cir. 2015).

107. *Compare id.* at 82 (a writ of mandamus under 28 U.S.C. § 1651(a) serves the "traditional function of confining a court to its prescribed jurisdiction" (cleaned up)), *with Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981))).

108. *See e.g.*, *Department of Navy v. Egan*, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) ("unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs").

75a

*Appendix A*

preliminary injunction to halt a CFPB investigation.[109] Over a dissent from then-Judge Kavanaugh, an emergency panel denied the requested relief in a non-precedential order.[110] It stated that a separation-of-powers violation is "not invariably an irreparable injury."[111]

If *John Doe* had been issued as a published opinion, or if the panel had later designated it for publication, stare decisis would require us to abide by its holding. But *John Doe* is an unpublished order.[112] That means it is

---

109. *John Doe Co. v. CFPB*, 849 F.3d 1129, 1130-31 (D.C. Cir. 2017).

110. *Id.* at 1135.

111. *Id.*

112. Review of the docket confirms this. *See* Order, *John Doe v. CFPB*, No. 17-5026 (D.C. Cir. Mar. 3, 2017).

Courts use the terms "published" and "unpublished" as terms of art to distinguish between (a) precedential opinions and (b) simple orders that do not bind future panels. It does not matter that West Publishing later put *John Doe*'s unpublished order in the Federal Reporter, without instruction from this court. Indeed, it would be ironic to allow the decision of a private corporation like West to determine the outcome of a case about whether FINRA is a private corporation executing federal law.

It also does not matter that other panels have cited *John Doe* "for seven years." Majority Op. at 1335. Courts are free to cite dissents, essays, articles, books, and many other forms of persuasive (but non-binding) authority. And sometimes a precedential opinion will even adopt as its holding the reasoning of a nonprecedential authority. But that's not what happened to *John Doe*. The majority has not cited a single precedential opinion that incorporated *John Doe*'s reasoning into its holding. If a precedential opinion *had*

76a

*Appendix A*

"not suitable for governing future cases" and does "not constrain a panel of the court from reaching a contrary conclusion in a published opinion after full consideration of the issue."[113]

Reliance on the (non-binding) order in *John Doe* is all the more curious considering that the *John Doe* dissent reads like a preview of *Axon*. Just as *Axon* held that it "impossible to remedy" the harm of "being subjected" to an "unconstitutional . . . proceeding by an unaccountable" decisionmaker "once the proceeding is over,"[114] the dissent in *John Doe* argued: "Irreparable harm occurs almost by definition when a person or entity demonstrates a likelihood that it is being regulated on an ongoing basis by an unconstitutionally structured agency that has issued binding rules governing the plaintiff's conduct and that has authority to bring enforcement actions against the plaintiff."[115]

**V**

The two remaining preliminary injunction factors also favor Alpine. "The public interest is not served by letting an unconstitutional[]" entity "continue to operate"

---

done so, then the majority could simply rely on the holding of that precedential opinion without having to rely on *John Doe*. In other words, the majority's dependence on *John Doe* is itself evidence that no precedential opinions of our court have held what *John Doe* held.

113. *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011) (cleaned up); *see also* D.C. Cir. Rule 36(c)(2), (e)(2).

114. *Axon*, 143 S. Ct. at 903.

115. *John Doe*, 849 F.3d at 1136 (Kavanaugh, J., dissenting).

77a

*Appendix A*

and persist in violating a business's rights.[116] And the demonstrated violation of Alpine's constitutional rights tips the balance of equities in its favor, even if FINRA's enforcement goals will be impeded until the close of the collateral litigation.[117] Alpine has therefore shown both that the issuance of its requested injunction is "in the public interest" and that the "balance of equities tips" in its favor.[118]

* * *

FINRA relies on a Goldilocks defense. It is too much like a private entity for Article II's strictures, yet too much like the government for the private nondelegation doctrine to apply.[119] But FINRA "cannot have its cake and eat it too."[120] Its split identity fails to provide the accountability

---

116.  *See id.* at 1137.

117.  *See id.*

118.  *Winter*, 555 U.S. at 20, 129 S.Ct. 365.

119.  *Compare* FINRA Br. at 2 (arguing that the Constitution's appointment and removal requirements can't apply to FINRA because it is "a private corporation that the government did not create and *does not control*" (emphasis added)), *with id.* at 3-4 ("FINRA's rulemaking and disciplinary powers are *subject to extensive SEC oversight*, and thus satisfy the private nondelegation doctrine." (emphasis added)).

120.  *Amtrak I*, 721 F.3d at 676.

FINRA frequently seeks benefits traditionally reserved for the government, such as immunity from suit and compliance with its rules under the force of law. *See, e.g., Gallagher v. FINRA*, No. 21-13605, 2022 WL 1815594, at *2-3 (11th Cir. June 3, 2022)

78a

*Appendix A*

required by our Constitution. When federal law empowers officials to decide a company's fate, they must be Officers of the United States, selected through the Constitution's Appointments Clause and properly removable by the President.

The district court erred when it held otherwise. Because the majority correctly enjoins FINRA from unilaterally expelling Alpine and destroying its business, I concur in that part of its judgment. But I respectfully dissent from the majority's decision not to enjoin the expedited enforcement proceeding in its entirety.

---

(granting FINRA immunity from suit because it was acting "under its delegated authority"); FINRA's Motion to Dismiss at 4, *Empire Financial Group, Inc. v. FINRA*, No. 9:08-cv-80534-KLR, 2008 WL 2717062 (S.D. Fla. May 21, 2008), ECF No. 2 ("Once approved by the SEC, FINRA rules enjoy the status of federal law.").

79a

**APPENDIX B — ORDER OF THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT, FILED NOVEMBER 22, 2024**

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23-5129

September Term, 2024

ALPINE SECURITIES CORPORATION,

*Appellant,*

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY AND UNITED STATES OF AMERICA,

*Appellees.*

FILED ON: NOVEMBER 22, 2024

Appeal from the United States District Court for the District of Columbia (No. 1:23-cv-01506)

Before: SRINIVASAN, *Chief Judge*, MILLETT and WALKER, *Circuit Judges*

80a

*Appendix B*

**JUDGMENT**

This cause came to be heard on the record on appeal from the United States District Court for the District of Columbia and was argued by counsel. On consideration thereof and in accordance with the opinion of the court filed herein this date. It is

**ORDERED** and **ADJUDGED** that the judgment of the district court be reversed in part to the extent that it held that the Financial Industry Regulatory Authority ("FINRA") could expel Alpine Securities Corporation prior to the opportunity for review of that expulsion decision by the Securities and Exchange Commission ("SEC"); the case be remanded for the district court to enter a limited preliminary injunction enjoining FINRA from giving effect to any expulsion order issued against Alpine until either the SEC reviews the order on the merits or the time for Alpine to seek SEC review lapses; the injunction pending appeal entered by this court on July 5, 2023, be dissolved only to the extent that it enjoins FINRA's expedited proceeding from going forward; and the portion of the injunction that would preclude FINRA from giving effect to any expulsion order it might issue against Alpine will remain in effect until the district court issues its injunction.

**Per Curiam**

81a

*Appendix B*

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/

Daniel J. Reidy
Deputy Clerk

Date: November 22, 2024

Opinion for the court filed by Circuit Judge Millett.
Opinion concurring in the judgment in part and dissenting
in part filed by Circuit Judge Walker.

82a

### APPENDIX C — ORDER OF THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT, FILED JULY 5, 2023

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23-5129

September Term
1:23-cv-01506-BAH

ALPINE SECURITIES CORPORATION,

*Appellant,*

SCOTTSDALE CAPITAL ADVISORS CORPORATION,

*Appellee.*

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY AND UNITED STATES OF AMERICA,

*Appellees.*

July 5, 2023, Filed

**BEFORE:** Henderson, Walker[*], and Garcia[**], Circuit Judges.

---

    [*] A statement by Circuit Judge Walker, concurring in this order, is attached.

    [**] Judge Garcia would deny the emergency motion for injunction pending appeal.

Midland/Odessa Division    Case No.: MO:24-CV-317

83a

*Appendix C*

**ORDER**

Upon consideration of the emergency motion for injunction pending appeal, the oppositions thereto, and the reply; and the administrative stay entered on June 8, 2023, it is

**ORDERED** that the administrative stay be dissolved. It is

**FURTHER ORDERED** that the emergency motion for injunction pending appeal be granted and the Financial Industry Regulatory Authority be enjoined from continuing the expedited enforcement proceeding against Alpine Securities Corporation pending further order of the court. Appellant has satisfied the stringent requirements for an injunction pending appeal. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008); *D.C. Circuit Handbook of Practice and Internal Procedures* 33 (2021).

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/

Michael C. McGrail
Deputy Clerk

84a

*Appendix C*

Walker, *Circuit Judge*, concurring:

"*Because the entire 'executive Power' belongs to the President alone, it can only be exercised by the President and those acting under him.*'"

To buy and sell securities, brokers must register with a self-regulatory organization. 15 U.S.C. § 78o(a)(1), (b)(1)(B). Self-regulatory organizations are responsible for "enforc[ing] compliance" with the "provisions" of the Securities and Exchange Act, and the "rules and regulations thereunder." *Id.* § 78s(g)(1); *see also id.* § 78o-3(b)(7).

Alpine Securities Corporation is a securities broker. Earlier this year, it found itself in trouble with its self-regulatory organization, the Financial Industry Regulatory Authority. Believing that Alpine violated a preexisting cease-and-desist order, FINRA brought an expedited enforcement action seeking to stop Alpine from selling securities. In response, Alpine filed this suit, collaterally attacking FINRA's authority to conduct its enforcement proceeding.

All that might sound like a run-of-the-mill encounter with the government. But here's the twist: Self-regulatory organizations are not government agencies. They are private corporations responsible for regulating securities brokers. *Id.* § 78s(g)(1).

---

\* *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 143 S. Ct. 1720, 1741 (2023) (Thomas, J., concurring) (cleaned up).

