**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| **CONTIQUE WILLCOT,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 7:24-cv-00317-DC-RCG** |
| | ) | |
| | ) | |
| **SECURITIES AND EXCHANGE** | ) | |
| **COMMISSION, et al.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**SECURITIES AND EXCHANGE COMMISSION'S MOTION TO DISMISS THE**
**AMENDED COMPLAINT**

TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

A.  Inherent risks in the OTC Market ............................................................................. 3

B.  Meta Materials corporate transactions ...................................................................... 4

   1.  2021 Merger between Metamaterials, Inc. and Torchlight Energy Resources, Inc. ............ 4

   2.  2022 transition of MMTLP shares to Next Bridge Hydrocarbons, Inc. ............................ 4

   3.  The FINRA trading halt ...................................................................................... 5

C.  The Commission filed fraud charges relating to the 2021 merger and is investigating the
   2022 NBH spinoff. ...................................................................................................... 8

D.  The SEC's Oversight of FINRA ................................................................................. 9

E.  Plaintiff's allegations relevant to his claims against the SEC ................................. 10

   1.  Overview of Plaintiff's allegations ................................................................... 10

   2.  Plaintiff's claims against the Commission........................................................ 11

   3.  Plaintiff's request for relief .............................................................................. 13

ARGUMENT ...................................................................................................................... 14

I.  This Court lacks subject-matter jurisdiction over the Amended Complaint. ...................... 14

  A.  The Court lacks jurisdiction over Plaintiff's claims against the Commission because he
   does not have standing. .......................................................................................... 14

     1.  Plaintiff lacks standing because he cannot show the Commission caused any alleged
     injuries. ............................................................................................................ 15
     2.  Plaintiff lacks standing because his claims cannot be redressed by this lawsuit. .......... 17
     3.  Plaintiff does not have standing to compel the Commission to enforce laws............... 19

  B.  The Court lacks jurisdiction over Plaintiff's programmatic challenges. ........................... 19

  C.  Sovereign immunity bars Plaintiff's claims.................................................................... 20

     1.  The Federal Tort Claims Act does not waive sovereign immunity for Plaintiff's claims
     for monetary damages. ...................................................................................... 21
     2.  The APA does not waive sovereign immunity over Plaintiff's claims. ........................ 22
       a.  Plaintiff's claims fall within the Section 701(a)(2) exception.................................... 23
       b.  Plaintiff is not challenging an agency action.......................................................... 24

D.   Plaintiff filed in the wrong court.................................................................................... 26

II.   Plaintiff fails to state a claim upon which relief can be granted.......................................... 27

A.   Plaintiff's claims that the Commission acted negligently and failed to supervise FINRA should be dismissed................................................................................................ 27

B.   Plaintiff's claim that the Commission violated Sections 17A and 15 of the Exchange Act and the antitrust laws should be dismissed. .............................................................. 29

C.   Plaintiff's claims regarding the constitutionality of the PSLRA should be dismissed...... 30

D.   Plaintiff's private nondelegation doctrine and separation of powers claim should be dismissed. ............................................................................................................... 32

E.   Plaintiff's Appointment Clause claims should be dismissed............................................ 34

F.   Plaintiff's claims seeking an order requiring systematic reforms, an audit of share transactions, and production of documents should be dismissed............................................ 37

CONCLUSION............................................................................................................................ 37

Defendant Securities and Exchange Commission ("SEC" or "Commission") moves to dismiss Plaintiff's Amended Complaint ("FAC"), ECF 3, pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and 12(b)(6).

## INTRODUCTION

This lawsuit is analogous to several failed litigations in which plaintiffs seek to hold self-regulatory organizations responsible for losses plaintiffs allegedly suffered because of frauds allegedly perpetrated by Defendants Gregory McCabe and John Brda (and social media promoters working on their behalf) leading up to corporate transactions executed by Meta Materials, Inc. in 2021 and 2022.[1] The only novelty here is that Plaintiff has added the Commission as a defendant.[2]

Plaintiff does not, however, allege the Commission *did* anything improper, or even that it failed to do anything *to or for him*. Rather, Plaintiff's case against the Commission rests wholly on the Commission's alleged *inaction* towards people and entities *other than himself*. He contends the Commission should have stopped the frauds by taking (unspecified) actions against the perpetrators of the alleged frauds (some of whom the Commission *has* sued) and should have taken (unspecified) actions against FINRA to override a trading halt FINRA issued shortly before the 2022 transaction. Plaintiff admits he sued the Commission because he anticipates that

---

[1] *See, e.g., Park v. FINRA*, No. 2:23-cv-69, 2023 WL 11795601 (N.D. Ga. Sept. 25, 2023) (dismissing case against FINRA); *Hofman v. Fidelity Brok. Serv., LLC*, No. 2:23-cv-00881, 2023 WL 3872564 (C.D. Cal. May 8, 2023) (dismissing case against FINRA and DTCC); *Tawil v. FINRA*, No. 4:22-cv-440, 2023 WL 4353179 (N.D. Fla. May 24, 2023) (dismissing case against FINRA); *Hensley v. TD Ameritrade, Inc.*, No. 3:23-cv-05159, 2023 WL 12068975 (W.D. Wash. Oct. 2, 2023) (dismissing case against FINRA); *Traudt v. Rubinstein*, 2:24-CV -00782, ECF 103 (D. Vt. July 17, 2024) (granting FINRA motion to dismiss).

[2] A handful of other plaintiffs filed similar complaints (most in this court) naming the Commission as a defendant on or about December 9, 2024. The Commission has filed a motion to dismiss in one case and such motions are forthcoming in the others.

FINRA will be found to be immune from liability, and he believes that if FINRA cannot be found liable, "the responsibility must shift to the SEC." FAC ¶ 214.

The claims in the FAC against the Commission should be dismissed for lack of subject-matter jurisdiction. First, Plaintiff does not have standing to bring his claims because the causal connection between his alleged injuries and the Commission's alleged inaction is too speculative and attenuated to support Article III standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382-83 (2024) (noting the difficulty of establishing standing when a plaintiff challenges the government's "lack of regulation of *someone else*" and holding "[t]he causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to a government action [or inaction] or cause a downstream injury to plaintiffs. The causation requirement also rules out attenuated links—that is, where the government action [or inaction] is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing.") (cleaned up and emphasis original). Nor would a ruling in Plaintiff's favor redress his alleged injuries. Second, sovereign immunity bars Plaintiff's claims. The Supreme Court has made clear that an agency's "decision not to take the enforcement actions requested by respondents is [] not subject to judicial review" because Congress gave agencies, "not [] the courts, the decision as to whether" to institute an enforcement action. *Heckler v. Chaney*, 470 U.S. 821, 838 (1985). Third, Plaintiff filed in the wrong court because any claim that the Commission failed to issue an order must be made in the court of appeals.

Finally, even if the Court had subject-matter jurisdiction, Plaintiff has failed to state a claim upon which relief could be granted. With respect to his claims regarding the constitutionality of FINRA's structure and authority, Plaintiff acknowledges that "[j]udicial bodies have consistently upheld the SEC-FINRA model, ruling that it does not contravene the

Private Nondelegation Doctrine" and that a ruling in his favor would "contradict established legal precedent." FAC ¶ 101.c-d. His other claims, including that the Private Securities Litigation Act of 1995 ("PSLRA") violates the separation of powers doctrine and the First, Fifth, and Fourteenth Amendments, are equally meritless.

## BACKGROUND

### A. Inherent risks in the OTC Market

The securities at issue in this matter were traded on the over-the-counter ("OTC") markets. The "OTC market differs from a traditional stock market like the New York Stock Exchange. The OTC is decentralized and 'essentially anonymous.'" *HPIL Hold., Inc. v. Zhang*, No. 23-CV-12050, 2025 WL 975444, at *2 n.1 (E.D. Mich. March 31, 2025) (citation omitted). "Due to the very low price, and to the lack of disclosure requirements that are generally applicable to securities listed on national exchanges, penny stocks on the OTC market are typically highly volatile in price and generally illiquid." *Tarpon Bay Part. LLC v. Zerez Hold. Corp.*, 79 F.4th 206 (2d Cir. 2023) (citing Joshua T. White, *U.S. SEC, Outcomes of Investing in OTC Stocks* (Dec. 16, 2016), *available at* https://www.sec.gov/files/White_OutcomesOTCinvesting.pdf).[3] Courts recognize that "OTC transactions are inherently riskier than those conducted on a regulated exchange." *SEC v. Lee*, 720 F. Supp.2d 305, 316 (S.D.N.Y. 2010); *HPIL Hold*, 2025 WL 975444, at *2 n.1 ("OTC markets are generally less transparent and less regulated than traditional stock markets, which makes them potentially riskier to invest in.") (citation omitted).[4]

---

[3] The study by White that the court in *Tarpon Bay* cited found that OTC investments generally have a "severely negative" investment return and the expected return "worsen[s] for OTC stocks that experience a promotional campaign." *U.S. SEC, Outcomes of Investing in OTC Stocks* at p. 1.
[4] *See also Petro-Diamond Inc. v. SCB & Assoc., LLC*, 122 F. Supp. 3d 949, 954 (C.D. Cal. 2015)

**B. Meta Materials corporate transactions**

**1. 2021 Merger between Metamaterials, Inc. and Torchlight Energy Resources, Inc.**

Plaintiff alleges that, on or about June 25, 2021, Metamaterials, Inc. ("META I") and

Torchlight Energy Resources, Inc. ("Torchlight") merged to form Meta Materials, Inc. ("META

II"). FAC ¶¶ 37-42.[5] As part of the merger, Series A Preferred Shares, designated as MMTLP,

were issued as a dividend to Torchlight shareholders and entitled shareholders to payments based

on the value of Torchlight's oil and gas assets. *Id.* ¶ 63. Plaintiff alleges that, in the lead up to the

merger, Brda and McCabe, and others acting in concert with them "made statements inflating the

valuation of the[se] oil and gas properties." *Id.* ¶ 29; *see also id.* ¶ 61 (alleging assets were worth

$47 million, not the claimed $20.96 to $41.92 billion). Plaintiff alleges that these misleading

claims "were referenced consistently in shareholder discussions" and led to "great expectations"

regarding MMTLP's financial prospects. *Id.* ¶ 33. Plaintiff also alleges that Brda, McCabe and

others were aware of various trading irregularities but failed to disclose or address them to the

detriment of retail investors. *Id.* ¶ 253.h.ii-iv.

