Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

## Whistleblower Tip Under Section 21F of the Securities Exchange Act of 1934

| | |
|---|---|
| Company / Issuer: | Torchlight Energy Resources, Inc. ("TRCH", "Torchlight", or the "Company") |
| Headquarters: | Plano, TX |
| Industry: | Oil & Gas |

Torchlight Energy – Drilling For Suckers

There is a saying that if you are sitting around a poker table and can't tell who is the shark and who is the fish, the fish is you. If you are investing in Torchlight Energy, Inc., one needs to understand that it *appears* a number of sharks have come together to collude to eat fish – in this case the fish are retail stock investors.

It would be easy to be cynical and think the SEC won't go after TRCH for the systematic fleecing of retail investors over the last number of years given TRCH's corporate attorney is a former SEC lawyer who seems to have now carved out a niche papering up documents for *seemingly* fraudulent transactions and defending executives who are involved in pump-and-dump and ponzi schemes. That would of course be embarrassing if the good guys have turned bad and are enabling just the type of fraud that the SEC has recently claimed to focus on. Indeed, TRCH has many of the items the SEC is allegedly focused on: retail investors, scams, repeat offenders, enabling gatekeepers and the use of social media, as examples.

Torchlight is a roughly $60 million market capitalization company. It is perhaps easy to say, why should Torchlight be a focus case. Torchlight is about more than just Torchlight and its management team, however. It is about the enablers – the attorneys, accountants and reserve engineers who appear to sign off on fraudulent deals and fraudulent financial statements; it is about the capital providers – the broker/dealers, individual brokers and "investors" that legitimize the scheme but are really part of it. It is about how retail investors get scammed, in this instance a number of doctors, lawyer and consultants and/or accountants from Ernst & Young, PwC and Deloitte. If "smart" investors can get duped, image how easy it is for less-sophisticated investors to fall prey. TRCH is about paid consultants who are really stock promoters or conduits for capital to be provided to stock promoters, including on social media. And it is about the SEC. How can these types of frauds be allowed to survive and perpetuate despite the red flags, repeated bad actors and warnings from the investment community.

**Whistleblower Tip [21F SEC Exchange Act 1934]**
**Company: Torchlight Energy, Inc. (NASD:TRCH)**

Per SEC filings:

"Torchlight Energy Resources, Inc., through its subsidiaries, engages in the
acquisition, exploration, exploitation, and/or development of oil and natural gas
properties in the United States. As of December 31, 2017 it had interests in four oil
and gas projects, including the Orogrande project in Hudspeth County, Texas; Hazel
project in Sterling, Tom Green, and Irion Counties, Texas; Winkler project in Winkler
County, Texas; and Hunton wells in partnership with Husky Ventures in Central
Oklahoma. The company was founded in 2010 and is based in Plano, Texas."

In reality, Torchlight *appears* to be a long-running fraudulent enterprise.

Consider the following recent transaction:

- On October 18, 2018, TRCH announced it had closed on $6 million of 16%
  unsecured debt financing.  $3 million of the proceeds were used to repay a
  promissory note held by Gregory McCabe, the Company's chairman.  As part
  of the deal, McCabe Petroleum, owned by Gregory McCabe was required to
  give a put option to the lender allowing them to receive the principal amount
  back from him and in addition, if there is a 'Fundamental Transaction,'
  McCabe Petroleum could be forced to pay a $1.5 million fee (25%) to the
  lender.  No interest or principal is due until 2020.
- As part of the October 2018 financing, Torchlight claims they formed a
  special committee of independent directors and engaged an independent
  financial consulting firm for a fairness opinion deeming the transaction
  appropriate.
- The statement made in its October 18, 2018 8-K filed with the SEC appears to
  be false and misleading for the following reasons.
  - After the recent refinancing, it TRCH has $17.6 million of <u>UNSECURED</u>
    debt.
  - At year-end 2017, TRCH indicated they had total reserves of 9,600
    barrels of oil equivalent, with only 2,300 of that oil.
  - The reported PV-10 at YE17 was $96,000
  - Since its inception as a public company in 2010, TRCH has had
    cumulative revenue of $11 million ($9.8 million oil revenue); it has
    only produced 140,349 barrels of oil and has never produced more
    than 200 barrels of oil per day on a quarterly basis with the daily
    average being 60 barrels a day.
  - Over the same timeframe, TRCH has reported $56 million of cash
    capital expenditures; it has reported $49 million of general &
    administrative expense; and it has reported $20 million of stock and
    warrants issued for "services," which really appear to be stock
    promotion.

- o Put simply, Torchlight has no cash flow. They have never had cash flow. They have no ability to support any debt, let alone nearly $20 million of unsecured debt.
- o It is a reasonable inference that no legitimate investor would lend TRCH money on an unsecured basis given there are almost no reported assets (per reserve engineer) and no cash flow.
- o Any broker/dealer or broker selling such debt would likely have to be party to the scheme or have not done the diligence a prudent man would do. They would be unable to find unsecured credit transactions in the oil and gas sector with a similar credit profile.
- o Any independent financial consulting firm giving a fairness opinion on this deal would likely be part of the fraud. Indeed, an entity named ATLAS Consulting appears to be a party to the TRCH fraud and has written fictitious pieces about the company in the past.
- o The SEC should ask the Company for the fairness opinion to inquire into the diligence done and basis for the opinion.
- o

https://www.sec.gov/Archives/edgar/data/1431959/000165495418011309/exhibit_10-1.htm

https://www.sec.gov/Archives/edgar/data/1431959/000165495418011309/trch_8k-17495.htm

All of the materials provided in this memo are sourced from public filings. Forensic accounting, ratio and relative analysis were all done. Expert-level examination of SEC filings was done. There could potentially be reasonable explanations for the transactions and combined backgrounds discussed, but it is also reasonable to infer what the facts suggest. By no means is all the material available to highlight questionable transaction included, but there should be a sufficient beacon leading the Commission toward similar transactions.

**Whistleblower Tip [21F SEC Exchange Act 1934]**
**Company: Torchlight Energy, Inc. (NASD:TRCH)**

The cast of characters involved in TRCH have to be described to be believed, but the highlights include:

- CEO a defendant in a federal RICO case relating to **ponzi scheme**

- CFO whose prior company was charged with running a **pump-and-dump**

- Investor relations individual charged by SEC for **running an oil & gas fraud**

- The counterparty to a 2014 transaction was indicted by the SEC for **conspiracy, securities fraud, mail fraud, wire fraud, money laundering** and failure to disclose foreign bank accounts.

- Stock promoter with ties to prior large **pump-and-dump**

- A **Trustee at University of Colorado at Boulder** who appears to be the primary "institutional investor" used to legitimize the apparent fraud.

- A former SEC lawyer who appears either **willingly negligent** or complicit in the fraudulent schemes

- Auditors who have separately **settled litigation relating to filing falsified financials**

- An apparent 'boiler-room' shop that was able to **scam partners at E&Y, PwC and Deloitte**, along with doctors and lawyers

- A **billionaire philanthropist** out of Tampa, FL who may have fallen victim to the scheme.

- 

**John Brda is TRCH's current CEO:**

Per the Company website:

"Mr. Brda has been our President and Secretary and a member of the Board of Director since January 2012. He was promoted to CEO in December of 2014 with the exit of our co-founder Tom Lapinski. Mr. Brda, who also co- founded the Company, has been the Managing Member of Brda & Company, LLC since 2002, which provides consulting services to public companies—with a focus in the oil and gas sector. Core competencies include capital formation, equity and debt financings, strategic business development and securities regulation matters. With over 20 years of investment banking experience, including 5 years as a fund manager, prior to becoming a consultant, Mr. Brda has the knowledge and experience to execute and ensure success for his client companies. Over that time period, Mr. Brda, either

originated, invested in, or placed over $70 million in financings. He graduated college in 1988 with a B.S. in Finance from Southern Illinois University, Carbondale, IL."

Mr. Brda has an interesting background. He was a defendant in a federal RICO case relating to a ponzi scheme, which was referenced in the Company's 2012 10-K:

> "Involvement in certain legal proceedings. In November 2007, Mr. Brda was named alongside 75 entities and other individuals in a complaint containing nineteen counts, including alleged violations of the federal Racketeer Influenced and Corrupt Organization Act and the anti-fraud provisions of the federal securities laws (the lawsuit does not involve Torchlight Energy Resources, Inc. in any way). Several months later, Mr. Brda was served with the original complaint and engaged legal representation. Based on Mr. Brda's minimal connection to the investments at issue in the complaint, he instructed his attorney to contact plaintiffs' counsel and try to negotiate a prompt resolution of the case and dismissal of the claims against him. His attorney contacted plaintiffs' counsel and thereafter told Mr. Brda that the claims against him had been resolved when – in fact – they had not. Unknown to Mr. Brda, he remained a defendant in the suit, and in part because no answer was filed on his behalf, and in part because he was never served with any of the relevant papers after the original complaint, the court entered a default judgment against him in September 2012. Mr. Brda received no actual notice of any kind regarding the continued existence of any claims against him, any entry of default, any motion or hearing for default judgment, or the default judgment itself, until March 2013. He promptly retained legal counsel who filed a motion to vacate the default judgment on April 11, 2013, which motion is now pending. A motion for leave to file an answer to plaintiffs' first amended complaint was also filed on that date. Discussions with plaintiffs' counsel for the possible resolution of this matter are ongoing. Mr. Brda contends that all claims against him in the litigation are without merit, and that the court should dismiss the counts against him."

> https://www.gpo.gov/fdsys/pkg/USCOURTS-iand-5_07-cv-04107/pdf/USCOURTS-iand-5_07-cv-04107-2.pdf

> http://www.iand.uscourts.gov/e-web/decisions.nsf/0/A37D415BD0B6A4578625761E006B3BDF/$File/MWB-07CV-4107+Armstrong+v+American+Pallet+Leasing+Inc++Motions+to+Dismiss+08262009.pdf

Case No. 7:24-cv-00317-DC-RCG          MIDLAND-ODESSA DIVISION
Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

The motion to vacate referenced in the TRCH filing was accepted by the court, which included a settlement. As part of the motion to vacate, Mr. Brda filed an affidavit describing his involvement in the American Pallet ponzi scheme.

> 2.      My only involvement in the facts giving rise to this action began in late 2004 when Craig Medoff told me that he was planning a reverse merger transaction involving American Pallet Leasing ("APL"). I have never had any involvement with any business planning or advising for APL. Mr. Medoff approached me to see if I knew anyone in the investor relations business who could help him market an issuance of stock associated with the reverse merger of APL. I introduced him to Curt Kramer. It is common in the industry to receive compensation for such introductions, and I received a total of 22,728 shares of stock in Literary Playpen, Inc. – APL's predecessor company. I received 3,863 shares by a stock certificate. After these shares were released from escrow in September 2004, I received and deposited them. I received an additional 18,865 shares by direct transfer to my brokerage account. On October 13, 2004, I transferred 19,728 shares from my personal account to the account of my LLC – Brda & Company LLC. Between October 4, 2004 and November 22, 2004, I sold or my LLC sold all but 28 shares of stock in Literary Playpen in the market. The total proceeds from those sales was $52,897.50. Regarding the 28 shares that were not sold, it appears that they became worthless when APL went out of business.

Perhaps it was a coincidence – just like many other coincidences – that the two individuals Mr. Brda interacted with at American Pallet – a fraud - have had subsequent run-ins with the SEC. Mr. Medoff was later barred by the SEC for selling "unregistered stock to the public through the use of materially false and misleading documents" and "made misrepresentations to investors about the progress and results of clinical trials for BioChemics' product and misled investors about valuations of BioChemics that were purportedly prepared by reputable independent investment banks."

https://www.sec.gov/litigation/admin/2016/34-77968.pdf

For his part, Mr. Kramer had the SEC enter into cease-and-desist proceedings against him for violations of Sections 5(a) and 5(c) of the Securities Act for selling stock to the investing public in violation of registration requirements.

https://www.sec.gov/litigation/admin/2016/33-10239.pdf

It will become a common theme of prior SEC interactions for many of Mr. Brda's associates. His Linkedin profile doesn't resemble the stated background in SEC filings of being an investment banker (which would come with registration), fund manager, or having a focus on the oil and gas sector. Despite Torchlight being headquartered in Plano, Texas, Mr. Brda lives in the St. Louis area. Drilling results to-date have been disappointing, as one might expect from a Company led by a CEO with little industry experience who surrounds himself with bad actors.