85a

*Appendix C*

Alpine says FINRA's enforcement action violates the Constitution because FINRA's hearing officers impermissibly wield executive power that may be exercised only by the President and officers under his supervision. And it seeks an injunction pending appeal to block its expulsion from FINRA—the so-called "corporate death penalty"—while it argues its case. App. 48.

By granting Alpine's request, the Court preserves the status quo and allows full consideration of Alpine's constitutional argument.

# I

We will enjoin agency action pending appeal when the party seeking the injunction is likely to win on the merits, it will suffer irreparable harm without an injunction, and the equities and public interest favor our intervention. *Nken v. Holder*, 556 U.S. 418, 426, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009); *see also John Doe Co. v. CFPB*, 849 F.3d 1129, 1131, 428 U.S. App. D.C. 55 (D.C. Cir. 2017).

If Alpine is likely to succeed on the merits, the other boxes are easily checked. Alpine would suffer an irreparable harm without an injunction because the ongoing FINRA enforcement proceedings would put it out of business. Plus, the resolution of claims by an unconstitutionally structured adjudicator is a "here-and-now injury" that cannot later be remedied. *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191, 143 S. Ct. 890, 215 L. Ed. 2d 151 (2023) (cleaned up).

86a

*Appendix C*

An injunction would also be equitable and in the public interest. The public interest favors preventing the deprivation of individual rights and abuses of government power. *See Nken*, 556 U.S. at 436. If Alpine's constitutional challenge has merit, that is the case here: It will be "subject[] to an illegitimate proceeding, led by an illegitimate decisionmaker." *Axon*, 598 U.S. at 191.

The interests cutting the other way are not as strong. The public has an interest in timely enforcement against those who violate the law. *Nken*, 556 U.S. at 436. But here the only evidence that Alpine *has* violated the law is FINRA's say so. And if Alpine is correct on the merits, then FINRA is an illegitimate decisionmaker.

That leaves Alpine's likelihood of success on the merits. At this early stage, Alpine has raised a serious argument that FINRA impermissibly exercises significant executive power. So the Court is correct to grant an injunction preserving Alpine's business while it litigates its constitutional challenge. To be clear, "I do not rule out the possibility that further briefing and argument might convince me that my current view is unfounded." *Ritter v. Migliori*, 142 S. Ct. 1824, 1824, 213 L. Ed. 2d 1034 (2022) (Alito, J., dissenting); *see also Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("[t]o reiterate," a vote to stay is "not a decision on the merits").

## II

In our system of government, the President alone is "vested" with the "executive Power." U.S. Const. art. II, § 1.

87a

*Appendix C*

To ensure that the executive power remains with the President, the Constitution puts limits on those who exercise it on the President's behalf. Anyone who "wield[s] significant executive power" must be an Officer of the United States. *See Buckley v. Valeo*, 424 U.S. 1, 126, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). Those officers must generally be removable by the President or an officer subordinate to the President. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2211, 207 L. Ed. 2d 494 (2020) (principal officers must be removeable by the President). And they must be appointed by an appropriate government body under the Appointments Clause. U.S. Const. art. II, § 2, cl. 2; *Lucia v. SEC*, 138 S. Ct. 2044, 2051, 201 L. Ed. 2d 464 (2018).

Applying those principles, the Supreme Court held that Administrative Law Judges *within* the SEC were Officers of the United States who must be appointed in accordance with the Appointments Clause. *Lucia*, 138 S. Ct. at 2049. The ALJs, the Court reasoned, "exercised significant authority" because they had "discretion" to exercise an "important" government function— "enforc[ing] the nation's securities laws." *Id.* at 2049, 2051, 2053 (cleaned up). The ALJs could, among other things, demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt. *Id.* at 2053.

FINRA's hearing officers are near carbon copies of those ALJs. They are tasked by statute with enforcing the nation's securities laws. 15 U.S.C § 78s(g)(1). They

88a

*Appendix C*

can "levy sanctions that carry the force of federal law." *Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017) (citing 15 U.S.C. § 78o-3(b)(7)). And like *Lucia*'s ALJs, hearing officers demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt. *See* FINRA Rules 8210 (Provision of Information and Testimony), 9252 (Requests for Information), 9235 (Hearing Officer Authority), 9263 (Evidence Admissibility), 9280 (Contemptuous Conduct).[1]

True, the SEC can review FINRA's decisions "on its own motion, or upon application by any person aggrieved . . . filed within thirty days." 15 U.S.C. § 78s(d)(2). But that doesn't differentiate the hearing officers from *Lucia*'s ALJs. The SEC could review the ALJs' decisions too. Yet that "ma[d]e no difference" to whether they exercised significant executive power. *Lucia*, 138 S. Ct. at 2054. The Court emphasized that the SEC "adopts [ALJs'] credibility findings absent overwhelming evidence to the contrary." *Id.* (cleaned up). The standard of review is similar here. *See Daniel D. Manoff*, 55 S.E.C. 1155, n.6 (2002) (credibility determinations made by NASD—FINRA's predecessor—"can be overcome only when there is 'substantial evidence' for doing so") (cleaned up).

In other words, if the ALJs in *Lucia* exercised "significant" executive power, then FINRA hearing officers probably do too. *Lucia*, 138 S. Ct. at 2051.

---

1. To be sure, there are some minor differences between the FINRA hearing officers and *Lucia*'s ALJs. For example, the ALJs "administer Oaths." *Lucia*, 138 S. Ct. at 2053. In FINRA hearings, that job is left to "a court reporter or notary public." FINRA Rule 9262 (Testimony).

89a

*Appendix C*

Does it make a difference that FINRA hearing officers are employees of a nominally private corporation? Probably not. Though FINRA is private, its enforcement activities are controlled by the government. The Securities Exchange Act *requires* FINRA to enforce government standards, including statutory provisions and SEC regulations. 15 U.S.C. § 78s(g)(1). And FINRA's own rules are generally vetted by the SEC before taking effect. *Id.* § 78s(b)(1). And the SEC can modify them at any time. *Id.* § 78s(c). And FINRA does not enjoy prosecutorial discretion—indeed, the SEC may remove FINRA's directors and officers if they do not enforce government standards. *Id.* §§ 78s(h)(4), 78o-3(b)(7). And even FINRA's code of procedure is approved by the SEC. *See Regulatory Notice 08-57*, FINRA (2008), https://www.finra.org/rules-guidance/notices/08-57 (FINRA announces SEC approval of its code of procedure, among other things).

From start to finish, FINRA hearing officers execute government laws subject to a government plan, with little to no room for private control. *Cf. Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928, 204 L. Ed. 2d 405 (2019) ("a private entity can qualify as a state actor . . . when the government compels the private entity to take a particular action").

Despite seeming to exercise the executive authority of the United States, FINRA hearing officers remain private employees. That presents two constitutional issues that will benefit from "full briefing, oral argument, and our usual extensive internal deliberations." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring).

90a

*Appendix C*

First, FINRA hearing officers are not appointed by a government body pursuant to the Appointments Clause. *See Lucia*, 138 S. Ct. at 2051. Second, they are shielded from removal by the SEC except for cause. 15 U.S.C. § 78s(h)(4). And the Supreme Court has assumed that the President may not remove SEC Commissioners at will. *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 487, 130 S. Ct. 3138, 177 L. Ed. 2d 706 (2010). That means that there are two layers of removal protection—one for the Commissioners and one for the hearing officers. That may well infringe on the President's "ability to execute the laws . . . by holding his subordinates accountable for their conduct." *Id.* at 496.

FINRA might prevail on those issues, but on the briefing before us, that seems unlikely. It would be odd if the Constitution *prohibits* Congress from vesting significant executive power in an unappointed and unremovable government administrator but *allows* Congress to vest such power in an unappointed and unremovable private hearing officer. *See Lucia*, 138 S. Ct. at 2051; *see also Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 57, 135 S. Ct. 1225, 191 L. Ed. 2d 153 (2015) (Alito, J., concurring) ("There is good reason to think that those who have not sworn an oath cannot exercise significant authority of the United States.").

To so hold could create a constitutional loophole. It would suggest that Congress was free to fix the constitutional infirmity with the ALJs in *Lucia* simply by moving them outside of the Executive Branch. But that

91a

*Appendix C*

wouldn't cure the basic defect motivating the Supreme Court: Only the President and properly appointed Officers of the United States may exercise significant executive power. *See Lucia*, 138 S. Ct. at 2051 (citing *Buckley*, 424 U.S. at 126). "What cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, No. 20-1199, slip op. 39, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857, 2023 U.S. LEXIS 2791 (U.S. June 29, 2023) (cleaned up).

To be sure, Congress may authorize private organizations to work with government regulators. For example, it does not violate the Constitution to let private entities make recommendations that the government later approves. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399, 60 S. Ct. 907, 84 L. Ed. 1263, 1940-1 C.B. 258 (1940). But the hearing officers here do not just make recommendations—they enforce securities laws and decide parties' rights. And unless the losing party appeals to the SEC or the SEC steps in unprompted, the hearing officers' decisions are final.

\* \* \*

There is a serious argument that FINRA hearing officers exercise significant executive power. And it is undisputed that they do not act under the President. That may be a constitutional problem. *See* U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 2, cl. 2.

Midland/Odessa Division    Case No.: MO:24-CV-317

92a

*Appendix C*

The Court is right to grant an injunction pending
appeal to let Alpine litigate its case against FINRA,
without the agency first sentencing it to the corporate
death penalty.