**2. 2022 transition of MMTLP shares to Next Bridge Hydrocarbons, Inc.**

Plaintiff alleges that as part of the merger that formed META II, Next Bridge

Hydrocarbons, Inc. ("NBH") was formed to hold Torchlight's oil and gas resources and was

META II's subsidiary. FAC ¶ 10. On or about July 15, 2022, NBH filed a Form S-1 registration

statement with the SEC that stated that NBH would be spun-off into an independent entity and

---

(noting the "high risks of trading on the unregulated, 'buyer beware' OTC market"); *In re Artic Glacier Int'l, Inc.*, 255 F. Supp. 3d 534, 560 n. 27 (D. Del. 2017) ("Companies listed on OTC Link have been described by the SEC as among the most risky investments.") (citation omitted).
[5] The Commission recognizes that factual, but not legal, allegations will be taken as true for the present motion, so it does not dispute any factual inaccuracies in the FAC.

that each shareholder of MMTLP would receive one share of NBH in exchange for each share of MMTLP, after which shares of MMTLP would be cancelled. NBH S-1 Registration Statement (July 15, 2022) ("NBH S-1"), p. 4 *available at*

https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm

(explaining the transaction generally and that MMTLP "Series A Preferred Stock will be cancelled" following issuance of NBH shares);[6] *see also* FAC ¶ 10 (referencing the spin-off of NBH shares); *id.* ¶ 14 (referencing the registration of NBH shares); *id.* ¶ 62 (alleging that "disclosures during the Next Bridge Hydrocarbons spin-off brought to light notable discrepancies" in alleged valuations of oil and gas assets). The NBH S-1 also advised investors that the company did not plan to make its shares DTC-eligible "which means that brokerage firms may be unwilling to hold or trade our Common Stock." NBH S-1 at p. 23.

Plaintiff alleges that, in the lead up to the spinoff, Brda engaged in a "pump-and-dump scheme" by encouraging unsuspecting investors to purchase shares based on false or misleading information while simultaneously selling shares. FAC ¶ 76. He similarly alleges that, during this period, McCabe made between nearly $53 million and $68 million selling MMTLP shares. *Id.* ¶ 82.

### 3. The FINRA trading halt

Plaintiff alleges that, on December 8, 2022, FINRA issued a "corporate action notice" for MMTLP that revised a corporate action notice FINRA issued on December 6, 2022. FAC ¶ 92; *see also* ECF 46-1, Exs. C-D (FINRA notices referenced by Plaintiff).[7] The FINRA notices state:

---

[6] A court may take judicial notice of "public disclosure documents filed with the SEC." *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

[7] Because Plaintiff incorporated the FINRA notices by reference in the FAC, the Court can consider them on a motion to dismiss. *See, e.g., U.S. ex. Rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003); *U.S. v. Senseonics Hold., Inc.*, SA-20-CV-00657,

(a) NBH shares would be issued to MMTLP shareholders with settled positions as of December 12, 2022; (b) anyone who purchased MMTLP after December 8, 2022 would not be entitled to receive NBH shares because they would not have settled positions as of December 12; (c) the MMTLP shares will be cancelled on December 13, 2022; and (d) the ticker symbol MMTLP would be deleted following the cancellation of MMTLP shares. ECF 46-1, Exs. C-D.

FINRA Rule 6440(a)(3) allows FINRA to halt trading if it "determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the OTC Equity Security * * * or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process." https://www.finra.org/rules-guidance/rulebooks/finra-rules/6440-0. On December 9, 2022, FINRA issued a U3 trading halt in MMTLP pursuant to Rule 6440(a)(3). FAC ¶ 97; *see also Trading and Quotation Halt for Meta Materials PFD SER A (MMTLP)* ("Trading Halt Notice"), *available at* *https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf.* The Trading Halt Notice said that the "trading and quoting halt will end concurrent with the deletion of the [MMTLP] symbol effective Tuesday, December 13, 2022." *Id.*; *see also* FINRA Rule 6440(b)(3) ("After FINRA initiates a halt in an OTC Equity Security as a result of an Extraordinary Event Halt, trading and quotations in the OTC market for the OTC Equity Security may resume when FINRA determines that the basis for the halt no longer exists, or when ten business days have elapsed from the date FINRA initiated the trading and quotation halt in the security, whichever occurs first.").

Plaintiff alleges that FINRA issued a FAQ document on March 16, 2023 purporting to

---

2023 WL 2354915, at *7 n.3 (W.D. Tex. March 3, 2023) (holding "the Court may consider its [a press release referenced in the complaint] contents in ruling on the motion to dismiss").

explain the reasons for the halt, but he asserts that the FAQ "failed to clearly define the 'extraordinary event' that justified the halt." FAC ¶ 113. In the FAQ Plaintiff references, FINRA stated, among other things, that it halted trading in MMTLP after December 8, 2022, because it was concerned that investors buying MMTLP on or after December 9, 2022, would not have realized that the shares they were purchasing would be imminently canceled and that they would not be entitled to receive NBH shares for their MMTLP shares prior to their cancellation. *See FAQ: MMTLP Corporate Action and Trading Halt* (March 16, 2023) ("FAQ"), *available at* [https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt.](https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt.)

Plaintiff alleges that FINRA issued a supplemental FAQ on November 6, 2023, that again failed to explain the reasons for the halt. FAC ¶ 134; *see also Supplemental FAQ: MMTLP Corporate Action and Trading Halt* (Nov. 6, 2023), *available at* [https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt.](https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt.)[8] FINRA further stated that, as of December 12, 2022, MMTLP would no longer have been DTC-eligible (and NBH shares were not expected to be DTC-eligible),[9] so it was uncertain if trades settling after December 12, 2022 (i.e., trades executed December 9, 2022, or later) would have settled in an orderly manner, including before the MMTLP shares were canceled on or about December 14, 2022. *See* FAQ.

Although Plaintiff argues "FINRA imposed an *indefinite* halt on MMTLP trading," FAC ¶ 253.a.1 (emphasis added), Plaintiff acknowledges that the halt was "lifted on December 13,

---

[8] Because Plaintiff referenced the FINRA FAQs in the FAC, the Court can consider them without converting the motion into a motion for summary judgment.

[9] The NBH S-1 warned investors that the company did not intend to seek DTC-eligibility for its shares "which means that brokerage firms may be unwilling to hold or trade our Common Stock." [https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm,](https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm,) at p. 23.

2024," on or about the date that MMTLP shares were canceled by the issuer, *id.* ¶ 284.d.

**C. The Commission filed fraud charges relating to the 2021 merger and is investigating the 2022 NBH spinoff.**

On June 25, 2024, the Commission issued an order finding that META II fraudulently raised $137.5 million by artificially inflating the value of its common stock by structuring the 2021 merger between META I and Torchlight to include the issuance of MMTLP to create a "short squeeze." *In re Meta Materials, Inc. (f/k/a Torchlight Energy Resources, Inc.*), Securities Release No. 11292, 2024 WL 3178156, at *1 (June 25, 2024).[10] In addition to imposing various injunctive remedies, the Commission ordered META II to pay a $1 million fine. *Id.* at *12. On June 24, 2024, the Commission also filed an enforcement action against Brda and Georgios Palikaras relating to the merger between META I and Torchlight.[11] *Id.* at *13. In that action, which is pending in the Eastern District of Texas, the Commission alleges that Palikaras and Brda violated various anti-fraud provisions of the federal securities laws. *SEC v. Brda*, 4:24-cv-1048 (E.D. Tex.), ECF 1. Among other remedies, the Commission is seeking disgorgement of ill-gotten gains, prejudgment interest, and civil penalties. *Id.* ¶ 144. This litigation is ongoing.

The Commission is also investigating MMTLP trading in the months leading up to the 2022 spinoff of NBH to determine whether any federal securities laws were broken during this period.[12] Details regarding the investigation are not public at this time.