### Roger N. Wurtele, TRCH's current CFO:

"Mr. Wurtele has served as our Chief Financial Officer since September 2013. He is a versatile, experienced finance executive that has served as Chief Financial Officer for several public and private companies. He has a broad range of experience in public accounting, corporate finance and executive management. Mr. Wurtele previously served as CFO of Xtreme Oil & Gas, Inc. from February 2010 to September 2013. From May 2013 to September 2013 he worked as a financial consultant for us. From November 2007 to January 2010, Mr. Wurtele served as CFO of Lang and Company LLC, a developer of commercial real estate projects. He graduated from the University of Nebraska and has been a Certified Public Accountant for 40 years."

Mr. Wurtele was previously an insider at Energy & Engine Technology Corp. and subsequently worked at Xtreme Oil & Gas, Inc.

https://www.sec.gov/cgi-bin/own-disp?action=getowner&CIK=0001177089

Energy & Engine Technology Corp. was headquartered in Plano, Texas at 5308 West Plano Parkway, while Xtreme Oil & Gas, Inc. was also headquartered in Plano at 5700 West Plano Parkway #3600. Torchlight's corporate address is 5700 West Plano Parkway #3600. TRCH agreed to buy assets from Xtreme Oil & Gas, Inc. in April 2013 but as part of the deal apparently took over their office space. Indeed despite Mr. Wurtele stating he did not begin working for TRCH until September 2013, the 2013 10Q filed on 8/16/13 indicated TRCH's corporate address was now that of Xtreme's.

Both Xtreme Oil & Gas, Inc. and Energy & Engine Technology Corp. were run by Mr. Wurtele and **Willard G. McAndrew III**, who was for a short time the COO of TRCH. Mr. McAndrew is now CEO of another apparent oil & gas fraud out of Plano, Texas that trades over-the-counter as Amazing Energy Oil and Gas, Co. (ticker: AMAZ).

Energy & Engine Technology Corp., was shut down by the SEC through cease-and-desist proceedings pursuant to Section 8A of the Securities Act. The matters involved "a common abuse found among certain small publicly held companies. In recent years, many such companies have hired stock promoters to tout their shares on stock-picking websites and through mass-mailed e-mail messages (commonly known as "spam"). The promoter is often compensated in the form of purportedly unrestricted shares of the company's common stock, which the promoter sells after its touting has attracted investor interest in the company."

https://www.sec.gov/litigation/admin/33-8311.htm

"According to the Commission's Orders, Energy & Engine, which maintains a natural gas gathering system, hired former stock promoter Siembida, of Depew, New York, and his company, Russell Management, to promote Energy & Engine on the Internet.

Energy & Engine paid Siembida in stock that was improperly registered pursuant to a Form S-8 Registration Statement."

https://www.seclaw.com/emailpumpanddump1003/

More specifically, the SEC charged Mr. Wurtele's prior company with running a **pump-and-dump scheme**.

### Derek K. Gradwell - runs TRCH investor relations as an emplo yeeof MZ Group:

Mr. Gradwell was previously charged by the SEC for his involvement in an oil & gas-related fraud.  Per the SEC, Gradwell and his co-conspirators, "fraudulently raised at least $3.8 million from investors, purportedly for investments in oil and gas wells" and "made misrepresentations about the performance of Shoreline's wells, a purported business relationship with El Paso Field Services, and their use of investor funds."  Gradwell concealed the "**misappropriation from investors** of more than $1.2 million to pay for lavish vacations, a wedding and honeymoon, a vacation home, gambling debts, customized motorcycles and other luxury items."

https://www.sec.gov/litigation/litreleases/lr18424.htm

It is worth noting that per the MZ Group website, **Luke Zimmerman** is also an employee of MZ Group and indicates on his biography that he used to work for **ATLAS Consulting** which appears to be one of the paid stock pumpers/promoters involved with Torchlight.  Further, Gradwell also runs IR for Amazing Energy Oil & Gas, seemingly another Plano-based oil & gas fraud.

### Jack M. Johnston, managing Member of Zenith Petroleum Corp.:

In June 2014, TRCH acquired certain oil and gas assets located in Oklahoma from Zenith Petroleum Corp.  In exchange for buying the assets **and receiving $1.65 million in cash**, TRCH issued 1.35 million restricted shares, valued at $5.9 million ($4.39/share).  The managing member of Zenith Petroleum is Jack M. Johnston of Colorado and Texas.  This transaction is highly unusual.  The buyer of the assets received cash from the seller of the assets.  TRCH's Hunton assets were later sold for $750,000 in 2016.

JACK JOHNSTON CHARGED IN 25-COUNT INDICTMENT Michael J. Norton, U.S. Attorney for the District of Colorado, and the Securities and Exchange Commission, along with other members of the U.S. Attorney's Securities Fraud Task Force, jointly announced on August 22, 1991 a Denver federal grand jury 25- count indictment. The indictment charges Jack M. Johnston of Englewood, Colorado and Houston, Texas with conspiracy, securities fraud, mail fraud, wire fraud, money laundering and failure to disclose foreign bank accounts. The British government's Serious Fraud Office gave substantial assistance regarding Channel Islands corporations and bank accounts, allegedly used to further the conspiracy. The indictment charges that,

from about September 1986 to about October 1988, Johnston secretly controlled Duralite Manufacturing Company, Inc., a pre-1933 Act company, and Mamba, Inc., Sable, Inc. and Warowl, Inc., all blind pools. Johnston allegedly caused nominee accounts to be established at various broker-dealer firms and caused sales of the four corporations' securities. The securities were sold to various customers, including Postel Investment Management, an investment management company in London, England responsible for investing holdings of various pension funds, including the pension funds of British postal workers. Allegedly, nominee bank accounts were opened in the United States and Channel Islands to conceal receipt of proceeds from sale of these securities. According to the indictment, Johnston's net proceeds from sales of the companies' stock were about $15,067,267.61. [U.S. v. Jack M. Johnston, Crim. No. 9l-CR-277, U.S.D.C. Colorado) (LR-12971).

### David Bromberg, owner of KBK Ventures, Inc., in Houston, Texas:

David Bromberg is a large "investor" and/or shareholder in Torchlight, with many of his shares allegedly being received as compensation for "consulting." Mr. Bromberg was involved in prior companies alongside John Brda, including iMedia international and **Ring Energy** (which ultimately became a legitimate oil and gas company).

Mr. Bromberg appears to have been deposed in a very large **pump-and-dump case** out of Houston, TX (Butch Ballow). He appears to have worked from Houston for a Denver-based broker/dealer (D.E. Frey), which had many run-ins with securities reglators.

https://www.chron.com/news/houston-texas/article/Victims-help-expose-swindler-s-schemes-2085483.php

https://archives.fbi.gov/archives/houston/press-releases/2011/harris-dempsey-butch-ballow-sentenced-to-statutory-maximum-prison-term-for-money-laundering-conviction

"Consulting" in the world of frauds, ponzi schemes and pump-and-dump's appears to be jargon for stock promotion. The best guess is KBK Ventures acts as a conduit for shares issued for themselves and others to utilize social media and other platforms to 'pump' TRCH.

While no consulting agreement between TRCH and KBK Ventures appear to be filed, a contract filed between KBK and Sweet Success Enterprises gives us a hint at the nature of the arrangement, which likely includes "disseminating information to their shareholders and the investment community, and introducing," to "members and components of the investment community; Consultant will attempt to inform the public of the potential investment merit and potential," "thereby increasing investor recognition, market liquidity and improve shareholder value."

https://www.sec.gov/Archives/edgar/data/1338067/000110465906015048/a06-6382_1ex10d27.htm

Mr. Bromberg is a large shareholder as detailed in S-1 filings.

**Brian Iacobelli, owner of Three Rivers Business Consulting:**

Like Mr. Bromberg, Brian Jacobelli appears to be or have been a "consultant" for penny stocks. A contract between his firm and another company shows his services include "to assist and consult with the Company in matters concerning investor relations and to represent the Company in finance and in investors communications and public relations with existing shareholders, brokers, dealers and other investment professionals as to the Company's current and proposed activities."

https://www.sec.gov/Archives/edgar/data/81350/000105291807000104/ex107.htm

Of note, the registered agent for Three Rivers Business Consulting appears to be Joseph I Emas, who was **barred by the SEC** from practicing before the Commission for a period of time due to filing statements that "he knew or should have known contained false statements" related to a penny/OTC stock.

Mr. Jacobelli received a large number of shares per S-1 filings.

**Roger Overby, broker at Skyway Capital Markets in Florida:**

In February 2018, Roger Overby sold a 12% Unsecured Promissory Note on behalf of TRCH to the David A. Straz Jr Revocable Trust of 1986 (billionaire philanthropist from Tampa, FL). The note pays 12% annual interest in monthly installments and also pays a 2.5% annual stock payment. Mr. Overby appears to have a history of high sales pressure tactics.

Given the Company's stated reserve value of approximately $100,000 and lack of cash flow, **no prudent man** could sell $4-plus million of unsecured Torchlight debt. **Skyway and Overby** could not have acted in good faith in selling this note to a client or clients.

https://www.sec.gov/Archives/edgar/data/1431959/000165495418002713/exhibit_10-19.htm

https://www.sec.gov/alj/aljdec/2016/id973bpm.pdf

https://www.ilsos.gov/adminactionssearch/adminactionssearch?command=viewPDF&itemId=92%203%20ICM7%20PRODCMZ13%20SE_AA_MgtView59%2026%20A1001001A13E10B54759C8644618%20A13E10B54759C864461%2014%201051

Case No. 7:24-cv-00317-DC-RCG          MIDLAND-ODESSA DIVISION
Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

**Umbrella Research – Joe Giamichael and Dmitry Shapiro:**

Umbrella receives shares in the name of Catalytic Capital Partners during later issuances, but between both entities, have been paid hundred of thousands of shares for what appears to be fictitious and/or fraudulent research, which can be found online with simple Google searches.  Umbrella and Giamichael have been involved in SEC proceedings relating to the nature of their research product in the past.

https://www.sec.gov/litigation/admin/2017/33-10391.pdf

https://www.geoinvesting.com/wp-content/uploads/2013/11/TRCH_Completes_12mm_Financing.pdf

Umbrella Research received a large number of shares per S-1 filings.  Obviously the research is bogus.

**ATLAS Consulting:**

Appear to run a potentially illegal/unregistered paid research site focusing on oil & gas companies.  Run by Dallas Salazar who has written a number of articles about TRCH over the years, some of which disclose that he owns shares.  Mr. Salazar, Amit Banerjee, Joe Filberto (a registered representative) and others appear to be part of a group connected with ATLAS that 'pump' Torchlight on Twitter, Seeking Alpha, Stocktwits and other sites.  Mr. Salazar wrote an article on Seeking Alpha stating that he had hired an independent geologist to review TRCH's Orogrande acreage.  This was the "geologist."

Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

### National Securities Corporation:

National Securities Corp., and a number of their individual brokers that have been disclosed in S-1 filings appear to have raised a significant amount of equity capital for TRCH over the past 5 years. An analysis of several years worth of S-1 filings, would suggest they were able to scam a number of partners from national consulting firms, including E&Y, PwC and Deloitte as well as doctors and lawyers, among others. NSC received warrants – as well as what appears to be a 10% commission on shares sold. We would speculate that not all of the shareholders disclosed in S-1 filings were accredited investors who were able to participate in unregistered equity offerings; further given the nature of the company and FINRA records of NSC and its brokers, we suspect their compensation was not disclosed.

https://www.sec.gov/Archives/edgar/data/1431959/000107878214000719/s104 1814_ex4z2.htm

https://www.sec.gov/Archives/edgar/data/1431959/000119983514000523/torc hlight-s1a3d_16184.htm

NSC brokers involved in the TRCH offerings had 40 FINRA disclosures among 15 individual brokers:

Roger Monteforte (2 FINRA disclosures), Richard Libretti (1), Joseph Glodek (8), Jonathan C. Rich (2), Andrei Amaritei (0), Joon Rhee (6), Coby Haddad (0), Don Bianco (0), Ray San Pedro (6), Tom Kelly (n/a), Dennis Karjanis (0), Brandon Leon (1), Adam Friedman (0), Greg Lourdin (10), Mike Rosado (4).