93a

**APPENDIX D — MEMORANDUM OPINION OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA,
FILED JUNE 7, 2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No. 23-1506 (BAH)

SCOTTSDALE CAPITAL
ADVISORS CORPORATION and
ALPINE SECURITIES CORPORATION,

*Plaintiffs,*

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

*Defendant,*

UNITED STATES OF AMERICA,

*Intervenor Defendant.*

Filed June 7, 2023

**MEMORANDUM OPINION**

Plaintiffs Scottsdale Capital Advisors Corporation ("SCA") and Alpine Securities Corporation ("Alpine") originally filed suit in the Middle District of Florida

94a

*Appendix D*

asserting several constitutional challenges to the operation and structure of the Financial Industry Regulatory Authority, Inc. ("FINRA"), a private corporation responsible for regulating broker-dealers in the securities industry. As litigation proceeded in that case, FINRA expedited an enforcement action against Alpine, alleging that this company committed thousands of violations of a permanent FINRA order to cease-and-desist certain conduct, which conduct required Alpine's immediate expulsion from FINRA's membership and thus the securities industry. Alpine coins that punishment "the corporate death penalty" given that such expulsion would necessitate a complete closure of Alpine's business and operations. Pls.' Second Am. Compl. ("SAC") ¶¶ 10, 129, ECF No. 43.

Weeks before the expedited enforcement action's scheduled hearing before FINRA, Alpine sought an emergency preliminary injunction from the district court in the Middle District of Florida, seeking to halt the expedited enforcement proceeding pending resolution of Alpine's constitutional challenges. After briefing and oral argument on the motion, however, the case was transferred to this Court for resolution—only two business days before the FINRA hearing. The day before the scheduled hearing, Alpine then renewed its emergency motion seeking a preliminary injunction or temporary restraining order ("TRO"). Alpine also seeks reconsideration of an earlier order of this Court denying its original emergency motion as filed in the Middle District of Florida.

95a

*Appendix D*

Upon consideration of Alpine's two pending motions, extensive briefing, oral argument, and the entire record herein, Alpine's motion for reconsideration is granted and its emergency motion for a preliminary injunction or TRO is denied.

## I.   BACKGROUND

The factual background and procedural history of this case is briefly recounted below.

### A.   Legal Landscape

The Securities Exchange Act of 1934 ("the Exchange Act"), as amended in 1938, created a complex statutory regime "of cooperative self-regulation" of so-called over-the-counter securities markets. *See United States v. NASD*, 422 U.S. 694, 700 n.6, 95 S. Ct. 2427, 45 L. Ed. 2d 486 (1975). That scheme permits private entities, known as self-regulatory organizations ("SROs"), to perform a supervisory role over the securities industry, subject to oversight from the Securities and Exchange Commission ("SEC" or "the Commission"). *See* 15 U.S.C. § 78s (describing the SEC's oversight role over SROs). Brokers and dealers transacting in the securities industry may not do so without registering with the SEC and joining a national securities association. *See id.* § 78o(a)(1), (b) (1). The only national securities association currently registered with the SEC is defendant FINRA. *See id.* § 78o-3 (describing the requirement for registration of a national securities association).

96a

*Appendix D*

### 1.    *FINRA's Corporate Structure*

FINRA is a Delaware not-for-profit corporation and SEC-registered national securities association that conducts business in the District of Columbia. *See* SAC ¶¶ 30–31. Following its formation from a 2007 consolidation between its predecessor, the National Association of Securities Dealers ("NASD"), and the enforcement arm of the New York Stock Exchange ("NYSE"), *id.* ¶ 40; *see also* Order Approving Proposed Rule Change to Amend the By-Laws of NASD, 72 Fed. Reg. 42,169 (Aug. 1, 2007), FINRA is governed by a board of twenty-two members, comprised of industry and non-industry members and FINRA's chief executive officer ("CEO"), which board oversees the organization's management and administration, *see* SAC ¶ 42–43. Board members are selected by FINRA's members and are removable only by a majority vote of FINRA's board or, "in very limited and specific circumstances, the SEC," and thus no Board member or the CEO is appointed by the SEC, the U.S. President, Congress, or any other governmental body. *Id.* ¶¶ 57–58; *see also* 72 Fed. Reg. at 42,170–72.[1] At the next level of management, FINRA executives are appointed and removed by the board, *see* SAC ¶ 59, with no involvement by the SEC or any other

---

1.    More specifically, the SEC may "remove from office or censure" a FINRA officer or director upon a finding that the individual in question "has willfully violated [applicable statutory provisions], the rules or regulations thereunder, or the rules of [FINRA], willfully abused his authority, or without reasonable justification or excuse has failed to enforce compliance" with securities laws. 15 U.S.C. § 78s(h)(4).

97a

*Appendix D*

government official or body. FINRA's funding is derived "almost exclusively" through membership fees as well as fines, penalties, and sanctions, *id.* ¶ 52, with its budget set "without any constraint or legislative cap" because FINRA receives no government funding, *id.* ¶ 51. *See also* FINRA By-Laws art. VI § 1 (Power of the Corporation to Fix and Levy Assessments), https://www.finra.org/rules-guidance/rulebooks/corporate-organization/power-corporation-fix-and-levy-assessments [https://perma.cc/PB84-KUXL]. Part of that budget includes salaries for FINRA's executives, as determined by the organization itself. *See id.* ¶ 53.

## 2.   *FINRA's Rules*

FINRA's supervisory duties over its membership—including roughly 3,400 brokerage firms, 150,000 branch offices, and 610,000 individual registered securities representatives—is varied. *See id.* ¶ 41. While FINRA promulgates its own rules and standards and enforces compliance with those rules through administering sanctions and barring individuals from FINRA membership, *see id.* ¶ 50, this supervisory authority is subject to the SEC's oversight and control, *Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017). For instance, the SEC may limit FINRA's operations or registration if FINRA violates a statute or SEC regulation. *See* 15 U.S.C. § 78s(h)(1). Suspension or revocation of that registration is subject to the SEC's opinion that such action "is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]." *Id.* The SEC also reviews and

98a

*Appendix D*

approves rules proposed by FINRA, *see id.* § 78s(b)-(c), with SEC approval a prerequisite for the majority of such rules, *see id.* § 78s(b)(1).[2] At any time and as "deem[ed] necessary or appropriate[,]" the SEC may also "abrogate, add to, and delete from" any FINRA rule "to insure the fair administration of the self-regulatory organization, to conform its rules to requirements of [the Exchange Act] and the rules and regulations thereunder applicable to such organization, or otherwise in furtherance of the purposes of [the Act]." *Id.* § 78s(c).

---

2.  The Exchange Act permits three avenues for promulgation of a FINRA rule without the SEC's express approval: (i) a rule designated by FINRA "as . . . constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing [FINRA] rule[;] . . . establishing or changing a due, fee, or other charge imposed by [FINRA;] . . . [or] concerned solely with the administration of [FINRA] or other matters[,]" 15 U.S.C. § 78s(b)(3)(A); (ii) a rule that "appears to the Commission . . . is necessary for the protection of investors, the maintenance of fair and orderly markets, or the safeguarding of securities or funds[,]" *id.* § 78s(b)(3)(B); and (iii) a rule on which the SEC does not act within a specified time are "deemed to have been approved[,]" *id.* § 78s(b)(2)(D). In either of the first two scenarios, within 60 days of the proposed rule's filing, the SEC "summarily may temporarily suspend the change in the rules . . . if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter." *Id.* § 78s(b)(3)(C). In such an instance, the SEC shall hold proceedings to determine whether the proposed rule shall be approved. *See id.*

Midland/Odessa Division   Case No.: MO:24-CV-317

99a

*Appendix D*

### 3.   *FINRA's Enforcement Regime*

Enforcement proceedings result from FINRA's investigation into alleged misconduct by its members, and such investigations are done at FINRA's discretion, without any influence from the SEC or other branch of government. *See* SAC ¶ 55; *see also* 15 U.S.C. § 78o-3(b)(8). In fact, "[i]nvolvement by SEC commissioners in this onerous and impactful process occurs only when—and if—a target of an investigation survives the investigation, prosecution, and internal appeal process." SAC ¶ 55. FINRA takes enforcement action against individuals or entities that violate a FINRA rule, SEC regulation, or statutory provision. *See* 15 U.S.C. § 78o-3(b)(7). Enforcement proceedings begin with FINRA filing a complaint against a targeted entity, providing notice to that entity of the specific charges. *See* FINRA Rule 9211 (Aug. 3, 2018), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9211 [https://perma.cc/3RM6-F9MF] (Authorization of Complaint). A FINRA hearing panel then conducts an evidentiary hearing, in which the entity may present arguments over multiple days. *See* 15 U.S.C. § 78o-3(h)(1); *see also id.* § 78o-3(b)(8) (requiring registered national securities associations to employ fair disciplinary procedures); FINRA Rule 9231 (June 4, 2020), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9231 [https://perma.cc/SVL6-8HZ2] (Appointment by the Chief Hearing Officer of Hearing Panel or Extended Hearing Panel or Replacement Hearing Officer). The panel then issues a statement of decision with findings. *See* 15 U.S.C. § 78o-3(h)(1)(A)-(C); *see also* FINRA Rule 9268 (Nov. 2, 2015), https://www.finra.org/rules-guidance/

100a

*Appendix D*

rulebooks/finra-rules/9268 [https://perma.cc/72SL-T7UW] (Decision of Hearing Panel or Extended Hearing Panel).

An aggrieved party may appeal that decision to FINRA's National Adjudicatory Council ("NAC"), which "may affirm, dismiss, modify, or reverse with respect to each finding." FINRA Rule 9348 (Nov. 2, 2015), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9348 [https://perma.cc/PWN9-TWS6] (Powers of the National Adjudicatory Council on Review). The NAC may also review the panel decision *sua sponte*. *See* FINRA Rule 9312 (Apr. 15, 2021), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9312 [https://perma.cc/74ZK-Q75W] (Review Proceeding Initiated by Adjudicatory Council). Such an appeal operates as a stay of the panel's decision pending NAC's decision. *See* FINRA Rule 9311 (Apr. 15, 2021), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9311 [https://perma.cc/BQ58-TCQT] (Appeal by Any Party; Cross-Appeal). A NAC decision may then be appealed to the SEC, *see* 15 U.S.C. § 78s(d)(2), which conducts *de novo* review and may consider evidence not previously considered by FINRA, *see* Commission Rule of Practice 452, 17 C.F.R. § 201.452.