---

[10] "In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record. Accordingly, the consideration of the [order against META II] does not convert this motion into one for summary judgment." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *see also Corpus v. Dep't of Vet. Aff.*, SA-23-CV-01478, 2024 WL 5099213, at *5 (W.D. Tex. Nov. 15, 2024) (taking judicial notice of administrative decision on motion to dismiss).
[11] Palikaras was President and CEO of Meta I and became President and CEO of META II following the merger. Plaintiff did not name Palikaras as a defendant in this action. McCabe is not a defendant in the Commission's ongoing Texas enforcement action.
[12] *See SEC Charges Former CEOs with Market Manipulation, Fraud, and Other Violations*, July 2, 2024, *available at https://www.sec.gov/newsroom/press-releases/2024-77*; *see also See SEC v.*

### D.  The SEC's Oversight of FINRA.

Since the early 1790s, participants in the securities markets have agreed to be governed by a self-imposed set of industry rules. *See* Stuart Banner, *The Origin of the New York Stock Exchange*, 1791-1860, 27 J. Legal Stud. 113, 114-15 (1998). In the Securities Exchange Act of 1934 ("Exchange Act"), Congress determined that a system of "[s]upervised self-regulation" would preserve "the traditional private governance of exchanges" while allowing "the Government to monitor exchange business in the public interest," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127-28 (1973), and it subsequently extended that system to private "national securities associations" of over-the-counter (or off-exchange) brokers and dealers, *U.S. v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 701 n.6, 732-33 (1975). "Since 1938, Congress has repeatedly amended the Exchange Act to bolster the self-regulatory scheme by increasing government oversight while preserving self-regulatory organizations' primary role in regulating the securities industry," including by making "joining a self-regulatory organization mandatory for virtually all securities traders." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1321 (D.C. Cir. 2024), *pet. for cert. filed*, No. 24-904 (U.S. Feb. 20, 2025).

The National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE") created FINRA in 2007 by consolidating their member oversight functions and forming a single, renamed registered national securities association. 72 Fed. Reg. 42,169,

---

*Brda*, 4:24-cv-1048-SDJ, ECF 61 at p. 1 ("the SEC is investigating potential violations relating to trading in 'MMTLP' between October 2022 and December 2022"). A court can "take judicial notice of government documents, court filings, [and] press releases * * *." *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 762 n.5 (9th Cir. 2018). *See also, e.g., Krystal One Acquisitions LLC v. Bank of Am.*, 805 Fed. Appx. 283, 287 (5th Cir. 2020) ("court may take judicial notice of matters of public record" including "filings from prior lawsuits"); *HCB Fin. Corp. v. McPherson*, No. 1:18-CV-1120, 2020 WL 7685936, at *1 n.5 (W.D. Tex. April 30, 2020) ("The court takes judicial notice of the filings made in the Mississippi Case as matters of public record.").

42,170 (Aug. 1, 2007). "FINRA is organized as a Delaware nonprofit corporation operated by private individuals and receives no funding from the federal government." *Alpine*, 121 F.4th at 1321. Rather, "[l]ike early self-regulatory organizations, FINRA is financed entirely through fees, fines, penalties, and sanctions levied against its members." *Id.* (cleaned up).

FINRA is subject to SEC supervision of its rules and disciplinary processes. 15 U.S.C. § 78s. The SEC reviews proposed rules and, where applicable, approves or rejects them, *id.* § 78s(b), and the SEC also has authority to "abrogate, add to, and delete from" any FINRA rule as the SEC "deems necessary or appropriate" to further the purposes of the Exchange Act, *id.* § 78s(c). In addition, the Commission supervises FINRA's enforcement of its rules, having power "to review a final disciplinary sanction imposed by [FINRA]," *id.* § 78s(e), either "on its own motion" or on petition by an aggrieved party, *id.* § 78s(d)(2). The SEC can also revoke FINRA's ability to enforce its rules, *id.* § 78s(g)(2), and it can step in and enforce any written rule itself, *id.* § 78o(b)(4). The Commission also has authority to monitor FINRA's compliance with the statutory requirements to be a self-regulatory organization and may suspend its registration or limit its activities if appropriate. *Id.* §§ 78s(h)(1), 78o-3(b).

**E. Plaintiff's allegations relevant to his claims against the SEC**

**1. Overview of Plaintiff's allegations**

The FAC alleges that the Commission (a) failed to enforce the securities laws and prevent the alleged frauds and (b) failed to supervise FINRA, particularly with respect to the U3 trading halt. Plaintiff contends that these alleged failures caused or contributed to financial losses from his investment. For example, Plaintiff generally contends that the "SEC neglected its oversight duties by failing to investigate or address systematic market irregularities, including synthetic/counterfeit share creation and naked short selling" from 2021 to 2024. FAC ¶ 253.b.i;

*see also, e.g., id.* ¶ 168. And with respect to the U3 trading halt, Plaintiff alleges that "the SEC allowed FINRA's U3 halt to persist indefinitely without requiring transparency or resolution." *Id.* ¶ 253.b.iv. Plaintiff further alleges that, following the trading halt, the SEC and others "neglected to implement corrective measures to mitigate the ongoing harm." *Id.* ¶ 6.

Plaintiff also raises constitutional claims regarding the structure and authority of FINRA and the PSLRA's application to this case.

### 2. Plaintiff's claims against the Commission

Determining the nature and scope of Plaintiff's claims is difficult. Plaintiff pleads eight different counts claiming violations of various statutes and also stating common law tort claims. FAC ¶¶ 224-246. Plaintiff summarizes his claims against the Commission (and FINRA and the DTCC)[13] by emphasizing that the claims against the Commission are based on a failure to act:

> These regulatory entities are included in Counts I, II, III, IV, VII, and VIII for their collective failure to fulfill statutory oversight responsibilities under federal securities laws. Their negligence enabled the proliferation of synthetic/counterfeit shares, naked short selling, and systemic market manipulation. FINRA's issuance of the indefinite U3 halt, without timely resolution or transparency, further violated its obligations under Sections 17A and 19 of the Securities Exchange Act. The SEC and DTCC compounded the harm by failing to enforce compliance with clearing and settlement standards, leaving retail investors in financial and legal limbo.

*Id.* ¶ 248.

Counts III, IV, VII, and VIII allege that the Commission was negligent in failing to enforce various provisions of the federal securities laws or in failing to supervise FINRA, both generally and with respect to the trading halt. *See, e.g., id.* ¶ 253.i ("Failure to enforce compliance with federal securities laws"); ¶ 253.ii ("Complicity in FINRA's inaction"). Count I

---

[13] DTCC was named as a defendant in the Complaint, ECF 1, but is not named in the FAC, ECF 3.

alleges that the Commission violated 17A of the Exchange Act but relies exclusively on a claim that the Commission negligently failed to reconcile discrepancies in share ownership. *Id.* ¶ 226.[14] Count II alleges that the Commission violated the Sherman Antitrust and Clayton Acts, alleging the Commission "fail[ed] to prevent concentrated market power and anti-competitive acquisitions." *Id.* ¶ 231.

Counts V and VI do not allege causes of action against the Commission despite stating that they are brought "Against All Defendants," FAC p. 52. Plaintiff's "Defendant Inclusion Summary," which is quoted above, excludes the Commission from these counts, *id.* ¶ 248, and the Counts do not refer to any alleged SEC action or inaction. In addition, the allegations are facially inapplicable to the Commission. *See* FAC ¶ 239 (claiming defendants "profited from illegal contracts," but the FAC does not allege the Commission profited from illegal contracts); *Id.* ¶ 241 (alleging defendants "conspir[ed] to manipulate securities," but the FAC does not allege the Commission participated in manipulating securities).

In addition to the enumerated counts, the FAC has two sections entitled, "Action for Declaratory Judgment & Injunctive Relief." First, Plaintiff seeks a declaration finding the PSLRA, 15 U.S.C. § 78u-4, is unconstitutional as applied in this case on a variety of different grounds, including that it violates the First Amendment, the Equal Protection and Due Process clauses of the Fifth Amendment, and the Fourteenth Amendment. FAC ¶¶ 255, 257, 258, 259,

---

[14] The first two paragraphs of Count I (¶¶ 224 and 225) allege that "Defendants" violated Sections 9(a) and 10(b) of the Exchange Act by engaging in manipulative practices including a pump and dump. It does not appear that these claims are brought against the Commission and the Complaint is devoid of allegations against the Commission that could support such claims. The Complaint does not allege that the Commission bought or sold securities or made statements in connection with the buying or selling of securities. Even if Plaintiff's claim could be read as an aiding and abetting claim, it would fail because "the private right of action under section 10(b) does not extend" to alleged aiders and abettors. *Affco Investments 2001, LLC v. Proskauer Rose, LLP*, 625 F.3d 185, 195 (5th Cir. 2010).

265. Second, Plaintiff "challenges the constitutional authority and corporate structure" of FINRA based on the private non-delegation doctrine, the Appointments Clause, and separation of powers principles because "FINRA wields significant executive authority * * * without presidential oversight, violating the President's Article II duties," "[i]ts Board of Governors, exercising substantial authority under U.S. law, are appointed by FINRA's members rather than through constitutionally required processes under the Appointments Clause," and "the SEC's delegation of broad regulatory powers to FINRA represents an unconstitutional transfer of legislative authority to an entity outside the legislative branch." FAC ¶ 266.