### Calvetti Ferguson:

TRCH's former auditors have a checkered past, including recently settling a class-action lawsuit related to falsified financials at another company. The current auditor is Briggs & Veselka Co. who also appears to be willfully negligent.

http://www.nobilishealth.com/notice-of-the-proposed-partial-settlement-of-the-nobilis-securities-class-action/

### Robert Moriarty:

Published a gold newsletter but appears to also pump small-capitalization energy stocks, including Torchlight and Amazing Energy. Mr. Moriarty is either not very smart or is in on the scams. If you consider the latter as an option, then it is also likely he did not buy the shares he owns that have been disclosed in S-1 filings, but they are rather payments for stock promotion. His articles often appear on Streetwise Reports (www.streetwisereports.com), which appears to be a site that is often used to promote fake "research."

https://www.streetwisereports.com/article/2018/07/31/torchlight-illuminates-a-new-texas-oil-basin.html

Received shares per S-1 filings.

### KMF Investment Partners and David Moradi:

Legit hedge funds that have been involved in prior scams and pump-and-dump schemes (Miller Energy and KaloBios, respectively). There is the possibility they are just very bad at due diligence to allow themselves to get involved in this apparent fraud, but there is also a chance they are knowingly participating in exchange for excess returns on 'investments.'

Identified through S-1 filings.

### Steve Dunning:

Unknown involvement other than large shareholder with ties to The Hendon Mob Poker Room, which is also connected with other shareholders – Sergey Sprikut and Neville Govender.

Identified through S-1 filings.

### Roth Capital Partners and Noble Capital Markets:

Broker/dealers who have done advisory work or capital raising for TRCH. They are willfully ignorant or worse. Roth publishes research on Torchlight and currently has a $1.75 price target.

### Torchlight Board of Directors:

E. Scott Kimbrough recently resigned, but Mr. Kimbrough's background disclosed in SEC filings does not match what can be found online. Further, Mr. Kimbrough owns a company called Maverick Operating LLC, which does the alleged drilling for TRCH and is presumably paid by the company for its services. That related party transaction has not been disclosed in SEC filings.

Michael J. Graves is a board member and insurance agent out of Iowa. His background in SEC filings does not match publicly available information.

Robert David Newton is a board member and appears to be insurance agent in Midland, TX. His background in SEC filings does not match what can be found online.

### Robert D. Axelrod:

Former SEC attorney based in Houston, Texas.  Was in the commissions Enforcement Division between 1973 and 1976.  Seems to have carved out a niche helping register and file documents with the SEC for Nevada corporations, reverse mergers, OTC scams and other shady publicly companies that have a strange tendency to go to $0; and defending defendants that get caught in ponzi schemes and pump-and-dumps.

Mr. Axelrod is involved in the two cases below, among others.

https://www.sec.gov/litigation/litreleases/2018/lr24107.htm

**$7M Pump-And-Dump Scheme Offenders Get Prison Time - Law360**
https://www.law360.com/.../7m-pump-and-dump-scheme-offenders-get-prison-time ▾
May 10, 2012 · The men are all accused of perpetrating a fraudulent **pump-and-dump** scheme through Red Sea Management Ltd., an asset protection company based in San Jose ... Barham is represented by Charley A. Davidson of Locke Lord LLP, **Robert D. Axelrod** of Axelrod Smith & Kirshbaum, and Barry Ethan Witlin.

### Robert Kenneth Dulin:

Torchlight would have gone the way of the tumbleweed years ago without capital providers and counterparties willing to do transactions that provided enough cash liquidity to survive.  **Robert Kenneth Dulin** appears to live in Longmont, Colorado.  He is listed –along with one of the businesses he uses to invest in Torchlight – as a Trustee at the University of Colorado at Boulder.

https://giving.cu.edu/about-us/cu-foundation/trustees

Mr. Dulin has invested in Torchlight individually and through a number of different entities, including **Sawtooth Properties, LLLP** (managing partner with 90% indirect pecuniary interest), **LLLP2** (1/3 pecuniary interest), **LLC1** (1/3 pecuniary interest), **Black Hills Properties, LLLP** (1/3 pecuniary interest), **Pine River Ranch, LLC** (1/3 pecuniary interest) and **Pandora Energy, LP** (50% pecuniary interest).  It appears Mr. Dulin's wife and children own the remaining interest in the above corporate entities.  By gifting shares to his family members, together with reporting on a pecuniary interest only, Mr. Dulin can sell shares without triggering SEC reporting requirements.  Likewise, John Brda has gifted hundred of thousands of shares to his parents.  These maneuvers could be consistent with a desire to move shares to accounts where they can be quietly sold.  Recall part of the pump-and-dump TRCH's current CFO was involved with included similar illegitimate securities sales.

It does not appear to be disclosed other than in his 13D filed in 2013, but Mr. Dulin was a shareholder in Torchlight Energy, Inc. ("TEI"), the private predecessor to TRCH that did a share exchange with Pole Perfect Studios to create the company.

"**Sawtooth and LLLP2** (as defined below in Item 5) were TEI Stockholders. At closing of the Exchange Agreement, Sawtooth and LLLP2 exchanged their shares of common stock of TEI for 100,000 and 50,000, respectively, (post-split) restricted shares of the Issuer's common stock (in December 2010, the Issuer effected a 4-for-1 forward split)."

https://www.sec.gov/Archives/edgar/data/1431959/000107878213001319/sch13d070813_sc13d.htm

Said differently, Mr. Dulin has been investing in Torchlight since before it went public. He had partnered with John Brda and others as shareholders in TEI. Mr. Dulin has received an egregious amount of warrants over the years, he has had convertible debt securities issued to him at premiums to par, exchanges appear to always be beneficial. The significant number of Form 4s he has filed with the SEC show common stock, warrant, convertible promissory note and convertible preferred stock investments. If Torchlight has done a deal, he's usually been the lead investor. TRCH filings, however, indicate a somewhat adversarial relationship where additional shares or warrants are provided to extend maturities, release collateral or exchange into new securities.

This much appears to be true: Mr. Dulin either knows or is willfully ignorant about TRCH's inability to repay any debt given their lack of cash flow and lack of assets. If you believe that premise, it is a reasonable inference to believe Mr. Dulin is part and parcel of the apparent fraud. If the evidence above isn't significant enough, consider than Mr. Dulin was making similar "investments" at **iMedia International, Inc.** – a company where Mr. John Brda claims to have been Director of Business development and David Bromberg/KBK Ventures was a consultant in the mid-to-late 2000s.

The playbook at IMedia appears eerily similar to what has transpired at Torchlight. Indeed, here is a $150,000 loan from **Sawtooth Properties LLLP** to iMedia which provides for warrants. Dulin has done a nearly identical deal with TRCH as will be discussed.

http://getfilings.com/sec-filings/100520/IMEDIA-INTERNATIONAL-INC_8-K/

**John Brda** is indicated as a shareholder and key consultant in **iMedia** filings, while **KBK Ventures** and **David Bromberg** is identified as a consultant working on investor relations.

http://pdf.secdatabase.com/2769/0000950148-06-000049.pdf

While its no crime for business partners to follow each other throughout the years, consider that **Dulin** and his entities often take adverse positions, requesting more shares or warrants. Understand that no legitimate investor could continue to lend to TRCH on an unsecured basis or look the other way as Mr. **Brda** and team burned through capital without TRCH ever receiving a return of, let alone a return on capital. It can be no coincidence that three people involved in a CD-ROM penny stock a decade ago are working together at an apparent oil and gas fraud. Indeed, public filings show TEI was formed in 2010, right around the time **iMedia** was being shut down by the SEC.

Mr. **Dulin's** Form 4 filings are a treasure trove of information:

https://www.sec.gov/cgi-bin/own-disp?action=getowner&CIK=0001577874

### Gregory McCabe:

Per TRCH website, "Mr. **McCabe**, from Midland, Texas, is an experienced geologist who brings over 32 years of oil and gas experience to the Company. He is a principal of numerous oil and gas focused entities including McCabe Petroleum Corporation, Manix Royalty, Masterson Royalty Fund, **G-Mc Exploration**. McCabe has been involved in numerous oil and gas ventures throughout his career and brings a vast experience in technical evaluation, operations and acquisitions and divestitures to the Torchlight Board. McCabe is Torchlight's largest shareholder and provided entry for the Company into its two largest assets, the Hazel Project in the Midland Basin and the Orogrande Project in Hudspeth County, Texas."

From the McCabe Ventures website, "Greg graduated from Sul Ross State University in 1984, where he earned a B.S. in Geology. Shortly after, he founded McCabe Petroleum Corporation in 1986. For over three decades, Greg has grown McCabe Petroleum Corporation into a successful petroleum company, while investing in a number of non-Oil & Gas ventures. Today, **McCabe Petroleum Corporation** serves as the cornerstone to the McCabe Ventures portfolio of companies."

http://www.mccabeventures.com/management-bios.php

Case No. 7:24-cv-00317-DC-RCG        MIDLAND-ODESSA DIVISION
Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

Mr. McCabe appears to have received TRCH's Hazel acreage as part of a series of transactions with **Arabella Exploration, Inc**. Similar to deals done with Torchlight, it appears a commission was arranged for his sons through **Green Hill Minerals, LLC**. In Torchlights case it appears Green Hill is getting equity and warrants for doing nothing - which could potentially be a means to recycle cash back to Greg McCabe.

**https://www.sec.gov/Archives/edgar/data/1506374/000121390015006804/f10q0615a1ex10ii_arabellaexp.htm**

**Arabella** is also the source for the Orogrande acreage. "These leases were originally bought by Arabella Petroleum at University Lands' 123F lease sale in April 2013, LaCoste-Caputo said. It was then sold to McCabe Petroleum in March 2014, and then to Torchlight Energy in July 2014."

http://bakken.com/news/id/226770/el-paso-readies-potential-shale-oil-boom-west-texas/

Arabella paid $7/acre for the Orogrande leases in 2013. Torchlight paid 865,000 shares and $100,000 cash for 172,000 acres on August 7, 2014, which worked out to $3.3 million, or approximately $20/acre. Note that approximately 40,000 of the acres expired in December 2014. Soon after closing their deal, TRCH began to 'pump' Orogrande as potentially worth $9 billion.

## Project Potential Snapshot



| Details | |
| --- | --- |
| Gross Acreage | 172,000 |
| Operator | TRCH |
| WI ** | 90% |
| Potential Locations (@ 60% productive) | 2500 |
| Net Locations to TRCH | 2250 |
| Potential EUR's / vertical well | 100k to 140k |
| Potential PV 10 well | $4 mm |
| Potential Reserves to TRCH @ 100k EUR | 225,000,000 BO |
| Potential PV 10 value on 2250 locations | $9B |

** Initial WI is 100%, assumes 10% back in by geology team

3

Beyond management needing to be in on the apparent fraud, Torchlight is a complex web of individuals and organizations that have worked together on prior penny stock reverse-merger pump-and-dumps (apparent), been charged and/or convicted by the SEC or other authorities for fraudulent investment activities, or have other regulatory red flags in their background. Management, the Board of Directors, reserve engineers, accountants, attorneys, broker/dealers, individual brokers, research shops, stock promoters, and other enablers appear to all be involved in the fraud.

'Proving' a case of fraud in a publicly-traded stock to the SEC isn't easy. Hunches, hyperbole and allegations don't cut it, while the fraudsters will of course try to make facts difficult to thread together. When many statements are false its hard to make distinctions between what is and isn't true. Torchlight, is however, a case that deserves the SEC's attention given it hits on many of the topics the SEC claims to be focused on: *retail investors, scams, repeat offenders, gatekeepers and social media* as examples.

The points that will be made about fraudulent accounting and false and misleading statements are straightforward. Related-party transactions are complex for a reason – to hide what is being done – but it should become apparent that the combined facts and cast of characters involved provide the ability to reasonably infer that TRCH is what it appears to be.

A common theme for Torchlight is that whether they buy or sell assets, the deal usually includes cash going to them. There are bills to pay. They do appear to drill some wells (unsuccessfully), have lease space and require professional services that demand cash, otherwise most transactions include equity. When they issue debt or preferred stock, the liabilities are often converted into equity at large premiums to face value. Stock and warrants are issued nearly continuously for "consulting services." Given the equity has been their funding vehicle, a death spiral is likely if the stock continues to swoon from recent levels below $1.00. **Retail investors** will lose out the most.