Final decisions by the SEC are subject to review by a federal appellate court with the filing of a petition by an aggrieved party, *see* 15 U.S.C. § 78y, but FINRA itself may not seek judicial review of an SEC decision contrary to a FINRA ruling, *see generally NASD v. SEC*, 431 F.3d 803, 812, 369 U.S. App. D.C. 13 (D.C. Cir. 2005).

101a

*Appendix D*

### B.  FINRA's Enforcement Action Against Plaintiff

Plaintiffs are broker-dealers and registered FINRA members, both owned by the same parent holding company. *See* SAC ¶¶ 28–29; Transcript of Hearing (June 1, 2023) ("Hr'g Tr.") at 9:17–23.[3] As early as 2019, FINRA received complaints from customers of Alpine alleging that the firm charged a significant monthly account fee. *See* FINRA's Opp'n to Pl.'s Renewed Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's TRO Opp'n"), Ex. A, March 22, 2022 Extended Hearing Panel Decision, *Dep't of Enf't v. Alpine Sec. Corp.*, FINRA Disciplinary Proceeding No. 2019061232601 ("March 2022 Panel Decision") at 2, ECF No. 70-1. On March 22, 2022, a FINRA hearing panel found that Alpine "converted and misused customer funds and securities, engaged in unauthorized trading, charged and paid customers unfair prices in securities transactions, charged customers unreasonable and discriminatory fees, and made an

---

3. Neither plaintiff is a stranger to FINRA enforcement proceedings. *See, e.g.*, FINRA's Opp'n to Pl.'s Renewed Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's TRO Opp'n") at 3, ECF No. 70 ("Alpine is a broker-dealer member of FINRA . . . and has been disciplined multiple times for violating FINRA rules."). For example, in the complaint, plaintiffs mention an effort by FINRA to SCA "for supposed violations of Section 5 of the Securities Act." SAC ¶ 115. FINRA's investigation into SCA began in March 2015 and concluded in September 2021 when the SEC set aside FINRA's findings and the NAC's affirmance that SCA violated the charged statutes. *See id.* ¶¶ 116–119; *see also In the Matter of the Application of Scottsdale Capital Advisors Corp.*, Release No. 93052, 2021 SEC LEXIS 2789, 2021 WL 4242630, at *9 (S.E.C. Sept. 17, 2021).

102a

*Appendix D*

unauthorized capital withdrawal." March 2022 Panel Decision at 1. For Alpine's violations, the panel ordered Alpine's expulsion from FINRA's membership, payment of restitution in an amount exceeding $4 million, and a "permanent cease and desist order." *Id.* Alpine then appealed that panel decision to the NAC, which appeal had the effect of staying the expulsion and restitution sanctions but the "permanent cease and desist order" took immediate effect, in accordance with the explicit use of this term in the panel decision and governing FINRA rules. *See* FINRA's TRO Opp'n at 3–4; *see also* FINRA Rule 9311(b) ("Any such appeal, however, will not stay a decision, or that part of a decision, that imposes a permanent cease and desist order.").

During the pendency of the NAC appeal, FINRA discovered that Alpine failed to comply with the permanent cease-and-desist order that had not been stayed pending Alpine's appeal to the NAC. *See* FINRA's TRO Opp'n at 4. After a months' long investigation, FINRA determined that Alpine violated the cease-and-desist order "more than 35,000 times by charging customers millions of dollars in unreasonable, unfair, and unlawful fees and commissions." *Id.* Notably, Alpine does not contest that position, but rather counters that its actions were not improper. *See* SAC ¶ 127. As a result, on April 19, 2023, FINRA initiated an expedited enforcement proceeding ("Enforcement Proceeding") to expel Alpine from FINRA membership and stop its continued improper conduct, a punishment characterized by plaintiffs as "the corporate death penalty." *See* FINRA's TRO Opp'n at 4; SAC ¶¶ 126–129. The Enforcement Proceeding was scheduled for May

103a

*Appendix D*

31, 2023. *See* Alpine's Renewed Emergency Mot. for a Preliminary Injunction & Temporary Restraining Order ("Pl.'s TRO Mot.") at 2, ECF No. 66. At a hearing before this Court, held on June 1, 2023, Alpine disclosed that the FINRA hearing officer postponed the Enforcement Proceeding until June 5, 2023, pending resolution of Alpine's motion for equitable relief, described below. *See* Hr'g Tr. at 7:13–16.

## C.    Procedural History in Federal Court

Plaintiffs filed their initial complaint in the Middle District of Florida on October 12, 2022, *see* Compl., ECF No. 1, then amended that complaint on February 3, 2023, *see* First Am. Compl., ECF No. 27. The government intervened on February 6, 2023, *see* Notice of Intervention by the United States of America, ECF No. 28, shortly before FINRA moved to dismiss the first amended complaint on March 10, 2023, with the government's support, *see* FINRA's Mot. Dismiss Pls.' Am. Compl., ECF No. 35; Gov't's Mem. of Law in Defense of the Challenged Provisions of the Federal Securities Law, ECF No. 37. Before FINRA's dismissal motion was fully briefed, the Supreme Court issued *Axon Enterprise Inc. v. FTC*, 598 U.S. 175, 143 S. Ct. 890, 215 L. Ed. 2d 151 (2023), which plaintiffs now claim is relevant to the relief they seek in their complaint.

Five days after *Axon*'s issuance, FINRA initiated the Enforcement Proceeding against Alpine on April 19, 2023. *See* SAC ¶ 126. Plaintiffs quickly filed the operative second amended complaint on April 28, 2023, in response to *Axon*,

104a

*Appendix D*

*see* SAC, and then approximately a week later, Alpine filed an emergency motion for a preliminary injunction on May 9, 2023, seeking to halt the Enforcement Proceeding then scheduled for May 31, 2023, *see* Pl.'s Emergency Mot. for Preliminary Injunction, ECF No. 45. The assigned Judge in the Middle District of Florida held a three-hour hearing on the motion on May 22, 2023, *see* Min. Entry (May 22, 2023), and, two days later, ordered the transfer of this case to this Court, *see* Order, ECF No. 62. That transfer took effect at approximately noon on Friday, May 26, 2023—two business days before the scheduled Enforcement Proceeding. *See* Case Transfer, ECF No. 63.

Upon being assigned this case, this Court denied, without prejudice, Alpine's emergency motion for preliminary injunction and FINRA's motion to dismiss because the materials filed relied on out-of-circuit, nonbinding case law mostly from the Fifth and Eleventh Circuits that was unfit for consideration of such extraordinary equitable relief on a truncated timeline. *See* Min. Order (May 26, 2023).[4] The parties were directed to propose a briefing schedule by the next business day, Tuesday, May 30, 2023. *See* Min. Order (May 26, 2023). On May 30, 2023, Alpine moved for reconsideration of the Order denying, without prejudice, its emergency preliminary injunction motion, ECF No. 65, as well as renewed its emergency motion for a preliminary injunction and temporary restraining order, ECF No. 66, prompting

---

4. The Court also signaled to the parties that exhaustion before the SEC may not have been met in this case according to the D.C. Circuit's ruling in *Springsteen-Abbott v. SEC*, 989 F.3d 4, 7–8, 451 U.S. App. D.C. 155 (D.C. Cir. 2021).

105a

*Appendix D*

entry of a highly expedited briefing schedule, *see* Min. Order (May 30, 2023), for briefing to be completed by 9 p.m. on May 30, 2023, *see* Gov't's Third Mem. in Defense of the Challenged Provisions of the Federal Securities Laws ("Gov't's Opp'n"), ECF No. 68; FINRA's Opp'n to Pl.'s Mot. for Reconsideration ("FINRA's Reconsideration Opp'n"), ECF No. 69; FINRA's Opp'n to Pl.'s Renewed Mot. for Preliminary Injunction & Temporary Restraining Order ("FINRA's TRO Opp'n"), ECF No. 70; Pl.'s Reply in Supp. of Mot. for Reconsideration ("Pl.'s Reconsideration Reply"), ECF No. 71; Pl.'s Reply in Supp. of Renewed Emergency Mot. for Preliminary Injunction & Temporary Restraining Order ("Pl.'s TRO Reply"), ECF No. 72, and a hearing scheduled for May 31, 2023, which, at the parties' request, was postponed until June 1, 2023, *see* Min. Order (May 31, 2023), Min. Entry (June 1, 2023).

At the hearing, the parties were directed to submit any supplemental briefs regarding the consequences should FINRA be deemed a state actor, as plaintiffs urged, and the validity of plaintiffs' First Amendment claim. *See* Min. Order (June 1, 2023). Following submission of those memoranda, *see* Gov't's Supp. Br. in Resp. to the Court's June 1, 2023 Min. Order ("Gov't's Supp. Br."), ECF No. 82; FINRA's Supp. Br. in Opp'n to Pl.'s Renewed Emergency Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's Supp. Br."), ECF No. 83; Pl.'s Supp. Br. in Supp. of Renewed Emergency Mot. for Preliminary Injunction and Temporary Restraining Order ("Pl.'s Supp. Br."), ECF No. 84; Pl.'s Supp. Resp. Br. in Supp. of Renewed Emergency Mot. for Preliminary Injunction and Temporary Restraining Order ("Pl.'s Supp.

106a

*Appendix D*

Reply"), ECF No. 85; FINRA's Resp. to Supp. Br. of Alpine ("FINRA's Supp. Reply"), ECF No. 86, plaintiff's motions are now ripe for consideration.

## II. LEGAL STANDARD

A temporary restraining order ("TRO") "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258, 364 U.S. App. D.C. 2 (D.C. Cir. 2004). An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief. *See, e.g., Gordon v. Holder*, 632 F.3d 722, 723–24, 394 U.S. App. D.C. 158 (D.C. Cir. 2011) (applying the preliminary injunction standard to a district court decision denying a motion for TRO and preliminary injunction). Preliminary injunctive relief is similarly "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392, 396 U.S. App. D.C. 1 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)).