### 3.  Plaintiff's request for relief

Plaintiff's "PRAYER FOR RELIEF" addresses all of his claims (equitable and legal). Plaintiff seeks declarations and injunctive relief regarding his PSLRA claims and his claims about FINRA's structure and authority. FAC ¶ 284.a, b. He also seeks other declaratory relief, including declarations that: (1) Defendants violated various federal securities and antitrust laws and violated fiduciary duties, FAC ¶ 284.c; and (2) the U3 trading halt was improper, *id.* ¶ 284.d. In addition, Plaintiff seeks compensatory damages, treble damages pursuant to the Sherman Antitrust Act and the Clayton Act, "disgorgement of profits wrongfully obtained," punitive damages, pre- and post-judgment interest; and costs and expenses. *Id.* ¶¶ 284.e, f, g, i, j, l, and p. Finally, Plaintiff seeks orders to address circumstances he claims were not handled properly: (1) [a]n order requiring injunctive relief to ensure market transparency and prevent similar systemic market failures, including "[a] full audit of all MMTLP and MMAT share transactions" and the "public release of all records, communications, and trading data related to MMTLP and MMAT shares," *id.* ¶ 284.h.i-ii; and (2) an order that the SEC and FINRA "[e]stablish clearer guidelines for regulatory intervention" and "improve oversight and accountability measures." ¶ 284.k.i-ii.

## ARGUMENT

**I.    This Court lacks subject-matter jurisdiction over the Amended Complaint.**

This Court lacks subject-matter jurisdiction over Plaintiff's claims. Plaintiff lacks

standing to bring his claims, and separately, sovereign immunity bars his claims and his claims

should have been filed in the court of appeals. "The burden of establishing federal jurisdiction

rests on the party seeking the federal forum." *Cleartrac, LLC v. Lanrick Contractors, LLC*, 53

F.4th 361, 364 (5th Cir. 2022) (cleaned up). "[A]t the Rule 12(b)(1) stage of the proceedings, the

plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician Hosps.*

*of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012). The "tenet that a court must accept as true

all allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).

**A.    The Court lacks jurisdiction over Plaintiff's claims against the Commission because he does not have standing.**

This Court lacks jurisdiction because Plaintiff has not established Article III standing.

"To establish standing, a plaintiff must show an injury in fact caused by the defendant and

redressable by a court order." *U.S. v. Texas*, 599 U.S. 670, 676 (2023); *California v. Texas*, 593

U.S. 659, 668 (2021) (plaintiffs bear the burden to plausibly allege each of these elements). "The

second and third standing requirements—causation and redressability—are often flip sides of the

same coin." *All. for Hippocratic Med.*, 602 U.S. at 380. "If a defendant's action causes an injury,

enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at

381. The converse is also true. To establish causation, a plaintiff must show that his injury is

"fairly traceable to the challenged action." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409

(2013) (cleaned up).

"[W]hen (as here) a plaintiff challenges the government's unlawful regulation (or lack of

14

regulation) of *someone else*, standing is not precluded, but it is substantially more difficult to establish. That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *All. for Hippocratic Med.*, 602 U.S. at 382 (cleaned up) (emphasis original). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.* at 383. "The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id.*

      **1.   Plaintiff lacks standing because he cannot show the Commission caused any alleged injuries.**

Plaintiff does not claim the Commission unlawfully regulated (or failed to regulate) *him*; he claims the Commission (1) failed to regulate Brda, McCabe, and other promotors who perpetrated the alleged frauds, and (2) failed to regulate FINRA. The link between the Commission's alleged regulatory failures and Plaintiff's alleged economic injuries is both speculative and attenuated.

Plaintiff claims that the Commission was "aware of trading irregularities related to MMTLP" yet "no substantive action was taken to resolve these irregularities or inform the investing public." FAC ¶ 119. Any link between these alleged inactions and Plaintiff's alleged monetary harm is purely speculative. Even if the SEC had investigated the irregularities, it is unknown whether, and when, it would have decided to bring an enforcement action and what relief it would have sought.[15] Even if the Commission would have brought an enforcement

---

[15] Plaintiff appears to allege that, because the Commission was aware of trading irregularities, it should have immediately brought an enforcement action. However, the Commission needs

action, a court would have needed to rule in the Commission's favor. Even if a court ruled in the Commission's favor, the court would have needed to enjoin the fraud or order recompense for monetary losses. Similarly, even if the Commission had publicized its concerns about META II and/or MMTLP, Plaintiff would have had to decide not to invest or to exit his investment. And even if Plaintiff wanted to exit his investment, his ability to do so would have been dependent on finding a willing buyer *after* public concerns about fraud had been raised. Plaintiff cannot show a causal connection between the Commission's alleged failures and his injuries because it is not "sufficiently predictable how third parties [or even the Plaintiff] would react to government action or cause downstream injury to plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383.

Plaintiff's claims relating to the Commission's alleged "failure to resolve the U3 halt" are similarly deficient. *See* FAC ¶ 284.f.[16] Even if the Commission had overturned the trading halt, it is entirely speculative whether Plaintiff would have avoided the economic loss he now alleges. First, even if the Commission had immediately cancelled the halt, Plaintiff would have been able to sell his shares *if, and only if*, another party were willing to purchase them at the price he seeks.[17] Second, even if Plaintiff found a willing buyer, it is unclear whether or how any such trades would have settled. Third, to the extent Plaintiff complains about the difficulties in "share

---

*evidence* of wrongdoing to bring an enforcement action and must also consider the best use of its resources in evaluating when to bring an action and what relief to seek. *See Heckler*, 470 U.S. at 827 (recognizing "the agency's expertise and better understanding of its enforcement policies and available resources").

[16] It is not clear what exactly the Plaintiff believes the Commission should have done regarding the trading halt, but he may be arguing that the Commission should have ended the halt or otherwise overruled FINRA's actions.

[17] A purchaser of MMTLP on or after December 9, 2022 would *not* have been eligible to receive NBH shares in exchange for this MMTLP shares, but the MMTLP shares such a purchaser just purchased would have been cancelled on or about December 13. To the extent Plaintiff claims that short sellers would have been forced to buy his shares, despite the generally unappealing prospect of buying shares that are about to be canceled, that is purely speculation.

reconciliation during the MMTLP-to-NBH transition," FAC ¶ 170, this inability stems from the *company's* decision not to make NBH shares DTC-eligible and therefore easily tradeable or transferable, not the Commission's alleged inaction regarding the halt.

### 2. Plaintiff lacks standing because his claims cannot be redressed by this lawsuit.

Examining the other side of the coin—redressability—confirms that Plaintiff lacks standing. First, Plaintiff's alleged economic injuries cannot be redressed by claims against the Commission because they are barred by sovereign immunity, as explained in detail in Section I.C. *See, e.g., Dee v. Granholm*, No. 23-1950, 2024 WL 4263831, at * 4 (D.D.C. Sept. 23, 2024) ("If a claim is barred by sovereign immunity, it is not redressable."). Plaintiff's requests for equitable relief are similarly deficient

Plaintiff's equitable claims broadly fall into four categories. First, Plaintiff seeks an order declaring that the "structure and authority" of FINRA and the PSLRA are unconstitutional. FAC ¶¶ 254, 284. Second, Plaintiff asks for declarations that the Commission violated various provisions of the federal securities laws and that the trading halt was improper. *Id*. ¶ 284.c, d. Third, Plaintiff asks for an order requiring the Commission to establish clearer guidelines and improve oversight to prevent future violations of the federal securities laws. *Id.* ¶ 284.k. Finally, Plaintiff asks for an order requiring an audit of MMTLP share transactions, disclosure of various documents, and enhanced oversight mechanisms. *Id.* ¶ 284.h.

If this court declared FINRA's structure unconstitutional, it would not redress Plaintiff's injuries. Such a declaration would have no impact on Plaintiff's ability to trade or reconcile his position in MMTLP or NBH because the MMTLP shares would still be canceled and the NBH shares would still not be DTC-eligible—both pursuant to decisions made by the issuers. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the

very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Environ.*, 523 U.S. 83, 107 (1998); *see also Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 456 (E.D. Tex. 2020) (finding no standing where "the Court is unable to grant relief that would effectively redress the alleged injury Plaintiffs claim to suffer"). The Court also cannot rely on such a finding to "restore trading in MMTLP," FAC ¶ 280, because META II canceled the shares, and they no longer exist and therefore cannot be traded.[18] Any decision to reissue shares would have to be made by META II and/or NBH. "There is no redressability, and thus no standing, where (as is the case here) any prospective" relief "depend[s] on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict." *Glanton ex. Rel. ALCOA Prescription Drug Plan v. AdvancePCS, Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (cleaned up).[19]

A declaration that Defendants violated various provisions of the federal securities laws or that the trading halt was improper, FAC ¶ 284.c, d, would similarly not provide any redress to Plaintiff because declaratory relief "cannot conceivably remedy any past wrong." *Stringer v. Whitley,* 942 F.3d 715, 720 (5th Cir. 2019) (cleaned up). A declaration regarding the constitutionality of the PSLRA would also not redress any harm Plaintiff suffered in connection with his MMTLP shares as such a declaration would concern the proceedings in this case, not

---

[18] To the extent Plaintiff is complaining about the difficulty in trading NBH shares received in exchange for MMTLP shares, Next Bridge did not seek DTC-eligibility. Next Bridge S-1, *https://www.edgar.sec.gov/AR/DisplayDocument.do?step=results&cik=0001936756&accession Number=0001193125-22-194228.* That was not a result of the trading halt and would not be remedied by a declaration regarding FINRA's constitutionality.

[19] Nor would a declaration precluding FINRA from issuing trading halts provide a future benefit that might confer standing. Plaintiff does not allege that he owns any other assets subject to FINRA regulation or, more importantly, that he faces an imminent threat from a comparable trading halt. Therefore, any future harm would be purely "speculative." *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023).

harm caused by alleged issues with trading in MMTLP shares.