It appears TRCH inflates perceived asset values by doing related party transaction between the Company and interested parties. It appears virtually all statements are false and misleading. Accounting is inconsistent and irregular. In short, a reasonable inference can be made that TRCH – with no cash flow over its existence, considerable debt relative to asset valuation, and little revenue in return for considerable expenditures, isn't a story of incompetence, but rather one of **conscious effort to mislead.**

Beyond management needing to be in on the apparent fraud, Torchlight is a complex web of individuals and organizations that have worked together on prior penny stock reverse-merger pump-and-dumps (apparent), been charged and/or convicted by the SEC or other authorities for fraudulent investment activities, or have other regulatory red flags in their background. Management, the Board of Directors, reserve engineers, accountants, attorneys, broker/dealers, individual brokers, research shops, stock promoters, and other enablers appear to all be involved in the fraud.

'Proving' a case of fraud in a publicly-traded stock to the SEC isn't easy. Hunches, hyperbole and allegations don't cut it, while the fraudsters will of course try to make facts difficult to thread together. When many statements are false its hard to make distinctions between what is and isn't true. Torchlight, is however, a case that deserves the SEC's attention given it hits on many of the topics the SEC claims to be focused on: *retail investors, scams, repeat offenders, gatekeepers and social media* as examples.

The points that will be made about fraudulent accounting and false and misleading statements are straightforward. Related-party transactions are complex for a reason – to hide what is being done – but it should become apparent that the combined facts and cast of characters involved provide the ability to reasonably infer that TRCH is what it appears to be.

A common theme for Torchlight is that whether they buy or sell assets, the deal usually includes cash going to them. There are bills to pay. They do appear to drill some wells (unsuccessfully), have lease space and require professional services that demand cash, otherwise most transactions include equity. When they issue debt or preferred stock, the liabilities are often converted into equity at large premiums to face value. Stock and warrants are issued nearly continuously for "consulting services." Given the equity has been their funding vehicle, a death spiral is likely if the stock continues to swoon from recent levels below $1.00. **Retail investors** will lose out the most.

It appears TRCH inflates perceived asset values by doing related party transaction between the Company and interested parties. It appears virtually all statements are false and misleading. Accounting is inconsistent and irregular. In short, a reasonable inference can be made that TRCH – with no cash flow over its existence, considerable debt relative to asset valuation, and little revenue in return for considerable expenditures, isn't a story of incompetence, but rather one of **conscious effort to mislead.**

Case No. 7:24-cv-00317-DC-RCG    MIDLAND-ODESSA DIVISION
Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

## Torchlight's accounting appears fraudulent

**Torchlight Energy**

|  | 3/31/17 | 6/30/17 | 9/30/17 | 12/31/17 | 3/31/18 | 6/30/18 |
|---|---|---|---|---|---|---|
| Oil (Bbls) | 101 | 140 | 336 | 9,730 | 7,858 | 4,865 |
| Gas (Mcf) | 2,303 | 2,332 | 2,041 | 2,583 | 2,008 | 1,857 |
|  |  |  |  |  |  |  |
| BOE | 485 | 529 | 676 | 10,161 | 8,193 | 5,175 |
| BOE/day | 5 | 6 | 7 | 110 | 91 | 57 |
| % oil | 20.80% | 26.50% | 49.70% | 95.80% | 95.90% | 94.00% |
|  |  |  |  |  |  |  |
| Revenue |  |  |  |  |  |  |
| Oil | $5,346 | $6,594 | $14,569 | $517,723 | $475,962 | $280,573 |
| Gas | $7,604 | $6,709 | $3,727 | $8,227 | $5,202 | $2,690 |
|  | $12,950 | $13,303 | $18,296 | $525,950 | $481,164 | $283,263 |
|  |  |  |  |  |  |  |
| $/Bbl Oil | $52.93 | $47.10 | $43.36 | $53.21 | $60.57 | $57.67 |
| $/Mcf Gas | $3.30 | $2.88 | $1.83 | $3.19 | $2.59 | $1.45 |
|  |  |  |  |  |  |  |
| Revenue/BOE | $26.71 | $25.16 | $27.06 | $51.76 | $58.73 | $54.74 |
| Cost/BOE | $8.57 | $22.65 | $24.40 | $13.83 | $27.94 | $35.64 |
| DD&A/BOE | $50.55 | $48.99 | $32.51 | $2.73 | $13.08 | $29.91 |
|  |  |  |  |  |  |  |
| Revenue | $12,950 | $13,303 | $18,296 | $525,950 | $481,164 | $283,263 |
| Cost of reveue | -4,157 | -11,976 | -16,499 | -140,555 | -228,903 | -184,425 |
| DD&A | 24,517 | 25,918 | 21,980 | 27,741 | 107,133 | 154,805 |
| G&A | 993,404 | 949,040 | 866,131 | 844,395 | 1,675,840 | 907,595 |
| Impairments |  |  |  |  | -139,891 | 0 |
| Other (income) | 47,155 | 81,099 | 129,157 | -2,693,315 | 103,941 | 528,216 |
| Net gain (loss) | -1,056,283 | -1,054,730 | -1,015,471 | 2,206,574 | -1,774,544 | -1,491,778 |
|  |  |  |  |  |  |  |
| Implied cash G&A | 681,246 | 544,479 | 543,171 | 733,013 | 939,295 | 643,994 |
| $/BOE | $1,405 | $1,030 | $803 | $72 | $115 | $124 |

In 2017, Torchlight reported a depletion, depreciation and amortization rate of $2.73/Barrel of oil equivalent produced (DD&A divided by BOE in the period). DD&A is effectively a reversal of the full cost amortization pool on a per unit basis. Given TRCH uses full cost accounting, all of its evaluated leasehold costs, net of impairment should be captured in the full cost pool. Reporting $2.73/BOE in 2017 is fraudulent. No other US company has recorded a DD&A rate remotely that low and the number is inconsistent with prior years and subsequent periods.

There may be a reason for the unexplainable accounting. Torchlight's appears to be producing from its Hazel properties, with production beginning in 2017, however, the properties appear to have been impaired for two reasons: (i) the company's reserve engineer did not include any reserves for Hazel in the year-end reserve report and (ii) the Company notes that they impaired unevaluated leasehold during 2017, but did not take the charge.

### 4. OIL & GAS PROPERTIES

The following table presents the capitalized costs for oil & gas properties of the Company as of December 31, 2017 and 2016:

|  | 2017 | 2016 |
|---|---|---|
| Evaluated costs subject to amortization | $ 5,022,129 | $ 1,470,939 |
| Unevaluated costs | 26,100,749 | 13,376,742 |
| Total capitalized costs | 31,122,878 | 14,847,681 |
| Less accumulated depreciation, depletion and amortization | (5,543,599) | (5,455,393) |
| Total oil and gas properties | $25,579,279 | $ 9,392,288 |

The Company identified impairment of $2,300,626 in 2017 related to its unevaluated properties. Although we had no recognized impairment expense in 2017, the Company has adjusted the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of unevaluated leases in 2017 in the amount of $2,300,626. The impact of this change will be to increase the basis for calculation of future period's depletion, depreciation and amortization to include $2,300,626 of cost which will effectively recognize the impairment on the Consolidated Statement of Income over future periods. The $2,300,626 has also become an evaluated cost for purposes of future period's Ceiling Tests and which may further recognize the impairment expense recognized in future periods.

This accounting appears improper. Rather than taking the impairment charge on the income statement in the period in which the impairment was taken, TRCH took no charge and appears to have not reduced the carrying value of its unproved properties. The net PP&E is the only book asset. If the Company were to materially impair its net PP&E, its ability to raise debt capital – which should be at zero given the economic reality of the assets - would likely be diminished. It appears the Company's Hazel project was impaired, however, disclosing that charge on the income statement and creating a large accounting loss would have highlighted the impairment.

Companies using full-cost accounting methods are allowed to capitalize nearly all costs related to exploration, but must perform a full-cost ceiling test on proved

Case No. 7:24-cv-00317-DC-RCG          MIDLAND-ODESSA DIVISION
Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

properties each reporting period, while unproved properties must be assessed periodically (at least annually).  The full-cost pool must be written down when net unamortized costs less related deferred income taxes exceed (1) discounted cash flows (future net revenue less estimated future expenditures), (2) cost of unproved properties not included in the costs being amortized, and (3) the cost of unproved properties in the cost being amortized.  Using this basis for the backdrop, TRCH should have next to no reserves as they do given there is little if any cash flow to discount back, but it also suggests the net PP&E is being significantly overstated. Indeed, it is difficult to understand why TRCH won't write off much of its net PP&E at its next annual ceiling test, leaving debt approaching book value of assets (economic value likely lower).

With Hazel seemingly impaired yet producing, no DD&A would be associated with the production, but the impairment would be added over time.  As Hazel production came online in 2017, then began to drop off, it would explain why the DD&A was so low in 2017 and began to rise in 2018 as a higher percentage of production was non-Hazel and subject to evaluated cost/full cost amortization.

Despite apparently impairing its Hazel project, TRCH has discussed monetizing it, announcing in April 2018 that is had begun a plan to market the asset, claiming that they were "bullish" about the asset despite wanting to sell it.  Further, the Company stated that the "mission on the Hazel Project was to prove the overall concept of the Wolfcamp horizontal development, increase the value of the acreage and exit at a higher value. We have achieved all goals and are now ready to focus all efforts and capital into the Orogrande."

These statements appear to be **false and misleading**.

https://ir.torchlightenergy.com/company-news/detail/638/torchlight-energy-announces-plan-to-market-midland-basin-assets

At times, TRCH's cash flow statements are difficult to understand.  Indeed, TRCH reported negative DD&A in the fourth quarter of 2016.  Additionally, their accounting of the prepayment of development costs (ie prepaid capex) appears to be improperly run through the working capital line items.  It is also impossible to understand a positive cash flow line item in the third quarter 2016 filing showing cash received as funds pending settlement.  This line item may have something to do with the departure of Willard McAndrew III, but the accounting appears incorrect. TRCH did make a large payment to Mr. McAndrew as part of his departure.

https://www.sec.gov/Archives/edgar/data/1431959/000165495416003781/exhibit_10-22.htm

TRCH stated in its filings that "as of December 31, 2017, we were producing from one well in the Viking Area of Mutual Interest, or AMI, and one well in Prairie Grove."

Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

Meanwhile, their own reserve engineer's reserve report filed with the 2017 10-K indicates only one well is producing from those two areas.

Quite frankly, it appears as if nearly all statements made by TRCH are false and misleading and it appears nearly all transactions have one purpose – to enrich management and co-conspirators at the expense of unsuspecting retail shareholders.

## Torchlight's uses related party transactions to help finance itself and perpetuate the apparent fraud

On October 18, 2018, TRCH announced it had closed on $6 million of debt financing and gave updates on its projects, including stating that they are "becoming a target for larger independent oil and gas companies." That statement is likely false and misleading given no projects have shown success to-date.

Despite issuing $6mm of new 16% unsecured debt, TRCH's 8-K filed with the SEC indicates $3 million of the proceeds would go to repay **Greg McCabe** for a promissory note he received in an asset transaction. Further, as part of the notes, the noteholders "required that McCabe Petroleum Corporation, a Texas corporation owned by our Chairman Gregory McCabe ("MPC"), provide them a put option whereby they have the right to have MPC purchase from them any unpaid principal amount due on the notes. Additionally, if there is a fundamental transaction, Mr. McCabe will be required to pay a fee to each noteholder that elects not to convert or require MPC to purchase the principal amount under the note, which fee will be equal to such noteholder's pro-rata share of a total fee amount of $1,500,000."