A plaintiff seeking preliminary injunctive relief must establish the following four factors: "that he is likely to

107a

*Appendix D*

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Ramirez v. Collier*, 595 U.S. 411, 142 S. Ct. 1264, 1275, 212 L. Ed. 2d 262 (2022) (quoting *Winter*, 555 U.S. at 20); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321, 437 U.S. App. D.C. 461 (D.C. Cir. 2018); *Aamer v. Obama*, 742 F.3d 1023, 1038, 408 U.S. App. D.C. 291 (D.C. Cir. 2014). The balance of equities and the public interest factors "merge" when the government is the opposing party. *Karem v. Trump*, 960 F.3d 656, 668, 447 U.S. App. D.C. 103 (D.C. Cir. 2020). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197, 410 U.S. App. D.C. 80 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292, 387 U.S. App. D.C. 205 (D.C. Cir. 2009)) (internal quotation marks omitted).[5]

---

5. The D.C. Circuit has in the past used a so-called "sliding scale" approach to evaluating the four preliminary injunction and TRO factors such that, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92, 387 U.S. App. D.C. 205 (D.C. Cir. 2009). While acknowledging that this approach is, at a minimum, in tension with current Supreme Court jurisprudence requiring a persuasive showing on all four factors, the D.C. Circuit has not resolved the continuing viability of the sliding-scale approach. *See, e.g., Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726, 458 U.S. App. D.C. 112 (D.C. Cir. 2022) (reserving "the question whether the sliding-scale approach remains valid"); *cf. Davis*, 571 F.3d at 1295–96 (Kavanaugh , J.,

Midland/Odessa Division    Case No.: MO:24-CV-317

108a

*Appendix D*

Preliminary injunctive relief and TROs are not remedies "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not [even] follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44, 201 L. Ed. 2d 398 (2018). Rather, a court must be persuaded as to all four factors. Moreover, "a party requesting a preliminary injunction must generally show reasonable diligence." *Id.* at 1944.

## III. DISCUSSION

While the focus of the pending motion for injunctive relief is to stall the pending Enforcement Proceeding against Alpine, plaintiffs' complaint is far more sweeping to challenge the "unconstitutional operation and structure of FINRA." SAC ¶ 1; *accord id.* at 33. Specifically, plaintiffs lodge six claims against FINRA: (1) that "FINRA's wide-ranging exercise of executive power is immune from Presidential supervision or control[,]" namely that FINRA's board "are afforded multi-level protection from removal thus impeding the President's ability to oversee the officers executing the laws of the United States in violation of the Constitution's separations of powers[,]" *id.* ¶¶ 141–151 (Count I); (2) that FINRA's board members are "officers of the United States whose appointments must comply with the Appointments Clause of the United

concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf v. Geren*, 553 U.S. 674, 128 S. Ct. 2207, 171 L. Ed. 2d 1 (2008)).

109a

*Appendix D*

States Constitution" and presently do not, *id.* ¶¶ 152–157 (Count II); (3) that the Exchange Act "improperly and unconstitutionally delegates legislative power to [FINRA] outside the Legislative Branch," regardless of whether this entity functions as a state actor or private entity, *id.* ¶¶ 158–161 (Count III); (4) that the Exchange Act's requirement that firms "join FINRA violates Plaintiffs' First Amendment right not to associate[,]" *id.* ¶¶ 162–171 (Count IV); (5) that "FINRA's disciplinary proceedings are biased, secretive, and fail to implement rules that maintain the integrity [of] the proceedings," in violation of the Due Process Clause of the Fifth Amendment, *id.* ¶¶ 172–176 (Count V); and (6) that "broker-dealers are not afforded the right to a trial by jury" during FINRA proceedings, in violation of the Seventh Amendment, *id.* ¶¶ 177–180 (Count VI).

Upon review of multiple papers filed by all parties and consideration of the arguments presented at the June 1, 2023, hearing before this Court, plaintiff's motion for reconsideration is granted. As refiled, plaintiff's motion for preliminary injunction and TRO properly cites binding law of this Circuit and correctly queues the issues for this Court's consideration.

Alpine has, however, failed to show a likelihood of success on the merits of plaintiffs' claims because FINRA is likely not a state actor, obviating all but one of plaintiffs' constitutional claims, and their surviving First Amendment claim likely lacks merit. Plaintiffs also likely do not assert a viable nondelegation doctrine claim. In reality, plaintiffs offer a multitude of critiques of FINRA

110a

*Appendix D*

throughout their complaint as disgruntled members of FINRA; however, those criticisms fall far short of amounting to likely sustainable constitutional challenges to the structure and processes of FINRA.

While, if expelled from FINRA, Alpine is sure to suffer from the forced closure of its business, such irreparable harm was of Alpine's own making by apparently viewing the permanent cease-and-desist order issued as part of the March 2022 Panel Decision as stayed pending appeal. *See* SAC ¶¶ 8–10 (acknowledging that the Enforcement Proceeding is "based on Alpine's alleged failure to comply with an order contained in an Initial Hearing Panel Decision that was issued in a prior lengthy FINRA action," but arguing "[h]owever, [such] Decision does not become final or effective unless and until it is affirmed by FINRA's appellate tribunal, the [NAC]. And that has not occurred . . . and no [NAC] decision has issued"). Ignoring the immediate effectiveness of a permanent cease-and-desist order, due to operation of an explicit FINRA rule, *see* March 2022 Panel Decision (using term "permanent cease and desist order"); FINRA Rule 9311(b), is notable context in assessing the irreparable harm claimed by Alpine. Further, given Alpine's unlikelihood of success in urging novel constitutional attacks on FINRA's structure and operations, reliance on the "here-and-now injury" of being subject to the Enforcement Proceeding, as defined by *Axon*, simply is insufficient to justify the extraordinary equitable relief requested. This conclusion is confirmed in assessing the balance of equities, which falls heavily in defendants' favor because the harm of permitting Alpine to continue its allegedly knowing violation of FINRA rules

111a

*Appendix D*

to the detriment of its customers, the securities industry, and the public must be given great weight.

Having failed on all factors for injunctive relief, as detailed below, Alpine's motion is denied.

## A.  Likelihood of Success on the Merits

Plaintiffs' separation of powers, Appointments Clause, Fifth Amendment, and Seventh Amendment claims are unlikely to succeed because FINRA is most likely not a state actor. That aside, as either a public or private entity, FINRA's structure and processes also likely do not violate the private nondelegation doctrine. Finally, plaintiffs' First Amendment claim is likely to fail because a compelling interest supports the Exchange Act's FINRA membership mandate and supersedes plaintiffs' right to expressive association. Thus, plaintiffs' claims are unlikely to succeed on the merits.

### 1.  *FINRA Is Not a State Actor*

"As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'" *Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922, 936, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982) (quoting *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 156, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978)). That said, the Supreme Court has held, "many times, that actions of private entities can sometimes be regarded as governmental action for

112a

*Appendix D*

constitutional purposes." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378, 115 S. Ct. 961, 130 L. Ed. 2d 902 (1995) (collecting cases).

Whether an entity is a state actor is largely a "fact-bound inquiry." *Lugar*, 457 U.S. at 939. While the Supreme Court "has articulated a number of different factors or tests in different contexts" to determine state action, *id.*, some key considerations remain consistent. *Cf. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) ("From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient[.]"). A court must consider if "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43, 417 U.S. App. D.C. 189 (D.C. Cir. 2015) (quoting *Brentwood*, 531 U.S. at 295); *accord Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974) ("[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.").

Determining a sufficient nexus involves assessing, among other things, the government's "exercise of 'coercive power,'" *Brentwood*, 531 U.S. at 296 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L.

113a

*Appendix D*

Ed. 2d 534 (1982)), which has been described variously as the government's provision of "significant encouragement, either overt or covert," *id.* (quoting *Blum*, 457 U.S. at 1004), and the degree of government control over the entity, *id.* (citing *Pennsylvania v. Bd. of Dirs. of City Trusts of Phila.*, 353 U.S. 230, 231, 77 S. Ct. 806, 1 L. Ed. 2d 792 (1957)), as well as the private entity's "willful" participation in a joint activity with the government, *id.* (quoting *Lugar*, 457 U.S. at 941), including the extent to which a public function is delegated to a private entity, *id.*, and how "entwined with governmental policies" the private entity is or the degree to which the government is "'entwined in [the private entity's] management or control,'" *id.* (quoting *Evans v. Newton*, 382 U.S. 296, 299, 301, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966)). An earlier Supreme Court decision also relied on two considerations for state action: (1) whether the private entity acted pursuant to "some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible" and (2) whether the actor is "a person who may fairly be said to be a state actor" or state official, an individual working with a state official, or an individual whose "conduct is otherwise chargeable to the State." *Lugar*, 457 U.S. at 937.[6]

---

6. Although plaintiff invokes the state action doctrine, plaintiff's argument at the hearing seemed to blend into the public function test, positing that the focus of whether a private entity is a state actor depends on the entity's specific role at any particular time. *See* Hr'g Tr. at 26:23–27:10. That line of argument is equally unlikely to succeed according to the Supreme Court's test in *Manhattan Community Access Corp. v. Halleck*, in which the Court held that, "to qualify as a traditional, exclusive public

114a

*Appendix D*

Employing all these considerations to the facts at hand, plaintiff has not proven the likelihood that FINRA is a state actor. First, the facts of FINRA's creation, operation, and oversight structure do not indicate state actor status. FINRA is a private organization incorporated under the laws of Delaware; neither an act of Congress nor the SEC created FINRA. *Cf. Blount v. SEC*, 61 F.3d 938, 941, 314 U.S. App. D.C. 52 (D.C. Cir. 1995) (holding that the Municipal Securities Rulemaking Board was a state actor because, *inter alia*, it was "created by an act of Congress"); *Lugar*, 457 U.S. 941–42 (holding that respondents acted "under color of state law" in depriving petitioner of his property pursuant to state law and joint participation with state officials in such deprivation). No government entity funds FINRA nor plays any role in the selection of its board members or officers, and those individuals are in no way characterized as governmental officers. *Cf. Brentwood*, 531 U.S. at 298–302 (finding that the school athletic association was a state actor because, *inter alia*, state board members sat on the association's governing bodies and public-school officials participated in the state retirement system, such that public institutions

---

function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function." 139 S. Ct. 1921, 1929, 204 L. Ed. 2d 405 (2019) (emphasis in original). Nowhere does plaintiff argue that FINRA's adjudicatory role in enforcing its own rules as an SRO is a traditional or exclusive public function. On the contrary, plaintiffs' complaint notes that FINRA is the successor of both the NASD and NYSE, two private entities, and that the role of regulating industry members has always fallen to those entities, as an initial matter, rather than the SEC. *See* SAC ¶¶ 36–40.