Finally, Plaintiff lacks standing to seek clearer guidelines, improved oversight, an audit of MMTLP, or a requirement that various documents be disclosed because none of those actions would redress the wrong he alleges he has suffered, and he also has provided no reason to believe they would address any future wrong that he expects he would suffer.

### 3. Plaintiff does not have standing to compel the Commission to enforce laws.

In addition to lacking standing because of causation and redressability issues, Plaintiff does not have standing to compel the Commission to take action to enforce the law. To the extent Plaintiff's claims are predicated upon the Commission's alleged failure to sanction the perpetrators of the frauds or FINRA, Plaintiff lacks standing because "the Executive's Article II authority to enforce federal law and the deeply rooted history of enforcement discretion in American laws" precludes it. *Texas*, 599 U.S. at 684 (holding plaintiffs did not have standing to challenge the Executive's lack of enforcement); *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution").

### B. The Court lacks jurisdiction over Plaintiff's programmatic challenges.

The court lacks jurisdiction over Plaintiff's broad programmatic challenges to the Commission's enforcement and regulatory programs. Plaintiff claims that "there are broader governance flaws in the financial markets, which must be addressed to protect investors," FAC ¶ 283.c, and requests an order requiring that the Commission "[e]stablish clearer guidelines for regulatory intervention to "[i]mprove oversight and accountability measures," *id.* ¶ 284.f.i-ii. The Supreme Court, however, has "announced a prohibition on programmatic challenges." *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000) (relying upon *Lujan v. Nat'l Wildlife Fed'n*,

497 U.S. 871 (1990)). In *Lujan*, instead of challenging a single "order or regulation," the plaintiff challenged the "continuing (and thus constantly changing) operations" of the agency's administration of its land use review program. 497 U.S. at 890. The Court rejected this gambit, holding that the plaintiff could not "seek *wholesale* improvement of this program by court decree, rather than in the office of the [agency] or the halls of Congress, where programmatic improvements are normally made." *Id.* at 891 (emphasis original); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (rejecting a "broad programmatic attack" regarding land management).[20] Plaintiff likewise seeks 'wholesale improvements' regarding the Commission's regulation of the securities market and oversight of FINRA, but the Court does not have authority to order such sweeping changes.

### C. Sovereign immunity bars Plaintiff's claims.

The United States has sovereign immunity absent an express waiver. *U.S. v. Sherwood*, 312 U.S. 584, 586 (1941). Waivers of sovereign immunity must be "expressed in unequivocal statutory text and cannot be implied," and they "will be strictly construed, in terms of [their] scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

Plaintiff does not identify any statute that purportedly waives sovereign immunity over his claims. He alleges the Court has jurisdiction under 28 U.S.C. § 1331, the Exchange Act, the Sherman Act, the Clayton Act, and the Constitution. FAC ¶ 2. To the extent this can be read as

---

[20]  In *Sierra Club*, the Fifth Circuit rejected a broad challenge to the agency's timber management program as an impermissible attempt to interfere with the program, even though plaintiffs identified some allegedly improper final agency actions within that program. 228 F.3d at 566. *See also Louisiana v. U.S.*, 948 F.3d 317, 321-22 (5th Cir. 2020) (rejecting a challenge to the Army Corps of Engineers' alleged inaction in maintaining a waterway because the plaintiff did not identify a specific agency action, but rather focused on the agency's alleged failures over a lengthy period).

Plaintiff arguing that these statutes waive sovereign immunity, this argument would fail.[21]

Nonetheless, the Commission will address certain statutes that waive sovereign immunity to

demonstrate their inapplicability to Plaintiff's claims.

### 1. The Federal Tort Claims Act does not waive sovereign immunity for Plaintiff's claims for monetary damages.

The Federal Tort Claims Act ("FTCA") "waives sovereign immunity and permits suits

against the United States for claims sounding in state tort law for money damages." *Cantu Silva*

*v. U.S.*, 110 F.4th 782, 781 (5th Cir. 2024) (citation omitted). However, the FTCA does not

waive sovereign immunity over Plaintiff's claims for numerous reasons. First, the Commission is

not a proper party to such a claim. *See, e.g., Galvin v. OSHA*, 860 F.2d 181, 183 (5th Cir. 1988)

("an FTCA claim against a federal agency or employee as opposed to the United States itself

must be dismissed for want of jurisdiction"). Second, Plaintiff has not alleged that he exhausted

administrative remedies. *See, e.g., Coleman v. U.S.*, 912 F.3d 824, 834 (5th Cir. 2019) ("holding

[that] exhaustion [is] a jurisdictional prerequisite for FTCA claims that cannot be waived"); *see*

*also* Ex. A, Declaration of Melinda Hardy ¶ 3 (indicating a search of the SEC database

containing FTCA claims "show[ed] that no administrative claims have been filed for or by Mr.

Willcot").[22] Third, even if Plaintiff had brought a claim against the United States after

---

[21] "[S]overeign immunity is not waived by a general jurisdictional statute such as 28 U.S.C. § 1331." *Koehler v. U.S.*, 153 F.3d 263, 266 n.2 (5th Cir. 1998). Nor do the Sherman or Clayton Acts "waive the sovereign immunity of the United States." *McMillan v. Dep't of Interior*, 907 F. Supp. 322, 326 (D. Nev. 1995). The Exchange Act also does not waive sovereign immunity. 15 U.S.C. § 78a et seq.; *cf Safeway Portland Emp. Federal Credit Union v. FDIC*, 506 F.2d 1213, 1216 (9th Cir. 1974) (rejecting claim that "the Securities Act of 1933 itself constitutes a waiver of sovereign immunity and supports jurisdiction").

[22] The Court is permitted to consider evidence outside the complaint "in evaluating a Rule 12(b)(1) motion that presents a factual challenge to subject matter jurisdiction." *Priovolos v. FBI*, 686 Fed. Appx. 150, 152 (3d Cir. April 17, 2017) (affirming motion to dismiss where government provided a sworn declaration stating plaintiff had not filed an administrative complaint); *see also Gordon v. Neugebauer*, No. 1:14-cv-0093, 2014 WL 7179012, at *5 (N.D.

exhausting administrative remedies, the FTCA's waiver of sovereign immunity would not apply

here because of the discretionary function exception, which states that sovereign immunity is not

waived for a claim "based upon the exercise or performance or the failure to exercise or perform

a discretionary function or duty on the part of a federal agency or any employee of the

Government." 28 U.S.C. § 2680(a); *see also, e.g., Molchatsky v. U.S.*, 713 F.3d 159, 162 (2d Cir.

2013) (plaintiffs' claims that the Commission's negligence caused losses from a fraud were

barred by sovereign immunity due to the discretionary function exception).[23]

Thus, Plaintiff's claims for money damages fail.

## 2.   The APA does not waive sovereign immunity over Plaintiff's claims.

The FAC does not invoke any provision that would waive sovereign immunity for

plaintiff's non-monetary claims. Plaintiff does not cite Section 702 of the APA which can waive

sovereign immunity for actions seeking non-monetary relief brought by "[a] person suffering

legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5

U.S.C. § 702. But even if Plaintiff had invoked 702, there is no waiver of sovereign immunity

because (1) Plaintiff's challenges concern investigative and regulatory decisions by the

Commission, which are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and not

reviewable, and (2) Plaintiff has not identified an "agency action" that caused legal wrong,

---

Tex. Oct. 31, 2014) (dismissing under Rule 12(b)(1) for lack of subject matter jurisdiction based
on declaration from defendant indicating plaintiff "has not filed an administrative tort claim
under the FTCA").

[23] To the extent Plaintiff is seeking monetary damages for his constitutional claims, "it is simply
axiomatic that such damages are not available where a plaintiff directly asserts constitutional
claims against the United States" because "the United States has not waived sovereign immunity
for constitutional claims." *Bustos v. U.S.*, 20-CV-00292, 2021 WL 11670028, at *2 (W.D. Tex.
Feb. 25, 2021). Similarly, to the extent Plaintiff's claims allege fraud or "manipulative tactics"
*see, e.g.,* FAC ¶ 1 and Count VII, "[s]uch intentional conduct [] is explicitly exempted from the
FTCA's waiver of sovereign immunity." *In re Orthopedic Bone Screw Prod. Liability Litig.*, 264
F.3d 344, 363 (3d Cir. 2001).

*Alabama-Coushatta Tribe v. U.S.*, 757 F.3d 484, 489 (5th Cir. 2014).

>    **a.   Plaintiff's claims fall within the Section 701(a)(2) exception.**

Section 701(a)(2) provides that Section 702's waiver of sovereign immunity does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Commission's authority to decide what to investigate, how to investigate, and whether to bring an enforcement action is committed to agency discretion by the plain language of the securities laws. Section 21(a) of the Exchange Act, 15 U.S.C. § 78u(a), states that "[t]he Commission may, *in its discretion*, make such investigations as it deems necessary" to determine whether a violation of the securities laws exists (emphasis added). Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(1), similarly states that the Commission "may *in its discretion* bring an action in the proper district court of the United States" when "it shall *appear to the Commission* that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter" (emphasis added). Congress bestowed similar discretion upon the Commission to act against an SRO "if in *its opinion* such action is necessary" to protect investors. 15 U.S.C. § 78s(h)(1) (emphasis added).