Requiring a personal put or personal guarantee is highly unusual. The 8-K also reveals that "prior to entering into the above transactions, our Board of Directors formed a special committee composed of independent directors to analyze and authorize the transactions on behalf of Torchlight Energy Resources, Inc. and determine whether the transactions are fair to the company. In this role, the special committee engaged an independent financial consulting firm which rendered a fairness opinion deeming that the transactions were fair to the company, from a financial point of view, and contained terms no less favorable to the company than those that could be obtained in arm's length transactions."

https://www.sec.gov/Archives/edgar/data/1431959/000165495418011309/trch_8k-17495.htm

As mentioned previously, TRCH has no assets and no cash flow. The fairness opinion done for the board would appear to have been fraudulent. It would not be a surprise if **ATLAS Consulting** was the "independent financial consulting firm." Given it is unlikely any investor would knowingly lend TRCH $6 million on an

unsecured basis given their assets and balance sheet, it is highly likely this is a related party transaction.

Based on a conversion feature, allowing the lender to convert into a 6% interest in the Orogrande project, the loan effectively values Orogrande at $100 million ($1mm per 1%). Torchlight has a 72.5% interest in the Orogrande project, thus their acreage is valued at $72.5 million. Recall TRCH paid $3.3 million for all the acreage, including leases that expired. No commercially successful wells have been drilled on the acreage since TRCH acquired it. The large increase in value can primarily be attributed to trading pieces of the acreage back and forth among themselves.

In TRCH's Form 10-Q filed for the first quarter of 2015, TRCH discloses that "on April 1, 2015, a major shareholder lent us $150,000 pursuant to a 12% promissory note due September 30, 2015, convertible at $0.25 per share. In addition, the major shareholder received 150,000 warrants, with a term of three years at an exercise price of $0.50 per share. "

That major shareholder was **Robert Kennth Dulin**. On 4/1/15, the stock was $0.30, so the transaction was immediately 20% in the money. The $0.50 warrants had value also, so the loan was issued at a large premium to face value, even with the 12% coupon. Recall, Robert Kenneth Dulin did a similar $150,000 loan while working with **John Brda** and **David Bromberg** at **iMedia International**.

Issuing debt at a premium appears to be a tactic to raise capital, but the true cost of the debt financing is never disclosed. Indeed, during 2013, the Company issued approximately $11 million of Convertible Notes that were issued $5.8 million in the money. Together with warrants that came with the notes and the coupon, the cost of the debt capital approached 70-80%.

"During the year ended December 31, 2013, the Company issued an additional $10,895,773 in principal value of 12% Notes. Such notes carry the same terms as described above. In connection therewith, the Company also issued a total of 1,308,082 five-year warrants to purchase common stock at an exercise price of $2.00 per share. The value of the warrant shares was $1,917,158 and the amount recorded for the beneficial conversion feature was $5,770,654. These amounts were recorded as a discount on the 12% Notes. In addition, the Company engaged a placement agent to source investors for the majority of these additional notes. This placement agent was paid a fee of 10% of the principal amount of the notes plus a non-accountable expense reimbursement of up to 2% of the principal raised by the agent. The placement agent also received 552,057 warrants to purchase common shares at $2.00 per share for a period of three years, valued at $614,163. All the amounts paid to the placement agent have been included in debt issuance costs and will be amortized into interest expense over the life of the 12% Notes. "

https://www.sec.gov/Archives/edgar/data/1431959/000107878214000520/f10k
123113_10k.htm

**Robert Kenneth Dulin** has a habit of getting sweetheart deals from Torchlight.  In its 2015 10-K, TRCH disclosed it has "finalized an agreement to sell a 5% working interest in the Orogrande acreage on June 30, 2015 with an effective date of April 1, 2015. Sales proceeds were $500,000 which was received in April, 2015. In addition, the Company issued 250,000 three year warrants with an exercise price of $.50 to the purchaser."  On June 30, 2015, the day the deal was finalized, the stock was at $1.35, so in exchange for 5% of an asset that the company was touting in slide decks as worth $9 billion, Dulin/Pandora Energy LP gave TRCH $500,000, but in return, they gave him warrants that were immediately worth $212,500.  However, it was subsequently disclosed in TRCH filings and Mr. Dulin's Form 4s that as part of the final terms of the deal, TRCH gave him an additional 500,000 warrants with a $2.31 strike price – the price the stock was on the date of issuance.  A rough estimate would suggest the 750,000 combined warrants had intrinsic and option value of $400,000, suggesting TRCH gave Mr. Dulin 5% of Orogrande for $100,0 -  valuing the entire acreage block at the time at $2 million and their current working interest at $1.45 million.

**Greg McCabe** isn't a stranger to being a party to odd transactions with TRCH.  In its 2017 10-K, TRCH disclosed that "on December 1, 2017, the transactions contemplated by the Purchase Agreement that our wholly-owned subsidiary, Torchlight Energy, a Nevada corporation ("TEI"), entered into with MPC closed. Under the Purchase Agreement, which was entered into on November 14, 2017, TEI acquired beneficial ownership of certain of MPC's assets, including acreage and wellbores located in Ward County, Texas (the "Ward County Assets"). As consideration under the Purchase Agreement, at closing TEI issued to MPC an unsecured promissory note in the principal amount of $3,250,000, payable in monthly installments of interest only beginning on January 1, 2018, at the rate of 5% per annum, with the entire principal amount together with all accrued interest due and payable on December 31, 2020. In connection with TEI's acquisition of beneficial ownership in the Ward County Assets, MPC sold those same assets, on behalf of TEI, to MECO at closing of the MECO PSA, and accordingly, TEI received $3,250,000 in cash for its beneficial interest in the Ward County Assets. Additionally, at closing of the MECO PSA, MPC paid TEI a performance fee of $2,781,500 in cash as compensation for TEI's marketing and selling the Winkler County assets of MPC and the Ward County Assets as a package to MECO. "

This transaction highlights TRCH's need to do deals to generate cash.  Torchlight bought assets from **Greg McCabe**, and in exchange he took a $3.25 million seller note, which was recently repaid with proceeds of the new $6 million note.  McCabe then sold those same assets on behalf of TRCH.  For reasons that aren't explained, TRCH effectively passed assets through its corporate structure and in exchange for doing so, received a $2.8 million performance fee.

Beyond appearing fraudulent given the company received $2.8 million cash for a wash transaction, the accounting of the transaction appears improper.  Indeed, the

note is disclosed on the cash flow statement, but no sale of assets is disclosed on the fourth quarter 2017 statement of cash flows. Indeed, TRCH ran the $2.8 million fee through operations as a consulting fee. The press release disclosing the transaction discusses giving McCabe the $3.25 million promissory note and 2.5 million shares as consideration and provided entry into a new region (Winkler County).

It is worth noting that MECO IV, LLC, Torchlight's new partner as a result of this transaction appears to have offices in the same area where **Mr. Dulin** lives in Colorado.

https://ir.torchlightenergy.com/company-news/detail/628/torchlight-enters-agreements-to-enter-prolific-delaware-basin

In yet another transaction which provided TRCH with a cash injection, **Jack M. Johnston** (recall, charged fraudster) and the Company did a deal in 2014.

"On June 6, 2014, our wholly-owned subsidiary, Torchlight Energy, Inc. ("TEI") entered into and closed a Purchase and Sale Agreement with Zenith Petroleum Corporation. Under the agreement, TEI purchased from Zenith certain oil and gas properties located in Oklahoma and received from Zenith $1,650,000 cash. As consideration for the properties and cash, Zenith received 1,350,000 restricted shares of common stock of Torchlight Energy Resources, Inc. The Purchase and Sale Agreement is included as Exhibit 10.1 to this current report, and a press release describing the acquisition is included as Exhibit 99.1.

Prior to the acquisition described above, in September 2013 we purchased from Zenith a 15.3% working interest in 5,101 net mineral acres in Kingfisher County, Oklahoma, for which Zenith received 558,356 restricted shares of common stock."

In exchange for the assets and cash, TRCH gave Johnston $5.9 million of restricted shares. In the press release from June 14, 2014, TRCH reiterated Q214 production guidance of 500 barrels of oil equivalent per day. The Company never produced more than 200/day.

https://www.sec.gov/Archives/edgar/data/1431959/000119983514000303/exhibit_99-1.htm

https://www.sec.gov/Archives/edgar/data/1431959/000119983514000303/exhibit_10-1.htm

Torchlight has had prior interaction with other oil and gas frauds that the SEC has gone after.  Indeed in 2015, the Company disclosed that it had allegedly "sold certain non-operated working interests in its Hunton assets to Breitling Energy Corporation for $600,000.The first tranche in the transaction was completed on March 10, 2015. A second tranche is planned for closing over the next few weeks, subject to certain terms and conditions."  Breitling Energy was an oil & gas fraud out of Dallas, Texas. The sale was never mentioned by TRCH in SEC filings despite the press release stating the deal had closed.

https://finance.yahoo.com/news/torchlight-energy-spud-first-well-130033490.html

After purchasing Orogrande from Greg McCabe in September 2014, Torchlight had an obligation to begin drilling it first well in order to hold the acreage block.  Per the first quarter 2015 10-Q, "the well was permitted and spudded and drilling began by March 31 and development is in progress at the date of this filing."  Despite stating they had started drilling in their 10-Q, Greg McCabe filed a letter dated March 30, 2015 with his May 2015 13D statement that states the opposite and indeed TRCH gave McCabe an option to purchase 631,250 shares for a total purchase price of $225,000 for a ten day extension to drill the well.  Flatly, it appears they made a false and misleading statement.  Further, TRCH issued the options at intrinsic value, giving no value to the option, thus effectively – or intentionally – gave something with equity value in exchange for cash.  While the transaction may appear complex, it is more of the same – do a deal and receive cash.

Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

"Date:        Mar. 30, 2015

To:          Greg McCabe

From:        John Brda, CEO Torchlight Energy

Re:          Option to Extend


Dear Greg:

Let this letter serve as our understanding on the extension you granted us for the
Orogrande drilling program on the Rich A-1 well.  We have agreed to give you an
option purchase 631,250 shares for a total purchase price of $225,000, in exchange
for the ten day extension.

The option must be exercised no later than 30 days after receipt of the logs
associated with the Rich A-1 well."

https://www.sec.gov/Archives/edgar/data/1431959/000119983515000188/trch
_10q-16405.htm

https://www.sec.gov/Archives/edgar/data/1431959/000089742315000027/lette
ragt.htm

Further suggesting something is amiss, McCabe also filed a subscription agreement
with his May 2015 13D which describes his purchase of $700,000 worth of TRCH
stock at $0.25 per share (2.8mm shares), while acknowledging that he understood
that the Company was in default under its 12% Series A and Series B Convertible
Notes.  Mr. McCabe purchased 2.8 million shares at $0.25.  The stock closed at $0.81
on May 11, 2015, the day of the transaction for an immediate profit of $1.6 million.
The Company got cash.  Greg McCabe got an excess return.  While the folks involved
would likely argue they were taking risks by entering into stock deals with a 'penny
stock,' the reality is the Company was seemingly paying millions of dollar to stock
promoters to influence the stock and move it higher.

Greg McCabe had discussions with TRCH in 2015 about participating in a preferred
stock deal that would ultimately refinance defaulted notes.  He was apparently
buying stock while having those discussions.  McCabe "is currently engaged in
discussions with management of the Issuer regarding the potential purchase by the
Reporting Person and other investors unaffiliated with the Reporting Person of
shares of the Issuer's preferred stock through a private placement transaction,
which preferred stock would be convertible into shares of Stock.  The Reporting
Person and the Issuer have not entered into any definitive agreement with respect

to such a private placement transaction. As a condition to the issuance of any such preferred stock, the Issuer would amend its charter by filing a certificate of designation setting forth the rights of such preferred stock."

"The Subscriber acknowledges that it is aware that the Company is in default on its 12% Series A Secured Convertible Promissory Notes and its 12% Series B Convertible Unsecured Promissory Notes. The Subscriber has reviewed the disclosure contained in the Company's Form 8-K filed with the SEC on April 7, 2015 and in the Risk Factors section and Subsequent Events note of the Company's Form 10-K filed on April 15, 2015."

https://www.sec.gov/Archives/edgar/data/1431959/000089742315000027/schedule13d.htm

https://www.sec.gov/Archives/edgar/data/1431959/000089742315000027/subscriptionagt.htm

It may be helpful to go through **McCabe's** transaction with TRCH.