115a

*Appendix D*

and public school officials were sufficiently entwined in the association). FINRA is self-governing; it creates its own rules and standards, including the setting of salaries of its officers and penalty amounts unilaterally. *Cf. Lebron*, 513 U.S. at 394–99 (finding that Amtrak was a state actor because it had the same objectives as the government, was created by the government, and functioned under the government's control such that "the corporation is part of the Government").

FINRA also aims to perform functions that are neither contemplated nor shared by the SEC, including, to name a few, administering broker qualifications examinations, *see Turbeville*, 874 F.3d at 1271, "conduct[ing] inspections of brokers and dealers," and enforcing compliance with professional industry standards as well as FINRA's own rules and regulations, SAC ¶ 49. In FINRA's adjudicative capacity, this SRO alone determines which cases to investigate and when to file a complaint, and any decision that FINRA makes is not binding on the SEC in any subsequent review by this federal agency. In fact, any review by the SEC is *de novo* and the agency may consider evidence not previously considered by FINRA or the NAC. *Cf. Peacock*, 794 F.3d at 43 (holding that Xerox is a state actor when performing as an agent of, and thus acting on behalf, of the District of Columbia to determine individuals' eligibility for prescription drug coverage under Medicaid). In essence, FINRA is an independent body that assists the SEC by funneling referrals to the federal enforcement agency, using rules and procedures approved by the SEC as sufficient to make the assistance helpful. *See Graman v. NASD*, No. 97-cv-1556 (JR), 1998

116a

*Appendix D*

U.S. Dist. LEXIS 11624, 1998 WL 294022, at *2 (D.D.C. Apr. 27, 1998) (employing the same reasoning to hold that FINRA is not a state actor). Such FINRA functions do not amount to the organization's entwinement with the SEC.

Second, plaintiff concedes that no court has yet to hold that FINRA is a state actor. *See* Hr'g Tr. 24:15–23 (The Court: "I haven't found any case that's held that FINRA is a state actor or any case that's found either the New York Stock Exchange, which is another SRO, or NASD, the predecessor to FINRA, was a state actor. Are there any such cases?" Plaintiff's Counsel: "There is not, to my knowledge, such a case."). Rather, a multitude of courts nationwide have held the contrary—that FINRA is a private entity wholly separate from the SEC or any other government agency.[7]

---

7.  *See, e.g., Desiderio v. NASD*, 191 F.3d 198, 206–07 (2d Cir. 1999) ("The NASD is a private actor, not a state actor."); *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 162 (2d Cir. 2002) (holding the same); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979) ("Congress preferred self-regulation by a private body over direct involvement of a governmental agency"); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997) ("NASD is a private party and not a governmental agent"); *Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010) ("Epstein cannot bring a constitutional due process claim against the NASD, because '[t]he NASD is a private actor, not a state actor.'" (citation omitted)); *see also Graman*, 1998 U.S. Dist. LEXIS 11624, 1998 WL 294022, at *3 ("Every court that has considered the question has concluded that NASD is not a governmental actor."); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001) ("The court is aware of no case—and Marchiano has presented none—in which NASD Defendants were found to be state actors either because of their regulatory

117a

*Appendix D*

The D.C. Circuit is notably not among those courts to have opined on this question. Consequently, both parties attempt to read between the lines of existing Circuit precedent discussing FINRA and its predecessor NASD as controlling, if not persuasive, authority in considering this question. *Compare* Gov't's TRO Opp'n at 1 (citing *Saad v. SEC*, 980 F.3d 103, 104, 450 U.S. App. D.C. 94 (D.C. Cir. 2020) (referring to FINRA as "a private self-regulatory organization")) *and id.* at 16 (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484–86, 130 S. Ct. 3138, 177 L. Ed. 2d 706 (2010) (contrasting defendant, a state actor, with "private self-regulatory organizations" in the securities space, such as FINRA)), *and* FINRA's TRO Opp'n at 8 (citing *Free Enterprise*, 561 U.S. at 484–86), *with* Pl.'s TRO Mot. at 9 (citing *NASD v. SEC*, 431 F.3d 803, 804–05, 807, 369 U.S. App. D.C. 13 (D.C. Cir. 2005) (referring to NASD as a "quasi-governmental agency" with "quasi-governmental authority to adjudicate actions against members" and "quasi-governmental power to discipline its members")). That exercise, while not fruitless, is also neither particularly helpful nor binding— the D.C. Circuit has not provided clear direction and has most recently passed on the opportunity to do so. *See Springsteen-Abbott v. SEC*, 989 F.3d 4, 7, 451 U.S. App. D.C. 155 (D.C. Cir. 2021) (referring only to the "premise that FINRA is a state actor" as "contested").

Third, policy considerations militate strongly against accepting Alpine's invitation to make the first judicial

responsibilities or because of any alleged collusion with criminal prosecutors. In fact, every court that has addressed those issues has rejected Marchiano's arguments.").

118a

*Appendix D*

determination that FINRA is a state actor. If FINRA were deemed a state actor, the ramifications would be significant and far-reaching—or in FINRA's words, would cause a "seismic shift in state action jurisprudence." Hr'g Tr. at 73:23–74:9.[8] Not only would Alpine be free to continue conduct FINRA previously found harmful to Alpine's customers absent an immediate enforcement action, *see* FINRA's Supp. Br. at 2–3, a finding that FINRA is a state actor would undermine Congress's express intent to establish a private, self-regulatory system in the securities industry, *see id.* at 3–4; Gov't's Supp. Br. at 3. Relatedly, FINRA would be exposed to constitutional and administrative challenges from which Congress specifically sought to insulate FINRA, *see* FINRA's

---

8. To elaborate, FINRA posited that finding this entity to be a state actor would amount not only to a departure from the "unanimous consensus" to the contrary, FINRA's Supp. Br. at 2, but also would jeopardize investor safety and market stability. For instance, subjecting SROs to federal constitutional requirements would impact "a vast range of industries, from railroads and airlines to utilities and hospitals[]" *id.* at 3–4, and would "impos[e] unwarranted constitutional roadblocks on [FINRA's] oversight of its broker-dealer members," potentially including a Fifth Amendment privilege not to testify despite FINRA's lack of subpoena power, *id.* at 5. Treating FINRA as a state actor would also "upend the well-functioning status quo" between FINRA and the SEC by shifting duties from the former to the latter. *Id.* at 6. "[D]ozens of other SROs responsible for carrying out enforcement functions and other regulatory responsibilities" would also be subject to constitutional requirements as state actors. *Id.* Finally, risking the stability of the current SRO structure in the securities industry "could create the risk of significant liquidity or credit problems among financial institutions or markets and thereby threaten the stability of the U.S. financial system." *Id.* at 7–8.

119a

*Appendix D*

Supp. Br. at 5; Gov't's Supp. Br. at 2, as recognized by the Supreme Court, *see Free Enterprise*, 561 U.S. at 484–86 (finding the Public Company Accounting Oversight Board ("PCAOB") to be a state actor and distinguishing this body from SROs in the securities industry, citing that the PCOAB is created by statute, its leadership is government-appointed, and it has "expansive powers to govern an entire industry"). Finally, such a finding could significantly impact the SEC's oversight role of FINRA, which is far more active in regulating aspects of the securities industry that the SEC currently does not touch, resulting in a potentially dramatic increase to the SEC's workload. *See* FINRA's Supp. Br. at 6; Gov't's Supp. Br. at 4. Although plaintiff attempts to paint the relief it *now* requests as narrow, *see* Pl.'s Supp. Br. at 1–2, the operative complaint states otherwise and asks for a significant remedy that would declare "that FINRA is a state actor obligated to respect the rights guaranteed under the United States Constitution," SAC, Prayer for Relief ¶ 1, and "that FINRA is presently constituted and operating in a manner that violates the Constitution," *id.* ¶ 2.

In vigorously urging that FINRA be deemed a state actor, plaintiffs make one thing crystal clear: plaintiffs are disgruntled members of FINRA. *See, e.g.*, SAC ¶¶ 64–73 (criticizing the selection and operation of FINRA's board), 74–83 (disparaging FINRA's independence and supposed lack of industry representation on the board), 87 (accusing FINRA of taking retaliatory action against members of the microcap market such as plaintiffs), 100–110 (lodging complaints about FINRA's fee structure, budget, and board-approved executive salaries), 129

120a

*Appendix D*

(asserting that the Enforcement Proceeding is FINRA's attempt "to obtain the corporate death penalty" against Alpine). Unfortunately for plaintiffs, however, their present challenge is not an effective way to file—let alone remedy—their grievances against FINRA. For instance, the relief they request would not cure all the deficiencies enumerated in their complaint. Declaring FINRA to be a state actor would not necessarily result in restructuring FINRA's board, its executive compensation structure, or its allegedly retaliatory motives against the microcap industry. SCA attempted to assert some of these claims against FINRA in 2019, but the district court dismissed the suit for lack of subject matter jurisdiction, and the D.C. Circuit affirmed that judgment after finding that SCA's breach of contract claim required administrative exhaustion prior to judicial review. *See Scottsdale Cap. Advisors Corp. v. FINRA*, 811 F. App'x 667, 668–69 (D.C. Cir. 2020) (Mem.). Plaintiffs may not now try to repackage those grievances as constitutional claims to obtain judicial review under the Supreme Court's recent *Axon* decision.