In *Heckler*, 470 U.S. at 838, the Supreme Court made clear that an agency's "decision not to take the enforcement actions requested by respondents is therefore not subject to judicial review under the APA." *See also id.* at 828, 830 (the "exercise of prosecutorial discretion" is the paradigmatic example of agency action committed to agency discretion by law because "a court would have no meaningful standard against which to judge the agency's exercise of discretion"); *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984) ("Congress intended to vest the SEC with considerable discretion in determining when and how to investigate possible violations of the statutes administered by the Commission"). The Commission also has broad discretion in

deciding when and how to use its regulatory authority to supervise FINRA. *See San Francisco Min. Ex. v. SEC*, 378 F.2d 162, 165 (9th Cir. 1967) (determination whether the Commission should take an action against an SRO under Section 19 of the Exchange Act "rests within the sound discretion of the agency");[24] *In re Application of John Boone Kincaid III for Review of Action Taken by FINRA*, Exchange Act Release No. 34-87384, 2019 WL 5445514, at *5 (SEC Oct. 22, 2019) (the Commission has discretion under *Heckler* whether to "take[] action against FINRA").

### b. Plaintiff is not challenging an agency action.

Section 702's waiver of sovereign immunity applies only if a plaintiff "identif[ies] some 'agency action' affecting him in a specific way." *Alabama-Coushatta*, 757 F.3d at 489. "'[A]gency action' for the purposes of [Section] 702 is set forth by 5 U.S.C. § 551(13), which includes a "failure to act."'" *Id.*, quoting 5 U.S.C. § 551(13); *see also Louisiana v. U.S.*, 948 F.3d 317, 321 (5th Cir. 2020) (stating that "agency action" is "a term of art that does not include all conduct") (cleaned up).[25]

Plaintiff's claims for equitable relief challenge the Commission's alleged "inaction." *See, e.g.,* FAC ¶ 224. But a "failure to act" is "properly understood as a failure to take an *agency*

---

[24] *See also Alpine Sec. Corp. v. NSCC*, No. 2:23-cv-00782, 2025 WL 901847, at *2 (D. Utah March 25, 2025) (the "SEC *may* limit a clearing agency's activities and operations or suspend or revoke its registration 'if in [the SEC's] *opinion* such action is necessary or appropriate in the public interest") (citing 15 U.S.C. § 78s(h)(1)) (emphasis added); *Opulent Fund v. Nasdaq Stock Mkt., Inc.*, No. C-07-03683, 2007 WL 3010573, at *6 (N.D. Cal. Oct. 12, 2007) (stating that § 78s(h)(1) "*permit[s]* the SEC to suspend, censure or impose other limits on an SRO for violating the Exchange Act, rules or regulations thereunder, or the SRO's own rules") (emphasis added).
[25] To the extent that Plaintiff is bringing any claims directly under the APA, any agency action would also have to be final. *Alabama-Coushatta*, 757 F.3d at 489. "Final agency actions are actions which (1) mark the consummation of the agency's decisionmaking process, and (2) by which rights or obligations have been determined or from which legal consequences will flow." *Sierra Club*, 228 F.3d at 565 (citation omitted).

*action*—that is, a failure to take one of the agency actions (including their equivalents) earlier

defined in § 551(13)." *Norton*, 542 U.S. at 62. A "'failure to act' is properly understood to be

limited, as are the other items in § 551(13), to a *discrete* action." *Id.* at 63 (emphasis original);

*see also Gentile v. SEC*, 974 F.3d 311, 317 (3d Cir. 2020) ("the APA allows challenges to

discrete agency action, but not broad challenges to the administration of an entire program.");

*Alabama-Coushatta*, 757 F.3d at 491 (holding that a complaint that did not name the specific

actions it was challenging was an impermissible "blanket challenge" because it was "directed at

the federal agencies' broad policies and practices"). To the extent Plaintiff's claim is a claim under

the APA to compel agency action allegedly unlawfully withheld or unreasonably delayed, 5 U.S.C. §

706(1), Plaintiff must establish that the SEC "failed to take a *discrete* agency action that it is *required to*

*take.*" *Harrison Cnty, Miss. v. U.S. Army Corps of Engins.*, 63 F.4th 458, 463 (5th Cir. 2023) (citing

*Norton*, 542 U.S. at 64) (emphasis original). Plaintiff's claim that the Commission "fail[ed] to fulfill

statutory oversight responsibilities under federal securities laws" and "compounded the harm by failing

to enforce compliance with clearing and settlement standards", *see* FAC ¶ 248, does not address a

*discrete* agency action the Commission was *required* to take. *See Harrison Cnty.*, 63 F.4th at 466

("Because the Corps has no duty to prepare the supplemental EIS the plaintiffs seek, the plaintiffs have

no APA claim for unlawful agency inaction, and the Corps is immune from their suit claiming

otherwise."). His claims regarding the PSLRA and FINRA's structure similarly do not identify any

agency actions the Commission was required to take.

Plaintiff points to no basis outside of the APA for a claim based on a failure to act, but

even if he could do so, he does not identify a failure to undertake any discrete acts that he is

challenging. In addressing what the Commission should have done, he vaguely claims that the

Commission "fail[ed] to enforce compliance with federal securities laws." *Id.* ¶ 253.b.i; *see also*

*id.* ¶ 253.b.ii (the "SEC allowed FINRA's U3 halt to persist"), *id.* ¶ 253.b.iii ("the SEC failed to

act in a manner consistent with its mission to protect retail investors"). The APA does not waive

sovereign immunity for Plaintiff's claims because instead of identifying agency action, he claims

only that at some undefined time the Commission should have undertaken some undefined

investigation, enforcement action, and/or systematic changes.[26]

### D. Plaintiff filed in the wrong court.

Plaintiff contends that the Commission has failed to "enforce the prompt resolution of the

U3 halt." *See, e.g.,* FAC ¶ 238. To the extent he contends the Commission should have issued an

order overturning FINRA's halt, that claim cannot be heard in this Court because "where a

statute commits final agency action to review by the Court of Appeals, the appellate court has

exclusive jurisdiction to hear suits seeking relief that might affect its future statutory power of

review." *Telecommunications Research & Action Center v. FCC ("TRAC")*, 750 F. 2d 70, 77-78

(D.C. Cir. 1984).

This principle applies here because the Courts of Appeals would have exclusive

jurisdiction to review a Commission order overturning a trading halt. An order to overturn a

trading halt would be issued under the Exchange Act, and Section 25(a) of the Exchange Act

provides appellate courts with exclusive jurisdiction over review of such orders. 15 U.S.C. § 78y.

*See SEC v. Jett*, 514 F. Supp. 2d 532, 535 (S.D.N.Y. 2007) (Section 25(a) of the Exchange Act

"confers exclusive jurisdiction on the Court of Appeals to review the merits of a Commission

order"). Plaintiff cannot "evade the appeals courts' exclusive jurisdiction by claiming his action

sounds in tort." *U.S. v. Baxter*, No. 1:10-cv-00435, 2011 WL 1988437, at *7 (D. Me. May 23,

---

[26] Even if Plaintiff's claims were not improperly amorphous, neither an investigation nor an enforcement action constitutes the "whole or part of an agency rule, order, license, sanction, relief, or the equivalent," so they are not "agency actions." 5 U.S.C. § 551(13).

2011); *see also, e.g., Jamison v. FTC*, 628 F. Supp. 1548, 1551 (D.D.C. 1986) (allowing plaintiff to avoid *TRAC* by couching claims in constitutional terms "would cripple the purpose of the *TRAC* doctrine").

## II. Plaintiff fails to state a claim upon which relief can be granted.

Even if Plaintiff had standing, sovereign immunity did not bar his claims, and he filed in the proper court, Plaintiff fails to state a claim upon which relief can be granted. *See Iqbal*, 556 U.S. at 678 ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (cleaned up). The FAC, therefore, should be dismissed pursuant to Rule 12(b)(6).

### A. Plaintiff's claims that the Commission acted negligently and failed to supervise FINRA should be dismissed.

Counts III, VII, and VIII, allege that (1) the Commission owed a duty of care to investors; (2) the Commission breached that duty by failing to stop the Meta Materials frauds or by failing to properly supervise FINRA; and (3) Plaintiff suffered a financial loss as a result. *See, e.g.,* FAC ¶ 235 ("Defendants collectively breached their duty of reasonable care"). Plaintiff's claims are without merit.

First, the Commission does not, in fact, owe a duty of care to individual investors. *See, e.g., Grady v. U.S.*, No. 13-15C, 2013 WL 4957344, at *4 (Fed. Cl. July 31, 2013), *aff'd*, 565 Fed. Appx. 870 (Fed Cir. May 7, 2014).[27] In *Grady*, the plaintiff sought to hold the Commission liable for losses he suffered during a stock market "Flash Crash," arguing the Commission

---

[27] To the extent the Court would look to Texas law, [a] person owes a duty of care to another person only if that duty arises out of a limited set of 'special relationships or circumstances.'" *Mack v. RPC, Inc.*, 439 F. Supp. 897, 901 (E.D. Tex. 2020) (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000)). No such special relationship exists between the Commission and investors.

violated it "statutory duty to maintain 'fair and orderly capital' markets." *Id.* The court held that the "SEC has no such duty because the statute [the Exchange Act] does not establish any sort of trust relationship that benefits investors." *Id.* (cleaned up). *See also Zelaya v. U.S.*, 781 F.3d 1315, 1325 (11th Cir. 2015) (questioning the claim that "the SEC breached 'the duty of care owed to investors' as a result of violations of its federal statutory duties * * * [because] mere breaches of federal statutory duties are, as a threshold matter, insufficient to support a cause of action").[28] Accordingly, courts have uniformly rejected attempts to hold the Commission liable for alleged investor losses. *See, e.g., Baer v. U.S.*, No. 11-1277, 2011 WL 6131789, at *7 (D.N.J. Dec. 8, 2011) ("If Plaintiffs prevailed, the SEC would become the guarantor of the investment decisions of individuals who choose to participate in regulated markets. While undoubtedly one function of the SEC is to protect the public from people like Madoff, to impose an obligation on the government to expend resources sufficient to uncover every wrong which could be discovered from a proper investigation is to impose an unlimited obligation on the government * * *").[29]

Second, even assuming a duty to investors existed, Plaintiff does not articulate how the Commission breached that duty. For example, Plaintiff does not point to any information that the Commission had that should have enabled the Commission to stop Plaintiff from investing in a

---

[28] In affirming dismissal, the court relied on the discretionary function exception under the FTCA to reject plaintiff's negligence claims, rather than failure to state a claim. *Zelaya*, 781 F.3d at 1326.