- 9/23/14 – receives 868,750 shares in exchange for Orogrande acreage (along with reversionary interest in the event TRCH does not drill by 3/31/15)
- 3/30/15 – receives option to purchase 631,250 shares at $0.36 in exchange for $225,000 (note total shares for Orogrande now 1.5mm even as if the share numbers were planned); 310,000 shares personally, rest to G Mc Exploration LLC
- 5/11/15 – bought 2,800,000 shares for $700,000, $0.25/share
- 6/9/15 – Bought $3,500,000 of convertible preferred stock ($3mm personally, $500k through **G Mc Exploration**; $1.15 strike); received a combined 608,694 warrants (521,739 personally; $1.40 strike); at the closing date, the stock was $1.92, so both the convertible preferred and warrants were issued in the money, or said differently, the Company was giving money away to Mr. McCabe and others. The preferred stock would convert into a combined 3,043,477 shares at the exchange ratio; the preferred stock could be converted any time and in any case will be converted by June 9, 2016.
- 9/30/15 – received 114,067 shares at $1.15 for preferred interest
- 12/31/15 – received 92,054 shares at $1.15 for preferred interest
- 2/16/16 – Purchased 50,000 shares in open market between $0.63 and $0.68
- 3/31/16 – received 91,054 shares at $1.15 for preferred interest
- 4/4/16 – received 1,500,000 warrants as consideration for conveyance of an interest in certain oil and gas leases

- 6/8/16 – exchanged preferred stock into 3,043,479 shares; received 69,041 shares for accrued interest to conversion
- 1/30/17 – received 3,301,739 shares as consideration for cancellation of membership interest in **Line Drive Energy LLC** as a result of merger with Torchlight
- 1/30/17 – cancelled the 1,500,000 warrants received on 4/4/16 and 521,739 warrants received 6/9/15 as part of preferred stock transaction
- 12/1/17 – 2,500,000 shares issued to **McCabe Petroleum**

As of December 11, 2017, McCabe's 13D indicates 13,648,390 shares owned through a combination of Greg McCabe, McCabe Petroleum and G Mc Exploration, LLC. Notably and unexplained, Greg McCabe's son's have received shares and warrants paid to Green Hill Minerals LLC in connection with "oil and gas lease related costs paid in the second and third quarters of 2016. Torchlight used Maverick Operating – owned by ex-board member Scott Kimbrough – to operate its wells. The first Hazel well was drilled around this time, but it is difficult to understand McCabe's sons' involvement. It is possible these transactions are just a means to return cash to McCabe for the cash he contributed to Torchlight.

The Series A Convertible Preferred stock issued in 2015 to repay defaulted promissory notes was done through a securities purchase agreement filed with the SEC that discloses the buyers. Of the $9.8 million raised, **McCabe**, **Dulin** and **Bromberg** bought $5.25 million, or 54%. The remaining buyers appear to be Midland-based friends of McCabe or others.

https://www.sec.gov/Archives/edgar/data/1431959/000089742315000031/securitiespurchaseagt.htm

**Robert Kenneth Dulin** was a lender in the 12% Series A Convertible Notes according to Form 4 filings. Mr. Dulin was both defaulting on TRCH and participating in the financing to cure the default. Although it is difficult to know if he participated, during 2013, the Series A Notes were the notes previously mentioned that were issued at a more than 50% premium and carried a 70-80% cost of capital. One can believe that **Robert Kenneth Dulin** has been partnered with **John Brda** and **David Bromberg** for over a decade across at least 2-3 companies and is just a glutton for punishment who always replaces and replenishes Torchlight with capital regardless of their performance and just gets lucky that he always receives massive share-based return of and return on capital. One can also believe in the **Easter Bunny.**

Per a filing, "on May 11, 2015, we completed the sale to five investors in a private offering for an aggregate 4,300,000 shares of our restricted common stock at a purchase price of $0.25 per share. We received an aggregate consideration of $1,075,000 for the securities. We did not pay any placement fees in connection with

the sale of these securities. We did not grant any registration rights to the purchasers in this offering."

https://www.sec.gov/Archives/edgar/data/1431959/000119983515000173/trch_8k-16402.htm

The day before this deal, the stock closed at $0.70. The day of it closed at $0.81. The day after is closed at $0.97. There was a huge spike in volume these three days, with over 1 million shares trading versus volume of 50,000 to 150,000 typical before and after those days. If these were unregistered shares, it is unusual that volume saw such a spike. Based on S-1 filings it would appear most likely that **David Moradi**, through Anthion Partners, was involved in the transaction. Whoever the buyer was, it is another transaction where TRCH received cash – in this case around $1.1 million – but in exchange – gave the buyer $3.3 million worth of stock.

**Robert Kenneth Dulin's** transactions with the Company go back many years and have a similar theme – transactions in exchange for shares, however a full detail of transactions beyond the SEC's five year look-back window is not value adding. It would not be surprising if Dulin, McCabe or Bromberg were parties to the Series B Convertible Notes or other transactions but Torchlight has a tendency to file "final" promissory notes with dates and names left blank. An older transaction highlights how long this charade has played out at the expense of shareholders.

"On December 18, 2012, the Company exchanged $412,500 of outstanding convertible promissory notes for new 12% Series A Secured Convertible Promissory Notes ("12% Notes") described below. The 12% Notes were issued as part of a larger offering with senior liens on the Company's oil and gas properties. In order to induce the holders of the previously outstanding convertible promissory notes to exchange such promissory notes and to relinquish their priority liens on the Company's oil and gas properties in favor of all 12% Convertible Promissory Note Holders, the Company agreed to grant the note holders a total of 235,714 four year warrants to purchase common stock at $1.75 per share, valued at $240,428, and 235,714 four year warrants to purchase common stock at $2.00 per share, valued at $233,357. The total of these warrants, $473,785, is reflected as debt issuance costs on the balance sheet as of December 31, 2012, as these costs relate to the larger offering of 12% Convertible Promissory Notes."

$412,500 of promissory notes received warrants worth $473,785 in consideration for an exchange and to release liens. **Mr. Dulin** once again received shares that appear to be from an adversarial position toward the Company, but instead they appear to be colluding together.

Similarly, Series B Convertible Note Holders were taken out at a large stock premium per filings,

"On April 10, 2017, we sold to investors in a private transaction two 12% unsecured promissory notes with a total of $8,000,000 in principal amount. Interest only is due and payable on the notes each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holders of the notes will also receive annual payments of common stock at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. Both notes were sold at an original issue discount of 94.25% and accordingly, we received total proceeds of $7,540,000 from the investors. We are using the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

These 12% promissory notes allow for early redemption, provided that if we redeem before April 10, 2018, we must pay the holders all unpaid interest and common stock payments on the portion of the notes redeemed that would have been earned through April 10, 2018. The notes also contain certain covenants under which we have agreed that, except for financing arrangements with established commercial banking or financial institutions and other debts and liabilities incurred in the normal course of business, we will not issue any other notes or debt offerings which have a maturity date prior to the payment in full of the 12% notes, unless consented to by the holders.

The effective interest rate is 16.15%.

On April 24, 2017 we used $2,509,500 of the proceeds from this financing to redeem and repay a portion of the outstanding 12% Series B Convertible Unsecured Promissory Notes. Separately, $1,000,000 of the principal amount of the Series B Notes plus accrued interest was converted into 1,007,890 shares of common stock and $60,000 was rolled into the new debt financing."

The price of the stock on 4/24/17 when TRCH issued 1,007,890 shares to convert the $1 million Series B Notes suggests they paid $1.4 to $1.5 million in stock to convert $1 million face value. This is not justified by the documents filed for the Notes with the SEC and no amendments are filed. As discussed time and again, this isn't an adversarial relationship with an investor, but rather it appears to be how the fraud operates.

A former board member has done similar transactions to the ones discussed previously - lending the company money then receiving stock and warrant value far in excess of the principal. Torchlight never fully discloses the true cost of capital it carries, which is substantial. 70% cost of capital would make the success of any legitimate company unlikely, let alone a potentially fraudulent one.

"On November 4, 2014, **Eunis L. Shockey** loaned us $500,000 under a 30-day promissory note. The promissory note accrues interest at an annual rate of 10%. We did not make payment on the note on the December 4, 2014 maturity date. As consideration for defaulting on the note and for Mr. Shockey agreeing to extend the note, we issued 400,000 warrants to Mr. Shockey on May 4, 2015. The warrants have a term of three years and an exercise price of $0.50 per share. On May 14, 2015, we repaid $100,000 of the note, reducing the principal balance to $400,000. On June 30, 2015, we issued 120,000 warrants to Mr. Shockey as consideration for agreeing to extend the promissory note to December 31, 2015. "

https://www.sec.gov/Archives/edgar/data/1431959/000119983515000376/trch_10q-16528.htm

Hazel Project – **Torchlight and McCabe**

From TRCH filings:

"Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin in exchange for 1,500,000 warrants to purchase shares of our common stock with an exercise price of $1.00 for five years and a back-in after payout of a 25% working interest to MPC.

Initial development of the first well on the property, the Flying B Ranch #1, began July 9, 2016 and development continued through September 30, 2016. This well is classified as a test well in the development pursuit of the Hazel Project. We believe that this wellbore will be utilized as a salt water disposal well in support of future development.

In October 2016, the holders of all of our then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest. As of December 31, 2016, no shares of our Series C Preferred Stock were outstanding.

On January 30, 2017, we and our then wholly-owned subsidiary, Torchlight Acquisition Corporation, a Texas corporation, or TAC, entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with Line Drive Energy, LLC, a Texas limited liability company, or Line Drive, and **Mr. McCabe**, under which agreements TAC merged with and into Line Drive and the separate existence of TAC ceased, with Line Drive being the surviving entity and becoming our wholly-owned subsidiary. Line Drive, which was wholly-owned by Mr. McCabe, owned certain assets and securities, including approximately 40.66% of 12,000 gross acres, 9,600 net acres, in the Hazel Project and 521,739 warrants to purchase shares of our common stock (which warrants had been assigned by Mr. McCabe to Line Drive). Upon the closing of the merger, all of the issued and outstanding shares of common

stock of TAC automatically converted into a membership interest in Line Drive, constituting all of the issued and outstanding membership interests in Line Drive immediately following the closing of the merger, the membership interest in Line Drive held by Mr. McCabe and outstanding immediately prior to the closing of the merger ceased to exist, and we issued **Mr. McCabe** 3,301,739 restricted shares of our common stock as consideration therefor. Immediately after closing, the 521,739 warrants held by Line Drive were cancelled, which warrants had an exercise price of $1.40 per share and an expiration date of June 9, 2020. A Certificate of Merger for the merger transaction was filed with the Secretary of State of Texas on January 31, 2017. Subsequent to the closing the name of Line Drive Energy, LLC was changed to Torchlight Hazel, LLC. We are required to drill one well every six months to hold the entire 12,000 acre block for eighteen months, and thereafter two wells every six month starting June 2018.

Also on January 30, 2017, TEI entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, TEI acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well, for consideration of $415,000, and additionally, Wolfbone caused to be cancelled a total of 2,780,000 warrants to purchase shares of our common stock, including 1,500,000 warrants held by MPC, and 1,280,000 warrants held by Green Hill Minerals, an entity owned by Mr. McCabe's son, which warrant cancellations were effected through certain Warrant Cancellation Agreements. The 1,500,000 warrants held by MPC that were cancelled had an exercise price of $1.00 per share and an expiration date of April 4, 2021. The warrants held by Green Hill Minerals that were cancelled included 100,000 warrants with an exercise price of $1.73 and an expiration date of September 30, 2018 and 1,180,000 warrants with an exercise price of $0.70 and an expiration date of February 15, 2020.

Since **Mr. McCabe** held the controlling interest in both Line Drive and Wolfbone, the transactions were combined for accounting purposes. The working interest in the Hazel Project was the only asset held by Line Drive. The warrant cancellation was treated in the aggregate as an exercise of the warrants with the transfer of the working interests as the consideration. We recorded the transactions as an increase in its investment in the Hazel Project working interests of $3,644,431, which is equal to the exercise price of the warrants plus the cash paid to Wolfbone.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%."

It has never been disclosed who bought or owned the Series C preferred stock that converted into a working interest in the Hazel project, but there is a filing that shows **Mr. McCabe** owned the Series C preferred, so <u>if you follow the text, he appears to have sold Torchlight assets, then bought the same assets back from them via the Series C conversion, then sold them back to the company.</u> They have done sham and wash transactions like this more than once.