Since FINRA is unlikely to be a state actor, plaintiff's separation of powers, Appointment Clause, Fifth Amendment, and Seventh Amendment claims are also likely foreclosed.

### 2. *FINRA Does Not Violate the Private Nondelegation Doctrine*

Pleaded in the alternative, plaintiffs next argue that the Exchange Act "improperly and unconstitutionally delegates legislative power to an entity outside the

121a

*Appendix D*

Legislative Branch." SAC ¶ 160. Alpine's motion for injunctive relief then focuses on FINRA's alleged violation of the private nondelegation doctrine, arguing that "Congress and the SEC have managed to delegate and outsource enforcement of federal securities law to a private entity that can ignore fundamental constitutional rights." Pl.'s TRO Mot. at 20. Defendants counter that no such violation is present because "FINRA functions subordinately" to the SEC, which maintains "authority and surveillance over FINRA's activities." Gov't's Opp'n at 8 (citation omitted); *accord* FINRA's TRO Opp'n at 11–13. Defendants are again likely correct.

"Federal agencies may not subdelegate their 'decision-making authority . . . to outside entities—private or sovereign—absent affirmative evidence of authority to do so.'" *Louisiana Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 696, 429 U.S. App. D.C. 398 (D.C. Cir. 2017) (*quoting U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566, 360 U.S. App. D.C. 202 (D.C. Cir. 2004)). Aside from explicit statutory authority, an agency delegation to a private entity is valid if the agency exercises "authority and surveillance" over the private actor and "law-making remain[s] in the hands of the agency and [is] 'not entrusted to the industry.'" *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 896 F.3d 539, 546, 437 U.S. App. D.C. 308 (D.C. Cir. 2018) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399, 60 S. Ct. 907, 84 L. Ed. 1263, 1940–1 C.B. 258 (1940)).

Congress intended that SROs, like FINRA, would fulfill a supervisory role over the securities industry. *See* 15 U.S.C. § 78o-3(b) (listing requirements of a

122a

*Appendix D*

broker-dealer association for the SEC to characterize the organization as a national securities association). Yet SROs' authority is subordinate to the SEC's ultimate control and oversight. The SEC may suspend or revoke FINRA's registration if "necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]." 15 U.S.C. § 78s(h)(1). While FINRA promulgates its own rules and standards for professional conduct, those rules are reviewed and approved by the SEC with very limited exceptions. *See Turbeville*, 874 F.3d at 1270 (describing the SEC's oversight duties); 15 U.S.C. § 78s(b)-(c). The SEC at any time may "abrogate, add to, and delete from" any FINRA rule. *Id.* § 78s(c).

Although FINRA may take the first step in investigating and disciplining an entity for violation of its rules, an SEC regulation, or a statutory provision, *id.* § 78o-3(b)(7), any adjudication by FINRA is subject to *de novo* and *sua sponte* review by the SEC, *id.* § 78s(d)(2); Commission Rule of Practice 452, 17 C.F.R. § 201.452. Such structure has resulted in a finding that federal securities laws do not amount to an unconstitutional delegation by every court to consider the issue. *See, e.g.*, *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977); *R.H. Johnson v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952). This Court sees no reason to depart from those findings and as

123a

*Appendix D*

such holds that plaintiffs' private nondelegation doctrine claim is unlikely to succeed on the merits.[9]

### 3.  *Plaintiffs' First Amendment Claim Lacks Merit*

Finally, plaintiffs challenge broker-dealers' "forced" association with FINRA "in order to engage in their chosen profession." SAC ¶ 164. Defendants argue that the Exchange Act's requirement that registered broker-dealers join FINRA "does not alone implicate any First Amendment right" and that, because "[p]laintiffs do not assert any 'expressive purpose[]' for which they wish to avoid association with FINRA," plaintiffs' First

---

9.  Plaintiffs' complaint alludes to a public nondelegation claim as well. *See* SAC ¶ 161 ("This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity."). Although that line of argument was not pursued in plaintiff's motion for injunctive relief, assuming, *arguendo*, that FINRA qualifies as a state actor, no unconstitutional public delegation of unfettered policy-making and enforcement authority is likely displayed because, in describing the duties of SROs, Congress delineated specific objectives that SROs should strive to accomplish, providing an "intelligible principle" under the public nondelegation doctrine. *See Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 401, 458 U.S. App. D.C. 629 (D.C. Cir. 2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001)); *see also* 15 U.S.C. § 78o-3(b)(6) (describing the goals of an SRO's rules to include, *inter alia*, "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . [and] to protect investors and the public interest").

124a

*Appendix D*

Amendment claim must fail. Gov't's Opp'n at 19; *accord* FINRA's TRO Opp'n at 13–14. Again, defendants' arguments have a substantial likelihood of prevailing.

Certainly, the First Amendment's protection of freedom of speech also extends to protect "[t]he right to eschew association for expressive purposes." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463, 201 L. Ed. 2d 924 (2018); *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate."). Freedom of expressive association, however, is not absolute. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000). Rather, the Supreme Court has held that a regulation may override that right when it "serve[s] compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* (quoting *Roberts*, 468 U.S. at 623).[10]

---

10. The Supreme Court's specific test proceeds as follows. After determining that the group engages in "expressive association," *Boy Scouts*, 530 U.S. at 648–50, whether forced inclusion "would significantly affect [the association's] ability to advocate public or private viewpoints," *id.* at 650–53, and whether inclusion of a member would significantly burden the association's expression, *id.* at 653–56, a court must then consider whether the restraint "runs afoul" of the expressive association by comparing the burden on expressive association with the state's interest in intruding into that right, *id.* at 656–59. Although the parties dispute resolution of each consideration, the last factor, as articulated above, *see id.* at 648, is dispositive of this dispute.

125a

*Appendix D*

FINRA articulates a significantly compelling interest embodied in the Exchange Act to justify mandatory FINRA membership. In permitting securities industry regulation through SROs, Congress intended those entities to "prevent fraudulent and manipulative acts and practices, [] promote just and equitable principles of trade, [] foster cooperation and coordination" among all industry players, "remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." 15 U.S.C. § 78o-3(b)(6).

Mandatory FINRA membership functions accordingly to ensure that broker-dealers transacting in the securities space all adhere to the same set of professional and industry standards to protect both actual and prospective securities purchasers. *See* Gov't's Supp. Br. at 6 (citing *Roth v. SEC*, 22 F.3d 1108, 1109, 306 U.S. App. D.C. 26 (D.C. Cir. 1994)). For instance, FINRA sets "recordkeeping and reporting obligations, fiduciary duties, and special antifraud rules[,]" Gov't's Supp. Br. at 7 (quoting *In re Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 34-27017, 1989 SEC LEXIS 1308, 1989 WL 1097092, at *3–4 (July 11, 1989)), as well as conducts professional training to assure industry participants that those transacting in the space are "financially capable" of doing so in accordance with regulatory standards and in pursuit of fair and transparent treatment of customers. Gov't's Supp. Br. at 7 (citing SEC, *Persons Deemed Not to Be Brokers*, Exchange Act Release No. 22172, 1985 SEC LEXIS 1217, 1985 WL 634795, at *2 (June 27, 1985)). By joining FINRA, members agree to bind themselves to

126a

*Appendix D*

standards and be held accountable if their conduct falls short—all to the benefit of free-flowing and functioning financial markets and fair treatment towards customers. Since the compelling interest in statutorily mandated FINRA membership so outweighs any expressive association right, plaintiffs again are unlikely to succeed on their First Amendment claim.[11]

In sum, none of plaintiffs' claims in their operative complaint are likely to succeed on the merits, resulting in this factor weighing against a preliminary injunction or a TRO.

## B.  Irreparable Harm

On the second factor, Alpine argues that resolution of the pending Enforcement Proceeding may include "the corporate death penalty" of expulsion from the industry, Pl.'s TRO Mot. at 1; *accord* SAC ¶¶ 10, 129, and, further, that "subjection to an illegitimate proceeding, led by an illegitimate decision maker constitutes 'a here-and-now

---

11.  Insofar as plaintiffs frame their First Amendment claim as a challenge to mandatory funding of FINRA, *see* SAC ¶ 165, that claim, too, is unlikely to succeed on the merits. While plaintiffs strongly criticize FINRA's funding, budget, expenditures, and executive compensation structures, such budgetary considerations and setting competitive executive salaries are part and parcel of a corporation's duties and so plaintiffs have not shown that FINRA uses any of its funding to engage in activity that is not germane to its purpose, rendering these complaints, no matter how meritorious, irrelevant to their First Amendment claim. *See Keller v. State Bar of Cal.*, 496 U.S. 1, 13–14, 110 S. Ct. 2228, 110 L. Ed. 2d 1 (1990).

127a

*Appendix D*

injury'" supporting a finding of irreparable harm, Pl.'s TRO Mot. at 22 (citing *Axon*, 143 S. Ct. at 903). FINRA counters that any harm imposed on Alpine from the Enforcement Proceeding is "overstated" because the outcome of the proceeding would not occur for many days, possibly months, and that such a decision could then be appealed to the SEC and stayed. *See* FINRA's TRO Opp'n at 15 (citing applicable FINRA rules on appeals of FINRA decisions). Here, the Supreme Court's *Axon* decision tips this factor in Alpine's favor.