[29] *Baer* rejected claims that the Commission was negligent in not addressing specific tips that, if investigated promptly, may have enabled the Commission to stop a Ponzi scheme by Bernard Madoff. *See also Donahue v. U.S.*, 870 F. Supp. 2d 97, 102 (D.D.C. 2012) (rejecting plaintiff's claim that "the SEC breached a duty of care to the plaintiffs and other investors in Madoff's enterprise" based on the discretionary function exception); *Dichter-Mad Fam. Part., LLP v. U.S.*, 707 F. Supp. 2d 1016, 1018 (C.D. Ca. 2010) (rejecting plaintiff's claim "that the SEC 'owes a duty of reasonable due care to all members of the general public including all investors in the U.S. financial markets who are foreseeably endangered by its conduct'").

company that he now alleges grossly inflated the value of its assets and made other misrepresentations to investors or should have enabled it to bring enforcement actions relating to the 2021 fraud sooner than it did. Nor does Plaintiff identify any action the Commission should have taken in overseeing FINRA that would have had any impact on how FINRA addressed the trading in MMTLP shares. Plaintiff's conclusory claim of negligence is insufficient. *See, e.g., Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024) ("conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true") (cleaned up).[30]

**B. Plaintiff's claim that the Commission violated Sections 17A and 15 of the Exchange Act and the antitrust laws should be dismissed.**

Count I alleges that the Commission violated Section 17A of the Exchange Act, 15 U.S.C. § 78q(a), by failing to maintain records. Count IV alleges that, by failing to resolve the MMTLP trading halt, the Commission violated Sections 17A(a)(1), 15 U.S.C. § 78q-1(a)(1), and 15A(b)(6) of the Exchange Act, 15 U.S.C. § 78o-3(b)(6). Count II alleges that the Commission violated the Sherman Antitrust Acts and the Clayton Act. None of these claims has merit.

First, neither Sections 17A nor 15A(b)(6) provide a private right of action. *See, e.g., Riggs v. Schappell*, 939 F. Supp. 321, 332 (D.N.J. 1996) ("argument that section 17A contains a private right of action must be rejected"); *Emmons v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 532 F. Supp. 480, 483 (S.D. Ohio 1982) ("15(A)(b)(6) 'neither confers rights on private parties nor proscribes any conduct as unlawful,' and cannot, by its terms, indicate a legislative intent to create a private right of action") (citing *Touche Ross v. Redington*, 442 U.S. 560, 569 (1979)). Moreover, 15 U.S.C. § 78q(a) creates record retention requirements on various types of regulated entities, not on the Commission. Similarly, 15 U.S.C. § 78q-1(a)(1) is simply

---

[30] Plaintiff's claims of Commission "inaction," *see, e.g.,* ¶ 209, also ignore that the Commission investigated and brought enforcement actions regarding fraud surrounding the 2021 merger and is investigating potential violations of the federal securities laws regarding the 2022 spinoff.

Congressional findings on clearance and settlement, not provisions the Commission could even in theory violate.

Finally, the Commission is not a proper defendant under the antitrust statutes, and separately, the FAC is devoid of facts supporting such claims against the Commission. *See Gonzalez v. U.S.*, No. EP-CV-263, 2015 WL 13344910, at *14 (W.D. Tex. Aug. 12, 2015) ("The United States, its agencies and officials, remain outside the reach of the Sherman Act.") (citation omitted); *see also e.g.*, *Cole v. Alaska Island Comm. Serv., Inc.*, No. 1:18-cv-00011, 2019 WL 13211822, at *9 (D. Alaska Oct. 11, 2019) (dismissing claims under the Sherman and Clayton Acts because "[i]t is well established that the United States and its agencies cannot be an antitrust defendant").

### C. Plaintiff's claims regarding the constitutionality of the PSLRA should be dismissed.

Plaintiff contends that the PSLRA is unconstitutional as applied because it violates: (1) the separation of powers doctrine by infringing on the powers of the courts, FAC ¶ 255; (2) "the First Amendment by chilling access to the courts," *id.* ¶ 257; (3) "the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small retail investors while shielding institutional actors from accountability," *id.* ¶ 258; (4) "the Due Process Clause of the Fifth Amendment by effectively denying Plaintiffs the opportunity to prove their claims," *id.* ¶ 259; and (5) the Equal Protection Clause of the Fourteenth Amendment because it preempts certain state law remedies, *id.* ¶ 260. These claims are without merit.

Congress's enactment of the PSLRA's heightened pleading standard does not violate the separation of powers doctrine because "Congress has undoubted power to regulate the practice and procedures of federal courts." *Sibbach v. Wilson & Co.*, 61 S. Ct. 422, 424 (1941); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (recognizing that

"[e]xacting pleading requirements are among the control measures Congress included in the

PSLRA" "[a]s a check against abusive litigation by private parties").

The PSLRA does not violate the First Amendment because it does not limit what Plaintiff

can say, in court or otherwise, nor does it impede his ability to petition the government for

redress of grievances;[31] it merely establishes a pleading standard a plaintiff must meet to survive

a motion to dismiss.

To state an equal protection claim, a "plaintiff must allege and prove that he received

treatment different from that received by similarly situated individuals and that the unequal

treatment stemmed from a discriminatory intent." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d

215, 227 (5th Cir. 2012). Plaintiff's equal protection claim fails because, among other reasons,

retail investors are not treated differently than institutional actors. The PSLRA applies equally to

both, and it applies regardless of whether a retail or institutional actor is a plaintiff or

defendant.[32] Even if there were some disparities in treatment, retail investors are not a protected

class and therefore Congress would only need (and had) a rational basis to conclude that curbs

were needed to prevent frivolous private securities lawsuits. *See generally Illumina, Inc. v. FTC*,

88 F.4th 1036, 1047 (5th Cir. 2023) ("rational-basis review is a low bar that is satisfied so long

as there is any reasonable conceivable state of facts that could provide a rational basis for the

classification") (citation omitted).[33]

---

[31] In fact, the FAC refers at length to actions taken by members of Congress in response to grievances aired by MMTLP investors. FAC ¶¶ 137-140, 142-43, 165-65.

[32] The PSLRA was enacted to encourage institutional investors to serves as lead *plaintiffs*, so institutions are subject to the heightened pleading standard, just as Plaintiff is. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 273 (3d Cir. 2001) ("Both the Conference Committee Report and the Senate Report state the purpose of the legislation was to encourage institutional investors to serve as lead plaintiff.").

[33] Plaintiff's Fourteenth Amendment claims fails because the "Fourteenth Amendment [] applies to the states, not the federal government." *Jones v. O'Malley*, 107 F.4th 489, 497 (5th Cir. 2024).

Plaintiff's Fifth Amendment due process claim is without merit. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The PSLRA pleading requirements in no way inhibit Plaintiff's access to the courts nor do they deprive him of a meaningful opportunity to present his case. That he cannot meet these standards does not mean he lacked a meaningful opportunity to do so.

### D. Plaintiff's private nondelegation doctrine and separation of powers claim should be dismissed.

Plaintiff lacks standing to bring his claim, but in any event, the Court should dismiss Plaintiff's claim that Congress "abdicate[d] its legislative responsibilities," FAC ¶ 269.b, and permitted "FINRA [to] exercise[] significant executive powers" in violation of the private nondelegation doctrine, *id.* ¶ 269.b.[34] As discussed above, self-regulatory organizations such as FINRA have played a crucial role in the securities industry since the founding. The Exchange Act subjects self-regulatory organizations to federal oversight that subordinates FINRA to the SEC. That statutory structure is consistent with nearly 100 years of precedent recognizing that "a private entity may aid a public federal entity that retains authority" over it, *Oklahoma v. U.S.*, 62 F.4th 221, 228-29 (6th Cir. 2023), including precedent from the Fifth Circuit, *National Horsemen's Benev. & Protect. Assoc. v. Black*, 107 F.4th 415, 423, 434-35 (5th Cir. 2024) ("*NHBPA*"), *petition for cert filed* (U.S. Oct. 15, 2024).

---

Moreover, the PSLRA did not preempt state law claims. *See, e.g., N. Sound Cap. LLC v. Merck & Co., Inc.*, 938 F.3d 482, 491 (3d Cir. 2019) ("Congress has repeatedly declined in the invitation—in the Securities Act, Exchange Act, the PSLRA, and SLUSA itself—to broadly preempt state-law securities claims.").