"On July 8, 2016, we sold a total of 10,000 shares of Series C Convertible Preferred Stock (the "Series C Preferred") to certain investors at a purchase price of $100 per share for total consideration of $1,000,000. See Note 6, "Stockholder's Equity," above.

As of September 30, 2016, Torchlight owned a 66.66% working interest in approximately 12,000 acres in the Hazel Prospect AMI in the Midland Basin having acquired it from McCabe Petroleum Corporation in exchange for 1,500,000 warrants to purchase our common stock. On October 10, 2016, all of the holders of the Series C Preferred converted into an aggregate 33% working interest in the Hazel Prospect AMI including the Flying "B" Ranch #1 well under the terms of the Certificate of Designation. The Series C Preferred holders, in the case of electing to convert the Series C Preferred into a working interest in the Flying "B" Ranch well, were also entitled to a capital credit (with the operator of the property) toward development expenses equal to their invested amount into the Series C Preferred. The Company had transferred the entire $1,000,000 in proceeds from the issuance of the Series C Preferred to the operator as a prepayment of development costs. Since the Series C Preferred holders elected to convert into the Flying "B" working interest, they also received capital credit on the records of the operator for the balance of any part of the prepayment placed by the Company not applied to the development cost of the Flying "B" well. The conversion by the Series C Preferred holders and related capital credit transfer results in the Company incurring a liability during fourth quarter, 2016 of $339,624 for its share of development cost related to its remaining 33.34% working interest in the well."

"Letter of Intent for Additional Hazel Project Acreage

On November 10, 2016, Torchlight entered into a nonbinding letter of intent ("LOI") with Torchlight's Chairman, Greg McCabe, to purchase an entity he owns which holds an additional 40.66% Working Interest in the Hazel Prospect. Upon entering into and closing a definitive agreement, Torchlight's total ownership would increase to 74% Working Interest. Under the proposed terms of the transaction, Torchlight would pay Mr. McCabe 3,301,379 shares of Torchlight common stock and concurrently therewith Mr. McCabe would cancel or cause to be cancelled 3,301,379 outstanding warrants. Additionally, closing of the transaction would be subject to Torchlight paying certain related costs."

Once again, if you follow this transaction, McCabe sold portion of the Hazel asset to TRCH. It then participated in the Series C Preferred used to fund development costs on the first well. McCabe then converted the preferred shares back into a working interest in the project in September 2016, then sold those same assets and more back to the Company via a LOU signed in November 2016.

Specific to Hazel, the Company once purchased a 6% working interest from an unrelated party. "Effective June 1, 2017, the Company acquired an additional 6%

working interest from unrelated working interest owners in exchange for 268,656 shares of common stock valued at $373,430, increasing its working interest in the Hazel project to 80%." That unrelated deal – before the Hazel impairment - values TRCH's interest in the Hazel project at approximately $4 million. Related party deals value the project much higher.

### Orogrande Project – **Torchlight, McCabe, Dulin, Founders**

"On September 23, 2015, our subsidiary, Hudspeth Oil Corporation ("HOC"), entered into a Farmout Agreement by and between HOC, Pandora Energy, LP ("Pandora"), Founders Oil & Gas, LLC ("Founders"), McCabe Petroleum Corporation and Greg McCabe (McCabe Petroleum Corporation and Greg McCabe are parties to the Farmout Agreement for limited purposes) for the entire Orogrande Project in Hudspeth County, Texas. The Farmout Agreement provides for Founders to earn from HOC and Pandora (collectively, the "Farmor") an undivided 50% of the leasehold interest in the Orogrande Project by Founder's spending a minimum of $45 million on actual drilling operations on the Orogrande Project in the next two years. Founders is to pay Farmor a total cost reimbursement of $5,000,000 in multiple installments as follows: (1) $1,000,000 at the signing of the Farmout Agreement, the balance of which was received on September 24, 2015; (2) within 90 days from the closing, Founders will frac and complete the Rich A-11 No. 1 Well; and (3) within five days of the spudding of each of the next eight wells drilled by Founders, Founders will pay to Farmor $500,000 resulting in the payment of the remaining amount; provided that, in the event that within 90 days after the fracing of the Rich Well, Founders notifies Farmor of its election not to drill any additional wells, Founders shall have no further obligation to make further payment. Upon payment of the first $1,000,000, Farmor assigned to Founders an undivided 50% of the leasehold interest and a 37.5% net revenue interest in the leases subject to the terms of the Farmout Agreement (including obligations to re-assign to HOC and Pandora if the 50% interest in the entire Orogrande Project is not earned) and a proportionate share of the McCabe 10% BIAPO (back in after pay out) interest; provided, however, that for each well that Founders drills prior to earning the acreage, it will be assigned a 50% working interest in the wellbore and in the lease on which it sits."

In Jul 2018, Founders and Torchlight ended their farm out via a Settlement & Purchase Agreement:

"On July 25, 2018, Torchlight Energy Resources, Inc. ("we or the "Company") and our wholly-owned subsidiary, Hudspeth Oil Corporation, entered into a Settlement & Purchase Agreement (the "Settlement Agreement") with Founders Oil & Gas, LLC, Founders Oil & Gas Operating, LLC, Wolfbone Investments, LLC (a wholly-owned company of Gregory McCabe, our Chairman) and McCabe Petroleum Corporation (also a wholly-owned company of Mr. McCabe), which agreement provides for Hudspeth Oil and Wolfbone Investments to each immediately pay $625,000 and for Hudspeth Oil or the Company and Wolfbone Investments or McCabe Petroleum to

each pay another $625,000 on July 20, 2019, as consideration for Founders Oil & Gas assigning all of its working interest in the oil and gas leases of the Orogrande Project to Hudspeth Oil and Wolfbone Investments equally. The assignments to Hudspeth Oil and Wolfbone Investments will be made when the first payments are made, and the payments to Founders Oil & Gas due in 2019 are not securitized. After this assignment (for which Hudspeth Oil's total consideration is $1,250,000), Hudspeth Oil's working interest will increase to 72.5%. Additionally, the Settlement Agreement provides that the Founders parties will assign to the Company, Hudspeth Oil, Wolfbone Investments and McCabe Petroleum their claims against certain vendors for damages, if any, against such vendors for negligent services or defective equipment. Further, the Settlement Agreement has a mutual release and waivers among the parties."

https://www.sec.gov/Archives/edgar/data/1431959/000165495418002713/exhibit_10-18.htm

https://www.sec.gov/Archives/edgar/data/1431959/000165495418008045/trch_8k-17427.htm

https://www.sec.gov/Archives/edgar/data/1431959/000165495418008738/exhibit_10-20.htm

It appears TRCH swept a disagreement under the rug with a $1.25 million payment in 2018 and future $1.25 million payment in 2019 – split evenly between the Company and Greg McCabe.

Torchlight appears to be litigious with little success as shown by the case below that went against them:

"With respect to Oil and Gas properties previously owned by the Company in Central Oklahoma, Torchlight Energy Resources, Inc. and its subsidiary Torchlight Energy, Inc. ("Torchlight") has pending in the 429th judicial district court in Collin County, Texas a lawsuit against Husky Ventures, Inc., Charles V. Long, Silverstar of Nevada, Inc., Gastar Exploration Inc., J. Russell Porter, Michael A. Gerlich, and Jerry R. Schuyler that was originally filed in May 2016 (previous defendants April Glidewell, Maximus Exploration, LLC, Atwood Acquisitions, LLC and John M. Selser, Sr have been non-suited without prejudice to re-filing the claims). In the lawsuit, Torchlight alleges, among other things, that the defendants acted improperly in connection with multiple transactions, and that the defendants misrepresented and omitted material information to Torchlight with respect to these transactions. The lawsuit seeks damages arising from 15 different causes of action, including without limitation, violations of the Texas Securities Act, fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, unjust enrichment and tortious interference. The lawsuit also seeks a complete accounting as to how Torchight's investment funds were used, including all transfers between and among the

Case No. 7:24-cv-00317-DC-RCG            MIDLAND-ODESSA DIVISION
Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

defendants. Torchlight is seeking the full amount of our damages on $20,000,000 invested."

While being sued and entering into bad deals that have never produced a return isn't a smoking gun for fraud, it is consistent with incompetence if the former isn't the case.

History:

- Torchlight Energy Resources, Inc. was originally incorporated in 2007 in Nevada as Pole Perfect Studios, Inc., a business focused on stripper pole dance studios and workout facilities.
- In November 2010, a share exchange was done, creating the new Torchlight, whereby its focus turned to oil & gas exploration. At the time of this transaction, TRCH had roughly 12.5 million shares outstanding. Of this amount, 36% were held by Thomas Lapinski (CEO and only employee; corporate address was his home address), 3% by Gregory Williams and 20% by John Brda (a consultant at the time; currently CEO). Lapinski, Williams and Brda controlled Torchlight Energy Inc. the private predecessor to TRCH.
- At year-end 2010, the Company had only one interest in an oil and gas project, the Marcelina Creek Field Development, which provided for the drilling of four wells with Bayshore Operating Corporation ("Bayshore").
- During 2010, the Company had no revenue and ended the year with $278,191 of cash. In the fourth quarter of 2010, the stock had a high price of $3.05 per share and a low price of $0.04 per share (per TRCH filings).
- During 2010 and every year thereafter, TRCH has had a 'going concern' statement in its Form 10-K.
- In late 2010, John Brda filed a 13-D disclosing 582,500 shares owned by Brda & Company, LLC. It is noted that this is net of a 100,000 share gift to his father, which appears to be a common theme of gifting shares to his parents, most likely to avoid reporting requirements.
- During 2011, TRCH had $24,152 revenue while expensing $1.1 million of stock compensation. 2011 ending share count was approximately 14.7 million shares.
- A common theme during TRCH's early years and currently is delays and drilling problems.
    - The Johnson #1-BH drilled with Bayshore in August 2010 ha water issues; a workover crew didn't work on the well until July 2011 at which time the well was damaged when pipe joints were dropped in the hole. The well was finally completed in August 2012, two years after the initial re-entry.
    - The first vertical well drilled with Bayshore in July 2011 had mechanical and pump problems which delayed completion; it wasn't acidized and re-worked until February 2012.
    - During 2012, TRCH entered into a farm-in agreement on the Coulter #1-R well, which was competed in February 2012, but as of year end 2012, frac fluid was allegedly still being recovered.
    - The Company's PV-10 for 2010-2012 was $0, $0 and $3.3 million, respectively. 2012 year-end reserves were audited by Netherland, Sewell & Associates, Inc., a respected reserve engineer.
- Joh Brda became President, Secretary and a member of the Board of Directors in January 2012. Per the Company:

- ○ "He has been the Managing Member of Brda & Company, LLC since 2002, which provides consulting services to public companies—with a focus in the oil and gas sector—on investor relations, equity and debt financings, strategic business development and securities regulation matters.

    We believe Mr. Brda is an excellent fit to our Board of Directors and management team based on his extensive experience in transaction negotiation and business development, particularly in the oil and gas sector as well as other non-related industries. He has consulted with many public companies in the last ten years, and we believe that his extensive network of industry professionals and finance firms will contribute to our success."

- In the Company's 2012 10-K, the following disclosure was made related to John Brda:
    - ○ "Involvement in certain legal proceedings. In November 2007, Mr. Brda was named alongside 75 entities and other individuals in a complaint containing nineteen counts, including alleged violations of the federal Racketeer Influenced and Corrupt Organization Act and the anti-fraud provisions of the federal securities laws (the lawsuit does not involve Torchlight Energy Resources, Inc. in any way). Several months later, Mr. Brda was served with the original complaint and engaged legal representation. Based on Mr. Brda's minimal connection to the investments at issue in the complaint, he instructed his attorney to contact plaintiffs' counsel and try to negotiate a prompt resolution of the case and dismissal of the claims against him. His attorney contacted plaintiffs' counsel and thereafter told Mr. Brda that the claims against him had been resolved when – in fact – they had not. Unknown to Mr. Brda, he remained a defendant in the suit, and in part because no answer was filed on his behalf, and in part because he was never served with any of the relevant papers after the original complaint, the court entered a default judgment against him in September 2012. Mr. Brda received no actual notice of any kind regarding the continued existence of any claims against him, any entry of default, any motion or hearing for default judgment, or the default judgment itself, until March 2013. He promptly retained legal counsel who filed a motion to vacate the default judgment on April 11, 2013, which motion is now pending. A motion for leave to file an answer to plaintiffs' first amended complaint was also filed on that date. Discussions with plaintiffs' counsel for the possible resolution of this matter are ongoing. Mr. Brda contends that all claims against him in the litigation are without merit, and that the court should dismiss the counts against him."