At the outset, Alpine bluntly states that FINRA's Enforcement Proceeding subjects it to potential expulsion from the industry, an existential threat to its business that would force the company to cease operations, and so the proceeding must be delayed. *See* Pl.'s TRO Mot. at 22–23. Yet, Alpine faces precisely the same expulsion penalty under the March 2022 Panel Decision currently on review by the NAC. *See generally* March 2022 Panel Decision. Enjoining the NAC review process, however, is not the focus of the injunctive relief Alpine now seeks, despite the fact that expulsion may be inevitable if the March 2022 Panel Decision is upheld. That consequence does not arise from any lack of due process afforded to Alpine at the original enforcement proceeding leading to the March 2022 Panel Decision now on appeal to the NAC, nor from the ongoing Enforcement Proceeding, nor even from plaintiffs' asserted constitutional claims. Rather, that consequence appears to be the result of Alpine's failure to comply with FINRA's permanent cease-and-desist order issued as part of the March 2022 Panel Decision. In the face of that decision, which took

128a

*Appendix D*

immediate effect on March 22, 2022, Alpine is suspected
of flouting FINRA's directive to cease harmful conduct
by failing to comply with FINRA's permanent cease-and-
desist order. *See* FINRA's TRO Opp'n, Ex. B, Pet. for a
Hearing & the Imposition of Sanctions—Preliminary
Statement ("Pet. for Enforcement Proceeding") ¶¶ 1–2,
ECF No. 70-2 ("FINRA's Department of Enforcement
requests a hearing . . . and the imposition of sanctions
against Respondent Alpine . . . for violating a March 22,
2022 Permanent Cease and Desist Order . . . . Alpine
disregarded the terms of the [Order], which was intended
to prevent the firm from harming customers through
ongoing acts of misconduct."). In allegedly defying the
permanent cease-and-desist order—by FINRA's count,
more than 35,000 times—FINRA decided that, due to
Alpine's chronic recidivism, this SRO had little choice
but to take expedited steps to expel the company from
the industry even while Alpine's appeal of the March
2022 Panel Decision is pending, a decision, as noted, that
also recommended expulsion. *See* Pet. for Enforcement
Proceeding ¶¶ 5–6.

In context, Alpine now seeks to employ extraordinary
equitable relief to halt FINRA's continuing enforcement
of its own orders, under the cloak of several asserted
constitutional claims so that this Court can save Alpine
from harm allegedly due to its own defiance of those orders.
Granting the requested TRO and consequently delaying
the Enforcement Proceeding would thus sanction Alpine's
alleged noncompliant conduct with FINRA's permanent
cease-and-desist order. Such a ruling would encourage
violators to race to district court with constitutional claims

129a

*Appendix D*

to delay or halt enforcement proceedings, providing a direct mechanism to subvert FINRA's enforcement of its own orders designed to protect the securities industry. Nonetheless, the irreparable harm factor focuses on the harm to the *plaintiff* seeking the relief, though the source of that harm is noteworthy in weighing these equitable factors.

On that point, Alpine invokes *Axon* to argue that its assertion of constitutional claims against FINRA and its adjudicatory process subjects the company to a "here-and-now injury" and automatically triggers a finding of irreparable harm. *See* Pl.'s TRO Mot. at 22–23 (quoting *Axon*, 143 S. Ct. at 903). Indeed, the Supreme Court expressed the view that being subjected to an adjudicatory process that a plaintiff claims is constitutionally flawed is "impossible to remedy once the proceeding is over" and a "grievance [for which] the court of appeals can do nothing: [a] proceeding that has already happened cannot be undone." *Axon*, 143 S. Ct. at 903–04. Alpine is right that this strong language in *Axon* must be viewed as a consideration relevant to irreparable harm, *see* Hr'g Tr. at 63:7–13 (Alpine agreeing that the "here-and-now injury" language in *Axon* is the Supreme Court "putting its thumb on the scale among the preliminary injunctive factors for irreparable harm"), and neither FINRA nor the government, as intervenor-defendant, present much argument against this view, *see, e.g.,* Hr'g Tr. at 78:13–80:11 (FINRA arguing only that *Axon* does not alter the preliminary injunction analysis); *id.* at 89:4–90:6 (referencing the government's choice not to take a position on certain preliminary injunction factors before stating

130a

*Appendix D*

that nothing in *Axon* displaces the preliminary injunction factors). Consequently, under the Supreme Court's explicit language, the nature of the constitutional claims asserted here, no matter their unlikelihood of success, suffice to show irreparable harm to Alpine, even though any such harm may stem directly from Alpine's noncompliant actions.[12]

---

12.  Although not argued by the parties, *Axon*'s extraordinary language in addressing the "problem . . . stemming from the interaction between the alleged injury and the timing of review," *id.* at 903, raises the question of whether the Supreme Court's comparison of a challenge to the constitutionality of an adjudicative body to the collateral order doctrine, is intended to ensure that constitutional claims must be given threshold consideration in district court, *see Axon*, 143 S. Ct. at 904–06, warranting an automatic stay of the challenged adjudication until resolution of the constitutional issues. Under that reading of *Axon*, which invokes the collateral order doctrine to propose that a constitutional challenge must be decided first similarly to consideration of "immunity doctrines," *id.* at 904–05, whether any of the preliminary-injunctive factors are met would become beside the point. On this point, *Axon* applies that reasoning to the facts before the Supreme Court, adding that "certain rights 'not to stand trial' or face other legal processes . . . are 'effectively lost' if review is deferred until after trial. . . . So too here." *Id.* at 904 (internal citations omitted). The Supreme Court's recent vacatur of a D.C. Circuit decision, which required a constitutional challenge to the Federal Energy Regulatory Commission ("FERC") to be exhausted before the agency, pursuant to the applicable statutory review scheme, signals that intention to broaden the collateral order doctrine. *See Bohon v. FERC*, No. 22-566, 2023 WL 3046112 (Apr. 24, 2023) (Mem.), 143 S. Ct. 1779, 215 L. Ed. 2d 678, *vacating* 457 U.S. App. D.C. 163 (D.C. Cir. 2022). The specter, then, of dual-tracked proceedings—one before federal district court and

131a

*Appendix D*

## C.   Balance of Equities and the Public Interest

Finally, the parties contest where other interests lie. Alpine argues that, FINRA "waited years to assert [its] claims [against Alpine] and would suffer no prejudice" from a delay in the Enforcement Proceeding and that the public has an interest in "assuring that Alpine is not subject to unconstitutional treatment at the hands of FINRA." Pl.'s TRO Mot. at 23 (footnote omitted). Conversely, FINRA argues that "[a] preliminary injunction would impair FINRA's pursuit of its regulatory mandate and undermine the public interest by barring FINRA" from enforcing its orders, including those against Alpine. FINRA's TRO Opp'n at 16. FINRA is correct.

---

another before a federal agency or adjudicatory body—raises the further question of what procedural mechanism is proper for managing the interaction between those proceedings. One option is expedited briefing of dispositive motions before the federal district court to resolve the merits of the constitutional challenge quickly, only halting the adjudicatory body's proceeding on a short-term basis. *See, e.g.*, *Sidak v. U.S. Int'l Trade Comm'n*, No. 23-cv-325 (TNM), 2023 U.S. Dist. LEXIS 78481, 2023 WL 3275635, at *4 n.3, *5–7, *13 (D.D.C. May 5, 2023) (in resolving the expedited motion for summary judgment, in this "unusual" case, carefully applying *Axon* to hold that plaintiff's Appointments Clause challenge to International Trade Commission Administrative Law Judges was ripe for review because, among other things, plaintiff was not a party to the underlying agency enforcement action and "had no obligation (nor opportunity) to earlier raise this claim in federal court"). All that said, because Alpine has not invoked *Axon* beyond the considerations of irreparable harm relevant to its pending motion for equitable relief, this case is no occasion to opine on these lingering questions.

132a

*Appendix D*

FINRA has an interest in protecting the public from the harms caused by broker-dealers engaging in securities violations. This is the very mission of this SRO. That overwhelming interest is especially important in FINRA's case of conducting expedited enforcement actions to halt the imminent risk to the public presented by bad actors potentially resulting in millions of dollars lost from customers, like those that initiated FINRA's investigation against Alpine in 2019. *See* March 2022 Panel Decision at 2 ("Enforcement's investigation of Alpine Securities began when some of Alpine Securities' customers complained to FINRA about, among other things, the firm's $5,000 monthly account fee."). The risk of harm to the public from an alleged bad actor openly and repeatedly flouting a remedial cease-and-desist order issued by a FINRA panel, allegedly thousands of times, at the expense of customers, is significant and concrete compared to Alpine's interest in asserting constitutional claims against FINRA that have an unlikelihood of success for the reasons already summarized. As such, the balance of equities and public interest disfavor any injunctive relief.

In considering the four factors in total, while irreparable harm tips in Alpine's favor, the other factors strongly weigh against granting plaintiff's request for equitable relief and so such relief is inappropriate here.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Reconsideration of Minute Order Denying Emergency Preliminary Injunction Motion is granted and plaintiffs'

Midland/Odessa Division   Case No.: MO:24-CV-317

133a

*Appendix D*

Renewed Emergency Motion for Preliminary Injunction
and Temporary Restraining Order is denied. An Order
consistent with this Memorandum Opinion will be entered
contemporaneously.

    Date: June 7, 2023

/s/ Beryl A. Howell
BERYL A. HOWELL
District Judge

134a

## APPENDIX E — EXCERPTS OF THE CONSTITUTION OF THE UNITED STATES

THE CONSTITUTION OF THE UNITED STATES

*Article. II.*

SECTION. 1

The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows:

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

[The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be

Midland/Odessa Division    Case No.: MO:24-CV-317

135a

*Appendix E*

counted. The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; and if no Person have a Majority, then from the five highest on the List the said House shall in like Manner chuse the President. But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote; A quorum for this Purpose shall consist of a Member or Members from two thirds of the States, and a Majority of all the States shall be necessary to a Choice. In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.]*

The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States

In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the

136a

*Appendix E*

Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.]*

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:- "I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States.

SECTION. 2

The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment.

Midland/Odessa Division   Case No.: MO:24-CV-317

137a

*Appendix E*

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session