[34] Plaintiff purports to present his separation of powers claim as distinct from his private nondelegation doctrine claim, but both claims are effectively claims under the nondelegation doctrine as they both concern whether Congress or the Commission has improperly delegated authority to FINRA, a private entity.

FINRA "function[s] subordinately" to the SEC, which wields "authority and surveillance over" FINRA's activities. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). The SEC "retains formidable oversight power[s] to supervise, investigate, and discipline [FINRA] for any possible wrongdoing or regulatory missteps." *NHBPA*, 107 F.4th at 435 (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007)). "[T]he SEC may abrogate, add to, and delete from all FINRA rules as it deems necessary." *Aslin v. FINRA*, 704 F.3d 475, 476 (7th Cir. 2013) (citations omitted) (citing 15 U.S.C. § 78s(b)(1), (c)); *NHBPA*, 107 F.4th at 426 (this provision makes a private entity's "rulemaking power" properly "subordinate" to a government agency). Moreover, FINRA must notify the SEC of any final disciplinary action it takes against a member, which is thereafter subject to *de novo* review by the SEC, acting sua sponte or in response to a petition from the aggrieved party. *See* 15 U.S.C. § 78s(d)(1)-(2). As a final backstop, the SEC can suspend or revoke FINRA's registration (and thus its ability to function as an SRO) "if in [the SEC's] opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter." 15 U.S.C. § 78s(h)(1); *see NHBPA*, 107 F.4th at 435 (observing that the SEC can, among other things, "derecognize FINRA's regulatory role entirely" and "remove FINRA board members for cause"). As Plaintiff concedes, FAC ¶ 101.c-d, "[i]n case after case, the courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors," *Oklahoma*, 62 F.4th at 229 (collecting cases).

The cases Plaintiff cites do not warrant a different result. In *Alpine*, 121 F.4th at 1327, the court issued a narrow preliminary injunction barring FINRA from issuing an order expelling a broker-dealer as a member of FINRA "immediately upon the issuance and prompt service of

FINRA's decision," which would have effectively barred the firm from the securities industry writ large before the SEC had an opportunity to review the expulsion. The panel expressly declined to enter a broader injunction based on nondelegation concerns with FINRA's structure more generally. *Id.* at 1328-29. And as relevant here, *Alpine* was expressly "limited to expulsion orders issued in expedited proceedings" against broker-dealers who are required to be FINRA members to engage in securities trading and "do not engage in any other significant business that could sustain operations" while seeking review. *Id.* at 1330-31. The present case is entirely different because Plaintiff is an investor, not a FINRA member being disciplined by FINRA (or even being directed to do or not do anything by FINRA), let alone being expelled from FINRA membership.[35]

### E. Plaintiff's Appointment Clause claims should be dismissed.

Plaintiff's allegation that FINRA's "structure and appointment process," FAC ¶ 268, violates the Appointments Clause fares no better. The Appointments Clause in Article II of the Constitution governs the manner of appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. It does not govern the selection of private executives or board members of a private corporation outside the government—private corporate officials whose accountability to the government under the Exchange Act is ensured by private-nondelegation principles. *See NAHBP*, 107 F.4th at 436-37 ("Challenges based on private nondelegation, on the one hand, and the Appointments Clause, on the other, appear mutually exclusive. For constitutional purposes, an entity is either governmental or not.").

A corporation is "part of the government," and its officers are subject to the

---

[35] *SEC v. Sloan*, 436 U.S. 103 (1978), cited repeatedly by Plaintiff, is likewise totally irrelevant. *Sloan* concerned action by the Commission, not an SRO, and the trading halt here was only four days because MMTLP shares were canceled by the issuer, so *Sloan's* 10-day limit is irrelevant.

Appointments Clause, only if "the Government creates the corporation" in "furtherance of governmental objectives" and "retains for itself permanent authority to appoint a majority of the directors of that corporation." *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (cleaned up). This test draws the line between government entities and private enterprises not only for purposes of First Amendment claims, as in the case in which it was first applied, *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 399 (1995), but also for structural constitutional claims like those arising under the Appointments Clause. *See Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 55 (2015); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 484-86, 503 (2010). "Only those entities that satisfy both conditions"—federal creation and federally selected leadership—"may be considered federal entities." *Kerpen v. Metro. Wash. Airport Auth.*, 907 F.3d 152, 159-60 (4th Cir. 2018). And the "failure to meet the threshold of establishing" an organization "as a federal entity is fatal to [a litigant's] claims under the Appointments Clause." *Id*. at 159-60; *cf. Corr v. Metro. Wash. Airports Auth.*, 702 F.3d 1334, 1337 (Fed. Cir. 2012).

That test derives from Supreme Court case law and forecloses Plaintiff's Appointments Clause claim. Applying the test in *NAHBP*, the Fifth Circuit rejected an Appointments Clause challenge to the Horseracing Integrity and Safety Authority because "the Authority was not created by the federal government … but was incorporated under Delaware law"; "the Authority was not created to further governmental objectives, but instead as a private association to address doping, medication, and safety issues in the thoroughbred racing industry"; and "the federal government does not control the operation of the Authority, nor has it retained for itself permanent authority to appoint a majority of the Authority's directors." 107 F.4th at 538 (cleaned up).

FINRA is a private corporation whose officers are not subject to the Appointments Clause for the same reasons. FINRA is a Delaware corporation, was not created by the government or to further a governmental objective, and its directors, executives, and other corporate officials are selected, not by the government, but by private entities in the manner specified in FINRA's private corporate charter. *See* FINRA, FINRA By-Laws art. VII, § 13 (2007), https://www.finra.org/rules-guidance/rulebooks/corporate-organization/election-governors.

Contrary to Plaintiff's assertion, FAC ¶ 267.b, FINRA's structure does not mirror the structure of the Public Company Accounting Oversight Board, at issue in *Free Enterprise Fund*, 561 U.S. 477. Indeed, that decision underscores that FINRA is not part of the government and its officials accordingly are not subject to the Appointments Clause. *Free Enterprise Fund* recognized that the accounting Board was "modeled on" the "private self-regulatory organizations in the securities industry," such as National Securities Clearing Corporation, FINRA, and the New York Stock Exchange, that "investigate and discipline their own members subject to Commission oversight." *Id*. at 484. The Court stressed, however, that there was a critical difference between the Board and these other entities: "[u]nlike the self-regulatory organizations," the accounting Board "is a Government-created, Government-appointed entity." *Id*. at 485. On that basis, Court determined the accounting Board is "part of the Government for constitutional purposes," and thus that its "members are Officers of the United States" to whom Article II's removal requirements apply, *id*. at 485-86 (quotation marks omitted). But the Court expressly distinguished the accounting Board from "private organizations like the New York Stock Exchange." *Id*. at 503.

**F. Plaintiff's claims seeking an order requiring systematic reforms, an audit of share transactions, and production of documents should be dismissed.**

Plaintiff's request that the Court order the Commission to "[e]stablish clearer guidelines for regulatory intervention in cases of market irregularities," FAC ¶ 284.k.i, and "[i]mprove oversight and accountability measures", *id.* ¶ 284.k.ii, should be dismissed because courts cannot issue such vague, overly broad declarations. *See, e.g., Lee v. Centurion of Fla., LLC*, No. 19-CV-210, 2020 WL 13845102, at *7 (N.D. Fla. July 21, 2020) (dismissing claims for declaratory and injunctive relief that were "overly broad and vague"); *Kristich v. Casady*, No. CIV-23-544, 2024 WL 4150475, at *5 (W.D. Okla. July 19, 2024) (recommending dismissal of "request for declaratory/injunctive relief [that] is overly broad and non-specific" because it "is not narrowly tailored enough to correct the specific violations claimed by Plaintiffs"), *adopted by* 2024 WL 3814046 (Aug. 14, 2024). *See also U.S. v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985) ("Precise resolution, not general admonition, is the function of declaratory relief.").

Plaintiff also asks the Court to order a "full audit of all MMTLP and MMAT share transactions, FAC ¶ 284.h.i, and the "public release of all records, communications, and trading data related to MMTLP and MMAT shares, *id.* ¶ 284.h.ii. Plaintiff fails to point to any statute or other authority that would entitle him to such relief. Individuals can seek documents from the Commission via the Freedom of Information Act ("FOIA"), but Plaintiff does not allege he has filed a FOIA request, and he has not brought a claim under the FOIA.

## CONCLUSION

For the foregoing reasons, Plaintiff's First Amended Complaint should be dismissed.

Respectfully Submitted,


Date: May 12, 2025                    /s/ Eric A. Reicher_____

Melinda Hardy *
D.C. Bar No. 431906
Eric A. Reicher**
D.C. Bar No. 490866
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-7921 (phone) (Reicher)
hardym@sec.gov
reichere@sec.gov

Jason J. Rose
Texas Bar No. 24007946
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 978-1408 (phone)
(817) 978-4927 (facsimile)
rosej@sec.gov

Counsel for Defendant

*  Pro Hac Vice Forthcoming
** Admitted Pro Hac Vice

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th of May, 2025, I filed or caused to be filed the foregoing SEC's Motion to Dismiss through the CM/ECF system which will provide service to Plaintiff since he has been granted permission to file electronically by the Court.

*/s/ Eric A. Reicher*
Eric A. Reicher
Special Trial Counsel
U.S. Securities and Exchange Commission