- At year-end 2013, the Company reported a PV-10 of $26.5 million, with only $3.2 million of that from proved developed reserves, meaning most of the

value was an estimate of the well value net of drilling costs, discounted to present value.

- During 2013, the Company entered into an agreement to acquire certain assets from Xtreme Oil & Gas, Inc., which was also based in Plano, Texas and likely also a fraud.   Xtreme was run by TRCH's current CFO and Willard McAndrew III…. finish
- In October 2013, TRCH entered into a JV agreement with Ring Energy. Notably, John Brda and others involved in Torchlight, created Ring Energy through a reverse merger structure similar to TRCH, but Ring ultimately became a legitimate oil and gas exploration company after they left.
- In May 2013, TRCH entered into an agreement with Husky Ventures for wells in the Hunton formation.
- Sept 2013, Zenith Petroleum 15.3% working interest for 5101 mineral acres in Kingfisher County, OK for 558,356 restricted shares ($3-ish).
- June 2014 deal with Zenith… purchased assets in OK, received $1.65mm cash and paid Zenith 1,350,000 restricted shares (low $4s)

Case No. 7:24-cv-00317-DC-RCG          MIDLAND-ODESSA DIVISION
Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

## Shares / Warrants Issued Per Sale of Unregistered Stock in Filings:

| Period | Type | Shares | Description |
|---|---|---|---|
| 2Q18 | shares | 172,342 | PIK interest due 4/1/18 |
| 2Q18 | shares | 100,000 | compensation for consulting services |
| 2Q18 | shares | 400,000 | warrant exercise |
| 2Q18 | warrants | 120,000 | Compensation for consulting services |
| 1Q18 | shares | 300,000 | Compensation for consulting services |
| 1Q18 | warrants | 500,000 | Compensation for consulting services |
| 4Q17 | shares | 350,000 | Issued to four consultants in connection with acquisition of mineral interests |
| 4Q17 | shares | 278,099 | Warrant exercise |
| 3Q17 | shares | 25,000 | Due to director on Litigation Committee |
| 2Q17 | shares | 237,001 | Due to director on Litigation Committee |
| 2Q17 | shares | 204,574 | Compensation for consulting services |
| 2Q17 | shares | 268,656 | Exchange for 6% working interest in Hazel project; 6/1/17 |
| 2Q17 | shares | 29,250 | Warrant exercise |
| 1Q17 | shares | 41,322 | Exchange for elimination of $50,000 unpaid compensation |
| 1Q17 | warrants | 200,000 | Investor relations services; $1.64 |
| 4Q16 | shares | 165,000 | Issued in connection with owned lease interests |
| 4Q16 | warrants | 221,000 | Issued in connection with owned lease interests; $0.70 strike; Nov '16 |
| 4Q16 | shares | 271,901 | Exercise of warrants held by former director |
| 4Q16 | shares | 70,000 | Compensation for consulting services |
| 4Q16 | warrants | 120,000 | Compensation for consulting services; $1.03 strike; Nov '16 |
| 3Q16 | shares | 150,000 | Compensation for consulting services |
| 3Q16 | shares | 251,456 | Issued in connection with oil and gas lease related costs (includes 115,000 shares to Green Hill Minerals, LLC, owned by McCabe's sons) |
| 3Q16 | warrants | 425,000 | Issued in connection with oil and gas lease related costs to Green Hill Minerals, LLC, owned by McCabe's sons; $0.70 strike due 2/20 |
| 3Q16 | shares | 250,000 | Warrant exercise; $0.50 per share in connection with termination of consulting agreement |
| 2Q16 | shares | 489,535 | Compensation for consulting services |
| 2Q16 | shares | 690,000 | Issued in connection with oil and gas lease related costs (includes 115,000 shares to Green Hill Minerals, LLC, owned by McCabe's sons) |
| 2Q16 | shares | 189,861 | Dividends on preferred stock |
| 2Q16 | warrants | 500,000 | Compensation for consulting services; $1.80 strike |
| 2Q16 | warrants | 1,500,000 | $1.00 strike; issued to McCabe Petroleum in connection with acquisition from MPC of working interest in Midland Basin |
| 2Q16 | warrants | 425,000 | Issued to Green Hills Minerals LLC (McCabe's sons); $0.70 strike |
| 2Q16 | warrants | 100,000 | Issued in connection with loan from EL Shockey; $0.77, expire 4/19 |
| 1Q16 | shares | 59,297 | Compensation for consulting services |
| 1Q16 | shares | 1,718,425 | Issued in connection with lease related costs |
| 1Q16 | shares | 21,739 | Conversion of preferred stock |
| 1Q16 | shares | 250,400 | Dividend on preferred stock |
| 1Q16 | warrants | 212,525 | Issued in connection with lease related costs; $1.00 strike; expire 1/19 |
| 1Q16 | warrants | 425,000 | Issued in connection with lease related costs; $0.70 strike; expire 2/20 |
| 1Q16 | warrants | 37,500 | Issued in connection with new loan from director; $1.08 strike; expire 1/19 |
| 1Q16 | warrants | 20,000 | Vested as compensation for services; $5 strike expire 2/17 |
| 4Q15 | shares | 328,438 | Compensation for consulting services |
| 4Q15 | shares | 257,750 | Dividend on Series A Convertible Preferred Stock |
| 4Q15 | shares | 30,000 | 10,000 each to Brds, Wurtele, McAndrew for unpaid compensation |
| 4Q15 | shares | 65,000 | Warrant exercise; $1.75 average exercise price |
| 4Q15 | warrants | 1,250,000 | Compensation for consulting services; 3-yr warrants, $2.03 strike |
| 4Q15 | warrants | 40,000 | Issued to Eunis L Shockey in exchange for extending a loan; $2.29 strike |
| 4Q15 | warrants | 15,000 | Compensation for consulting services; 3-yr warrants, $3.50 strike |
| 3Q15 | warrants | 500,000 | Final terms for sale of Orogrande to Robert Kenneth Dulin; $2.31 strike |
| 3Q15 | shares | 468,734 | Compensation for consulting services |
| 3Q15 | shares | 319,390 | Dividend on Series A Preferred Stock due 9/30/15 |
| 3Q15 | warrants | 750,000 | Compensation for consulting services |
| 3Q15 | warrants | 390,000 | Issued in connection with short-term loans |
| 2Q15 | shares | 1,412,458 | Compensation for consulting services |
| 2Q15 | shares | 631,250 | Warrant exercise, $0.35 strike, received $225,000 cash; granted in 1Q15 |
| 2Q15 | shares | 30,000 | Modification of mineral leases for the extension of drilling obligations |
| 2Q15 | warrants | 85,750 | Issued in connection with short-term loans; 5yr warrants, $2.50 strike |
| 2Q15 | warrants | 650,000 | Issued in connection with short-term loans; 5yr warrants, $0.50 strike |
| 2Q15 | warrants | 250,000 | Issued in connection with sale of 5% of Orogrande to RKD; $0.50 strike |

**Whistleblower Tip [21F SEC Exchange Act 1934]**
**Company: Torchlight Energy, Inc. (NASD:TRCH)**

| Period | Type | Shares | Description |
|---|---|---|---|
| 2Q15 | stock options | 2,950,000 | issued to executive officers; $1.52 and $1.79 strikes |
| 4Q14 | warrants | 75,000 | Compensation for consulting services; 3yr, $5 strike |
| 4Q14 | warrants | 150,000 | issued to shareholder in connection with funds loaned to company under promissory note; 3yr, $1 strike |
| 4Q14 | shares | 15,000 | Warrant exercise |
| 4Q14 | shares | 32,500 | Settlement of a lawsuit |
| 4Q14 | shares | 200,000 | Compensation for consulting services |
| 3Q14 | shares | 365,000 | Compensation for consulting services |
| 3Q14 | shares | 70,000 | issued in exchange for cash |
| 3Q14 | shares | 75,000 | Units, $3.50/share + 2 warrantsbelow, received $262,500; placed by NSC |
| 3Q14 | warrants | 61,045 | 5yr warrants; $4.50 strike |
| 3Q14 | warrants | 61,045 | 5yr warrants; $7 strike |
| 3Q14 | shares | 868,750 | Orogrande interest acquisition |
| 3Q14 | shares | 400,000 | Warrant exercise |
| 3Q14 | warrants | 60,974 | issued with $1.372mm 12% Series B Unsecured Convertible Promissory Note ($4.50 conversion, due June 2017) |
| 3Q14 | shares | 2,500 | issued to placement agent for sale of notes |
| 2Q14 | shares | 50,180 | Compensation for consulting services |
| 2Q14 | shares | 100,000 | Warrant exercise |
| 2Q14 | warrants | 142,111 | 5yr, $6 strike issued with $3.2mm 12% Series B Convertible Notes |
| 2Q14 | stock options | 60,000 | $5.05 strike; issued to employee of subsidiary for services rendered |
| 1Q14 | shares | 2,500 | Compensation for consulting services |
| 1Q14 | shares | 102,500 | Warrant exercise |

Case No. 7:24-cv-00317-DC-RCG        MIDLAND-ODESSA DIVISION
Whistleblower Tip [21F SEC Exchange Act 1934]
Company: Torchlight Energy, Inc. (NASD:TRCH)

Small sample of the type of professionals NSC appears to have solicited for TRCH
unregistered equity offerings per S-1's:

S-1 filed with SEC 10/30/2014

| | shares | |
|---|---|---|
| Alan Hertz | 9,375 | attorney |
| Carlo Alberici | 15,625 | accountant/ kpmg |
| Carlos M Bermudez | 7,813 | akin gump lawyer |
| Charles H Wheeler | 7,813 | doctor, lubbock, tx |
| Christopher H Paskach Living Trust Dtd 6-16- | 7,813 | kmpg looks like |
| Clinton McDonnough | 7,813 | dallas office at ernst & young |
| Dale A LeMasters | 7,813 | retired KPMG |
| David B O'Neill | 7,813 | partner at PWC |
| Dennis D Howarter & Pamela J Howarter | 7,813 | partner at PWC |
| Donald P Favre | 15,625 | partner at PWC |
| Donald R. Gauthier Jr. | 7,813 | inventor / merck |
| Edward William Sean Ballington and Estelle ( | 7,813 | PWC |
| Gregory Chubon | 7,813 | insurance agent in houston, tx |
| Gregory J Coffey | 17,188 | attorney |
| Jonathan F Malan | 7,813 | accountant PWC |
| Jonathan Grainick | 7,813 | partner at PWC |
| Judy Reed Smith | 23,438 | doctor but not medical doctor? |
| Marc Bielski & Heather B Gordon Bielski | 7,813 | doctor |
| Mario Dell'Aera Jr. | 7,813 | KPMG |
| McDade & Co Profit Sharing Plan & Trust[11] | 15,625 | doctor |
| Michael Giannelli | 15,625 | attorney |
| NFS/FMTC SEP IRA FBO Dr Neal James Nesbi | 7,813 | doctor |
| Nick Valk | 7,813 | attorney |
| Patrick M Barberich and Monica Barberich | 7,813 | accountant florida |
| Paul J. Raspicka | 86,250 | Works at Invesco .... is he investing alongside client money |
| Peter C Beale | 7,813 | KPMG |
| Raspicka 2009 Trust(20) | 31,250 | Works at Invesco .... is he investing alongside client money |
| Raspicka 2012 Trust(19) | 30,000 | Works at Invesco .... is he investing alongside client money |
| Ray Garcia | 10,938 | partner PWC |
| Raymond Keller | 7,813 | doctor |
| Robert Eydt | 7,813 | accountant PWC |
| Samuel Rosenberg | 9,375 | doctor |
| Scot Guempel | 7,813 | KMPG |
| Scott Guasta | 15,625 | accounant at E&Y |
| Sharad and Chandrikda Patel | 7,813 | doctor |
| Thomas Mayberry | 12,500 | doctor |
| Timothy M Fulmer | 7,813 | accountant |
| Tom Steele | 7,813 | attorney |